Caroline A. Morgan
Fox Rothschild LLP
100 Park Avenue, 15th Fl.
New York, NY 10017
Telephone: 212-878-7900

Jeffrey S. Kravitz (admitted *pro hac vice*)
Rom Bar-Nissim (admitted *pro hac vice*)
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, California 90067-1506
Telephone:  310-598-4150
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATT HOSSEINZADEH,<br><br>                    *Plaintiff,*<br><br>      – vs –<br><br>ETHAN KLEIN and HILA KLEIN,<br><br>                    *Defendants.* | **Civ. 16-cv-3081 (KBF)**<br><br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)** |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    LEGAL STANDARDS ................................................................................... 3

    A.    Legal Standard For 12(c) Motions ........................................................ 3

    B.    Incorporation By Reference .................................................................. 3

    C.    It Is Appropriate To Determine The Issue Of Fair Use On A 12(c) Motion ......... 5

III.    SUMMARY OF THE THREE VIDEOS ........................................................ 7

    1.    The Work: *Bold Guy vs. Parkour Girl* ..................................... 7

    2.    The Critique Video: *The Big, the BOLD, the Beautiful* ............................. 8

    3.    The Lawsuit Video: *We're Being Sued* .................................... 9

IV.    ARGUMENT ............................................................................................. 10

    A.    The Critique Video Constitutes Fair Use .............................................. 10

    1.    First Factor: The Purpose and Character of the Use ................................. 11

    2.    Second Factor: Nature of the Copyrighted Work .................................... 14

    3.    Third Factor: The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole .................................... 14

    4.    Fourth Factor: Effect of Use on Market for Plaintiff's Work .................. 15

    B.    Plaintiff's DMCA Misrepresentation Claim Should Be Dismissed .................... 17

    C.    Plaintiff's Defamation Claim Should Be Dismissed ............................................. 18

V.    CONCLUSION........................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adjmi v. DLT Entm't Ltd.*,
   97 F. Supp. 3d 512 (S.D.N.Y. 2015) .................................................................................5, 6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................................3

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) .................................................................................11, 12, 14

*Bell Atl. Co. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................................3

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d 2006) .....................................................................................................14

*Biro v. Condé Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..........................................................................18, 19

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) .................................................................................11, 14, 16

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) .........................................................................5, 6, 13, 16, 17

*Burnett v. Twentieth Century Fox*,
   491 F. Supp. 2d 962 (C.D. Cal. 2007) ...............................................................................5

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) .....................................................................................11, 12, 14, 15, 16

*Cariou v. Prince*,
   714 F.3d 694 (2d Cir. 2013) ...........................................................5, 11, 12, 14, 15, 16

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir.2002) ................................................................................................4

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
   817 F.3d 46 (2d Cir.2016) ..................................................................................................4

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004_ ...............................................................................5

*Daly v. Viacom*,
    238 F. Supp. 2d 1118 (N.D. Cal. 2002) ....................................................................5

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y. 2012)....................................................................19

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003).............................................................................................10

*Equals Three, LLC v. Jukin Media, Inc.*,
    139 F. Supp. 3d 1094 (C.D. Cal. 2015) ....................................................12, 13, 15

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ...............................................................................16

*Fleckenstein v. Friedman*,
    266 N.Y. 19, 193 N.E. 537 (1934).........................................................................19

*Franklin v. Daily Holdings, Inc.*,
    135 A.D. 3d 87 (N.Y. App. Div. 2015) ............................................................18, 19

*Fulani v. New York Times Co.*,
    260 A.D. 2d 215 (1st Dept.1999)...........................................................................19

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)...............................................................................3, 4

*Goldberg v. Levine*,
    97 A.D. 3d 725 (N.Y. App. Div. 2012) ..................................................................19

*Guccione v. Hustler Magazine, Inc.*,
    800 F.2d 298 (2d Cir. 1986)...........................................................................18, 19

*Jewell v. NYP Holdings, Inc.*,
    23 F. Supp. 2d 348 (S.D.N.Y. 1998).................................................................18, 19

*Johnson v. Rowley*,
    596 F.3d 40 ........................................................................................................3

*Karedes v. Ackerley Grp.*,
    423 F.3d 107 (2d Cir. 1986).................................................................................19

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998).............................................................................11, 15

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002).....................................................................4

*Morris v. Schroder Capital Mgmt. Int'l,*
    445 F.3d 525 (2d Cir. 2006)........................................................................3

*Neilsen v. Rabin,*
    746 F.3d 58 (2d Cir. 2014).........................................................................3

*NXIVM Corp. v. Ross Inst.,*
    364 F.3d 471 (2d Cir. 2004)...............................................................11, 16

*On Davis v. The Gap, Inc.,*
    246 F.3d 152 (2d Cir. 2001).....................................................................16

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
    602 F.3d 57 (2d Cir. 2010).........................................................................4

*Rapoport v. Asia Elec. Holding Co., Inc.,*
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)..........................................................4

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013).........................................................................3

*Shipman v. R.K.O. Radio Pictures, Inc.,*
    20 F. Supp. 249 (S.D.N.Y.1937) ...............................................................4

*Stepanov v. Dow Jones & Co.,*
    120 A.D. 3d 28 (2014) .............................................................................19

*Tannerite Sports, LLC v. NBCUniversal Media LLC,*
    135 F. Supp. 3d 219 (S.D.N.Y. 2015).....................................................19

*TCA Television Corp. v. McCollum,*
    839 F. 3d 168 (2nd Cir. 2016).............................................4, 5, 11, 12, 14

*Tierney v. Vahle,*
    304 F.3d 734 (7th Cir.2002) ......................................................................6

*Walker v. Time Life Films, Inc.,*
    615 F. Supp. 430 (S.D.N.Y.1985) .............................................................4

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir. 1986).........................................................................4

*Williams v. Citibank, N.A.,*
    565 F. Supp. 2d 523 (S.D.N.Y. 2008)........................................................4

*Wright v. Warner Books, Inc.,*
    953 F.2d 731 (2d Cir. 1991).....................................................................11

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ..............................................................5

**Statutes**

17 U.S.C. § 107 .............................................................................................10, 11, 15

17 U.S.C. § 512(f) ...............................................................................1, 2, 17, 18, 21

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ..................................................................................3, 6

Fed. R. Civ. P. 12(c) .....................................................................................3, 5, 6

Fed. R. Civ. P. 12(d) ..........................................................................................6

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.05[A][1][a],
    at 13–162 (Matthew Bender, rev. ed., 2016) .........................................................11

3–12 *Nimmer on Copyright* § 12.10 (2009) .............................................................4

William F. Patry, *Patry on Fair Use* § 4.1 (2015) ......................................................14

# I.      INTRODUCTION

The Second Amended Complaint ("SAC") of Plaintiff Matt Hosseinzadeh ("Plaintiff") is

an attempt to silence and punish lawful speech. Plaintiff takes umbrage with two YouTube

videos created by Defendants Ethan and Hila Klein (collectively, "Defendants"). Defendants'

videos lawfully critiqued one of Plaintiff's YouTube videos and Plaintiff himself. Apparently

unable to withstand Defendants' criticism, Plaintiff filed this lawsuit, seeking injunctive relief

and damages, claiming Defendants engaged in: (1) copyright infringement; (2) misrepresentation

under 17 U.S.C. § 512(f); and (3) defamation.

Plaintiff's SAC demonstrates a dangerous misapprehension of the law. He is convinced

that the First Amendment protections of fair use and substantial truth do not apply to his claims.

Plaintiff is simply wrong. Each of his claims are devoid of merit and must be dismissed.

Plaintiff's copyright infringement claim must be dismissed because it is clear from the

face of the complaint that Defendants engaged in fair use. Plaintiff's copyright claim involves

two YouTube videos, which are properly before this Court by way of the incorporation by

reference doctrine. In 2013, Plaintiff posted onto YouTube a short film entitled *Bold Guy vs.

Parkour Girl* ("Work") where Plaintiff portrays himself as a smooth and suave pickup artist and

impressive parkour[1] athlete. In 2016, Defendants made a reaction video to Plaintiff's Work

entitled *The Big, the BOLD, the Beautiful* ("Critique Video"), which provided a scathing and

encompassing critique of Plaintiff's Work and recast it as a misogynistic piece of pseudo-

pornography. This critique imbued Plaintiff's work with new insights and meaning, making it

clear that the Critique Video is highly transformative. Furthermore, the amount Defendants used

---

[1] Parkour is a form of gymnastics that uses an urban landscape as an obstacle course. Parkour involves scaling walls,
jumping over railings and buildings and the like.

of the Work is reasonable in light of their critical purpose. Nor can Plaintiff plausibly claim any form of market harm to his Work – nor has he – because it is well-established that disparagement of the Work is not remediable under the Copyright Act. As such, Plaintiff's copyright infringement claim must fail.

Plaintiff's misrepresentation claim must also fail as a matter of law. Plaintiff claims Defendants violated 17 U.S.C. § 512(f) by asserting in their counter notification that their use was (1) fair use; (2) not commercial; (3) transformative; and (4) necessary. Section 512(f) does not prohibit any of these representations. Rather, the statute only prohibits two types of misrepresentations: (1) that the secondary work is infringing; or (2) that the secondary work was not disabled or removed as a result of a mistake or misidentification. None of these categories apply to Plaintiff's claim for misrepresentation. Furthermore, a plain reading of the statute makes it clear that the misrepresentations proscribed by the statute could only come from the person issuing a takedown notification, not a counter notification. As such, this claim must also fail.

Finally, Plaintiff's defamation claim must fail under the doctrine of substantial truth, which may be decided on a motion for judgment on the pleadings. After the commencement of this lawsuit, Defendants made a YouTube video, entitled *We're Being Sued* ("Lawsuit Video"), recounting the absurdity of Plaintiff's settlement offers and the allegations contained in his prior complaints. Plaintiff does not dispute that nearly everything said in the 15:43 minute video was true or protected opinion. Rather, his claim focuses on one sentence from the video, which stated: "Several months passed and nothing happens, and then we get an email from [Mr. Hoss'] lawyer to [Defendants' prior counsel]." Plaintiff took offense that Defendants did not mention that he emailed Defendants prior to his lawyers' email.  But this minor omission is not actionable. It is completely implausible that the inclusion of Plaintiff's outreach and email in the

2

Lawsuit Video would have suddenly recast him in a positive light, particularly since the email foreshadowed the absurdity to come.

Upon scrutiny, it is clear that no amount of artful pleading could cure Plaintiff's defective SAC, particularly in light of the fact this is his third bite at the apple. Therefore, Defendants respectfully request this Court to dismiss Plaintiff's SAC without leave to amend.

## II.    LEGAL STANDARDS

### A.    Legal Standard For 12(c) Motions

A motion under Fed. R. Civ. P. 12(c) employs "the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." *Johnson v. Rowley,* 596 F.3d 40, 43-44 (quoting *Morris v. Schroder Capital Mgmt. Int'l,* 445 F.3d 525, 529 (2d Cir. 2006)). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In this regard, the "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Moreover, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id*. at 678 (quoting *Bell Atl. Co. v. Twombly,* 550 U.S. 544, 555 (2007)). Nor does the presumption of truth extend to "conclusory allegations or legal conclusions couched as factual allegations." *Neilsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013)).

### B.    Incorporation By Reference

On a motion for judgment on the pleadings, like a 12(b)(6) motion, it is appropriate for a court to consider "documents appended to the complaint or *incorporated in the complaint by reference* …." *Goel v. Bunge, Ltd*., 820 F.3d 554, 559 (2d Cir. 2016) (emphasis added; internal

3

ellipsis omitted) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.,* 817 F.3d 46, 51 n. 2 (2d Cir.2016)); *see also TCA Television Corp. v. McCollum*, 839 F. 3d 168, 172 (2nd Cir. 2016).

The Second Circuit has recognized that "in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Goel,* 820 F.3d at 559 (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)).

In copyright infringement actions, "the works themselves supersede and control contrary descriptions of them, [Citation] including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotes omitted) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 52 (2d Cir. 1986); 3–12 *Nimmer on Copyright* § 12.10 (2009); citing *Walker v. Time Life Films, Inc.,* 615 F. Supp. 430, 434 (S.D.N.Y.1985); *Shipman v. R.K.O. Radio Pictures, Inc.,* 20 F. Supp. 249, 249 (S.D.N.Y.1937)).

This principle is not just limited to copyright actions: "If [incorporated] documents contradict the allegations of the … complaint, the documents control and this Court need not accept as true the allegations in the … complaint." *Rapoport v. Asia Elec. Holding Co., Inc.,* 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); *see also Williams v. Citibank, N.A.,* 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("[A] court need not accept as true an allegation that is contradicted by documents on which the complaint relies"); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("If a plaintiff's allegations are contradicted by [a document incorporated by reference], those allegations are insufficient to defeat a motion to dismiss.")

4

Courts have routinely incorporated by reference audiovisual works to determine copyright infringement or libel claims at the pleading stage. *See e.g., Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 691-92 (7th Cir. 2012) (incorporating by reference a television episode and a YouTube video to determine fair use on a 12(b)(6) motion); *Adjmi v. DLT Entm't Ltd.,* 97 F. Supp. 3d 512, 516 (S.D.N.Y. 2015) (incorporating by reference the nine seasons of the television show *Three's Company* to determine fair use on a Rule 12(c) motion); *Burnett v. Twentieth Century Fox,* 491 F. Supp. 2d 962, 966 (C.D. Cal. 2007) (incorporating by reference two television shows to determine fair use on a 12(b)(6) motion); *Zella v. E.W. Scripps Co.,* 529 F. Supp. 2d 1124, 1131–32 (C.D. Cal. 2007) (incorporating by reference television episodes to determine copyright infringement claim on a 12(b)(6) motion); *Daly v. Viacom,* 238 F. Supp. 2d 1118, 1121–22 (N.D. Cal. 2002) (incorporating by reference a television program to determine libel and other state law claims on a 12(b)(6) motion); *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (finding audio recordings containing allegedly defamatory statements were incorporated by reference).

Here, the Work, Critique Video and Lawsuit Video are all incorporated by reference into the SAC. The Work and Critique video are integral to Plaintiff's copyright infringement claim. The Lawsuit Video is integral to Plaintiff's defamation claim, since it contains the alleged defamatory statement and provides the context of the alleged defamatory statement, which the law requires. These videos control over any contrary descriptions of them contained in the SAC.

## C.    It Is Appropriate To Determine The Issue Of Fair Use On A 12(c) Motion

Recently, the Second Circuit stated that granting a motion to dismiss is appropriate when fair use is "clearly established by a complaint as to support dismissal of a copyright infringement claim." *TCA Television,* 839 F.3d at 178 (citing *Cariou v. Prince,* 714 F.3d 694, 707 (2d Cir.

5

2013); *Brownmark,* 682 F.3d 687). Indeed, another Southern District of New York case has already granted 12(c) motion on the issue of fair use. *Adjmi,* 97 F. Supp. 3d at 535.

*Brownmark,* which the Second Circuit cited with approval for the propriety of granting 12(b)(6) motions on the issue of fair use, provides valuable guidance. First, the Seventh Circuit stated that a Rule 12(c) motion for judgment on the pleadings is the most appropriate way to make a fair use determination at the pleading stage because such motions allow for the use of affirmative defenses. *See Brownmark,* 682 F.3d at 690 & 690 n. 1.

Second, the Seventh Circuit noted that employing the incorporation by reference doctrine to include the works at issue does not trigger Rule 12(d) – which would convert a Rule 12(b)(6) or 12(c) motion into a motion for summary judgment. *Id.* at 690. As the Seventh Circuit explained:

> In effect, the incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment. The doctrine prevents a plaintiff from "evading dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proves his claim has no merit."

*Id.* (internal brackets omitted) (quoting *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002)).

Third, the Seventh Circuit noted that "it makes eminently good sense to extend the doctrine to cover [audio-visual] works, especially in light of technological changes that have occasioned widespread production of audio-visual works." *Id.* at 691.

Therefore, Defendants' Rule 12(c) motion is a proper vehicle for this Court to make a fair use determination, particularly in light of the fact that the works at issue are properly before this Court.

### III.   SUMMARY OF THE THREE VIDEOS

**1.   The Work:** *Bold Guy vs. Parkour Girl*

The Work was released in 2013 and is a scripted 5:24 video that showcases Plaintiff as a suave pickup artist with spectacular parkour skills. The first half of the Work is devoted towards the dialogue between Plaintiff's character and a woman exercising on the street ("Woman"). Plaintiff approaches the Woman on the street and admires her body. The Woman initially appears disgusted by Plaintiff. She expresses how she has a right to work out on the street without being accosted by Plaintiff's character. She often employs both feminist rhetoric and crude quips to convince Plaintiff's character to leave her alone. Plaintiff always responds with clever rejoinders that parry the Woman's rhetoric. This serves to showcase Plaintiff's wit and ability to use his charm to disarm even the most hostile of women.

Plaintiff's rejoinders appear to pique the Woman's interest. Her attitude shifts from disgust to arousal and begins to physically grope Plaintiff. Plaintiff's character uses this opportunity to turn the tables on the woman's feminist rhetoric, claiming he is the one being used and abused. The back and forth ultimately climaxes with a challenge by the Woman to Plaintiff's character: If Plaintiff can catch her, he can have her.

The second half of the Work is devoted to this chase scene. The Woman runs through the landscape, jumping over walls and other physically perilous stunts. Plaintiff, not to be outdone, gives chase and with even more physically perilous stunts. Ultimately, Plaintiff successfully catches the Woman. Living up to her promise, the Woman offers herself to Plaintiff. Plaintiff, not to be outdone, says that she can have him only if she catches him. The film ends with the Woman expressing her astonishment to the camera and giving chase.

2.      **The Critique Video:** *The Big, the BOLD, the Beautiful*

The Critique Video was released in 2016 and is a 13:47 minute reaction video that mocks, comments, analyzes and (at times) praises Plaintiff's Work. It employs 24 separate clips from Plaintiff's Work. Each clip ranges from 2 to 24 seconds in length. Each clip is followed by criticism and commentary on that specific clip. In the aggregate, the Critique Video uses 3:18 minutes of the Work. The remaining 10:29 minutes of the Critique Video is devoted to Defendants' critique and commentary of the Work.

The Critique Video begins by putting Plaintiff's Work into historical context. Ethan points out that the Work comes from an era he describes as "Cringe Tube." Throughout the Critique Video, further comments are made on how Plaintiff's Work falls into this "Cringe Tube" era.

The Critique Video then proceeds to lambast Plaintiff's Work as being a misogynistic piece of pseudo-pornography. Every clip is thoroughly scrutinized, from the intro credits till the ending. Defendants critique the dialogue as being contrived. They point out that Plaintiff portrays his behavior of verbally accosting the Woman on the street as normal and that the Woman's attempts to rebuff him as abnormal. They point out that every line by the Woman serves as a setup to showcase Plaintiff's suave and clever wit, which is actually cringe-worthy. They discuss how the dialogue reflects Plaintiff's distorted worldview that such loathsome conduct is perfectly normal.

Defendants also critique the characters of the Work. They point out how both characters are portrayed in a completely unrealistic fashion. They comment on how the Woman, as with all of the female characters appearing in Plaintiff's videos, are overly rude and sexualized. They also point out how the Woman, like all of the female characters appearing in Plaintiff's videos,

shifts from being repelled by Plaintiff's character to being attracted to him very quickly. They repeatedly comment on how Plaintiff's character is not suave but smug. They critique his sleeveless hoodie costume as being tacky and a reflection of Plaintiff's vanity.

Defendants also critique the parkour chase scene as being absurd. They scrutinize how the various parkour moves (*e.g*., jumping railings and scaling walls) actually slow down the chase because the characters could have easily used alternative routes that would have been quicker and easier. The Defendants also debate amongst themselves whether the parkour moves are impressive, with Ethan being sarcastically impressed and Hila being honestly unimpressed.

Defendants also critique the ending of the video. They point out how the film concludes with Plaintiff's character suddenly appearing on both sides of the Woman. Ethan comments how this breaks any shred of realism in the film because, prior to this moment, the film appeared relatively realistic.

The Critique Video ends with Defendants genuinely praising Plaintiff's videos and encouraging their viewers to watch them, acknowledging the tremendous amount of effort Plaintiff put into creating his videos.

### 3.    The Lawsuit Video: *We're Being Sued*

The Lawsuit Video is a 15:43 minute published on May 23, 2016. It summarizes the events leading up to this lawsuit and the lawsuit itself. The video is divided into three major discussions: (1) fair use (2:00 minutes duration); (2) settlement offers (4:14 seconds duration); and (3) the lawsuit itself (8:45 minutes duration). The Lawsuit Video also contains an introduction that is 44 seconds.

In the video, Defendants begin by explaining the difficulty in asserting and litigating the fair use defense. Next, Defendants point out the absurdity of Plaintiff's settlement offers. For

example, the Lawsuit Video exposes how Plaintiff provided a settlement offer, whereby

Defendants would be required to promote Plaintiff's YouTube channel for two months and

compliment him as an individual and an artist. Finally, the bulk of the video is devoted towards

dissecting the absurd allegations contained in Plaintiff's prior First Amended Complaint. They

analyze how certain allegations are plainly false. For example, Defendants point out how

Plaintiff alleged that the majority of the Critique Video was comprised of the Work, when it

clearly was not. In the Lawsuit Video, Defendants express their concern about capitulating to

Plaintiff's settlement demands and the precedent such capitulation would create.

## IV.   ARGUMENT

### A.   The Critique Video Constitutes Fair Use

The Supreme Court stated fair use serves as a "built-in First Amendment

accommodation" to copyright law. *Eldred v. Ashcroft,* 537 U.S. 186, 219-20 (2003). The

Copyright Act states: "[F]air use of a copyrighted work ... for purposes such as ***criticism* [or]**

***comment*** … is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added).

Section 107 sets forth four factors courts should use to determine the question of fair use:

(1) the purpose and character of the use, including whether such use is of a

commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted

work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted

work.

17 U.S.C. § 107.  These factors are non-exclusive and must be viewed collectively, with their results "weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

### 1.    First Factor: The Purpose and Character of the Use

The Second Circuit has repeatedly reiterated: "[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107 [*e.g.,* criticism or comment]." *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 477 (2d Cir. 2004) (citing *Wright v. Warner Books, Inc.,* 953 F.2d 731, 736 (2d Cir. 1991)); *TCA Television*, 839 F.3d at 179 ("[T]he uses identified by Congress in the preamble to § 107—criticism [and] comment … might be deemed 'most appropriate' for a purpose or character finding indicative of fair use.") (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.05[A][1][a], at 13–162 (Matthew Bender, rev. ed., 2016)); *Authors Guild v. Google, Inc*., 804 F.3d 202, 215 (2d Cir. 2015) ("Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it."). As the Second Circuit aptly observed: "The possibility of criticism or comment – whether or not parodic – is a risk artists and their subjects must accept." *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 n. 7 (2d Cir. 1998)

The touchstone inquiry under this factor is whether the use is "transformative." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir. 2006). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Cariou v. Prince,* 714 F.3d 694, 708 (quoting *Campbell,* 510 U.S. at 579).

The "transformative use" inquiry asks "whether the new work merely supersedes the objects of the original creation, or instead ***adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message***." *TCA*

11

*Television*, 839 F.3d at 180 (emphasis in the original) (quoting *Campbell,* 510 U.S. at 579);

*Cariou,* 714 F.3d at 705-06. "Copying from an original for the purpose of criticism or

commentary on the original or provision of information about it, tends most clearly to satisfy

*Campbell* 's notion of the 'transformative' purpose involved in the analysis of Factor One."

*Authors Guild*, 804 F.3d at 215–16.

      *Equals Three, LLC v. Jukin Media, Inc.,* 139 F. Supp. 3d 1094 (C.D. Cal. 2015) provides

valuable guidance. The lawsuit involved a YouTube channel that routinely used other video clips

from YouTube. *Id.* at 1099. The YouTube channel would "provide spoken and performed

commentary on the various video clips, including facial expressions, sarcastic remarks, derisive

commentary, sexual innuendo, and social commentary directly targeting and referencing the

people, events, and circumstances depicted in the Source Videos." *Id.*

      The court found that the YouTube channel's use was "highly transformative." *Id.* at 1094.

The court reasoned its finding as follows:

> [T]he episodes comment upon or criticize Jukin's videos. Equals Three's episodes
> directly respond to and highlight humorous aspects of Jukin's videos. The
> episodes do so via the host's reactions to the videos, jokes, narration, costumes
> and graphics. The host's narration does not simply recount what is shown in
> Jukin's videos; instead the host makes comments about Jukin's videos that
> highlight their ridiculousness by creating fictionalized narratives of how the
> events transpired, using similes, or by directly mocking the depicted events and
> people.
> …
> This is not a case where the addition of minimal narration, an introduction, or text
> did not change the essential character of the original work.

*Id.* at 1104-05.

      Like the use at issue in *Equals Three,* the Critique Video is highly transformative. It

provides a scathing critique of Plaintiff's Work. While the Work tries to showcase Plaintiff as a

smooth and suave pickup artist with reality defying parkour skills, the Critique Video casts the

Work as a misogynistic form of pseudo-pornography. The Critique Video comments on all aspects of the Work, including its contrived dialogue, stilted characters and awkward storyline. No aspect of the Work is left unscathed. Like *Equals Three*, Defendants used facial expressions, sarcastic remarks, derisive commentary, sexual innuendo, and social commentary directly targeting and referencing the people, events, and circumstances depicted in the Work.

*Brownmark* also provides valuable guidance. The lawsuit involved a South Park episode that recreated a viral music video posted on YouTube, entitled *What What (In The Butt)* ("WWITB"), in order to critique viral videos on the Internet. *Brownmark,* 682 F.3d at 689. The Seventh Circuit found that South Park's use had "obvious transformative value" because "[t]he underlying purpose and character of [South Park's] work was to comment on and critique the social phenomenon that is the 'viral video.'" *Id.* at 693.

Here, like the defendants in *Brownmark,* Defendants' Critique Video uses Plaintiff's Work to comment on and critique his video, along with the social phenomenon Ethan dubs as "Cringe Tube."

Finally, no reasonable person could perceive the Critique Video as a replacement for Plaintiff's Work. From the start, it is clear from the graphics intro and the appearance of Defendants that this is not Plaintiff's Work. Furthermore, the Critique Video dissects the Work into 24 separate parts, ranging from 2 to 24 seconds – with the majority of the clips being 10 seconds or less. Each clip from the Work is followed by critique and commentary by Defendants of that specific clip. Even the longest clip of 24 seconds is overdubbed with Defendants' commentary. Defendants' unadulterated commentary and critique comprise 10:29 minutes of the 13:47 minute video. Such disjointed use of the Work, coupled with scathing critique, could hardly serve as a substitute for the original; no one wanting to experience Plaintiff's clever

13

rejoinders and athletic ability will want to watch Defendant's Critique Video, which lambasts every aspect of the Work.

Therefore, it is clear that this factor favors the Defendants because the Critique Video's use of the Work is highly transformative.

### 2.    Second Factor: Nature of the Copyrighted Work

The second statutory factor examines whether the Work is (1) creative or factual; and (2) published or unpublished. *Cariou,* 714 F.3d at 709-10 (quoting *Blanch,* 467 F.3d at 256). Here, the Work is undoubtedly creative and published. However, the fact that the Work is creative is of "limited usefulness where, as here, the creative work of art is being used for a transformative purpose." *Cariou,* 714 F.3d at 710 (internal quotes omitted) (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 612 (2d 2006)); *see also Authors Guild,* 804 F.3d at 220 ("The second factor has rarely played a significant role in the determination of a fair use dispute.") (citing William F. Patry, *Patry on Fair Use* § 4.1 (2015)).

Therefore, this factor favors Defendants, given the highly transformative nature of the Critique Video and the limited weight this factor has in the fair use analysis.

### 3.    Third Factor: The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

"The third statutory factor asks whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *TCA Television*, 839 F.3d at 185 (internal quotes and ellipsis omitted) (quoting *Campbell,* 510 U.S. at 586); *Blanch,* 467 F.3d at 257. "The third-factor inquiry must take into account that the extent of permissible copying varies with the purpose and character of the use." *Cariou,* 714 F.3d at 710 (quoting *Bill Graham,* 488 F.3d at 613).

"The law does not require that the secondary artist may take no more than is necessary." *Cariou,* 714 F.3d at 710 (citing *Campbell,* 510 U.S. at 588; *Leibovitz,* 137 F.3d at 114). Rather, "[t]he secondary use must be permitted to 'conjure up' *at least* enough of the original to fulfill its transformative purpose." *Cariou,* 714 F.3d at 710 (emphasis in the original; internal quotes omitted) (quoting *Campbell,* 510 U.S. at 588; *Leibovitz*, 137 F.3d at 114).

Again, *Equals Three* provides valuable guidance. There, the court found the amount used to be reasonable: "Though Equals Three uses the arguable heart of Jukin's videos, it does not show more than is reasonably necessary to convey enough of the events to allow the host's jokes, comments, and criticisms to make sense to the viewer and resonate." *Equals Three,* 139 F.Supp. 3d at 1107.

Like the use at issue in *Equals Three*, the amount and substantiality of the Work that Defendants used in the Critique Video is reasonable. The Critique Video uses 3:18 minutes of the Work – which is 5:24 minutes long. As mentioned, the Work is divided into 24 clips that are only 2 to 24 seconds with the majority being 10 seconds or less. Each clip is necessary for the Critique Video's transformative purpose because each clip of the Work is thoroughly critiqued by Defendants.

Therefore, in light of the reasonable amount of the Work that was used and the Critique Video's highly transformative purpose, this factor favors Defendants.

###    4.    Fourth Factor: Effect of Use on Market for Plaintiff's Work

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell,* 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). The Supreme Court made it clear: because a critique "may quite legitimately aim at garroting the original, destroying it commercially as well as artistically, [Citation] the role of courts is to ***distinguish between 'biting criticism that merely suppresses demand and copyright***

15

*infringement which usurps it.*" *Campbell,* 510 U.S. at 592 (emphasis added; internal brackets omitted) (quoting *Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir. 1986). The Second Circuit has been equally emphatic about this point. *See Cariou,* 714 F.3d at 708 ("We have made clear that 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work'"); *Blanch,* 467 F.3d at 258 (same); *NXIVM,* 364 F.3d at 481-82 (same).

Furthermore, "the law recognizes no derivative market for critical works." *Campbell,* 510 U.S. at 592. The fact that a critique "may impair the market for derivative uses by the very *effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market*." *Id.* at 593 (emphasis added); *see also On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001) ("If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a *devastating review of a book that quotes liberally from the original to show how silly and poorly written it is*), this transformative use will be found to be fair use, notwithstanding the harm.") (emphasis added).

The Supreme Court explained this point in *Campbell*:

This distinction between potentially remediable displacement and unremediable disparagement is reflected in the rule that there is no protectible derivative market for criticism. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

*Campbell,* 510 U.S. at 592.

*Brownmark* also provides valuable guidance on the potential market for YouTube videos. In examining the fourth fair use factor, the Seventh Circuit stated:

16

As the *South Park* episode aptly points out, there is no "Internet money" for the video itself on YouTube, only advertising dollars that correlate with the number of views the video has had. It seems to this court that [South Park's] likely effect, ironically, would only increase ad revenue. Any effect on the derivative market for criticism is not protectable. [Citation] And the plaintiff has failed to give the district court or this court any concrete suggestion about potential evidence indicating that the *South Park* parody has cut into any real market (with real, non-Internet dollars) for derivative uses of the original WWITB video.

*Brownmark,* 682 F.3d at 693-94.

Here, Plaintiff has suffered no cognizable harm under the Copyright Act. As *Brownmark* aptly pointed out, there is no Internet money for Plaintiff's Work, since it was only posted on YouTube. Furthermore, Plaintiff has suffered no cognizable harm because the Critique Video's analysis of the Work is a scathing critique. As the law makes clear, this constitutes unremediable disparagement. Whether examining the market for Plaintiff's original Work or its potential derivatives, Plaintiff has no right to claim market harm due to the Critique Video garroting his Work. Nor does he. The SAC does not contain a single allegation describing market harm to the Work (or any other harm he may have suffered for that matter). Nor is any market harm plausible because, at the end of the Critique Video, Defendants explicitly state that Plaintiff put a lot of work into his videos and that their viewers should watch them.

Therefore, in light of the fact that the harm Plaintiff suffered was unremediable disparagement, this factor also favors Defendants.

### B.   Plaintiff's DMCA Misrepresentation Claim Should Be Dismissed

Plaintiff's misrepresentation claim under 17 U.S.C. § 512(f) must fail as a matter of law. Section 512(f) prohibits two forms of misrepresentation: (1) "that the material or activity is *infringing*"; or (2) "that material or activity was *removed or disabled by mistake or misidentification*." 17 U.S.C. § 512(f)(1-2) (emphasis added).

17

As a threshold matter, the language of the statute reveals that a 512(f) misrepresentation claim only applies to copyright holders issuing takedown notifications, not secondary users issuing counter notifications. It would strain reason to believe the issuers of counter notifications would state that their use was infringing or that they removed or disabled their content by mistake or misidentification.

More importantly, Plaintiff does not allege that Defendants misrepresented that the Critique Video was infringing or that it was taken down by mistake or misidentification. Instead, Plaintiff accuses Defendants of misrepresenting that the Critique Video was (1) "fair use under U.S. Copyright law"; (2) "noncommercial"; (3) "transformative in nature"; and (4) did not use "more of the of the original work than necessary." SAC, ¶ 64. None of these representations fall under the categories set forth in 17 U.S.C. § 512(f).

Therefore, Plaintiff's misrepresentation claim under 17 U.S.C. § 512(f) must fail.

### C.   Plaintiff's Defamation Claim Should Be Dismissed

It is an axiom of defamation law that defamation must involve "a false statement." "To satisfy the falsity element of a defamation claim, plaintiff must allege that the complained of statement is 'substantially false.' 'If an allegedly defamatory statement is 'substantially true,' a claim of libel is 'legally insufficient and should be dismissed'" *Franklin v. Daily Holdings, Inc.,* 135 A.D. 3d 87, 94 (N.Y. App. Div. 2015) (internal brackets and ellipsis omitted) (quoting *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir. 1986); *Biro v. Condé Nast,* 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)).

"A statement is substantially true if the statement would ***not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced'"*** *Franklin,* 135 A.D. 3d at 94 (emphasis added) (quoting *Biro,* 883 F. Supp. 2d at 458; *Jewell v. NYP Holdings,*

*Inc.,* 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998); *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934)). "Indeed, it is well settled in New York 'that an alleged libel is not actionable if the published statement could have ***produced no worse an effect on the mind of a reader than the truth pertinent to the allegation***" *Franklin,* 135 A.D. 3d at 94  (emphasis added) (quoting *Guccione,* 800 F.2d at 302; citing *Fleckenstein,* 266 N.Y. at 23, 193 N.E. 537; *Fulani v. New York Times Co.,* 260 A.D. 2d 215 (1st Dept.1999)).

Further, "[t]he accuracy of the report should be assessed on the publication as a ***whole, not isolated portions*** of it [and a] defendant is held only to a standard of substantial, not literal, accuracy." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 233 (S.D.N.Y. 2015) (emphasis added) (quoting *Karedes v. Ackerley Grp.,* 423 F.3d 107, 114 (2d Cir. 1986)).

Both New York state and federal courts have routinely decided the issue of substantial truth at the motion to dismiss stage. *See e.g., Tannerite,* 135 F. Supp. 3d at 235-36 (granting defendant's 12(b)(6) motion on the grounds of substantial truth); *Stepanov v. Dow Jones & Co.*, 120 A.D. 3d 28, 34 (2014) (granting defendant's motion to dismiss on the grounds of substantial truth); *Biro*, 883 F. Supp. 2d at 458 (finding an alleged defamatory statement was substantially true on defendant's 12(b)(6) motion); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (finding an alleged defamatory statement was substantially true on defendant's 12(b)(6) motion); *Goldberg v. Levine*, 97 A.D. 3d 725, 726 (N.Y. App. Div. 2012) (granting defendant's motion to dismiss on the grounds of substantial truth).

Plaintiff's SAC does not allege that the Lawsuit Video, as a whole, was substantially false. Rather, Plaintiff surgically focuses on a single sentence of the 15:43 minute Lawsuit Video. *See* SAC ¶ 42. Specifically, Plaintiff alleges that the purported defamatory statement was

"Several months passed and nothing happens, and then we get an email from [Mr. Hoss'] lawyer to [Defendants' counsel]." *Id.* Plaintiff claims this is false and defamatory because he sent a personal email to Defendants requesting they take down the Critique Video before his lawyers communicated with Defendants' lawyers. *See* SAC, ¶¶ 41-43; Exhibit 3.

The law does not permit Plaintiff to premise a claim for defamation on this statement. First, Defendants' reporting on the settlement communications, as a whole, was true. A testament to this fact is that Plaintiff could not identify any other statement in the 15:43 minute video that was false. Second, it is completely implausible that the inclusion of the email in the Lawsuit Video would have a resulted in the audience receiving a more positive impression of the Plaintiff. The entire thrust of the Lawsuit Video was to discuss the absurdity of Plaintiff's settlement efforts and the allegations contained in his complaint – all of which was true or protected opinion. Plaintiff's email merely foreshadowed the absurdity to come. Plaintiff's email contains several bellicose accusations, such as Defendants' Critique Video constituted digital piracy, copyright infringement and not fair use. Moreover, the email offers a hard and fast demand that Defendants' take down the video immediately otherwise he will consider their conduct willful infringement, issue a takedown notice and proceed with legal action. *See* SAC; Exhibit 3. No reasonable person would have a different opinion about the Plaintiff had Defendants included this information. Stripped bare, it is clear Plaintiff's defamation claim is an unabashed attempt to silence and punish Defendants for exercising their First Amendment rights to speak and report on this lawsuit.

Therefore, it is clear that Plaintiff's defamation claim has no merit and must be dismissed.

20

## V.    <u>CONCLUSION</u>

Having exposed Plaintiff's SAC as meritless, Defendants will now speak plainly: Plaintiff's SAC is an abusive attempt to silence and punish Defendants for lawfully criticizing him and his Work. His SAC undermines the First Amendment and seeks to pervert copyright and defamation law to achieve this end. His gross misunderstanding of the law permeates every single cause of action contained in his SAC. His copyright claim is completely meritless because, upon examination of the works in question, Defendants' Critique Video is clearly a fair use of the Work. His misrepresentation claim under 17 U.S.C. § 512(f) strains credulity, because it is premised on a nonsensical reading of the statute. Finally, his claim for defamation is barred because – whether Plaintiff can accept the truth or not – the Lawsuit Video is substantially true. His focus on one sentence of the 15:43 minute video demonstrates his obliviousness regarding how his actions come across to the public. No reasonable person would think better of Plaintiff merely because he sent a misguided and bellicose email to Defendants. The proper remedy for all of these causes of action is Plaintiff's self-reflection, not abusing the judicial process and bullying Defendants into submission.

For the reasons stated above, Plaintiff's SAC must be dismissed without leave to amend.

DATED:  December 16, 2016                    **FOX ROTHSCHILD LLP**

By: /s/ Jeffrey S. Kravitz
      Caroline A. Morgan
      Fox Rothschild LLP
      100 Park Avenue, 15th Fl.
      New York, NY 10017
      Telephone: 212-878-7900
      Fax: 212-692-0940

      Jeffrey S. Kravitz (admitted *pro hac vice*)
      Rom Bar-Nissim (admitted *pro hac vice*)
      Fox Rothschild LLP

21

1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Telephone: 310-598-4150
Facsimile: 310-556-9828
Attorneys for Defendants