**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATT HOSSEINZADEH,

*Plaintiffs*,

– against –

ETHAN KLEIN and HILA KLEIN,

*Defendant*s.

**Civ. Action No**.: 16-cv-3081 (KBF)
**ECF Case**

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS CROSS-MOTION FOR JUDGEMENT ON THE PLEADINGS AND IN**
**OPPOSITION TO THE DEFENDANTS' MOTION FOR JUDGMENT ON THE**
**PLEADINGS PURSUANT TO FED. R. CIV. P. 12(C)**

THOMPSON BUKHER LLP
75 Broad Street, Suite 2120
New York, New York 10004
(212) 920-6050

*Attorneys for the Plaintiff*

## Table of Contents

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

A 12(C) MOTION IS APPROPRIATE.................................................................................. 2

THE INFRINGING VIDEO TRANSCRIBED ..................................................................... 4

ARGUMENT .......................................................................................................................... 4

       A.     The Infringing Video Does Not Constitute a Fair Use ................................... 4

              1.     Purpose and Character of the Use: The Infringing Work is not transformative................................................................................... 6

              2.     Nature of the Copyrighted Work ................................................... 18

              3.     The Amount and Substantiality of the Portion Used..................... 19

              4.     Effect of Use on Market for Plaintiff's Work................................ 20

       B.     Defendants Infringed on Plaintiff's Copyright ............................................ 21

       C.     Plaintiff's Second Claim For Relief (DMCA Misrepresentation) Pleads A Valid Cause Of Action................................................................................. 22

       D.     Plaintiff's Third Claim For Defamation States A Cause Of Action ........... 23

CONCLUSION...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 519 (S.D.N.Y. 2015) ..................................4, 7

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 926 (2d Cir. 1994) ...........................19

*Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992) ............................................6

*Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006)...........6

*Biro v. Conde Nast*, 883 F.Supp.2d 441, 458-459 (S.D.N.Y. 2012)......................................24

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) ........................................................5, 7

Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 693 (7th Cir. 2012) ..............21

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) ........................4, 5, 6, 18, 20

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998)..........6, 17, 19

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003)......6, 8, 15, 16, 17, 18

*Equals Three, LLC v. Jukin Media, Inc.*, 139 F.Supp.3d 1094 (C.D. Cal. 2015) ................15

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991) ................................................................................................................22

*Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 93-94 (1st Dep't 2015)...........................24

*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986)..............................24

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562-63 (1985)........................3, 20

*Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992) ..............................22

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004) ..............................................3

*Printers II, Inc. v. Professionals Publishing, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986).........25

*Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) ............................................................21

*Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) ....................................................7

*Stepanov v. Dow Jones & Co., Inc.*, 120 AD3d 28, 34 (1st Dept 2014)..............................23

*Stewart v. Abend*, 495 U.S. 207, 237 (1990).......................................................................18

Twin Peaks Prods. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1376 (2d Cir. 1993) ..............18, 19

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008)..........6, 8

**Statutes**

17 U.S.C. § 107 ..................................................................................................................5, 18

17 U.S.C. § 410 .......................................................................................................................22

17 U.S.C. § 512(f) ...............................................................................................................22, 23

17 U.S.C. § 512(g)(2)(C) ..........................................................................................................23

17 U.S.C. § 512(g)(3)(C) ..........................................................................................................22

17 U.S.C. §§ 101-803 ................................................................................................................21

Fed. R. Civ. P. 12(c) ..............................................................................................................1, 2

U.S. Const. art. I, § 8, cl. 8 .........................................................................................................4

**Other Authorities**

Restatement [Second] of Torts § 558..........................................................................................24

Plaintiff Matt Hosseinzadeh ("**Plaintiff**") submits this memorandum of law in opposition to the motion of defendants Ethan Klein ("**Mr. Klein**") and Hila Klein ("**Ms. Klein**") (collectively the "**Defendants**") for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and in support of its cross-motion for judgment on the pleadings pursuant to the same.

## PRELIMINARY STATEMENT

In light of the Defendants' use of virtually the entirety of Plaintiff's original creative work (the "**Work**")—certainly the entirety of its substantive shots, cutting merely portions of non-dialogue action sequences—the chief question raised by the Defendants' fair use defense is whether their video (the "**Infringing Video**")[1] in fact used only so much of the original as absolutely necessary to express its "point" or whether the same point could have been made by using such smaller portions of the Work so as not to supplant the original.

While recent evolutions in fair use doctrine have allowed defendants to use the "heart" or sometimes even the entirety of a creative work for a commercial purpose, such cases uniformly state that, in order to succeed on a fair use defense, the defendant's use must have been both transformative and must have used only such portions of the original work as necessary to such transformation. As detailed in the clip by clip descriptions below, if it was actually Defendants' goal to transform or, as they say, recast the Work as a misogynistic piece of pseudo-pornography, they could have used a substantially smaller portion of the Work to do so. As is clearly evident from the Infringing Video itself, nearly all of the Defendants' use of the Work served as a jumping board for their own comedy routine, rather than as a piece to "critique." Indeed, Defendants' jokes are far more pornographic, offensive, and disturbing than any interpretation of the Work, and their additions—which serve to supplant rather than comment upon the Work's intended humor—are no more transformative than a laugh track added to a television sitcom that had not bothered to include one. Such an addition

---

[1] As much as Defendants would like to define it the "Critique Video," such definition is also a question before this Court.

1

constitutes nothing more than an unlicensed derivative work.

Judging by the YouTube community's various emails to Plaintiff, many of which have threatened his life, they feel that Plaintiff prevailing in this matter would destroy the entire industry of YouTube "reaction videos." Nothing could be further from the truth. YouTube's reaction videos need only use such portions of original work as is necessary to convey the reaction. In fact, should Plaintiff fail to prevail in this matter, then what we will next see on YouTube is entire feature films shown in unlicensed, Mystery Science Theater format – a film of friends watching a film. Commentators like the Defendants would need only film themselves laughing and joking along with certain scenes or otherwise making unrelated, inside jokes to otherwise replay entire creative works on YouTube. The Defendants are asking the Court to countenance the equivalent of republishing an entire novel with inane "criticisms" scrawled in the margins as a fair use under the Copyright Act.

The Defendants' very public discussion of this matter has managed to convince the media that the Plaintiff's lawsuit arises from his offense at the Defendants' criticism. Watching the Infringing Video, we hope that Court observes that this makes no sense in light of all of the positive things that the Defendants said about Plaintiff and his collective works. Plaintiff's offense stems from the fact that the Defendants used virtually the entirety of his creative Work, including his original musical composition on which Defendants did not even comment, as a prop in their unrelated comedy routine. Defendants use hyperbole, insults, and dramatic fiction to compensate for illogical arguments and a suffering set of facts. Both defendants and their counsel have already exhibited that they are careless not only in their review, but in their submissions to the Court. Yet, the evidence speaks for itself, and the Court will agree that Defendants' careless and uninhibited use of every substantive second of the Work in the Infringing Video is not – and cannot be – fair use.

### A 12(C) MOTION IS APPROPRIATE

The Plaintiff agrees with the Defendants that it is appropriate to resolve the claims in this matter via a Fed. R. Civ. P. 12(c) motion and, accordingly, cross-moves for the same. The Defendants do not

dispute that they copied Plaintiff's Work and incorporated it into their Infringing Video. And Plaintiff, likewise, agrees that it is appropriate to incorporate by reference the Plaintiff's Work, the Defendants' Infringing Video, and the Defendants' "We're Being Sued" video (the "Defamatory Video"), which have been submitted as exhibits to the Defendants' brief. Accordingly, Plaintiff refers the Court to the law cited in the Defendants' brief on the appropriateness of its 12(c) motion and the incorporation of the videos.

Likewise, if the Court finds that the Infringing Video did not constitute a fair use, then it is equally appropriate for the Court to find that the Defendants committed copyright infringement (Plaintiff's First Claim) in their use of the Plaintiff's Work. Equally so, as discussed below, if the Defendants committed copyright infringement, then they committed a DMCA Misrepresentation (Plaintiff's Second Claim) by materially misrepresenting that their use of the Plaintiff's Work was a fair use, noncommercial, transformative in nature, and used no more of the original Work than necessary in response to Plaintiff's DMCA take-down request.

The Plaintiff does have some reservations to the extent that the question of transformative use is often referred by Courts as a question of fact to a jury where, as in this case, a jury demand had been made. At other times, with respect to transformative use, Courts will consider the "subfactor" of whether the defendant acted in good or bad faith in creating their video. *NXIVM Corp. v. Ross Inst*., 364 F.3d 471, 478 (2d Cir. 2004); *see also Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562-63 (1985). Such motivational considerations could only be submitted as testimony outside of the confines of a 12(c) motion. Nevertheless, the Plaintiff feels that the Defendants' treatment of the Work was so clearly non-transformative that the Court is unlikely to require evidence apart from the incorporated videos to make that determination. We note, however, that should the Court in its judgment deem this to be a close question, then it is certainly within the Court's discretion to convert this motion into one for summary judgment and have the parties submit additional evidence— especially in light of the fact that this matter's discovery period is scheduled to end just fifteen days

3

hence.

## THE INFRINGING VIDEO TRANSCRIBED

Initially, Defendants, in an effort to mislead the Court, routinely conflate Plaintiff with the main character in the Work. While Plaintiff does play the part of this main character, the character is a carefully scripted personality that is entirely separate and distinct from the actual person, the filmmaker Matt Hosseinzadeh. Otherwise, in their brief, Defendants provide a decent summary of the three videos at issue: the original Work, the Infringing Video, and the Defamatory Video—the last of which is relevant to Plaintiff's third claim for defamation. To the extent that a proper fair use analysis, particularly with respect to the question of transformative use, requires a detailed analysis, we provide a more thorough transcript of the Infringing Video to aid in the Court's deliberations. To the extent that it is appropriate, as Defendants argued in their brief, to incorporate by reference the Infringing Video in this motion, it should be equally appropriate to transcribe the contents of the video for the Court and, in any case, the Court can independently verify the accuracy of the transcription as against the incorporated video. *See Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 519 (S.D.N.Y. 2015) (using teleplay transcriptions for subject videos). Accordingly, the Court here may appropriately do the same or otherwise rely on the transcriptions that Plaintiff has provided herein.

Where the transcriptions are included below, we have taken the liberty of color-coding Plaintiff's original content and Defendants' original content for illustrative purposes.

## ARGUMENT

### A.    The Infringing Video Does Not Constitute a Fair Use

The fair use doctrine is designed to "fulfill copyright's very purpose, 'To promote the Progress of Science and useful Arts,'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const. art. I, § 8, cl. 8), by balancing the simultaneous needs "to protect copyrighted material and to allow others to build upon it." *Id.* As the Second Circuit has observed, there is an

inevitable tension between the property rights [that copyright law] establishes in

4

> creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them-- or ourselves by reference to the works of others, which must be protected up to a point. The fair-use doctrine mediates between the two sets of interests, determining where each set of interests ceases to control.

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006). At stake in this case is the incentive for authors like the Plaintiff to expend personal resources on writing a script, hiring actors, leasing equipment, and ultimately creating original works of expression versus the freedom of others to create alleged works of criticism which, by their nature, would require copying *some* parts of the original work in order to aid any legitimate criticism.

The common law doctrine of fair use is codified at Section 107 of the Copyright Act of 1976 as follows:

> The fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The evaluation of these factors is "an open-ended and context-sensitive inquiry," *Blanch*, 467 F.3d at 244; *accord Campbell*, 510 U.S. at 577 (stating that "the statute, like the doctrine it recognizes, calls for a case-by-case analysis"), and the examples listed in the statute (i.e., criticism, comment, news reporting, and teaching) are illustrative rather than limiting. *Campbell*, 510 U.S. at 577-78. The four statutory factors may not "be treated in isolation, one from another"; instead they all must "be explored, and the results weighed together, in light of the purposes of copyright." *Id*. at 578. "The ultimate test of fair use, therefore, is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better

served by allowing the use than by preventing it.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992)).

### 1. Purpose and Character of the Use: The Infringing Work is not transformative.

Most critical to the inquiry under the first fair-use factor is "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579; *see also Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006). Specifically, courts ask "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. The fair use doctrine seeks to protect a secondary work if it "adds value to the original-- if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings," because such a work contributes to the enrichment of society. *Castle Rock*, 150 F.3d at 141 (alteration in original).

#### a. On the whole, the Infringing Work adds nothing distinct to the original.

New works are described as transformative "when the works use copyrighted materials for purposes distinct from the purpose of the original material." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (holding video clips of Elvis Presley incorporated into a supposed biography non-transformative because the biography was "at least in part" seeking to profit from the "inherent entertainment value of Elvis' appearances"); *accord Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008) (citing *Elvis Presley Enters*. and finding against transformative use where defendant's Harry Potter "Lexicon often lacks restraint in using Rowling's original expression for its inherent entertainment and aesthetic value").

In this case, Defendants claim that the Infringing Work, on the whole, serves as a commentary on the original Work. However, should the Court visit the Defendants' YouTube channels

6

(www.youtube.com/user/h3h3Productions and www.youtube.com/user/h2h2productions), the Court would take judicial notice[2] of the fact that Defendants are *exclusively* entertainers and have in their dozens of collective videos *never* published a serious work of literary or film criticism. It is very important to Defendants, as is made clear in their moving brief, that the Court perceive them as critics rather than what they plainly are, comedic talk-show entertainers. Defendants' misleading efforts are stopped at the door of the Infringing Video itself.

Every single one of Defendants' videos, including the Infringing Video, is published purely to entertain the Defendants' subscribers just like Plaintiff's videos, including his Work, are created purely to entertain Plaintiff's subscribers. Accordingly, viewed on the whole, the Infringing Video served the exact same purpose as the original Work—to entertain—except it supplanted the Work by including some additional elements of humor in the form of the Defendants' jokes. Many of Defendants' jokes, as discussed below, had nothing to do with the Work. And those that do relate to the Work hardly, if at all, provide useful criticism to the viewer, but rather serve as a visual aid to Defendants' standard format of improvisational humor based on various topics and objects. To this extent, the Infringing Video constituted an unlicensed derivative work of the Work, using the original Work as a prop in its comedy act.

While the commercial nature of a use no longer carries the weight it once did against a finding of fair use, the real concern behind the commercial nature inquiry is "the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch*, 467 F.3d at 253. Courts will not find fair use when the secondary use "can fairly be characterized as a form of commercial exploitation," but "are more willing to find a secondary use fair when it produces a value that benefits the broader public

---

[2] In evaluating a motion on the pleadings "the court's scope of review includes "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *Adjmi*, 97 F.Supp.3d at 527 (*citing Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)) (emphasis added).

interest." *Id.* As noted above, should the Court take judicial notice of the Defendants' YouTube channels, it would be clear that the Defendants' subscribers do not patronize the Defendants for their keen analysis and commentary of creative works—much less the Plaintiff's creative work—but do so purely for comedic entertainment. Likewise, the Court may take judicial notice of the Wikipedia.org page devoted to the Defendants' "h3h3Productions" channel which describes h3h3Productions as "an Israeli-American comedy YouTube channel produced by husband-and-wife team … mostly consist[ing] of sketch comedy and reaction videos."[3] Defendants boast of over 2.8 million subscribers in the "Comedy" and "vlog" genres.

No "broader public interest" was served by adding additional humor to what was already meant to be a humorous video. In other words, returning to the holding of *Elvis Presley Enters.*, using a funny video to make a new funny video does not serve "purposes distinct from the purpose of the original material." 349 F.3d at 629. The Infringing Video as a whole, therefore, is not transformative.

### *b. The Infringing Work copied the Work far in excess of what was necessary.*

"A finding of verbatim copying in excess of what is reasonably necessary diminishes a finding of transformative use." *Warner Bros. Entm't Inc*., 575 F.Supp.2d at 544 (citing *Campbell*, 510 U.S. at 587 (observing that "whether a substantial portion of the infringing work was copied verbatim from the copyrighted work . . . may reveal a dearth of transformative character under the first factor, or a greater likelihood of market harm under the fourth")).

The Defendants couch their Infringing Video as a "critique" and proceed to broadly summarize how it scrutinized various elements of the Plaintiff's Work. (Def. Brief at pp. 8-9.) In so doing, the Defendants attempt to paint over the numerous instances, far outnumbering instances of valid criticism, where the Defendants' commentary was either irrelevant to the excerpts shown or so inane as to lack any substantive value. To highlight this, we review a transcript of the entirety of the Infringing Video:

**0:00 - 1:15**: (Defendants introduce themselves and talk about Plaintiff as the king of

---

[3] *h3h3Productions*, Wikipedia.org (Dec. 26, 2016), https://en.wikipedia.org/wiki/H3h3Productions.

"CringeTube.")

**1:16 - 1:23**: Seven second excerpt of original Work title screen.

**1:24 - 1:43**: ***Ethan***: I like the fucking text is like a, does like a wave dance prolongs the shit out of that. You see that? Even now and it's done? ***Hila***: Oh, yea. ***Ethan***: Like this (waves hands). ***Hila***: (laughs). ***Ethan***: Can I get a little bit from you Hila? ***Hila***: (mutters unintelligibly as she waves her arms). ***Ethan***: Oh c'mon! Get your shit together, Hila.

Early on, Defendants do take an opportunity to introduce their prop. An introductory explanation nor simply saying that one "likes" something in no way constitutes substantive criticism.

**1:43 - 1:48**: Five second excerpt of Bold Guy meeting Athletic Girl while she is stretching.

**1:49 - 2:07**: ***Ethan***: Oh, my god. ***Hila***: (mutters unintelligibly). ***Ethan***: This is like Prank Invasion. ***Hila***: Yea. ***Ethan***: One point oh. That's just you know, doing, spreading my asshole on the street like you do. ***Hila***: Just on the street. ***Ethan***: This is like some real nature shit. This is like presenting yourself. ***Hila***: Yea. ***Ethan***: In the most classical sense.

Here again, Defendants' commentary, at most, compares the Work to another copyrighted work, "Prank Invasion." While this may form the beginning of a critical statement, Defendants go no further, and immediately digress into their usual impromptu, non-critical banter.

**2:07 - 2:17**: Ten second excerpt of Bold Guy talking to Athletic Girl about her form. She asks if he is a creep.

**2:18 - 3:31**: ***Ethan***: I don't know lady, you're spreading open your asshole on the sidewalk, I'm not sure you're in a position to be calling people creeps. ***Hila***: Yea... What I love about his videos is that he setup that situation. ***Ethan***: Yea the blame really is on Matt. ***Hila***: This is... this is his script. ***Ethan***: Yea, you're right. ***Hila***: So, if you look at it from his point of view, this is just a girl doing this stuff on the street. ***Ethan***: You're right. I'm placing the blame entirely in the wrong place. It goes back to the famous saying, "We see the world not as it is but as we are." Okay, now a little more wisdom from uncle Ethan here, but basically grandpa Ethan here, but basically this is how Matt Hoss sees the world, it says more about him. Let's enter the mind of Matt Hoss. Matt, look at him, I love his face right now. Just gotta love Matt. ***Hila***: (Unintelligible). ***Ethan***: Yea gotta show those (unintelligible) off. C'mon. Guy walks around like this you know he's bold and... he's probably beautiful. ***Hila***: It's sleeveless shirt with the hoodie. ***Ethan***: The sleeveless with the hoodie is probably one of the classiest pieces of clothing you can own. It's like I do want to protect my head, but at the same time, you know it might be so cool I want to protect my head, but at the same time (raises sleeves) c'mon. My arms need to breathe. It's such a classy clothing. ***Hila***: It's a really great combo.

9

The Defendants' commentary above arguably began as criticism of Plaintiff in that it reminds the viewer that it is indeed a scripted work. It then immediately shifts to a comical discussion that is based on Bold Guy's costume. This discussion, however, in no way required Defendants to show the 2:07 – 2:17 excerpt. The same things could have been said of the 1:43 – 1:48 excerpt that was already shown. Clearly, the Defendants showed the 2:07 – 2:17 segment to break up the monotony of their previous commentary and to move their video along rather than to serve as a legitimate basis for criticism.

**3:31 - 3:43**: Twelve second excerpt of Bold Guy exchange with Athletic Girl regarding her attention-seeking.

**3:44 - 5:02**: *Ethan*: You know when you watch a porn you endure this shit because you know it's going somewhere but here it's like there's no payoff. *Hila*: It's just the crappy... *Ethan*: It's the crappy pornage. *Hila*: Story. *Ethan*: It's like, what is the point of this? And the thing that always baffled me about Bold Guy, before we get too deep into this (shows YouTube view numbers), ho-ho, what! Nine million views? *Hila*: What! *Ethan*: But look at the, like, ratio, people are... *Hila*: When did he get so many... ten million views. *Ethan*: Well this is from 2013. This is CringeTube. This is from the CringeTube era like I said. Damn. But like I said, people liked it. Like, people genuinely were on board with Matt Hoss. And I'm not saying the guy deserves hate, I think he's doing his own thing and I respect that. But it's just, I find it interesting that so many people saw the world as he does. *Hila*: Yea. *Ethan*: I guess that's what I mean. Uh. That's shocking. That shocks me. *Hila*: Ten million views? The subscribers are low. *Ethan*: Yea you think that, he would have, well that's from CringeTube. People before just, I mean, I don't know how many people got their dicks out and just probably moved on. *Hila*: Flowing with the cringe. *Ethan*: This was before Prank Evasion so this was like the first generation of JerkTube. Of jerky little ding-dong on YouTube.

Here, Defendants again compare the work to Prank Invasion, as well as referring to it as "cringe tube," two comparisons they have already made, which did not require additional footage of the Work to make a second time. The Defendants' sole purpose for continuing to show additional excerpts of the original Work in their original sequential order could only have been for the intrinsic entertainment value of watching the Plaintiff's original Work for its own sake.

**5:02 - 5:18**: Sixteen second excerpt continued exchange between Athletic Girl and Bold Guy.

**5:19 - 5:42**: *Ethan*: I love how he always, he writes their lines always to set him up.

*Hila*: Yea. *Ethan*: Zinger. *Hila*: Yea. *Ethan*: It's pretty funny. *Hila*: He always just... the female character is always so annoying. And he writes them like that. *Ethan*: Super offensive, super slutty, super bitchy, but then ultimately they give into his sexual prowess. *Hila*: Because how can you not? *Ethan*: How could you not? He's Matt Hoss, get a load of that face.

**5:43 - 5:54**: Eleven second excerpt of Bold Guy and Athletic Girl flirting.

**5:55 - 6:03**: *Ethan*: Oh, wow. Wow. *Hila*: What kind of (unintelligible) is that? *Ethan*: It's one that says porn is imminent. But it's not.

**6:04 - 6:06**: Two second excerpt of Bold Guy and Athletic Girl continuing to flirt.

**6:07 - 6:15**: *Ethan*: He wrote that in by the way. *Hila*: What are these situations? *Ethan*: Just remember that remember whenever I comp anything like that, he wrote that in. He wrote, "She said Strong shoulders." *Hila*: Yea.

**6:16 - 6:32**: Sixteen second excerpt of Bold Guy and Athletic Girl continuing to flirt.

**6:33 - 6:48**: *Ethan*: Holy fuck. *Hila*: Of course. *Ethan*: And it's just that easy, baby, get out there and get some girls yourselves guys. *Hila*: Sleeveless shirt with a hoodie. *Ethan*: That's the key. Bracelets are out. *Hila*: Yea. *Ethan*: Sleeveless hoodies in. *Hila*: In. *Ethan*: In, in, in, in.

The forgoing excerpts and the Defendants' "reactions" to them provided absolutely nothing new to that which Defendants had already offered by this point. Again, the Defendants' only purpose in continuing to show excerpts of the Work in sequential order was to entertain their viewers with the underlying Work's intrinsic entertainment value, paused, occasionally, so that Defendants could make a few jokes. Otherwise, at this point the Defendants' commentary presented nothing more than a comedy routine playing off of the original Work.

**6:48 - 6:59**: Eleven second excerpt wherein Athletic Girl propositions Bold Guy to catch her and she will let him do whatever he wants to her.

**7:00 - 7:27**: *Ethan*: Oh, is that a fucking promise? Because I can think of some foul shit. I always found that phrase funny too. It's like, what are you going to do to her? You going to have sex with her? And then what? Like what weird shit do you have in mind? Are you going to put a carrot up her ass? I mean where does this go? You going to shit in her mouth? Put a carrot by her you know what I mean? It's like, tsk, how far are we taking this?

At this point Mr. Klein ceased even to comment on the underlying Work and proceeded along his own tangent and wish-fulfillment. Again, everything that the Defendants had to say about the

dialogue between the characters in the Work had already been said. This additional content was superfluous and sought nothing more than to compound entertainment upon preexisting entertainment.

**7:27 - 7:39**: Twelve second excerpt wherein Bold Guy accepts the challenge. Plaintiff's original music starts.

**7:40 - 8:12**: *Ethan*: Yea, he thinks he's like a parkour guy. *Hila*: Oh yea. *Ethan*: He thinks he's like a parkour expert, he's got that whole, that whole level of greatness. Dude, Matt Hoss is... I want Matt Hoss to have a show. This shit is so fucking entertaining, like legit. He kind of fell off recently, but I want him on TV, I really do. This shit is so entertaining. *Hila*: It's funny. *Ethan*: Porn, titties, ass, and the x-factor of parkour. *Hila*: I completely forgot about him, he's so funny. *Ethan*: He's great. He's such a great character.

The Defendants noted their appreciation of the entertainment value of the Work's action sequence. While this did not add anything particularly substantive in the sense of criticism, perhaps this could have served as some sort of valid criticism if, as we will see below, the Defendants did not run virtually the entirety of the rest of the video to make more-or-less the same point.

**8:12 - 8:20**: Eight second excerpt parkour action sequence while original music plays.

**8:21 - 8:36**: (original music continues to play over commentary, digitally fed into the Infringing Video rather than as background music on the Defendants' computer) *Hila*: He could have just taken the stairs. *Ethan*: I was going to say, is he required to do that? He could have just gone around. *Ethan*: The stairs were there. *Ethan*: Look, can you imagine the casting call for this? Looking for cute, petite, parkour girl to star in my parkour sex video.

**8:37 - 9:02**: Twenty-five second excerpt of continued parkour action with original music. *Ethan* (speaking over video): Get her Matt, she wants your dick, you can do anything you want to her. Just imagine putting that carrot up her ass dude. Visualize the carrot in her ass man. You gonna put, you gonna put some mayonnaise in her fucking mouth. Mayonnaise mouth fetish.

**9:03 - 9:12**: *Ethan*: God, he scaled that wall with so much grace. It's got me thinking about Matt, so much shoulder, you know what I'm saying, so much grace.

**9:12 - 9:19**: Seven second excerpt of continued parkour action with original music.

**9:19 - 10:00**: *Ethan*: What happens when she, when he catches her? Does he have to like tackle her? *Hila*: He does whatever he wants. *Ethan*: No, does he like take her out and then rape her? Is that what she's saying? *Hila*: Yea, whatever he wants. *Ethan*: Hope he's got mayonnaise and carrots with him. Cause that's what I want. That's what I've always wanted. Carrots in the ass, mayonnaise in the mouth. *Hila*: What's with the mayonnaise? *Ethan*: I don't know, she said whatever I want. Well why are you more

12

confused about the mayonnaise but not the carrot in the ass? I don't know why you chose that one. *Hila*: Cause... *Ethan*: Well the carrot goes in the ass but the man, well maybe, I mean, I just like mayonnaise. *Hila*: You can just eat mayonnaise. *Ethan*: That's basically what I'm suggesting.

**10:00 - 10:09**: Nine second excerpt of continued parkour action with original music.

**10:09 - 10:11**: *Ethan*: There's a fuck... this, there's a sidewalk next to you.

**10:11 - 10:14**: Three second excerpt of continued parkour action with Ethan talking over it. *Ethan*: Why did he jump that wall?

**10:14 - 10:17**: *Ethan*: ...and stuff. You dang goubus.

**10:17 - 10:23**: Six second excerpt of continued parkour action with original music.

**10:23 - 10:39**: *Ethan*: So this was the action sequence. I guess. **This was the meat of the video** (emphasis added). *Hila*: It's pretty long. *Ethan*: It's action-packed. It's got it all. Sex, action, mayonnaise. *Hila*: Drama. *Ethan*: Carrots.

**10:39 - 10:47**: Eight second excerpt of continued parkour action with original music (shown for no apparent reason).

**10:47 - 11:02**: *Ethan*: That was sick. *Hila*: Nah. *Ethan*: That was some straight-up parkour. *Hila*: It's supposed to look effortless. *Ethan*: What, that didn't look effortless? That was fucking parkour dude.

**11:02 - 11:09**: Seven second excerpt of continued parkour with original music until Bold Guy catches girl.

**11:09 - 11:19**: *Ethan*: Woah. I'm gonna like this video. That was badass. *Hila*: Yea. *Ethan*: He's going to fuck the shit out of her now, man.

The entirety of the above excerpts and commentary consisted of nothing more than (i) the Defendants showing sequential excerpts of the ongoing action sequence; and (ii) Mr. Klein narrating what happened in those sequences. Technically, the Defendants could have just narrated the content of the Plaintiff's Work without showing any excerpts. Of course, such narration would certainly constitute a derivative work of the original Work by recasting it into a new medium. Likewise, it would be bizarre for the Defendants to now argue that they "transformed" the unlicensed derivative work created by their narration by infusing that narration with excerpts from the original Work.

We must also point out that (i) Defendants have, at this stage in their Infringing Video, slavishly

copied and performed Plaintiff's original musical work without a single word of commentary on it; and (ii) the only content offered by the Defendants in the foregoing, outside of narrating the action sequences, was in the form of Mr. Klein's diatribe on carrots and mayonnaise which had nothing to do with the Plaintiff's Work. To this last point, we note that the central theme of Defendants' moving brief is that they claim to critique the Work as "a misogynistic piece of pseudo-pornography" (Def. Brief. at p. 8) when Mr. Klein's comments about rape and object-insertion served to supplant the Work with sexual innuendo far above and beyond what was insinuated in the original. Defendants continued:

**11:19 - 11:22**: Three second excerpt of Work. Athletic Girl unable to escape from Bold Guy who magically appears at every corner.

**11:22 - 11:41**: *Ethan*: You know what? I got a problem with this now because I was on-board, this was real video, and now they kind of broke that realism and my dick deflated. Cause I was rock hard. Cause I was thinking I could do this. But now I know it's fake. *Hila*: Yea. *Ethan*: Disappointing. *Hila*: That's a shame. *Ethan*: Disappointing.

**11:41 - 11:49**: Eight second excerpt of Work, dialogue between Bold Guy and Athletic Girl.

**11:49 - 12:07**: *Ethan*: And then he pulls out a jar of mayonnaise, and ah, this is for saying I could do anything I want to you. *Hila*: I didn't know you like mayonnaise so much. *Ethan*: It's pretty good. I really like mayonnaise. I love mayonnaise. It's valentine's day Hila, what you got for me?

**12:07 - 12:25**: Eighteen second excerpt of Work, dialogue between Bold Guy and Athletic Girl. Rolling credits from Work.

**12:25 - 13:47 (End)**: *Ethan*: So, I mean that was like a, that was actually a romp. That was a romp and a riot. *Hila*: What's a romp? *Ethan*: It's a riot. A romp is a goof, plus a spoof, plus a gaff, plus a riot. You never heard romp? *Hila*: No I never heard that word. *Ethan*: Well I'm just introducing it now, it's a new word. It's a new, it's like saffron is to soup. It spices the whole dish up. That was a total romp. That was a lot of fun. So, that is the Matt Hoss Zone. Look, it's a sexy place, it's a wild place, it's a mayonnaisey place, and it's a romp. Most of all it's a mayonnaise romp. Maybe I should kind of let them mayonnaise romp. But there is plenty more, so I recommend going to Matt Hoss, checking him out, he's... look... say what you will but the guy puts a lot of effort into his videos, he clearly plans them, he's very professional, I mean the guy cares about what he does. So, you know, we goof on him but he deserves some respect, you know.

Nothing in the form of substantive commentary was contributed to the Work by the Defendants in section 5:03 – 13:47 (End) of the Infringing Work. Was it truly necessary to use virtually all of the

14

original Work to make and repeat the same comments for fourteen minutes that were already made in the first five minutes of the Infringing Video?

The Defendants' brief urges the Court to rely on a recent Central District of California case, *Equals Three, LLC v. Jukin Media, Inc.*, 139 F.Supp.3d 1094 (C.D. Cal. 2015), as instructive. For a plethora of reasons, it is not. The primary difference between the videos at issue in *Equals Three* and Plaintiff's Work is the fact that "[a]s pertains to [the *Equals Three*] case, [plaintiff's] videos are typically short, 'point-and-shoot' style depictions of events that actually happened," *id.* at 1104 (emphasis added), whereas Plaintiff's Work is a scripted 5:24 video utilizing actors, a written script, planned cinematography, multiple cameras, and original music composition. The *Equals Three* court found it "difficult to say whether [defendant's] episodes, which undisputedly use graphics and narration to tell jokes about the events depicted in the videos, criticize these videos—which were themselves made to serve the purpose of humor and entertainment—or simply point out their inherent humor." *Id.* Unlike the videos in *Equals Three*, Plaintiff's Work does not depict real events that could be seen as humorous—the Work is a work of creatively scripted humor. In other words, it could not be considered transformative for Defendants to point out any "inherent humor" in Plaintiff's Work because Plaintiff's Work was carefully crafted to be explicitly humorous.

Thus, where Defendants could not transform a creative work of comedy to make it even more funny—since doing so would necessarily supplant the original, an act fatal to the idea of fair use, *Elvis Presley Enters.,* 349 F.3d at 629 (a work is only transformative when it "use[s] copyrighted materials for purposes distinct from the purpose of the original material")—they are left solely with the fair use purpose of criticism. But even here they fail. In *Equals Three*, "the [defendant's] narration does not simply recount what is shown in [plaintiff's] videos; instead the [defendant] makes comments about [plaintiff's] videos that highlight their ridiculousness by creating fictionalized narratives of how the events transpired, using similes, or by directly mocking the depicted events and people." *Id.* As detailed above, the Infringing Work, for the most part, simply narrates what is shown in the Work, and in no

way creates a fictional narrative for short "short, 'point-and-shoot' style depictions of events that actually happened." *Id.* at 1104. To the extent that the Defendants occasionally make fun of Plaintiff's characters or dialogue, such commentary cannot be viewed as transformative in light of the fact that the *fictional* characters and dialogue were written to be ridiculous in the first place. Moreover, to the extent that Mr. Klein occasionally used an excerpt to start off on a tangent, talking about fictionalized "what if" scenarios, how could such fiction, added to existing fiction, serve as transformative fair use? Fiction building upon preexisting fiction is the definition of a "derivative work."

Another important differentiator to the case at bar is the fact that in *Equals Three* "the [defendant] weaves an originally-crafted humorous story theme throughout the episode using multi-media content—text, graphics and animation, sound effects, voice overs, and video clips—to enhance and develop the story." *Id.* at 1099. In contrast, the Infringing Video featured no original text, graphics, animation, sound effects, voice overs, or video clips apart from Plaintiff's Work. As admitted by the Defendants, the Infringing Video merely used "facial expressions, sarcastic remarks, derisive commentary, sexual innuendo, and social commentary." (Def. Brief at p. 13.) In other words, the Defendants talked while the Work played in the background. Certainly, if the Defendants had something meaningful to say about the original Work, then even mere talk could be viewed as transformative, but as discussed both broadly and in clip-to-clip detail above, the majority of the Defendants' talk amounted to banally recounting what was being shown in clips from the Plaintiff's Work, punctuated with the occasional vapid exclamation along the lines of, "Oh, I like that part," or, "That part was funny."

Perhaps most importantly, *Equals Three* did not rule that the defendant's videos constituted a fair use, it merely ruled that the plaintiff did not carry its burden to achieve summary judgment on the issue of fair use. If the Court follows that case's story further, which it may do as a matter of judicial notice, it will note that the issue of transformative use ultimately proceeded to jury trial and that the case settled shortly before verdict. In fact, it settled immediately before "[t]he jury came back with a

unanimous 'no' on each count, no fair use."[4]

Ultimately, if the Defendants insist on pointing the Court to Ninth Circuit law, then the more relevant, and certainly the more controlling, case would be the Ninth Circuit decision in *Elvis Presley Enters.* where entertaining clips of a creative performance were used in a documentary. As discussed above, *Elvis Presley Enters.* held that the use of Elvis Pressley's clips was not transformative, even in a biographical documentary that commented on Pressley's life, because the clips were used in order to profit from the "inherent entertainment value of Elvis' appearances." 349 F.3d at 629. Virtually identical to the case at bar:

> [T]he documentary often uses shots of Elvis appearing on television while a narrator or interviewee talks over the film. These clips range from only a few seconds in length to portions running as long as 30 seconds. In some instances, the clips are the subject of audio commentary, while in other instances they would more properly be characterized as video "filler" because the commentator is discussing a subject different from or more general than Elvis' performance on a particular television show.

349 F.3d at 624. Here, excerpts of Plaintiff's Work which, together, constituted almost the entirety of the Work were almost entirely used for their entertainment value and, as discussed above, to move Defendants' Infringing Video along by functioning as triggers, fillers, and breaks for the Defendants' dialogue. Much of the Defendants' dialogue had nothing to do with the action in the excerpts, or only tenuously addressed the action in a general manner while striking off on unrelated tangents or, more often than not, banally narrated the action in the excerpts with no substantive commentary whatsoever.

Equally on point with the facts at issue are several New York cases where the defendants copied in excess of what was reasonably necessary for their commentary. In *Castle Rock Entm't*, the Court refused to find a transformative use when the defendant created a trivia questions and answers book utilizing 84 of the then published 86 "Seinfeld" television episodes where the defendants only minimally altered the original show's expression. 150 F.3d at 143. In *Twin Peaks Prods. v. Publ'ns*

---

[4] Ashley Cullens, *YouTube Trial: Juror Says YouTuber's Incorporation of Unlicensed Clips Is Not Fair Use*, The Hollywood Reporter (Mar. 3, 2016), http://www.hollywoodreporter.com/thr-esq/youtube-trial-juror-says-youtubers-872610.

*Int'l, Ltd.*, the Court refused to find a transformative use in the defendant's book commentary on the popular "Twin Peaks" television show, which, in written form, summarized the plot of every one of that show's episodes. 996 F.2d 1366, 1376 (2d Cir. 1993). The *Twin Peaks* Court went so far as to discuss the evolution of the abridgement doctrine, concluding that "[t]he Act defines a 'derivative work' to include an abridgement." *Id.* Certainly, to the extent that the Infringing Video depicted the entire substantive plot of the Work such that one would no longer need to see the Work to know what it was about, the Infringing Work would, at least in part, constitute an unlicensed abridgement of the Work. Finally, *Warner Bros. Entm't* cites both of the above cases, as well as *Elvis Presley Enters.*, in finding that a lexicon on the Harry Potter universe "lacks restraint in using Rowling's original expression for its inherent entertainment and aesthetic value." 575 F.Supp.2d at 545.

To the extent that Defendants claim their Infringing Work functions as a commentary or criticism of the Work, one could not help but conclude that their use of nearly the entirety of the Work, excerpted in sequential order, and in most instances commented upon in, at best, passing, at worst, irrelevant manner, is wholly void of restraint in using the Work for its inherent entertainment and aesthetic value.

### 2. Nature of the Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586; *see also Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works"); *Twin Peaks*, 996 F.2d at 1376 (second factor "favors . . . creative and fictional work"). Although this factor may be of less importance when assessed in the context of certain transformative uses, *see, e.g., Campbell*, 510 U.S. at 586 (creative nature of original "Pretty Woman" song "not much help" to fair use analysis "since parodies almost invariably copy . . . expressive works"), the fictional nature of the copyrighted work remains

significant in the instant case where, as discussed above, the secondary use is at best minimally transformative. Thus, the second statutory factor favors the Plaintiff. *Castle Rock Entm't*, 150 F.3d at 144 (holding the second factor in favor of plaintiff where the secondary use was minimally transformative).

### 3.   The Amount and Substantiality of the Portion Used

In *Campbell*, a decision post-dating *Twin Peaks*, the Supreme Court clarified that the third factor—the amount and substantiality of the portion of the copyrighted work used—must be examined in context. The inquiry must focus upon whether "the extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." 510 U.S. at 586-87. "By focussing [sic] on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 926 (2d Cir. 1994).

In this case the Defendants admit to having used 3:18 minutes of a 5:24 minute video. Quite apart from the fact that this mathematically accounts for over 60% of the Work, it happens to account for 100% of the substantive portions of the Work, excerpted in sequential order such that anyone viewing the Infringing Work would no longer need to watch the Work in order to know its plot, story, or even the entirety of its substantive dialogue. The question before this Court is whether such quantity used was reasonable in relation to the purpose of the Defendants' copying. The Defendants claim that their purpose was for commentary and criticism, but as discussed in subpart 1 above, the Defendants' legitimate commentary and criticism could have been made using only a fraction of what they had used. Following the first two or three excerpts of the Work, the Defendants said nothing of the subsequent excerpts that could not have been said of the first. It is transparent that the Defendants used the majority of the Work's excerpts as filler for their video, to move the "action" of their own dialogue

forward and to serve as a springboard for their own inside jokes and non-transformative humor.

Plaintiff notes again that Defendant's reliance on *Equals Three*, as discussed in detail above, is unavailing. The character of the original works at issue, as well as the purpose of the secondary use, are entirely different as between that case and the case at bar. Accordingly, the third statutory factor favors Plaintiff.

### 4.    Effect of Use on Market for Plaintiff's Work

At this point, the Plaintiff respectfully urges the Court to engage in an intellectual comparative experiment: Watch the Infringing Video then see if the Court can bring itself to immediately watch the entirety of the original Work. Imagine the average YouTube viewer who, due to the relative popularity of the Defendants' channels (over 2.8 million subscribers), stumbles upon the Infringing Video first. It is highly unlikely that such user, whose job is not to litigate or judge a case, is likely to sit through a five minute video that she has already seen within a longer fifteen minute video.

The Supreme Court has recently retreated from its earlier cases suggesting that the fourth statutory factor is the most important element of fair use, *see Harper & Row*, 471 U.S. at 566, recognizing instead that "all [factors] are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578; *see Texaco*, 60 F.3d at 926 (applying *Campbell* approach). Under this factor, courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation marks and citation omitted). The fourth factor must also "take account . . . of harm to the market for derivative works," *id*. (emphasis added), defined as those markets "that creators of original works would in general develop or license others to develop," *id*. at 592. In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work. *Id*. at 593. The more

transformative the secondary use, the less likelihood that the secondary use substitutes for the original. *Id.* at 591.

As discussed above, the Infringing Work is not transformative, nor does it function as legitimate commentary or criticism to the extent that it (i) mainly uses excerpts of the Work for their inherent entertainment value; and (ii) attempts to supplant the Work's entertainment value by adding additional humor in the form of inside jokes and irrelevant rants. The Infringing Work functions as a derivative work, not a commentary. In fact, if Plaintiff published outtakes showing the behind-the-scenes filming of his Work, the humor in such outtakes—such as the actors having a chuckle about their scenes or their dialogue—would serve the exact same function as the Infringing Work. As the author of a humorous creative video, it is the Plaintiff's exclusive right to supplant his video with additional humor. The Infringing Work certainly harms the market for any such derivative works.

Defendants' reliance on *Brownmark Films, LLC v. Comedy Partners* is inapposite because in *Brownmark* "[t]he [defendant's video] is clearly a parody and has not supplanted the original [video]." 682 F.3d 687, 693 (7th Cir. 2012). *Brownmark's* reference to "Internet money" is made solely to point out that viewers who watch a parody on television are not less likely to watch the original video on the Internet. In this case, the Infringing Video is not a parody or even transformative of the Work, it seeks to supplant the Work as humorous entertainment, and it is therefore perfectly reasonable to assume that a YouTube user who has seen the Infringing Video on YouTube would be less likely to bother with the original on YouTube.

**B.    Defendants Infringed on Plaintiff's Copyright**

The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101-803, grants copyright owners a bundle of exclusive rights, including the rights to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." Id. § 106. "Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *see Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340,

361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991). There are two main components of this prima facie case of infringement: "a plaintiff must first show that his work was actually copied . . . . [and] then must show that the copying amounts to an improper or unlawful appropriation." *Laureyssens v. Idea Group, Inc*., 964 F.2d 131, 139-40 (2d Cir. 1992) (quotation marks and citations omitted).

In this case, Defendants do not dispute that Plaintiff owns the exclusive copyright in and to the Work. With respect to the pleadings, Plaintiff has pled his exclusive ownership in the copyright (Second Amended Complaint ¶ 9 ("**SAC**")), Defendants did not deny such ownership in their answer (Answer ¶ 9, denying having sufficient knowledge), the Court may take judicial notice of Plaintiff's copyright registration (Reg. No. Pau 3-770-968) which is incorporated by reference in the SAC and serves as *prima facie* evidence of copyright ownership. 17 U.S.C. § 410. Finally, the Defendants' fair use defense would serve no purpose if Defendants did not at least implicitly admit to Plaintiff's copyright ownership. Nor do Defendants deny that the Infringing Video used 3:18 minutes of the 5:24 minute Work.

Accordingly, if the Court finds against Defendants' fair use defense, then the Court must find in favor of Plaintiff's copyright infringement claim.

## C.  Plaintiff's Second Claim For Relief (DMCA Misrepresentation) Pleads A Valid Cause Of Action

Defendants correctly state that 17 U.S.C. § 512(f) prohibits misrepresentation: (1) "that the material or activity is infringing"; or (2) "that material or activity was removed or disabled by mistake or misidentification." 17 U.S.C. § 512(f)(1-2). Plaintiff's second claim for DMCA Misrepresentation arises out of the fact that, after causing YouTube to remove the Infringing Video, the Defendants filed a counter-notification with YouTube under penalty of perjury (*see* 17 U.S.C. § 512(g)(3)(C)) that their Infringing Video was removed by mistake, explaining that the video was "improperly removed because it was, among other reasons, a fair use and 'noncommercial.'" (Second Amended Complaint ¶ 33.)

Defendants' argument, that the language of 512(f) only applies to copyright holders issuing takedown notifications makes no sense. Why would 512(g)(3)(C) then require counter notices to be made under penalty of perjury? In any case, the language of 512(f) clearly applies to "**[a]ny person** who knowingly materially misrepresents under this section." 17 U.S.C. § 512(f) (emphasis added). Likewise, why would 512(f)(2) apply, as Defendants argue, to copyright holders who issue takedown notifications when 512(f)(2) specifically speaks to "material or activity" that was "removed or disabled by mistake"? There exists no cognizable scenario where a copyright holder issuing a takedown notification would have his own content removed or disabled by mistake. Indeed, the policy behind 512(f)(2) to find secondary users in violation of misrepresentation when they send a false counter notice is clear in the fact that 512(g)(2)(C) requires the content host, after receiving a counter notice, to replace the removed material *unless* it receives additional notice that the copyright holder has filed an action against the infringer. *See* 17 U.S.C. § 512(g)(2)(C). Thus, to the extent that the Defendants' false counter notice left Plaintiff with no choice but to file a federal action, clearly the policy behind 512(f) is to impose damages against Defendants for forcing the Plaintiff's hand with their misrepresentation should Plaintiff prevail on his copyright claim.

Accordingly, where Defendants have infringed upon Plaintiff's copyright, they have misrepresented their Infringing Video to YouTube as a fair use and noncommercial, and thus Defendants are in violation of 512(f).

### D.    Plaintiff's Third Claim For Defamation States A Cause Of Action

"Defamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Stepanov v. Dow Jones & Co., Inc.*, 120 AD3d 28, 34 (1st Dept 2014). "To create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the

statement irrespective of special harm or the existence of special harm caused by the publication." Restatement [Second] of Torts § 558.

Plaintiff has clearly alleged that in the Defamatory Video, the Defendants stated that after publishing the Infringing Video "several months passed and nothing happen[ed], and then we get an email from [Plaintiff's] lawyer" demanding removal of the Infringing Video and fees. (SAC ¶ 41.) This statement was false because, between the publication of the Infringing Video and Plaintiff hiring his own counsel, he had personally reached out to the Defendants, with no request for consideration, to simply remove the Infringing Video; and Defendants lashed back that he can speak to their attorney about the issue if he wants to discuss. (SAC ¶ 43.) The Defamatory Video is incorporated by reference to this motion, and the email exchange between the parties was annexed to the SAC at Exhibit 3 and is, therefore, also incorporated by reference hereto. The Defendants' false statement was published in order to falsely cast Plaintiff as greedy and litigious (SAC ¶ 50) and was republished by numerous major publications specifically casting the Plaintiff in such manner (SAC ¶ 51).

Defendants now argue that Plaintiff's claim for defamation should fail because the Defamatory Video, apart from its one admittedly false statement, was true. Plaintiff is not aware of any defense which allows a defendant to publish a false statement tarnishing a person's reputation so long as all the other things that the defendant says in that publication, whether or not they are about that person, are true. Nor do any of the Defendants' cited caselaw support such proposition. All of the Defendants' cited cases deal with interpreting statements that may or may not have implied a falsity about the plaintiff. *See e.g.*, *Franklin v. Daily Holdings, Inc.,* 135 A.D.3d 87, 93-94 (1st Dep't 2015) (analyzing whether quoting a plaintiff's true statement from a Twitter account within the context of an unrelated newspaper article could imply a falsity from the true statement); *Guccione v. Hustler Magazine, Inc*., 800 F.2d 298, 301 (2d Cir. 1986) (analyzing whether quoting plaintiff's past true statement printed in the present tense implied that he was committing adultery at the very time the statement was printed); *Biro v. Conde Nast*, 883 F.Supp.2d 441, 458-459 (S.D.N.Y. 2012) (holding that calling a new art

authentication method "radical" rather than "emerging" makes no substantial difference). At any rate, the standard to assert a substantial truth defense requires the Defendants to show that "the gist or substance of the **challenged statements** be true." *Printers II, Inc. v. Professionals Publishing, Inc*., 784 F.2d 141, 146 (2d Cir. 1986) (emphasis added).

In this case, while the Defendants are seeking to cast the entire Defamatory Video as one big statement, Plaintiff is in fact challenging only one statement made therein, which statement, as Plaintiff has alleged, damaged Plaintiff's reputation and was restated by numerous major media outlets that used the implication that Plaintiff was litigious and greedy as the "crux" of the story reporting this matter. Plaintiff has alleged that this damaged his reputation, and Plaintiff is prepared to prove his damages. Defendants' argument, that it is implausible that an accurate account of the events leading up to this lawsuit would have resulted in the audience receiving a more positive impression, is a matter for evidentiary discovery, not for a motion on the pleadings. Moreover, it makes no sense that the law would countenance Defendants making a false statement, even one, just so long as the rest of their video accurately reported subsequent events.

The Defamatory Video may have accurately reported the substance of Plaintiff's Complaint, but it falsely reported the events leading up to the filing of that Complaint but for which falsehood, the Plaintiff has adequately alleged, he would not have suffered reputational injury. Plaintiff must now be allowed to proceed to prove the extent of his injury.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court denies the Defendants' motion for judgment on the pleadings and grants Plaintiff's cross-motion for the same.

Dated:  New York, New York
        December 30, 2016

THOMPSON BUKHER LLP



By: _____
    Tim Bukher (TB1984)
    Michael Feldberg (MF0220)
75 Broad Street, Suite 2120
New York, New York 10004
Telephone: (212) 920-6050
Facsimile: (646) 349-2366

*Attorneys for the Plaintiff*