**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATT HOSSEINZADEH,

*Plaintiff,*

– against –

ETHAN KLEIN and HILA KLEIN,

*Defendant*s.

**Civ. Action No**.: 16-cv-3081 (KBF)
**ECF Case**

# PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGEMENT

THOMPSON BUKHER LLP
75 Broad Street, Suite 2120
New York, New York 10004
(212) 920-6050

*Attorneys for the Plaintiff*

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS .................................................................................................. 2

LEGAL STANDARD...........................................................................................................8

ARGUMENT .......................................................................................................................8

      A.     The Infringing Video Does Not Constitute a Fair Use ........................................8

            1.     Purpose and Character of the Use: The Infringing Work is not transformative. ..........................................................................................9

            2.     Nature of the Copyrighted Work ...............................................................21

            3.     The Amount and Substantiality of the Portion Used ................................22

            4.     Effect of Use on Market for Plaintiff's Work...........................................23

      B.     Defendants Infringed on Plaintiff's Copyright ...................................................24

      C.     Defendants' Infringement was Willful ................................................................25

CONCLUSION...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

Cases

*Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 926 (2d Cir. 1994) ....................................22, 23

*Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992) ...........................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006)..........................10

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) ..................................................................8, 9, 11

*Bryant v. Media Right Prods., Inc*., 603 F.3d 135, 143 (2d Cir. 2010) ................................................25

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 575 (1994) ...............................8, 9, 10, 12, 21, 23

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc*., 150 F.3d 132, 141 (2d Cir. 1998) . 8, 9, 10, 11, 21

*Davis v. The Gap, Inc*., 246 F.3d 152, 174 (2d Cir. 2001)...................................................................11

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003)..............................10

*Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct.
1282 (1991) .......................................................................................................................................24

*Folsom v. Marsh*, 9 F. Cas. 349 (CDD Mass. 1841)..........................................................................12

*Isl. Software & Computer Serv. v. Microsoft Corp*., 413 F.3d 257, 264 (2d Cir. 2005).....................25

*Laureyssens v. Idea Group, Inc*., 964 F.2d 131, 139-40 (2d Cir. 1992) ...............................................24

*Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) ...........................................................................24

*Ringgold v. Black Entm't Television, Inc*., 126 F.3d 70, 79 (2d Cir. 1997) .........................................11

*Stewart v. Abend*, 495 U.S. 207, 237 (1990)......................................................................................21

*TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016) ..............................................22

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008).............10, 12, 21

Statutes

17 U.S.C. § 107 ................................................................................................................9, 21

17 U.S.C. § 504(c) ..................................................................................................................25

17 U.S.C. § 504(c)(2) .............................................................................................................25

17 U.S.C. §§ 101-803 .............................................................................................................24

Fed. R. Civ. P. 56(a) ................................................................................................................8

U.S. Const. art. I, § 8, cl. 8 ......................................................................................................8

Other Authorities

Barton Beebe, <u>An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005</u>, 156 Pa. L. Rev. 549, 616 (2008) ....................................................................................................................23

Plaintiff Matt Hosseinzadeh ("**Plaintiff**") submits this Memorandum of Law in Support of its Motion for Partial Summary Judgement against defendants Ethan Klein ("**Mr. Klein**") and Hila Klein ("**Ms. Klein**") (collectively the "**Defendants**") seeking to (i) dismiss the Defendants' affirmative defense of fair use; (ii) holding Defendants liable for copyright infringement; and (iii) holding that the Defendants' copyright infringement was willful. The facts underlying this motion are fully set forth in Plaintiff's Rule 56.1 Statement of Undisputed Facts ("**St**.").

## PRELIMINARY STATEMENT

The heart of this motion rests on the fact that the Defendants used virtually the entirety of Plaintiff's original creative work (the "**Work**")—and the actual entirety of its substance, cutting merely portions of non-dialogue sequences. As such, the chief question raised by the Defendants' fair use defense is whether their video (the "**Infringing Video**") in fact used only so much of the original as absolutely necessary to express its "point" or whether the same point could have been made by using such smaller portions of the Work so as not to supplant the original.

This Court has already had the opportunity to review the parties' legal arguments on their previously filed cross-motions for judgment on the pleadings. While it is Plaintiff's position that the Infringing Video cannot constitute a fair use as a matter of law, we now respectfully submit evidence—mainly in the form of Defendants' express admissions—to help color Plaintiff's legal position. At deposition, Defendants admit that (i) they are not and have never viewed themselves as critics; (ii) their YouTube channels serve and have always served the primary purpose of comedic entertainment; (iii) they had a prior understanding of fair use, including the understanding that they should only use so much of an original work as necessary to make a point of commentary, and they chose to ignore this with respect to Plaintiff's Work; and (iv) they used virtually all of the Work to make the same exact point of purported "commentary" over and over again.

The Defendants contend that they sought to recast the Work as a piece of "pseudo pornographic misogyny." Plaintiff respectfully directs the Court's attention to Mr. Klein's deposition transcripts

(cited herein) which make clear in the way that Mr. Klein recites "pseudo pornographic misogyny" as a sort of mantra, regardless of the Infringing Video segment presented to him, that the Defendants are merely engaging in post-hoc revisionism to justify their infringement. But even if we are to accept, for the sake of argument, that this "recasting" of the Work was truly the Defendants' intent, it remains inarguable that Defendants could have used a substantially smaller portion of the Work to make their point.

It is clearly evident from the Infringing Video itself that nearly all of the Defendants' use of the Work served as a jumping board for their own comedy routine rather than as a piece to "critique." Indeed, Defendants' jokes are far more pornographic, offensive, and disturbing than any interpretation of the Work, and their additions—which serve to supplant rather than comment upon the Work's intended humor—are no more transformative than a laugh track added to a television sitcom that had not bothered to include one. Such an addition constitutes nothing more than an unlicensed derivative work.

Finally, it is important to underscore that, despite their prior rhetoric and egregious hyperbole with respect to freedom of speech, the Defendants' defense of fair use asks this Court to change the state of copyright law to such an extreme that YouTube would become a forum for people to copy and display entire feature films so long as they include segments of themselves watching those films and making tenuously related jokes to amuse their audience (a sort of unlicensed Mystery Science Theater format). There is no law to support this. And this is not hyperbole. This is exactly what Defendants have done with Plaintiff's Work and would now have the Court countenance.

## STATEMENT OF FACTS

The following material facts are uncontroverted:

## Defendants Copied and Publicly Displayed Plaintiff's Copyrighted Work

Plaintiff is a recognized filmmaker, having a cult following, with original film productions on the popular YouTube.com ("YouTube") channel, "MattHossZone," with some productions having

view counts exceeding 10 million views. (St. 1.). Defendants create and post video content to their YouTube channels having the names "Ethan and Hila" and "H3H3 Productions" respectively. (St. 2.) Plaintiff is the sole owner of the registered copyright in and to the creative Work having an effective date of registration of June 19, 2015. (St. 3.) On February 15, 2016, Defendants posted the Infringing Video to the Ethan and Hila channel which video had copied and displayed segments comprising 3:18 minutes of Plaintiff's 5.24 minute Work. (St. 7.) The Infringing Video was created and publicly displayed without license from Plaintiff. (St. 8.)

Initially, on April 2, 2016, Plaintiff emailed the Defendants to request that they immediately remove the Infringing Video and cease future infringement of the Work. (St. 9.) Mr. Klein, on behalf of the Defendants, responded via email, refusing to cease infringement, claiming fair use exemption, directing Plaintiff to contract their attorney, and daring Plaintiff to file a takedown request with YouTube pursuant to the DMCA, stating that the Defendants would dispute such takedown notice and that the "[Infringing Video] will be reinstated within two weeks" because the Defendants have "dealt with this many times," and such allegations of infringement were a "matter of routine to [them]." (St. 10.) On April 23, 2016, Plaintiff submitted a takedown request of the Infringing Video to YouTube pursuant to § 512(c)(3) of the DMCA. (St. 11.) The Defendants submitted to YouTube a counter-notification pursuant to § 512(g)(3), affirming under penalty of perjury that the Infringing Video was improperly removed because it was, among other reasons, a fair use and "noncommercial." (St. 12.) As such, Plaintiff was forced to file this action. (St. 13.)

**Defendants Used the Work to Serve the Same Purpose as the Original Work**

The Infringing Video copied 3:18 minutes of the 5:24 minute Work and displaying the copied segments in the same sequential order as they appeared in the original Work. (St. 15 – 32.) Defendants claim that their Infringing Video is a work of commentary and criticism, however Mr. Klein, who makes the final editorial decisions for all Defendants' videos, has no formal education in critiquing film. (St. 33-35.)

3

In addition to the lack of Mr. Klein's formal education in film criticism, the Defendants admit that their channels were initially created to feature works of "comedy," specifically, "videos intended to make [their] audience laugh." (St. 36.) The Defendants would use the videos of third-parties in order to serve the purpose of comedy. (St. 37.) It has always been and remains the purpose of the Defendants' YouTube channels to showcase comedy videos. (St. 38-39.) Significantly, Mr. Klein does not consider himself to be a literary or film critic; he considers himself to be a comedian and comic personality. (St. 40-41.) Equally significant is the fact that the original Work was meant to serve the entertaining and comedic purpose of satirizing modern day courting rituals. (St. 6.)

**Defendants Used Extensive Portions of the Work to Repeatedly Make the Same Comments**

Defendants claim that the Infringing Video is a work of commentary and criticism. (St. 33.) They summarize the thesis of their commentary is to portray the Work as a piece of "pseudo pornograph[ic] misogyny." (St. 43.) Defendants represent that "pretty much every scene" in the Work "has this cring-y pseudo pornographic message" and admit that "every excerpt that [they] used pretty much stands for the same idea" with respect to misogyny. (St. 44-45.)

The Infringing Video can be dissected into fifteen segments wherein each segment consists of an excerpt from Plaintiff's Work followed by video of Defendants discussing that excerpt. (St. 17-32.) At his deposition, Mr. Klein explained the commentary that Defendants meant to convey with respect to each excerpt of the Work that they used. (St. 46-66.) According to the Defendants: (i) the first excerpt was used to setup the Infringing Video as a historical reference point to what they refer to as "cringe-tube;" (ii) the second excerpt was meant to liken the Work to a third-party "PrankInvasion" series of videos "because it taps into the same pornographic market […] where [Plaintiff's] suave character come[s] swoop in and get that – get that ass, as they say;" (iii) the third excerpt was meant to convey the **same** idea as conveyed by the second excerpt; (iv) the fourth excerpt was meant to convey the **same** ideas as the first excerpt and that the Work is "misogynistic pseudo pornography;" (v) the fifth excerpt was meant to convey the **same** point that the Work is "really just misogynistic pseudo

pornography;" (vi) the sixth excerpt was meant to convey the **same** point as the previous excerpts; (vii) the seventh excerpt, which consisted of an action sequence from the Work, was meant to convey the **single** point that Defendants appreciated the entertainment value of that excerpt; (viii) the eighth excerpt, which continued the action sequence from the Work, was meant to convey that the action sequence was silly or absurd; (ix) the ninth excerpt, which continued the action sequence from the previous excerpt, was **again** meant to convey that the action sequence was silly or absurd and meant to build **again** "upon this whole thesis of the misogynistic pseudo pornography;" (x) the tenth excerpt, which continued the action sequence from the previous excerpt, was **again** meant to point out that the action sequence was silly or absurd; (xi) the eleventh excerpt, which continued the action sequence from the previous excerpt, was meant to convey that Ms. Klein thought the action sequence was too long—Defendants represent that this was conveyed by the *tone* of Ms. Klein's voice; (xii) the twelfth excerpt, which continued the action sequence from the previous excerpt, was meant to convey, **again**, the "misogynistic pornography[y]" of the Work—despite Defendants not actually saying anything about "misogynistic pornograph[y]" in that segment; (xiii) the thirteenth excerpt, which continued the action from the previous excerpt, was **again** meant to convey the "pseudo pornography" and "misogynistic" nature of the Work—Defendants admit that the point they meant to convey with respect to this excerpt had **already been made by Defendants several times** in the Infringing Video but that this specific excerpt adds more action from the Work to that commentary; (xiv) the fourteenth excerpt, which concluded the action from the previous excerpt, was **again** meant to convey "misogynistic pseudo pornography;" and (xv) the fifteenth excerpt was used by the Defendants to convey that the **entire** Work was a "romp and riot." (St. 46-66; see also Exs. 7-21.)

**Defendants Understood the Principles of Fair Use and Ignored Them**

Prior to this lawsuit, based on their own research, Defendants had an understanding that "transformative use" was "in its essence, to change the meaning, the expression of the video that's being criticized." (St. 89.) Whenever Defendants uploaded a video, they had a policy of analyzing its

content and deciding, based on their own research, that it was a fair use of whatever third-party content they used within. (St. 90.) While editing their videos, Defendants were "mindful to basically cut out as much of the [third-party video content] as possible, and to make sure that [Defendants] were commenting or critiquing every – every segment that came before. So it was part one, reducing the amount of the [third-party video content]. And part two, making sure that there was transformative use of it." (St. 91.) Defendants represent that in the past they were careful to only use so much of the third-party video content as was necessary for their commentary. (St. 92.) Defendants' previous editorial care with respect to the economy of original third-party content used and the editorial thoughtfulness of adding stylistic alterations as a way to highlight the substance of their commentary is readily apparent in examples of their other videos such as "Who Are The Fine Brothers" video, their "Marshal Pope" video, and their "Reaction to PrankInvasion Videos." (St. 93.)

Defendants compare Plaintiff's Work to an unrelated third-party's "PrankInvasion" video, stating in deposition that both works are "carving out kind of a similar space on YouTube, of this misogynistic pseudo pornography." (St. 68.) Whereas PrankInvasion apparently features candid shots "trying to look like it's real life," Defendants admit that it is "pretty clear" to them that the Plaintiff's Work is scripted and not pretending at realism. (St. 69.) Nevertheless, in their video excerpting segments of the PrankInvasion video, Defendants treated the PrankInvasion video to significant editorial alterations in the form of modulating the host's voice at times, zooming on people to underscore a point, inserting other creative content to highlight certain points, and even altering the colors of the original video. (St. 70-71.) Defendants' understanding of editorial stylization as a tool for transformation is further exemplified by the significant stylistic treatment of third-party works in some of their other videos. (St. 73-74, 93.) Indeed, Defendants expressly admit that they understood that stylistic alterations "contributed to the fair use aspect of their PrankInvasion reaction video." (St. 75.)

Defendants did not treat Plaintiff's Work to any such editorial stylistic alterations in furtherance of their alleged commentary. (St. 72.)

**Defendants Deemed Plaintiff an Insignificant Threat**

The number of subscribers that a YouTube channel has is an indicator of the success and influence of the channel's owners. (St. 94-99.) Defendants acknowledge the importance of subscribers to their own YouTube channels, checking their numbers on a regular basis as part of their "job." (St. 101.) Between their two channels the Defendants have in excess of 4 million subscribers. (St. 100.)

At one point in the past, the Defendants were issued a DMCA take-down of one of their other videos by third-party content network FullScreen, which represents the PrankInvasion videos. (St. 102-03.) The Defendants felt that their video which was taken down was a fair use of the PrankInvasion videos, and they posted a video titled "Censorship On YouTube" to their channel to complain about the takedown. (St. 104-05.) Defendants admit that their "Censorship On YouTube" video was responsible for creating a YouTube community controversy which ultimately resulted in FullScreen's reinstating the Defendants' original video and FullScreen's CEO personally apologizing to the Defendants. (St. 106-07.)

When Plaintiff initially reached out to Defendants to ask that they remove the Infringing Video, they dismissed him, dared him to move against them, and noted that such was "a matter of routine" for them. (St. 10, 108.) After Plaintiff commenced this action, Defendants published their "We Are Being Sued" video wherein they denigrated the Plaintiff, resulting in a major YouTube controversy that even generated mainstream news coverage—and further denigration of Plaintiff—in the mainstream media. (St. 109-10.) Significantly, the PrankInvasion YouTube channel, which capitulated to the Defendants, has over 2.5 million subscribers; Plaintiff's channel has 170,000. (St. 111-12.)

**The Market for Plaintiff's Work and Plaintiff's Enforcement of his Copyrights**

Plaintiff earns revenue from his Work in connection with advertising that YouTube airs with his Work. (St. 82.) Additionally, as a filmmaker and composer of the original music in the soundtrack to his Work, Plaintiff stands to make licensing revenues from third-parties who would wish to license his Work or elements of his Work for their own projects. (St. 86.) In fact, Plaintiff had received several

third-party requests to either license advertising space to his work (outside of YouTube advertising) and to license the use of the original music in his work. (St. 87.) Indeed, Defendants have had similar offers for their own work and are well-aware of the licensing opportunities available to original YouTube works. (St. 88.) Accordingly, Plaintiff is diligent about enforcing his copyrights and has written numerous, successful cease and desist requests and DMCA take-down requests in the past. (St. 80 – 81.)

## LEGAL STANDARD

Summary judgement should be granted if "there is no genuine dispute as to any material fact and the movement is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the facts underlying the affirmative defense of fair use and copyright infringement are not in dispute, summary judgement is appropriate. *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)).

## ARGUMENT

### A.  The Infringing Video Does Not Constitute a Fair Use

The fair use doctrine is designed to "fulfill copyright's very purpose, 'To promote the Progress of Science and useful Arts,'" *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 575 (1994) (quoting U.S. Const. art. I, § 8, cl. 8), by balancing the simultaneous needs "to protect copyrighted material and to allow others to build upon it." *Id*. As the Second Circuit has observed, there is an

> inevitable tension between the property rights [that copyright law] establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them-- or ourselves by reference to the works of others, which must be protected up to a point. The fair-use doctrine mediates between the two sets of interests, determining where each set of interests ceases to control.

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006). At stake in this case is the incentive for authors like the Plaintiff to expend personal resources on writing a script, hiring actors, leasing equipment, and ultimately creating original works of expression versus the freedom of others to create alleged works

8

of criticism which, by their nature, would require copying *some* parts of the original work in order to aid any legitimate criticism.

The common law doctrine of fair use is codified at Section 107 of the Copyright Act of 1976 as follows:

> The fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The evaluation of these factors is "an open-ended and context-sensitive inquiry," *Blanch*, 467 F.3d at 244; *accord Campbell*, 510 U.S. at 577 (stating that "the statute, like the doctrine it recognizes, calls for a case-by-case analysis"), and the examples listed in the statute (i.e., criticism, comment, news reporting, and teaching) are illustrative rather than limiting. *Campbell*, 510 U.S. at 577-78. The four statutory factors may not "be treated in isolation, one from another"; instead they all must "be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 578. "The ultimate test of fair use, therefore, is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" *Castle Rock Entm't, Inc.*, 150 F.3d at 141 (quoting *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992)).

### 1.   Purpose and Character of the Use: The Infringing Work is not transformative.

Most critical to the inquiry under the first fair-use factor is "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579; *see also Bill Graham Archives v. Dorling*

*Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006). Specifically, courts ask "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. The fair use doctrine seeks to protect a secondary work if it "adds value to the original-- if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings," because such a work contributes to the enrichment of society. *Castle Rock*, 150 F.3d at 141 (alteration in original).

### a. On the whole, the Infringing Work adds nothing distinct to the original.

New works are described as transformative "when the works use copyrighted materials for purposes distinct from the purpose of the original material." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (holding video clips of Elvis Presley incorporated into a supposed biography non-transformative because the biography was "at least in part" seeking to profit from the "inherent entertainment value of Elvis' appearances"); *accord Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008) (citing *Elvis* and finding against transformative use where defendant's Harry Potter "Lexicon often lacks restraint in using Rowling's original expression for its inherent entertainment and aesthetic value").

In this case, Defendants claim that the Infringing Work serves as a commentary on the original Work in an effort to gain more leniency in the review of their fair use defense. However, the mere fact that a secondary work seeks to comment, criticize, or, as in the case of *Campbell*, parody an underlying work does not automatically grant such work the status of fair use. "[P]arody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Campbell*, 510 U.S. at 581 ("petitioners' suggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair"). To be clear, the Infringing Video is in no way a parody.

10

Indeed, at deposition, Defendants admit that their YouTube channels only ever meant to serve the purpose of comedy and that Mr. Klein, who makes all of the editorial decisions with respect to the Defendants' work, has no education in film criticism, does not, at any rate, consider himself a literary or film critic, and in fact considers himself a comedian and comic personality—the Infringing Work, which does nothing more than supplant the original Work's comedic intent, perfectly illustrates its purely entertainment, rather than commentary, intent. Many of Defendants' jokes, as discussed below, had nothing to do with the Work. And those that do relate to the Work hardly, if at all, provide useful criticism to the viewer, but rather serve as a visual aid to Defendants' standard format of improvisational humor based on various topics and objects. To this extent, the Infringing Video constituted an unlicensed derivative work of the Work, using the original Work as a prop in its comedy act.

Defendants' Infringing Work may at times seem to comment on or criticize aspects of the Plaintiff's Work, but the central question under the first factor is whether such comment or criticism "adds value to the original – if [the Work] is used as a raw material, transformed in creation of new information, new aesthetics, new insights and understandings," *Blanch*, 467 F.3d at 251-252 (citing *Castle Rock Entm't, Inc.*, 150 F.3d at 132), or "whether the new work merely supersedes the objects of the original creation." *Id*. at 251 (citing *Davis v. The Gap, Inc*., 246 F.3d 152, 174 (2d Cir. 2001) (internal quotations omitted).

The Second Circuit has declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work. *See Twin Peaks Prods. v. Publ'ns, Int'l, Ltd*., 996 F.2d 1366, 1376 (2d Cir. 1993) (defendant's book **commentary** on the popular "Twin Peaks" television show summarized the plot of every one of the show's episodes) (emphasis added); *Castle Rock Entm't Inc.*, 150 F.3d at 142-43 (quiz book called the "Seinfeld Aptitude Test" not transformative when its purpose was "to repackage [the television show] Seinfeld to entertain Seinfeld viewers"); *Ringgold v. Black Entm't Television, Inc*., 126 F.3d 70, 79 (2d Cir. 1997) (copy of

plaintiff's painting used as decoration for a television program's set not transformative because it was used for "the same decorative purpose" as the original).

To be clear, Plaintiff does not argue that comedy and humor do not constitute criticism or comment under Section 107 or that the Court should engage in a subjective judgment of the value of the Infringing Work. Instead, Plaintiff respectfully submits that the Court should focus its attention on the first factor's central purpose of investigation: "in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation." *Campbell*, 510 U.S. at 579 (citing *Folsom v. Marsh*, 9 F. Cas. 349 (CDD Mass. 1841)); accord *Harper & Row, Publrs.*, 471 U.S. at 562 ("supplanting" the original).

In this case, as discussed below and as transcribed in Plaintiff's Statement of Undistputed Facts, Defendants' excerpts of the Work served as nothing more than filler for their comedy routine. At deposition, Mr. Klein's explanation as to what over ninety percent of the exerpts of the Work were meant to "critique" consisted of Mr. Klein repeating his mantra that the excerpt was meant to highlight the "psuedo pronograph[ic] misogyny" of Plaintiff's Work. If highlighting the Work's "pseudo pronographic misogyny" was truly the Defendants'intent, rather than a suspiciously well-rehearsed retroactive justification for their slavish copying, then surely the Defendants did not need to use over sixty percent of the Work, virtually one hundred percent of the substantive portions of the Work, and certainly the heart of the Work, to make this one point over and over again.

### b. The Infringing Work copied the Work far in excess of what was necessary.

"A finding of verbatim copying in excess of what is reasonably necessary diminishes a finding of transformative use." *Warner Bros. Entm't Inc*., 575 F.Supp.2d at 544 (citing *Campbell*, 510 U.S. at 587 (observing that "whether a substantial portion of the infringing work was copied verbatim from the copyrighted work . . . may reveal a dearth of transformative character under the first factor, or a greater likelihood of market harm under the fourth")).

As in Plaintiff's previously-filed cross-motion for judgement on the pleadings, we review

below transcripts of the Infringing Video highlighted to show Plaintiff's content and Defendants' content for illustrative purposes. In addition to an objective review of how Defendants used far more of the Work than was necessary for repeating the same points about the Work, or otherwise simply narrating the Work, we have also included below Defendants' own explanation, from Mr. Klein's deposition, as to what each point of commentary meant to convey. Tellingly, Plaintiff's prior analysis of the Infringing Video has been, for the most part, confirmed by Mr. Klein at his deposition:

> **0:00 - 1:15**: (Defendants introduce themselves and talk about Plaintiff as the king of "CringeTube.")

> **1:16 - 1:23**: Seven second excerpt of original Work title screen.

> **1:24 - 1:43**: *Ethan*: I like the fucking text is like a, does like a wave dance prolongs the shit out of that. You see that? Even now and it's done? *Hila*: Oh, yea. *Ethan*: Like this (waves hands). *Hila*: (laughs). *Ethan*: Can I get a little bit from you Hila? *Hila*: (mutters unintelligibly as she waves her arms). *Ethan*: Oh c'mon! Get your shit together, Hila.

Defendants claim that this section meant to introduce a historical reference point for "cringe-tube," (St. 46) but really Defendants simply took an opportunity to introduce their comedy prop—the Plaintiff's Work.

> **1:43 - 1:48**: Five second excerpt of Bold Guy meeting Athletic Girl while she is stretching.

> **1:49 - 2:07**: *Ethan*: Oh, my god. *Hila*: (mutters unintelligibly). *Ethan*: This is like Prank Invasion. *Hila*: Yea. *Ethan*: One point oh. That's just you know, doing, spreading my asshole on the street like you do. *Hila*: Just on the street. *Ethan*: This is like some real nature shit. This is like presenting yourself. *Hila*: Yea. *Ethan*: In the most classical sense.

Defendants state that they meant to liken the Work to a third-party "PrankInvasion" series of videos "because it taps into the same pornographic market […] where [Plaintiff's] suave character come[s] swoop in and get that – get that ass, as they say." (St. 47.) While this may form the beginning of a critical statement, Defendants go no further, and immediately digress into their usual impromptu, non-critical banter.

> **2:07 - 2:17**: Ten second excerpt of Bold Guy talking to Athletic Girl about her form.

13

She asks if he is a creep.

**2:18 - 3:31**: *Ethan*: I don't know lady, you're spreading open your asshole on the sidewalk, I'm not sure you're in a position to be calling people creeps. *Hila*: Yea... What I love about his videos is that he setup that situation. *Ethan*: Yea the blame really is on Matt. *Hila*: This is... this is his script. *Ethan*: Yea, you're right. *Hila*: So, if you look at it from his point of view, this is just a girl doing this stuff on the street. *Ethan*: You're right. I'm placing the blame entirely in the wrong place. It goes back to the famous saying, "We see the world not as it is but as we are." Okay, now a little more wisdom from uncle Ethan here, but basically grandpa Ethan here, but basically this is how Matt Hoss sees the world, it says more about him. Let's enter the mind of Matt Hoss. Matt, look at him, I love his face right now. Just gotta love Matt. *Hila*: (Unintelligible). *Ethan*: Yea gotta show these (unintelligible) off. C'mon. Guy walks around like this you know he's bold and... he's probably beautiful. *Hila*: It's sleeveless shirt with the hoodie. *Ethan*: The sleeveless with the hoodie is probably one of the classiest pieces of clothing you can own. It's like I do want to protect my head, but at the same time, you know it might be so cool I want to protect my head, but at the same time (raises sleeves) c'mon. My arms need to breathe. It's such a classy clothing. *Hila*: It's a really great combo.

The Defendants' commentary above arguably began as criticism of Plaintiff in that it reminds the viewer that it is indeed a scripted work. It then immediately shifts to a comical discussion that is based on Bold Guy's costume. This discussion, however, in no way required Defendants to show the 2:07 – 2:17 excerpt. The same things could have been said of the 1:43 – 1:48 excerpt that was already shown. Clearly, the Defendants showed the 2:07 – 2:17 segment to break up the monotony of their previous commentary and to move their video along rather than to serve as a legitimate basis for criticism. At deposition, Mr. Klein admits that this segment meant to convey the **same** idea as the previous segment.

**3:31 - 3:43**: Twelve second excerpt of Bold Guy exchange with Athletic Girl regarding her attention-seeking.

**3:44 - 5:02**: *Ethan*: You know when you watch a porn you endure this shit because you know it's going somewhere but here it's like there's no payoff. *Hila*: It's just the crappy... *Ethan*: It's the crappy pornage. *Hila*: Story. *Ethan*: It's like, what is the point of this? And the thing that always baffled me about Bold Guy, before we get too deep into this (shows YouTube view numbers), ho-ho, what! Nine million views? *Hila*: What! *Ethan*: But look at the, like, ratio, people are... *Hila*: When did he get so many... ten million views. *Ethan*: Well this is from 2013. This is CringeTube. This is from the CringeTube era like I said. Damn. But like I said, people liked it. Like, people genuinely were on board with Matt Hoss. And I'm not saying the guy deserves hate, I think he's doing his own thing and I respect that. But it's just, I find it interesting that

so many people saw the world as he does. *Hila*: Yea. *Ethan*: I guess that's what I mean. Uh. That's shocking. That shocks me. *Hila*: Ten million views? The subscribers are low. *Ethan*: Yea you think that, he would have, well that's from CringeTube. People before just, I mean, I don't know how many people got their dicks out and just probably moved on. *Hila*: Flowing with the cringe. *Ethan*: This was before Prank Evasion so this was like the first generation of JerkTube. Of jerky little ding-dong on YouTube.

Here, Defendants again compare the work to Prank Invasion, as well as referring to it as "cringe tube," two comparisons they have **already made**, which did not require additional footage of the Work to make a second time. At deposition, Mr. Klein admits as much. The Defendants' sole purpose for continuing to show additional excerpts of the original Work in their original sequential order could only have been for the intrinsic entertainment value of watching the Plaintiff's original Work for its own sake.

**5:02 - 5:18**: Sixteen second excerpt continued exchange between Athletic Girl and Bold Guy.

**5:19 - 5:42**: *Ethan*: I love how he always, he writes their lines always to set him up. *Hila*: Yea. *Ethan*: Zinger. *Hila*: Yea. *Ethan*: It's pretty funny. *Hila*: He always just... the female character is always so annoying. And he writes them like that. *Ethan*: Super offensive, super slutty, super bitchy, but then ultimately they give into his sexual prowess. *Hila*: Because how can you not? *Ethan*: How could you not? He's Matt Hoss, get a load of that face.

**5:43 - 5:54**: Eleven second excerpt of Bold Guy and Athletic Girl flirting.

**5:55 - 6:03**: *Ethan*: Oh, wow. Wow. *Hila*: What kind of (unintelligible) is that? *Ethan*: It's one that says porn is imminent. But it's not.

**6:04 - 6:06**: Two second excerpt of Bold Guy and Athletic Girl continuing to flirt.

**6:07 - 6:15**: *Ethan*: He wrote that in by the way. *Hila*: What are these situations? *Ethan*: Just remember that remember whenever I comp anything like that, he wrote that in. He wrote, "She said Strong shoulders." *Hila*: Yea.

**6:16 - 6:32**: Sixteen second excerpt of Bold Guy and Athletic Girl continuing to flirt.

**6:33 - 6:48**: *Ethan*: Holy fuck. *Hila*: Of course. *Ethan*: And it's just that easy, baby, get out there and get some girls yourselves guys. *Hila*: Sleeveless shirt with a hoodie. *Ethan*: That's the key. Bracelets are out. *Hila*: Yea. *Ethan*: Sleeveless hoodies in. *Hila*: In. *Ethan*: In, in, in, in.

At deposition Mr. Klein admits that this excerpt was meant to convey the **same** idea of

"misogynistic pseudo pornography" as the 1:43 – 2:07 segment. Clearly the Defendants' only purpose in continuing to show excerpts of the Work in sequential order was to entertain their viewers with the underlying Work's intrinsic entertainment value, paused, occasionally, so that Defendants could make a few jokes.

> **6:48 - 6:59**: Eleven second excerpt wherein Athletic Girl propositions Bold Guy to catch her and she will let him do whatever he wants to her.

> **7:00 - 7:27**: *Ethan*: Oh, is that a fucking promise? Because I can think of some foul shit. I always found that phrase funny too. It's like, what are you going to do to her? You going to have sex with her? And then what? Like what weird shit do you have in mind? Are you going to put a carrot up her ass? I mean where does this go? You going to shit in her mouth? Put a carrot by her you know what I mean? It's like, tsk, how far are we taking this?

At this point Mr. Klein ceased even to comment on the underlying Work and proceeded along his own tangent and wish-fulfillment. At deposition Mr. Klein admits that Defendants meant to convey the **same** point that the Work is "really just misogynistic pseudo pornography" as conveyed in the previous segment. (St. 52.) This additional content was superfluous and sought nothing more than to compound entertainment upon preexisting entertainment.

> **7:27 - 7:39**: Twelve second excerpt wherein Bold Guy accepts the challenge. Plaintiff's original music starts.

> **7:40 - 8:12**: *Ethan*: Yea, he thinks he's like a parkour guy. *Hila*: Oh yea. *Ethan*: He thinks he's like a parkour expert, he's got that whole, that whole level of greatness. Dude, Matt Hoss is... I want Matt Hoss to have a show. This shit is so fucking entertaining, like legit. He kind of fell off recently, but I want him on TV, I really do. This shit is so entertaining. *Hila*: It's funny. *Ethan*: Porn, titties, ass, and the x-factor of parkour. *Hila*: I completely forgot about him, he's so funny. *Ethan*: He's great. He's such a great character.

The Defendants noted their appreciation of the entertainment value of the Work's action sequence. At deposition Mr. Klein admits that this was the sole point meant to be conveyed. While this did not add anything particularly substantive in the sense of criticism, perhaps this could have served as some sort of valid criticism if, as we will see below, the Defendants did not run virtually the entirety of the rest of the video to make more-or-less the **same** point.

**8:12 - 8:20**: Eight second excerpt parkour action sequence while original music plays.

**8:21 - 8:36**: (original music continues to play over commentary, digitally fed into the Infringing Video rather than as background music on the Defendants' computer) *Hila*: He could have just taken the stairs. *Ethan*: I was going to say, is he required to do that? He could have just gone around. *Ethan*: The stairs were there. *Ethan*: Look, can you imagine the casting call for this? Looking for cute, petite, parkour girl to star in my parkour sex video.

**8:37 - 9:02**: Twenty-five second excerpt of continued parkour action with original music. *Ethan* (speaking over video): Get her Matt, she wants your dick, you can do anything you want to her. Just imagine putting that carrot up her ass dude. Visualize the carrot in her ass man. You gonna put, you gonna put some mayonnaise in her fucking mouth. Mayonnaise mouth fetish.

**9:03 - 9:12**: *Ethan*: God, he scaled that wall with so much grace. It's got me thinking about Matt, so much shoulder, you know what I'm saying, so much grace.

**9:12 - 9:19**: Seven second excerpt of continued parkour action with original music.

**9:19 - 10:00**: *Ethan*: What happens when she, when he catches her? Does he have to like tackle her? *Hila*: He does whatever he wants. *Ethan*: No, does he like take her out and then rape her? Is that what she's saying? *Hila*: Yea, whatever he wants. *Ethan*: Hope he's got mayonnaise and carrots with him. Cause that's what I want. That's what I've always wanted. Carrots in the ass, mayonnaise in the mouth. *Hila*: What's with the mayonnaise? *Ethan*: I don't know, she said whatever I want. Well why are you more confused about the mayonnaise but not the carrot in the ass? I don't know why you chose that one. *Hila*: Cause... *Ethan*: Well the carrot goes in the ass but the man, well maybe, I mean, I just like mayonnaise. *Hila*: You can just eat mayonnaise. *Ethan*: That's basically what I'm suggesting.

**10:00 - 10:09**: Nine second excerpt of continued parkour action with original music.

**10:09 - 10:11**: *Ethan*: There's a fuck... this, there's a sidewalk next to you.

**10:11 - 10:14**: Three second excerpt of continued parkour action with Ethan talking over it. *Ethan*: Why did he jump that wall?

**10:14 - 10:17**: *Ethan*: ...and stuff. You dang goubus.

**10:17 - 10:23**: Six second excerpt of continued parkour action with original music.

**10:23 - 10:39**: *Ethan*: So this was the action sequence. I guess. **This was the meat of the video** (emphasis added). *Hila*: It's pretty long. *Ethan*: It's action-packed. It's got it all. Sex, action, mayonnaise. *Hila*: Drama. *Ethan*: Carrots.

**10:39 - 10:47**: Eight second excerpt of continued parkour action with original music (shown for no apparent reason).

17

**10:47 - 11:02**: *Ethan*: That was sick. *Hila*: Nah. *Ethan*: That was some straight-up parkour. *Hila*: It's supposed to look effortless. *Ethan*: What, that didn't look effortless? That was fucking parkour dude.

**11:02 - 11:09**: Seven second excerpt of continued parkour with original music until Bold Guy catches girl.

**11:09 - 11:19**: *Ethan*: Woah. I'm gonna like this video. That was badass. *Hila*: Yea. *Ethan*: He's going to fuck the shit out of her now, man.

The entirety of the above excerpts and commentary consisted of nothing more than (i) the Defendants showing sequential excerpts of the ongoing action sequence; and (ii) Mr. Klein narrating what happened in those sequences. Technically, the Defendants could have just narrated the content of the Plaintiff's Work without showing any excerpts. Of course, such narration would certainly constitute a derivative work of the original Work by recasting it into a new medium. Likewise, it would be bizarre for the Defendants to now argue that they "transformed" the unlicensed derivative work created by their narration by infusing that narration with excerpts from the original Work.

We must also point out that (i) Defendants have, at this stage in their Infringing Video, slavishly copied and performed Plaintiff's original musical work without a single word of commentary on it; and (ii) the only content offered by the Defendants in the foregoing, outside of narrating the action sequences, was in the form of Mr. Klein's diatribe on carrots and mayonnaise which had nothing to do with the Plaintiff's Work. At deposition Mr. Klein claims that these excerpts were all meant to highlight the silliness of the Work's action and to "build upon this whole thesis of misogynistic pseudo pornography" which, at this point, has been the Defendants' "commentary" with respect to nearly all of the segments shown. Moreover, it bears noting that Mr. Klein's comments about rape and object-insertion served to supplant the Work with sexual innuendo far above and beyond what was insinuated in the original. Defendants continued:

**11:19 - 11:22**: Three second excerpt of Work. Athletic Girl unable to escape from Bold Guy who magically appears at every corner.

**11:22 - 11:41**: *Ethan*: You know what? I got a problem with this now because I was on-board, this was real video, and now they just kind of broke that realism and my dick

deflated. Cause I was rock hard. Cause I was thinking I could do this. But now I know it's fake. *Hila*: Yea. *Ethan*: Disappointing. *Hila*: That's a shame. *Ethan*: Disappointing.

**11:41 - 11:49**: Eight second excerpt of Work, dialogue between Bold Guy and Athletic Girl.

**11:49 - 12:07**: *Ethan*: And then he pulls out a jar of mayonnaise, and ah, this is for saying I could do anything I want to you. *Hila*: I didn't know you like mayonnaise so much. *Ethan*: It's pretty good. I really like mayonnaise. I love mayonnaise. It's valentine's day Hila, what you got for me?

**12:07 - 12:25**: Eighteen second excerpt of Work, dialogue between Bold Guy and Athletic Girl. Rolling credits from Work.

**12:25 - 13:47 (End)**: *Ethan*: So, I mean that was like a, that was actually a romp. That was a romp and a riot. *Hila*: What's a romp? *Ethan*: It's a riot. A romp is a goof, plus a spoof, plus a gaff, plus a riot. You never heard romp? *Hila*: No I never heard that word. *Ethan*: Well I'm just introducing it now, it's a new word. It's a new, it's like saffron is to soup. It spices the whole dish up. That was a total romp. That was a lot of fun. So, that is the Matt Hoss Zone. Look, it's a sexy place, it's a wild place, it's a mayonnaisey place, and it's a romp. Most of all it's a mayonnaise romp. Maybe I should kind of let them mayonnaise romp. But there is plenty more, so I recommend going to Matt Hoss, checking him out, he's... look... say what you will but the guy puts a lot of effort into his videos, he clearly plans them, he's very professional, I mean the guy cares about what he does. So, you know, we goof on him but he deserves some respect, you know.

Nothing in the form of new or, frankly, substantive commentary was contributed to the Work by the Defendants in section 5:03 – 13:47 (End) of the Infringing Work. Mr. Klein admits at deposition that the remainder of the excerpts simply echo the **same** purported "misogynistic pseudo pornography" thesis about the Work that they have repeated **over and over again** in previous statements. Considering the fact that Mr. Klein states that he, at times, interpreted the Defendants' tone, rather than their express statements, to convey this thesis, we are baffled why at deposition Mr. Klein could not think of something different or new to be impliedly conveyed by the Defendants tone. Ultimately, was it truly necessary to use virtually all of the original Work to make and repeat the **same** comments for fourteen minutes that were already made in the first three minutes of the Infringing Video?

*Elvis* is precisely on point here because, as here, a work of alleged commentary (a documentary) failed to transform entertaining clips of a copyrighted work when it used such clips in

order to profit from their "inherent entertainment value." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003). In *Elvis*, "in some instances, the clips are the subject of audio commentary, while in other instances they would more properly be characterized as video 'filler' because the commentator is discussing a subject different from or more general than Elvis' performance on a particular television show." *Id*. at 624.

To be clear: Plaintiff does not seek to have the Court judge the substantive value of the Defendants' commentary, but merely whether the Plaintiff's Work served the commentary versus serving merely the same entertainment purpose as the original Work. Sure, as Mr. Klein admits at deposition, Defendants commented on (i) historical context; (ii) the "pseudo pornographic nature" of the Work; and (iii) the silly action sequence. But did Defendants need to use nearly the entirety of the original Work to make such comments? The answer is no. As discussed above, the first two "substantive" comments had already been made after showing the first two excerpts of the work totaling 10 seconds, the third comment could have been made with the first 4 second excerpt of the action sequence that Defendants used.

Accordingly, Defendants could have based **all** of their "commentary" on clips from the Work totaling 24 seconds. Instead, Defendants chose to use 3:18 minutes, repeating virtually identical instances of "commentary" over sequential clips from the Plaintiff's Work such that the entire substance of Plaintiff's work, including the closing credits, were displayed in the Infringing Video. There can be no reason to use so much of the Plaintiff's Work than for its intrinsic entertainment value, as a prop for their many jokes that had nothing to do with the Work,[1] and to set an entertaining pace to the Infringing Work. Second Circuit law, *supra*, is as clear as the Ninth Circuit on this issue: when a work is copied for its intrinsic entertainment value or when defendants copy in excess of what is

---

[1] Mr. Klein's absurd deposition statement that his "mayonnaise in the mouth, carrots in the ass" comment is a metaphor for "misogynistic pseudo pornography" (where it seems, from his deposition, that everything is a metaphor for that one point) highlights how Defendants continuously engage in post-hoc revision of the purpose of their Infringing Video. (St. 65.)

reasonably necessary for their commentary, such use is not deemed transformative. *See also Warner Bros. Entm't Inc.*, 575 F.Supp.2d at 545 (citing *Elvis* and finding against transformative use where defendant's Harry Potter "Lexicon often **lacks** **restraint** in using Rowling's original expression for its inherent entertainment and aesthetic value" (emphasis added).

To the extent that Defendants claim their Infringing Work functions as a commentary or criticism of the Work, excerpted in sequential order, and in most instances commented upon in passing, at best, and otherwise irrelevantly, is wholly void of restraint in using the Work for its inherent entertainment and aesthetic value.

### 2. Nature of the Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586; *see also Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works"); *Twin Peaks Prods.*, 996 F.2d at 1376 (second factor "favors . . . creative and fictional work"). Although this factor may be of less importance when assessed in the context of certain transformative uses, *see, e.g., Campbell*, 510 U.S. at 586 (creative nature of original "Pretty Woman" song "not much help" to fair use analysis "since parodies almost invariably copy . . . expressive works"), the fictional nature of the copyrighted work remains significant in the instant case where, as discussed above, the secondary use is, at best, minimally transformative.

Defendants admit that the Work is a scripted, creative Work. Thus, in light of Defendants non-transformative or, at best, minimally transformative us of the Work, the second statutory factor favors the Plaintiff. *Castle Rock Entm't, Inc.*, 150 F.3d at 144 (holding the second factor in favor of plaintiff where the secondary use was minimally transformative).

### 3.  The Amount and Substantiality of the Portion Used

The law requires that "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016). In *Campbell*, a decision post-dating *Twin Peaks*, the Supreme Court clarified that the third factor—the amount and substantiality of the portion of the copyrighted work used—must be examined in context. The inquiry must focus upon whether "the extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." 510 U.S. at 586-87. "By focussing [sic] on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 926 (2d Cir. 1994).

In this case the Defendants admit to having used 3:18 minutes of a 5:24 minute video. Quite apart from the fact that this mathematically accounts for over 60% of the Work, it happens to account for 100% of the substantive portions of the Work, excerpted in sequential order such that anyone viewing the Infringing Work would no longer need to watch the Work in order to know its plot, story, or even the entirety of its substantive dialogue. The question before this Court is whether such quantity used was reasonable in relation to the purpose of the Defendants' copying. The Defendants claim disingenuously that their purpose was for commentary and criticism, but as discussed in subpart 1 above, the Defendants' legitimate commentary and criticism could have been made using only a fraction of what they had used. Following the first two or three excerpts of the Work, the Defendants said nothing of the subsequent excerpts that could not have been said of the first. It is transparent that the Defendants used the majority of the Work's excerpts as filler for their video, to move the "action" of their own dialogue forward and to serve as a springboard for their own inside jokes and non-transformative humor.

Even if the Court ultimately concludes that the Infringing Work is somehow transformative,

allowing the Defendants to use not only the heart but substantially all of the Work in connection with commentary which, again, only needed 24 seconds of the Work, would render the first factor not just dominant but determinative. Such ruling would be inconsistent with the long-standing prescription, as noted in *Campbell*, that all factors must be considered.[2]

### 4.   Effect of Use on Market for Plaintiff's Work

The Supreme Court has recently retreated from its earlier cases suggesting that the fourth statutory factor is the most important element of fair use, *see Harper & Row, Publrs.*, 471 U.S. at 566, recognizing instead that "all [factors] are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578; *see Texaco Inc.*, 60 F.3d at 926 (applying *Campbell* approach). Under this factor, courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation marks and citation omitted). The fourth factor must also "take account . . . of <u>harm to the market for derivative works</u>," *id.* (emphasis added), defined as those markets "that creators of original works would in general develop or license others to develop," *id.* at 592. In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work. *Id.* at 593. The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original. *Id.* at 591.

In this case, not only has Plaintiff received numerous offers to license his work—including

---

[2] The academic work of Prof. Barton Beebe is instructive here, finding that a "regression analysis [of historical fair use cases] predicts that if a defendant makes a commercial use of a creative, published work, its chances of succeeding in its fair use defense decline from 35.5% to 12% if it is found to take the entirety of that work, and to 1.0% if it is found to take the heart of that work." Barton Beebe, <u>An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005</u>, 156 Pa. L. Rev. 549, 616 (2008).

elements present in his work such as his original music—but so too are the Defendants aware of the licensing opportunities present in such YouTube works to the extent that Defendants have in fact licensed their own work under such opportunities. The evidence submitted herewith shows not only that there is a market to display advertising in connection with the Work, but that the Work's underlying elements can be licensed by the Plaintiff for separate derivative projects. This is why Plaintiff has, in the past, as well as now, zealously enforced his copyrights.

The point here, as made in factor one, is that Defendants used Plaintiff's work mainly for its entertainment value. Certainly if the Defendants only used the 24 seconds or so that they would have needed for their comments, then this would arguably not have harmed Plaintiff's exclusive right to license his Work out for its entertainment value. But Defendants used the 2:54 remaining minutes of the Plaintiff's work purely for something that they should have licensed from Plaintiff—to entertain their viewers. Additionally, the Defendants have not only usurped Plaintiff's exclusive right to license his Work and its underlying elements, but have expressly encouraged the greater YouTube community to do the same by posting a video to their 4 million subscribers denigrating Plaintiff and touting their infringement as an "obvious" fair use.

**B.**   <u>**Defendants Infringed on Plaintiff's Copyright**</u>

The Copyright Act of 1976, 17 U.S.C. §§ 101-803, grants copyright  owners a bundle of exclusive rights, including the rights to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." Id. § 106. "Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *see Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991). There are two main components of this prima facie case of infringement: "a plaintiff must first show that his work was actually copied . . . . [and] then must show that the copying amounts to an improper or unlawful appropriation." *Laureyssens v. Idea Group, Inc*., 964 F.2d 131, 139-40 (2d Cir. 1992) (quotation marks and citations omitted).

24

Defendants have admitted to copying and publicly displaying Plaintiff's Work. Defendants had no license from Plaintiff to do so. Defendants' use of Plaintiff's Work was not a fair use.

Accordingly, the Defendants should be held liable on Plaintiff's First Claim for Copyright Infringement. Pursuant to 17 U.S.C. §§ 504(c) and 505, as the owner of a registered copyright, Plaintiff is entitled to statutory damages, the amount of which is to be determined at trial, as well as costs and reasonable attorney's fees in connection with its copyright infringement claim.

## C.     Defendants' Infringement was Willful

When a plaintiff can demonstrate, either directly or through circumstantial evidence, that the defendant had knowledge that his actions constituted infringement, or recklessly disregarded such possibility, enhanced statutory damages for willful copyright infringement under 17 U.S.C. § 504(c)(2) may be awarded. *See Bryant v. Media Right Prods., Inc*., 603 F.3d 135, 143 (2d Cir. 2010) (reciting standard); *Isl. Software & Computer Serv. v. Microsoft Corp*., 413 F.3d 257, 264 (2d Cir. 2005) ("proffering circumstantial evidence that gives rise to an inference of willful conduct").

In this case, the Defendants admit to having had an understanding of fair use prior to infringing upon the Work. Their understanding is evidenced by a number of their prior videos that show a significantly higher degree of editorial thought than afforded to the Work. Moreover, the Defendants' blanket dismissal of Plaintiff's take-down request and their prior course of conduct—their success as generating controversy to bring other copyright holders to their knees as they attempted to do with Plaintiff—show both circumstantially and directly give rise to an inference of willful infringement. Defendants intentionally neglected to modify the Work in any way to test the limits of a fair use defense. Defendants resurrected the Infringing Video after being requested to remove it. Defendants had every intent that their actions would cause Plaintiff to back down.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgement.

Dated:  New York, New York
        February 13, 2017

                                           THOMPSON BUKHER LLP

                                       By: _____

                                          Tim Bukher (TB1984)
                                          Michael Feldberg (MF0220)
                                     75 Broad Street, Suite 2120
                                     New York, New York 10004
                                     Telephone: (212) 920-6050
                                     Facsimile: (646) 349-2366

                                     *Attorneys for the Plaintiff*