Caroline A. Morgan
Fox Rothschild LLP
100 Park Avenue, 15th Fl.
New York, NY 10017
Telephone: 212-878-7900

Jeffrey S. Kravitz (admitted *pro hac vice*)
Rom Bar-Nissim (admitted *pro hac vice*)
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, California 90067-1506
Telephone:  310-598-4150
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATT HOSSEINZADEH,<br><br>               *Plaintiff,*<br><br>    – vs –<br><br>ETHAN KLEIN and HILA KLEIN,<br><br>               *Defendants.* | **Civ. 16-cv-3081 (KBF)**<br><br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56** |

## TABLE OF CONTENTS

I.      Preliminary Statement ................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................... 2

        A.      Plaintiff Matt Hosseinzadeh And The Bold Guy Series ...................... 2

        B.      Plaintiff's Intent For The Work .......................................................... 3

        C.      Defendants Ethan and Hila Klein ....................................................... 4

        D.      Defendants Approach To Reaction Videos ......................................... 4

        E.      The Nature of Defendants' Critique of the Work ............................... 5

        F.      The Critique Video's Commercial Impact On The Work .................... 9

        G.      Plaintiff's Response To The Critique Video ......................................10

        H.      The Lawsuit Video...........................................................................11

III.    LEGAL STANDARD ...............................................................................12

IV.     ARGUMENT ...........................................................................................12

        A.      The Critique Video Constitutes Fair Use ..........................................12

                1.      The First Fair Use Factor Favors Defendants ..........................13

                2.      The Fourth Fair Use Factor Favors Defendants .......................20

                3.      The Third Fair Use Factor Favors Defendants.........................21

                4.      The Second Fair Use Factor Favors Defendants......................22

        B.      Plaintiff's DMCA Misrepresentation Claim Must Fail......................23

        C.      Plaintiff's Defamation Claim Must Fail............................................23

V.      CONCLUSION ........................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abilene Music, Inc. v. Sony Music Entm't, Inc.*,
   320 F. Supp. 2d 84 (S.D.N.Y. 2003) .................................................................... 14, 15, 18

*Adjmi v. DLT Entm't LTD*,
   97 F. Supp. 3d 512 (S.D.N.Y. 2015) ............................................................................ 18

*Adobe Sys. Inc. v. Christenson*,
   809 F.3d 1071 (9th Cir. 2015) ..................................................................................... 20

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) .................................................................................................... 12

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ....................................................................................... 13

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ................................................................................... 17, 22

*Biro v. Condé Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) .................................................................. 23, 24, 25

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ........................................................................... 13, 15, 20, 22

*Bleistein v. Donaldson Lithographing Co.*,
   188 U.S. 239 (1903) ................................................................................................ 15, 16

*Bourne Co. v. Twentieth Century Fox Film Corp.*,
   602 F. Supp. 2d 499 (S.D.N.Y. 2009) ......................................................................... 18

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ...................................................................................... 21

*Burnett v. Twentieth Century Fox Film Corp.*,
   491 F. Supp. 2d 962 (C.D. Cal. 2007) ......................................................................... 18

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
   87 F. Supp. 3d 499 (S.D.N.Y. 2015) ........................................................................... 17

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) .......................................................................... 13, 14, 15, 20, 21, 22

ii

*Cariou v. Prince,*
    714 F.3d 694 (2d Cir. 2013) ............................................................... 13, 15, 20, 22

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................... 12

*Equals Three, LLC v. Jukin Media, Inc.,*
    139 F. Supp. 3d 1094 (C.D. Cal. 2015) ............................................................. 19

*Fisher v. Dees,*
    794 F.2d 432 (9th Cir. 1986) ............................................................................. 20

*Fleckenstein v. Friedman,*
    266 N.Y. 19, 193 N.E. 537 (1934) ..................................................................... 24

*Franklin v. Daily Holdings, Inc.,*
    135 A.D. 3d 87 (N.Y. App. Div. 2015) ......................................................... 23, 24

*Fulani v. New York Times Co.,*
    260 A.D. 2d 215 (1st Dept.1999) ....................................................................... 24

*Guccione v. Hustler Magazine, Inc.,*
    800 F.2d 298 (2d Cir. 1986) ......................................................................... 23, 24

*Hicks v. Baines,*
    593 F.3d 159 (2d Cir. 2010) ............................................................................... 12

*Hofheinz v. Discovery Commc'ns, Inc.,*
    No. 00 CIV. 3802 (HB), 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) .............. 16

*Ingber v. Lagarenne,*
    299 A.D. 2d 608 (2002) ..................................................................................... 24

*Jewell v. NYP Holdings, Inc.,*
    23 F. Supp. 2d 348 (S.D.N.Y. 1998) ................................................................. 24

*Karedes v. Ackerley Grp.,*
    423 F.3d 107 (2d Cir. 1986) ............................................................................... 24

*Leibovitz v. Paramount Pictures Corp.,*
    137 F.3d 109 (2d Cir. 1998) ....................................................... 14, 15, 18, 22

*Lenz v. Universal Music Corp.,*
    815 F.3d 1145 (9th Cir. 2016), *cert. denied,* 137 S. Ct. 416 (2016) ................... 23

*Love v Morrow & Co.,*
    193 A.D. 2d 586 (1993) ..................................................................................... 24

iii

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 729 (9th Cir. 2003) .................................................................... 15, 18

*N. Jersey Media Grp. Inc. v. Pirro*,
   74 F. Supp. 3d 605 (S.D.N.Y. 2015) ................................................................ 17

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ..................................................................... 13, 20

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ..................................................................... 20, 21

*Scott v. Harris*,
   550 U.S. 372 (2007) .................................................................................... 12

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014) ................................................................. 17, 22, 23

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
   135 F. Supp. 3d 219 (S.D.N.Y. 2015) .............................................................. 24

*TCA Television, Corp. v. McCollum*,
   839 F.3d 168 (2d Cir. 2016) ................................................................. 13, 14, 21

*Wade Williams Distribution, Inc. v. Am. Broad. Co.*,
   No. 00 CIV. 5002 (LMM), 2005 WL 774275 (S.D.N.Y. Apr. 5, 2005) .............................. 15

*Yankee Publishing Inc. v. News America Publishing, Inc.*,
   809 F. Supp. 267 (S.D.N.Y. 1992) (Leval, J.) .................................................... 15

*Zeliner v. Summerlin*,
   494 F.3d 344 (2d Cir. 2007) ......................................................................... 12

## **Statutes**

17 U.S.C. § 107 ................................................................................. 12, 13, 14, 16

17 U.S.C. § 107(4) ...................................................................................... 20

17 U.S.C. § 512(f) ...................................................................................... 23

## **Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................... 12

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.05[A][1][a],
   at 13–162 (Matthew Bender, rev. ed., 2016) ...................................................... 13

William F. Patry, *Patry on Fair Use* § 4.1 (2015) .................................................... 22

iv

Defendants Ethan and Hila Klein (collectively, "Defendants"), hereby submit this Memorandum of Law in Support of their Motion for Summary Judgment ("Motion") and move for judgment against Plaintiff Matt Hosseinzadeh ("Plaintiff") on his claims for (1) Copyright Infringement; (2) DMCA Misrepresentation; and (3) Defamation. The facts underlying this motion are fully set forth in Defendants' Rule 56.1 Statement of Undisputed Facts ("St.").

## I.    PRELIMINARY STATEMENT

In its January 24, 2016 Order, this Court admonished the parties that "[w]hether [*The Big, The BOLD, The Beautiful* ("Critique Video")] is transformative does not end the fair use inquiry, nor the quantum of [*Bold Guy vs. Parkour Girl* ("Work")] copied." Rather, the Court reminded the parties that fair use is a "context sensitive inquiry" and that all factors must be considered and weighed together, including "commercial impact." (ECF #79 p. 2-3).

Now, with the facts before it, the Court can plainly see that there can be no dispute: the Critique Video is fair use. There can be no dispute regarding market harm, since ***Plaintiff admits the Critique Video increased views and revenue for his Work***. There can be no dispute that the Critique Video transformed Plaintiff's Work with a meaning and message Plaintiff never intended. Plaintiff testified that his works, as a factual matter, are not misogynistic; Defendants' Critique Video proved him wrong. Plaintiff also stated that the Bold Guy ("BG") is a part of his psyche and represents the ideal to which he strives; Defendants exposed Plaintiff's ideal of masculinity as a paragon of buffoonery. There can be no dispute that the amount Defendants used of the Work was reasonable in light of their highly transformative purpose. At deposition, Ethan went into extensive detail on the nature of Defendants' critique of the Work and how the clips served to prove their criticisms clearly. Plaintiff acts like he is oblivious to Defendants' criticism, but that does not entitle him to wage war on the obvious: the Critique Video is fair use.

Nor did Defendants misrepresent their DMCA counter-notification. Plaintiff has no evidence Defendants lacked a subjective good faith belief that their Critique Video was erroneously taken down; their defense of this lawsuit is a testament to that belief.

Nor did Defendants defame Plaintiff by omitting mention of his April 2, 2016 email ("Email") from Defendants' *We're Being Sued* video ("Lawsuit Video"). The entire premise of this claim is that, by omitting mention of Plaintiff's Email, Defendants painted him as greedy and litigious. But his Email threatened Defendants with a lawsuit for monetary damages and rejected the possibility of fair use and every other statement made in the Lawsuit Video is true or protected opinion. No reasonable juror would think the omission was defamatory.

Plaintiff must realize he cannot treat well-settled law and undisputed facts like the women in his videos; they will not change simply because Plaintiff is persistent and impervious to their hostility. He claims this lawsuit is not about criticism. But it is obvious Defendants exposed the Work, the Bold Guy character ("BG") and even the entire BG series ("Series") as misogynistic pseudo-pornography and ridiculed Plaintiff's ideal of masculinity. So, whether Plaintiff is aware of it or not, his lawsuit *is* directed at punishing and silencing lawful criticism.

It is time for Plaintiff's war on reason to end. The undisputed facts prove Plaintiff's claims are meritless and no reasonable juror would think otherwise. Defendants respectfully request this Court to grant their Motion in its entirety and enter judgment against Plaintiff.

## II.   STATEMENT OF FACTS

### A.   Plaintiff Matt Hosseinzadeh And The Bold Guy Series

Plaintiff is an amateur videomaker who uploads his videos onto his YouTube channel, MattHossZone. St. 2. He is the writer, director, producer and star of the Series, which he created in 2011. St. 3. His copyright is for an unpublished compilation of 24 episodes of the Series. St. 4. The Work is the twelfth episode in the Series and uploaded unto YouTube in August 2013. St. 5

2

Plaintiff states that the premise of the Series is that "[t]he Bold Guy approaches women and tries to flirt with them and possibly date them," using confidence and humor to do so.  St. 6. Plaintiff described the character as follows: "He simply takes action without fear, without worrying what other people think, what other people's approval of his behavior is." St. 7. In many episodes, the female characters are openly hostile to BG but, by the end, quickly become sexually attracted to him. St. 8. Often, BG is bare chested or with his arms exposed. St. 9. Some episodes contain a post-coital conversation between BG and the female character. St. 10. Some episodes contain a parkour scene. St. 11.

Plaintiff states he "share[s] characteristics with all the characters [he] create[s]. They're all parts of [his] psyche." St. 12. He received the "bold" moniker from a real life exchange where he approached a woman, got her number and was told he was bold. This interaction inspired BG and his name. St. 13. Prior to this litigation, Plaintiff explained BG in a Q&A with his fans.

> Every character that I write, boy or girl, is an aspect of me. It comes from my brain, obviously. The Bold Guy probably more so than any other character. Because it is the main character that I've created that's heavily influenced and inspired by my real life.
> …
> I share a lot of qualities with the Bold Guy but I'm not the Bold Guy. The Bold Guy is an exaggerated perfect version of me. Of who I wish to be. The ideal that I strive for.

St. 14. Only now does Plaintiff state it is factually false to describe BG as his alter ego. St. 15.

**B.       Plaintiff's Intent For The Work**

Plaintiff states that he does not analyze his works and leaves it to the viewer to interpret them. St. 16. Yet, he states, as a factual matter, that his works are not misogynistic. St. 17.

Plaintiff states the Work is intended as "social satire" and "pokes fun at social politics." His theme is "[a] guy is chasing a girl and flirting with her," which is shown when the female character ("Woman") says "catch me," a subsequent chase ensues and, once BG catches her, he

ACTIVE\44413742.v1-2/13/17

turns the tables. Plaintiff says he intended to convey a message about sexism and the objectification of women by having the "two characters turn the tables on each other and flirt with each other and chase each other." He did not intend any message about pornography. St. 18.

**C.    Defendants Ethan and Hila Klein**

Defendants are a married couple who make comedy videos on YouTube. In 2015, they were voted by Reddit users as YouTubers of the Year. St. 19. They have two channels: their primary channel H3H3 Productions ("H3H3") and secondary channel Ethan and Hila ("E&H"). Defendants provide a variety of comedic content on their channels, including sketches, vlogs and reaction videos. St. 20. They are also known for their social commentary. On election night, NBC News quoted Ethan's tweet regarding the election opposite a tweet by House Speaker Paul Ryan. St. 21. Defendants have made videos commenting on politics (St. 22), intellectual property and legal issues (St. 23) and online content that is inappropriate. St. 24.

In particular, Defendants target sexually inappropriate content on YouTube. One example is the YouTube channel, Prank Invasion, which produces "kissing prank" videos. These videos are scripted and depict the host approaching women in public and pranking them into a kiss or fellatio. Defendants have targeted Prank Invasion for creating a "false reality in which [the host] was promoting lewd behavior … enticing kids to kind of go out and try to commit what could only be construed as sexual assault" and where women are easy prey to alpha males audacious enough to push women well beyond their comfort zone. Defendants made these points by making four reaction videos deconstructing Prank Invasion's content. St. 25.

**D.    Defendants Approach To Reaction Videos**

Defendants consider reaction videos a very broad genre and can only speak to their own approach to them. Defendants' reaction videos provide their personal insights on someone else's video through critical analysis, parody and commentary. Defendants find these videos through

4

various websites, including YouTube and Reddit. St. 26. Defendants do not select these videos because they consider them inherently funny. Rather, Defendants select these videos because they have something critical to say about the video in a comedic manner. St. 27.

Defendants have established practices to ensure their reaction videos constitute fair use. They understand fair use from their personal research but occasionally consult with an attorney. They ensure that their commentary is substantial and transformative and that they use only what is necessary to make their point. During editing, Defendants are "mindful to basically cut out as much of the original video as possible" and "make sure that [they] were commenting or critiquing every segment that came before." This approach is nearly identical to the one set forth by the American University's Code of Best Practices in Fair Use for Online Videos. St. 28.

The reaction videos on H3H3 differ from the ones posted on E&H. H3H3 reaction videos involve Ethan's reaction while Hila is filming. Ethan reactions are bombastic, expressing comedic outrage to the outrageous things Defendants find online. Some of these videos employ stylistic edits, like editing in other clips, tinting, zooming and using graphic images. Defendants do not rely on these stylistic edits to transform the work. Rather, they consider their commentary and critique to be the heart of their claim to fair use and the stylistic edits merely add texture and comedic effect. St. 29. Reaction videos posted on E&H differ in that they include Hila, are intended to be more lighthearted and rarely employ the stylistic edits. Hila is not a substitute for stylistic edits.  Rather, E&H reaction videos are a different format offering Hila's perspective, in addition to Ethan's, which brings an added level of commentary to the video. St. 30.

### E.    The Nature of Defendants' Critique of the Work

The Critique Video is 13:47 minutes long and posted unto E&H on February 15, 2016. It uses 24 distinct clips from Plaintiff's Work, each ranging from 1 to 24 seconds with 75% being 12 seconds or less (i.e., 75%). The clips amount to 3:15 minutes of the 5:24 minute Work (i.e,

5

60%). Defendants' critique and commentary comprises 10:43 minutes of the 13:47 minute

Critique Video (i.e., 75%). The longest clip is overdubbed by commentary. St. 31.

The thesis of Defendants' commentary and critique of the Work has four over-arching

themes: (1) put the Work in historical context; (2) expose the Work as misogynistic pseudo

pornography; (3) critique the masculinity of BG in the Work and Series; and (4) critique Plaintiff

for creating such works. St. 32. Below is a summary of each these points, how Defendants made

them and why their purpose was to show how these criticisms pervaded the entire Work.

**Historical Context:** Defendants comment on the Work by placing it in historical context. St. 33.

"CringeTube": Defendants begin by placing the Work in historical context and explain

how the Work comes from the "CringeTube" era. "CringeTube" was a period marked by

sexually embarrassing (i.e., cringe-worthy) videos on YouTube. Two things are communicated

about the Work by contextualizing it as from the "CringeTube" era: (1) the Work is sexually

inappropriate, cringy and weird; and (2) it is from an era where such content was pervasive and

popular on YouTube but would not be successful by today's standards. Defendants further

explicate on this point by analyzing the Work's views relative to Plaintiff's subscriber count.

Two and a half years after Plaintiff uploaded the Work (when the Critique Video was made), the

Work received nearly ten million views. But this did not translate into a high subscriber count

because the Work served as a form of pseudo pornography; people watched and, once satisfied,

moved on without any attachments.

Prank Invasion: Defendants explicate on the Work's historical context by describing it as

a predecessor to Prank Invasion. By drawing this comparison, Defendants build on themes they

have previously established in their videos about misogynistic and sexually inappropriate content

on YouTube that creates false realities for impressionable pubescent males. This comparison also builds on their previous point about the Work being from the "CringeTube" era.

**Misogynistic Pseudo-Pornography:** Defendants critique the Work for being misogynistic and pseudo-pornographic. St. 34. Defendants point out how the Work's plot, dialogue and characters have all the trappings of a pornographic film, except the act is never consummated.

Depiction of the Women: Defendants critique how the Woman is depicted in a pornographic and misogynistic manner. They critique: (1) how she appears to sexually present herself to BG as he approaches; (2) how her character – and indeed the majority of Plaintiff's female characters – are depicted in a hypersexualized manner; (3) how the Woman and the majority of Plaintiff's female characters begin as incredibly hostile to BG but suddenly shift to being irresistibly attracted to him; and (4) how her dialogue resembles a pornographic film. They use short clips of the dialogue exchanges between the Woman and BG in the beginning and end of the Work to establish the veracity of these critiques. By showing the character's progression throughout the Work instead of an isolated moment or two, Defendants prove their critique that the Woman is completely unrealistic and emblematic of a male dominated fantasy.

Primal Nature Documentary: Defendants point out the misogynistic and pornographic nature of the Work by comparing its scenes to a primal nature documentary. Defendants establish this early on in the Critique Video by mocking how the Woman appears to sexually present herself to BG. They build on this point during the Work's chase scene to mock how BG chasing after the Woman resembles a primal standoff where BG is trying to physically conquer the Woman to engage in sexually depraved acts.

Carrots and Mayonnaise: Defendants critique the Work's absurd pornographic and misogynistic premise by using the metaphor of "carrots and mayonnaise." This metaphor is

7

established when the Woman tells BG that, if he catches her, BG can do whatever he wants to her. Defendants portray this line as straight out of a pornographic film. They use the metaphor to ridicule how the line invites an infinite number of sexually depraved possibilities. The metaphor becomes a theme in Defendants' critique of the absurdity of the chase scene and to explain why BG expends so much effort to catch the Woman. The metaphor is also used to critique how the Work builds to this depraved sexual encounter that never actually materializes.

**Critique of BG**: Defendants critique holds the depiction of BG's masculinity to ridicule. St. 35.

<u>Depiction of BG as an alpha male</u>: Defendants lambast how the Work depicts BG as an alpha male who can simply swoop in and get any woman he wants. Through ridiculing the various clips of dialogue and plot from throughout the Work, they critique how the character's arc and Work's narrative project a false reality whereby women are easy and will engage in sexual relations if a man is an alpha male who is bold and impervious to a woman's hostility.

<u>Portraying BG as a buffoon</u>: Defendants dismantle Plaintiff's portrayal of masculinity by pointing out the numerous instances the Work attempts to portray BG as suave, clever and athletic when he is actually a buffoon. They illustrate this point by ridiculing clips of BG's pseudo-clever rejoinders, smug expressions, sleeveless hoodie costume, fervently chasing after the Woman, and lack of physical prowess during the parkour chase scene.

**Critique of Plaintiff**: Defendants critique Plaintiff for creating the Work, BG and Series. St. 36.

<u>The works are a reflection of Plaintiff's mind</u>: Defendants ridicule how the Work, BG and the Series are a reflection of Plaintiff's mind. This point is set up initially when Hila states: "What I love about [Plaintiff's] videos is that he setup that situation. … [T]his is his script. … So, if you look at it from his point of view, this is just a girl doing this stuff on the street." By exposing the multiple instances where the Work resembles misogynistic pseudo-pornography,

8

how the female characters are emblematic of a male fantasy and how BG's masculinity is actually buffoonery, Defendants take Plaintiff to task for creating works that are replete with absurd and perverse themes and messages. It serves to reinforce the point that the Work's plot, dialogue, action and characters are all a sexual fantasy Plaintiff is trying to play out on video.

BG as Plaintiff's alter ego:  Defendants critique BG as being Plaintiff's alter ego. They mock how Plaintiff created BG and the Work to live out his sexual fantasy. They expose how the multiple instances where Plaintiff attempts to showcase his masculinity, athleticism, wit and sexual appeal are actually highly manicured, such as (1) how he writes the dialogue to compliment himself physically and make himself appear clever; (2) how his attempt to come across as suave only make him appear smug and unappealing; and (3) how his use of parkour does not show physical prowess but is gratuitous, absurd and graceless.

### F.    The Critique Video's Commercial Impact On The Work

Revenue for YouTube videos is generated by advertisements placed on the video, which YouTube splits with the creator. The more traffic a video has the more revenue it generates, but the revenue per view can vary due to various external factors like a higher revenue rate during the holiday season. St. 37.

During December 2015 – three months before Defendants posted the Critique Video on February 15, 2016, the views and revenue for the Work dropped and flat-lined. In the days following February 15, 2016, the Work experienced a spike in views and revenue. St. 38. Plaintiff confirmed that the Critique Video caused the spike in views and revenue for the Work and admitted he has no evidence Defendants siphoned views or revenue for his Work. St. 39. In the month following the spike, the Work's views and revenue increased. St. 40.

/ / /

/ / /

9

### G.   Plaintiff's Response To The Critique Video

Plaintiff saw the Critique Video and viewed it for infringement. The primary focus of his analysis was the amount used. Plaintiff believes Defendants did not comment, critique or ridicule his Work. Yet, he recognizes Defendants' Critique Video was different then his Work because Defendants talked about his content. St. 41. He does recognize the following comments from individuals other than Defendants as forms of criticism: (1) his work is misogynistic (even though he believes that is factually false); (2) his work is cringe-worthy; and (3) his parkour is bad (but only in those exact words). St. 42.

On April 2, 2016, Plaintiff sent Defendants an email demanding they takedown the Critique Video ("Email"). He claimed Defendants engaged in copyright infringement and digital piracy. He threatened to take legal action and seek damages, profits, attorneys' fees and costs if they failed to take down the Critique Video within 24 hours. The Email rejected the possibility that the Critique Video was fair use. St. 42. Plaintiff describes the Email as a "friendly" and "kind request" and that Defendants' refusal to comply "forced" him to hire counsel. St. 44.

The same day Defendants responded to Plaintiff's Email and cc'ed their then attorney. They politely declined Plaintiff's invitation to takedown the video and requested Plaintiff to direct all future correspondence about pursuing his threat of legal action to counsel. St. 45.

Plaintiff hired counsel who sent a cease and desist letter and threatened Defendants with a lawsuit. Plaintiff demanded Defendants takedown the Critique Video, pay him $3,750 in fees and never speak of the incident, which Defendants rejected. St. 46. Defendants then made the Critique Video publicly inaccessible. Despite this, Plaintiff filed a YouTube copyright strike against them. St. 47. Plaintiff made another settlement offer demanding Defendants promote him and his channel for two months, which Defendants rejected. Plaintiff stated he wanted something of value from Defendants and settled for promotion because he was "generous." St. 48.

Around April 26, 2016, Plaintiff issued a takedown notice on the Critique Video. Defendants filed a counter-notification asserting the Critique Video was fair use and that they had a good faith belief the Critique Video was taken down erroneously. St. 49.

## H.   The Lawsuit Video

On May 23, 2016, Defendants uploaded the Lawsuit Video, which is a 15:43 minute video summarizing the events leading up to this lawsuit and the lawsuit itself. The discussion is divided into four parts: (1) an introduction explaining the situation (44 seconds); (2) fair use (2:00 minutes); (2) settlement offers (4:14 minutes); and (3) the lawsuit itself (8:45 minutes). St. 50. Defendants explained the difficulty of litigating the fair use defense and the absurdity of Plaintiff's settlement offers. St. 51. But the majority of the video discusses the lawsuit, including exposing some of the allegations in Plaintiff's First Amended Complaint ("FAC") as absurd and plainly false. For example, Plaintiff alleged that the Work comprised the majority of the Critique Video when it clearly did not. Defendants expressed their personal opinions on the lawsuit, their concern on the precedent capitulating to Plaintiff's settlement demands would create and, if they failed to stand up for fair use, other YouTubers would experience similar threats. St. 52.

Defendants did not mention the Email because they considered it insignificant to the overall story. They viewed the email as a belligerent threat but inconsequential compared to Plaintiff's settlement offers and lawsuit. St. 53.  Plaintiff experienced public backlash and received hate mail from the lawsuit, reading some in a YouTube video to show he was impervious to criticism. St. 54. Later, he said the Series was on hold due to "parasites" who use his content without permission. Plaintiff initially admitted he was referring to Defendants, but later said it was for anyone who used his content without permission. St. 55.

Plaintiff also claims that the Lawsuit Video resulted in the media spreading the following falsehoods about him: (1) that his works are misogynistic; (2) that BG is his alter ego; (3) that

11

Defendants believe this lawsuit is about silencing criticism; (4) that this lawsuit is against many of the most popular creators on YouTube; and (5) the events leading up to the lawsuit. St. 56.

## III.   LEGAL STANDARD

Summary judgment is appropriate when the movant carries its burden by "show[ing] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Material facts are "facts that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010). Furthermore, the nonmoving party cannot defeat summary judgment by presenting evidence so "blatantly contradicted by the record … that no reasonable jury could believe it." *Scott v. Harris,* 550 U.S. 372, 380 (2007). "Incontrovertible evidence relied on by the moving party… should be credited by the court on a [summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zeliner v. Summerlin,* 494 F.3d 344, 371 (2d Cir. 2007).

## IV.   ARGUMENT

### A.   The Critique Video Constitutes Fair Use

The Copyright Act states: "[F]air use of a copyrighted work ... for purposes such as *criticism* [or] *comment* … is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). Section 107 sets forth four factors courts should use to determine the question of fair use: (1) "the purpose and character of the use, including whether such use is of a commercial nature

or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.  The factors are non-exclusive and "weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

### 1.    The First Fair Use Factor Favors Defendants

Under the first factor, the touchstone inquiry is whether the use is "transformative." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir. 2006). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Cariou v. Prince,* 714 F.3d 694, 708 (2d. Cir. 2013) (quoting *Campbell,* 510 U.S. at 579).

The "transformative use" inquiry asks "whether the new work merely supersedes the objects of the original creation, or instead ***adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message***." *TCA Television, Corp. v. McCollum* ("*TCA*"), 839 F.3d 168, 180 (2d Cir. 2016) (emphasis in the original) (quoting *Campbell,* 510 U.S. at 579); *Cariou,* 714 F.3d at 705-06.

It is well-established: "Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015) (Leval J.).[1]  The Second Circuit noted: "The possibility of criticism

---

[1] *See also TCA*, 839 F.3d at 179 ("[T]he uses identified by Congress in the preamble to § 107—criticism [and] comment … might be deemed 'most appropriate' for a purpose or character finding indicative of fair use.") (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.05[A][1][a], at 13–162 (Matthew Bender, rev. ed., 2016)); *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 477 (2d Cir. 2004) ("[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107").

or comment – whether or not parodic – is a risk artists and their subjects must accept." *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 n. 7 (2d Cir. 1998).

Defendants' purpose was to criticize and comment on Plaintiff's Work with a four-fold thesis: (1) to place the Work in historical context; (2) to expose Plaintiff's Work as misogynistic pseudo pornography; (3) critique the masculinity of BG in the Work and Series; and (4) to critique Plaintiff for creating such works. St. 32.

"*[H]umorous forms of criticism* … may claim fair use under § 107." *Campbell,* 510 U.S. at 579-80 (emphasis added). To "ridicule" the original for "comic effect" is one of the "types of comment and criticism that traditionally have had a claim to fair use protection as transformative works." *Id.* at 580-583; *see also Leibovitz,* 137 F.3d at 114 (comedic ridicule of original was transformative); *Abilene Music, Inc. v. Sony Music Entm't, Inc.,* 320 F. Supp. 2d 84, 89 (S.D.N.Y. 2003) ("[T]o comment on or criticize the 'substance or style of the original composition' through humor or slapstick, makes it a form of criticism."). "[H]umorous forms of criticism … *provide social benefit*, by shedding light on an earlier work, and, in the process, creating a new one." *Campbell,* 510 U.S. at 579 (emphasis added).

Defendants criticized Plaintiff's Work through humor, ridicule and mockery. Sometimes Defendants' critique was explicit; sometimes implied with the subtext coming from Defendants' word choice, tone, body movements and facial expressions. St. 57.

Comedic uses are not transformative when the "*only purpose* served by the extent of defendants' taking is *identically comedic* to that of the original authors [and copies] extensively for its *original comedic effect* [with] '*no critical bearing on the substance or style of the original*'" *TCA,* 839 F.3d at 182-83 (emphasis added) (quoting *Campbell*, 510 U.S. at 580-81);

14

*see also Abilene,* 320 F. Supp. 2d at 91 ("appropriate[ing] material … for humorous effect,

without directing its criticism or ridicule at the copied work itself," is not transformative).

Defendants did not use the Work for its inherent humor; their purpose was to criticize and

ridicule the Work's plot, dialogue, characters, action, theme and message as misogynistic,

pornographic and absurd. St. 58. This is not a scenario where Defendants merely laughed while

watching long, uninterrupted portions of the Work or freerided on its original comedic effect

devoid of any commentary with any critical bearing on the substance or style of the Work.

The Supreme Court stated that the standard to determine whether a use constitutes as

criticism is if it "***reasonably could be perceived as commenting on the original or criticizing it,***

***to some degree***." *Campbell,* 510 U.S. at 583 (emphasis added); *see also Cariou,* 714 F.3d at 707

(courts must "examine how the [works] may '***reasonably be perceived' in order to assess their***

***transformative nature***.") (emphasis added). The Supreme Court formulated this standard to

avoid subjective value judgments, like whether the use is valid, legitimate or in good taste.

> As Justice Holmes explained, "it would be a dangerous undertaking for persons
> trained only to the law to constitute themselves final judges of the worth of a
> work, outside of the narrowest and most obvious limits. At the one extreme some
> works of genius would be sure to miss appreciation. Their very novelty would
> make them repulsive until the public had learned the new language in which their
> author spoke." *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251
> (1903) (circus posters have copyright protection); cf. *Yankee Publishing Inc. v.
> News America Publishing, Inc.,* 809 F. Supp. 267, 280 (S.D.N.Y. 1992) (Leval, J.)
> ("First Amendment protections do not apply only to those who speak clearly,
> whose jokes are funny, and whose parodies succeed") (trademark case).

*Campbell*, 510 U.S. at 582–83 (internal brackets omitted).[2]

_____

[2] *See also Blanch,* 467 F.3d at 255 ("It is not, of course, our job to judge the merits of
[defendant's work] or of [defendant's] approach to art."); *Mattel, Inc. v. Walking Mountain
Prods.,* 353 F.3d 729, 802 (9th Cir. 2003) ("However one may feel about [defendant's] message
– whether he is wrong or right, whether his methods are powerful or banal – his photographs
[are] parody …."); *Leibovitz,* 137 F.3d at 113 ("The Court cautioned that the quality of the
parody is not to be evaluated"); *Wade Williams Distribution, Inc. v. Am. Broad. Co.,* No. 00 CIV.
5002 (LMM), 2005 WL 774275, at *9 (S.D.N.Y. Apr. 5, 2005); ("Courts have consistently and

15

Defendants' four-fold thesis about the Work may reasonably be perceived. First, their commentary placing the Work in historical context may reasonably be perceived. St. 33. Examples include: (1) the discussion on the CringeTube era; (2) the comparisons to Prank Invasion; and (3) the discussion of the Work's popularity when it was released and why it resulted in relatively few subscribers.

Second, Defendants' commentary about the Work's misogynistic and pornographic nature may reasonably be perceived throughout the Critique Video. St. 34. For example, they point out how (1) the Woman appears as if she is sexually presenting herself to BG (which Plaintiff states does not have any overt or covert sexual connotation (St. 60)); (2) the dialogue is emblematic of a pornographic film; (3) the female characters are unrealistic and resemble a male fantasy by suddenly shifting from being incredibly hostile to irresistibly attracted to BG; (4) the Work's premise is absurd and pornographic (i.e., the Woman's sexual challenge that, if BG catches her, he can do whatever he wants to her); (5) the Work resembles a primal nature documentary, particularly its chase scene; (6) the Work seeks to appeal to a young audience who would otherwise not be able to access pornography; and (7) the repeated references to "carrots and mayonnaise" to ridicule the Work's plot and characters.

Third, Defendants' critique of the masculinity of BG in the Work and Series may reasonably be perceived. St. 35. Some examples are: (1) BG presents a distorted reality where an alpha male can swoop in and conquer any woman; (2) BG's masculinity is actually buffoonery;

---

prudently avoided subjective judgments in copyright cases, and this Court will not engage in one here.") (citing *Bleistein,* 188 U.S. at 251); *Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 CIV. 3802 (HB), 2001 WL 1111970, at *4 (S.D.N.Y. Sept. 20, 2001) ("Section 107 does not explicitly distinguish between entertaining and serious, plausible and implausible, or weighty or frivolous commentaries, and I do not propose to engage in such subjective line-drawing.").

(3) the character treats women like sexual objects; and (4) the gratuitous use of parkour.

Finally, Defendants' critique of Plaintiff as the author of the Work, BG and Series may reasonably be perceived, by (1) pointing out how the plot, dialogue and characters are all a reflection of his mind; (2) critiquing Plaintiff's plot, dialogue and characters as reflecting his misogynistic pornographic fantasy; (3) critiquing how Plaintiff writes dialogue complimenting his body and to set his character up to appear clever; and (4) critiquing his parkour skills. St. 35.

There can be no dispute: Defendants' critique is obvious. No reasonable juror could deny Defendants' thesis transformed Plaintiff's Work with new insights, meaning and message.

Commentary and critique may also reasonably be perceived when "the altered purpose or context of the work [is] evidenced by surrounding commentary or criticism." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch*")*, 756 F.3d 73, 84 (2d Cir. 2014) (citing *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 609–610 (2d Cir. 2006). "Such 'surrounding commentary or criticism' clearly militates for a finding of transformative use." *BWP Media USA, Inc. v. Gossip Cop Media, LLC* ("*BWP*"), 87 F. Supp. 3d 499, 507 (S.D.N.Y. 2015) (quoting *Swatch,* 756 F.3d at 84); *Cf. Id.* (finding use of photo surrounded by commentary and criticism of original was transformative; use of photo that was not surrounded by commentary and criticism was not); *N. Jersey Media Grp. Inc. v. Pirro,* 74 F. Supp. 3d 605, 615-17 (S.D.N.Y. 2015) (including cropping and hashtag to photo was not transformative).

Here, Defendants commentary and critique may reasonably be perceived from how they dissected Plaintiff's Work and surrounded it with commentary. They chopped up 3:15 minutes of Plaintiff's 5:24 minute Work into 24 clips ranging from 1-24 seconds with 75% being twelve seconds or less. The longest clip is an outlier and overdubbed with comedic commentary. Defendants' commentary comprises over 10:43 minutes of the 13:47 minute Critique video (i.e.,

17

75%). St. 31. The bulk of Defendants' critique targets the Work's dialogue, characters, plot, action, themes and message. St. 58. This is not a scenario where someone watched long, uninterrupted portions of the work with minimal commentary. No reasonable juror could deny that Defendants transformed Plaintiff's Work by surrounding it with critical commentary.

The Critique Video may reasonably be perceived as transformative for altering the associations, tone and context of the Work. *See Mattel,* 353 F.3d at 802 (finding transformative use when a "different set of associations and a different context" is given to the original); *Leibovitz,* 137 F.3d at 114 (finding transformative use from facial expression that "contrasts so strikingly" with original it could "reasonably be perceived as commenting on the seriousness, even the pretentiousness, of the original."); *Adjmi v. DLT Entm't LTD,* 97 F. Supp. 3d 512, 531-32 (S.D.N.Y. 2015) (finding a screenplay transformative because of "markedly different tone" that served as a "vehicle to criticize and comment on the original's light-hearted, sometimes superficial, treatment of certain topics and phenomena."); *Bourne Co. v. Twentieth Century Fox Film Corp.,* 602 F. Supp. 2d 499, 509 (S.D.N.Y. 2009) (finding use of song in television parody transformative from "strikingly different in tone and message."); *Abilene,* 320 F. Supp. 2d at 90 (finding use of song transformative because of "tone that might reasonably be perceived as sarcastic."); *Burnett v. Twentieth Century Fox Film Corp.,* 491 F. Supp. 2d 962, 968 (C.D. Cal. 2007) (finding fair use when placing the original character in an "awkward, ridiculous, crude, and absurd situation").

Defendants Critique Video may reasonably be perceived as transformative by (1) associating Plaintiff's Work with misogyny and pornography, which Plaintiff did not intend and states is factually false about his works; (2) associating BG's confidence with buffoonery; and

(3) altering the Work's tone by making its sexual innuendo disgusting and plot absurd. St. 17, 34-36.

*Equals Three, LLC v. Jukin Media, Inc.,* 139 F. Supp. 3d 1094 (C.D. Cal. 2015) provides valuable guidance, since it is the only decision to tackle the "reaction video" genre. The court found that the reaction videos at issue "highly transformative" comment and criticism because:

> Equals Three's episodes directly respond to and highlight humorous aspects of Jukin's videos. The episodes do so via the host's reactions to the videos, jokes, narration, costumes and graphics. The host's narration does not simply recount what is shown in Jukin's videos; instead the host makes comments about Jukin's videos that highlight their ridiculousness by creating fictionalized narratives of how the events transpired, using similes, or by directly mocking the depicted events and people.
> …
> This is not a case where the addition of minimal narration, an introduction, or text did not change the essential character of the original work.

*Id.* at 1104-05.

Here, Defendants' use is nearly identical to that in *Equal's Three.* Their commentary directly mocks the ridiculousness of the Work's plot, dialogue, characters, and action sequences. St. 58. Defendants created fictional narratives about the Work, like imagining what BG will do when he catches the Woman and parodying the audience's response to the Work. St. 60. No reasonable juror would view their commentary as merely "minimal narration, an introduction, or text" that "did not change the essential character of the original work."

For all these reasons, it is obvious the Critique Video may reasonably be perceived as transformative comment and critique and no reasonable juror would think otherwise.

/ / /

/ / /

/ / /

/ / /

19

2.     **The Fourth Fair Use Factor Favors Defendants**

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell,* 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)).[3] The Supreme Court made it clear: because a critique "may quite legitimately aim at garroting the original, destroying it commercially as well as artistically, [Citation] the role of courts is to **distinguish** between 'biting **criticism** that merely **suppresses demand** and **copyright infringement** which **usurps it.**'" *Campbell,* 510 U.S. at 592 (emphasis added; internal brackets omitted) (quoting *Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir. 1986)).

The Second Circuit has "made clear that 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.'" *Cariou,* 714 F.3d at 708 *Blanch,* 467 F.3d at 258 (same); *NXIVM,* 364 F.3d at 481-82 (same). "If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a **devastating review of a book that quotes liberally from the original to show how silly and poorly written it is**), this transformative use will be found to be fair use, notwithstanding the harm." *On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001) (emphasis added).

It is undisputed: Defendant's Critique Video generated views and revenue for the Work. The Work's views and revenue flat-lined three months before the Critique Video was posted.

_____

[3] Given the Court's interest, Defendants shall discuss the fourth factor next. But Defendants also believe the burden of proof to show market harm is on the Plaintiff, not Defendants. *See Blanch,* 467 F.3d at 248 (finding Plaintiff could not prove market harm); *cf. Adobe Sys. Inc. v. Christenson,* 809 F.3d 1071, 1079 (9th Cir. 2015) ("fairness dictates that a litigant ought not have the burden of proof with respect to facts particularly within the knowledge of the opposing party."). Proof of market harm is within the exclusive knowledge of Plaintiff, therefore, he should bear the burden on this factor.

After Defendants posted the Critique Video on February 15, 2016, the Work experienced a spike in views and revenue. St. 38. Plaintiff confirmed this at his deposition and admitted he has no evidence that Defendants' use siphoned views or revenue. St. 39. To the contrary, in the month following the spike, the Work experienced an increase of views and revenue.[4] St. 40.

Plaintiff cannot argue Defendants' use harmed his ability to license his Work for critical reaction videos because "the law recognizes no derivative market for critical works." *Campbell,* 510 U.S. at 592. Also, the fact that a critique "may impair the market for derivative uses by the very ***effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market***." *Id.* at 593 (emphasis added). The Supreme Court explained:

> This distinction between potentially remediable displacement and unremediable disparagement is reflected in the rule that there is no protectible derivative market for criticism. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

*Campbell,* 510 U.S. at 592. Plaintiff cannot argue he has a market to license the Work for critiques exposing how it is misogynistic, pornographic and creates a false reality about masculinity. As such, it is indisputable:  Plaintiff has suffered no market harm.

### 3.    The Third Fair Use Factor Favors Defendants

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *TCA*, 839 F.3d at 185 (internal ellipsis omitted) (quoting *Campbell,* 510 U.S. at 586);

---

[4] Defendants hope this illustrates that, when a reaction video provides new insights and meaning to the original, it increases the market for the original by enticing the viewer of the secondary work to experience the original on their own. *See Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 693 (7th Cir. 2012).

*Blanch,* 467 F.3d at 257. "The law does not require that the secondary artist may take no more than is necessary." *Cariou,* 714 F.3d at 710 (citing *Campbell,* 510 U.S. at 588; *Leibovitz,* 137 F.3d at 114). "[W]here an evaluation or description is being made, copying the exact words may be the only valid way precisely to [*sic*] report the evaluation." *Swatch,* 756 F.3d at 85.

The amount and substantiality of Defendants' use was reasonable in light of their purpose to: (1) place the Work in historical context; (2) expose Plaintiff's Work as misogynistic pseudo pornography; (3) critique the masculinity of BG in the Work and Series; and (4) critique Plaintiff for creating such works. St. 31. At deposition, Ethan went into great detail explaining Defendants' thesis, how it manifested itself and why each clip served as evidence to establish and prove their thesis clearly. St. 61. Their purpose was to prove how these criticisms applied to the entire Work and were not isolated occurrences taken out of context. St. 62. Moreover, Defendants' criticisms – particularly on the misogynistic and pornographic portrayal of Plaintiff's female character and deconstructing the image of BG's masculinity – extended, not just to the Work itself, but the entire Series. St. 34. Therefore, in light of Defendants' highly transformative critique and the fact their use increased the market for the original, there can be no dispute: Defendants' use of the clips from the Work was reasonable.

### 4.  The Second Fair Use Factor Favors Defendants

The second statutory factor examines whether the Work is (1) creative or factual; and (2) published or unpublished. *Cariou,* 714 F.3d at 709-10 (quoting *Blanch,* 467 F.3d at 256). "The second factor has rarely played a significant role in the determination of a fair use dispute." *Author's Guild,* 802 F.3d at 220 (Leval, J.) (citing William F. Patry, *Patry on Fair Use* § 4.1 (2015)). The fact that the Work is creative is of "limited usefulness where, as here, the creative work of art is being used for a transformative purpose." *Cariou,* 714 F.3d at 710 (internal quotes omitted) (quoting *Bill Graham,* 448 F.3d at 612). Nor is this a situation where Defendants

22

usurped "the author's right to control the first public appearance of his expression." *Swatch,* 756

F.3d at 88. Therefore, this factor favors Defendants, given the highly transformative nature of the

Critique Video and the limited weight given to this factor.

**B.     Plaintiff's DMCA Misrepresentation Claim Must Fail**

As this Court noted, Plaintiff's DMCA claim is "exceedingly weak." (ECF #79, p. 3 n.1).

He cannot show Defendants "knowingly materially misrepresent[ed] … that material or activity

was removed or disabled by mistake or misidentification." 17 U.S.C. § 512(f). Even assuming

Defendants' Critique Video is not fair use (which it is), Plaintiff cannot prove Defendants lacked

a "good faith belief" that the Critique Video was erroneously taken down. *See Id.* at §

512(g)(3)(C); *cf. Lenz v. Universal Music Corp.,* 815 F.3d 1145, 1153–54 (9th Cir. 2016), *cert.*

*denied,* 137 S. Ct. 416 (2016) (applying a "subjective good faith belief" standard – not objective

standard – to issuers of takedown notices). The counter-notice demonstrates Defendants' good

faith belief. St. 49. Ethan explained at great length why Defendants considered the Critique

Video to be fair use. St. 61. They have policies to ensure their reaction videos constitute fair use,

which are nearly identical to those found in the Code of Best Practices in Fair Use of Online

Videos. St. 28. Indeed, Defendants' defense of this lawsuit is a testament to their belief that the

Critique Video is fair use and taken down erroneously. Moreover, if the Critique Video is fair

use, this claim fails under any scenario. As such, Plaintiff's DMCA claim must fail.

**C.     Plaintiff's Defamation Claim Must Fail**

As this Court noted, Plaintiff's defamation claim is "exceedingly week." (ECF #79, p. 3

n.1). It fails under the substantial truth doctrine. "If an allegedly defamatory statement is

'substantially true,' a claim of libel is 'legally insufficient and should be dismissed'" *Franklin v.*

*Daily Holdings, Inc.,* 135 A.D. 3d 87, 94 (N.Y. App. Div. 2015) (internal brackets and ellipsis

omitted) (quoting *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir. 1986); *Biro v.*

*Condé Nast,* 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)). "As a defense, 'truth need not be established to an extreme literal degree. Provided that the defamatory material on which the action is based is substantially true (***minor inaccuracies are acceptable***), the claim to recover damages must fail." *Ingber v. Lagarenne,* 299 A.D. 2d 608, 609 (2002) (quoting *Love v Morrow & Co.,* 193 A.D. 2d 586, 587 (1993)). "The accuracy of the report should be assessed on the publication as a ***whole, not isolated portions*** of it [and a] defendant is held only to a standard of substantial, not literal, accuracy." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 233 (S.D.N.Y. 2015) (emphasis added) (quoting *Karedes v. Ackerley Grp.,* 423 F.3d 107, 114 (2d Cir. 1986)).

"A statement is substantially true if the statement would ***not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced***'" *Franklin,* 135 A.D. 3d at 94 (emphasis added) (quoting *Biro,* 883 F. Supp. 2d at 458; *Jewell v. NYP Holdings, Inc.,* 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998); *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934)). "Indeed, it is well settled in New York 'that an alleged libel is not actionable if the published statement could have ***produced no worse an effect on the mind of a reader than the truth pertinent to the allegation***" *Franklin,* 135 A.D. 3d at 94  (emphasis added) (quoting *Guccione,* 800 F.2d at 302; citing *Fleckenstein,* 266 N.Y. at 23, 193 N.E. 537; *Fulani v. New York Times Co.,* 260 A.D. 2d 215 (1st Dept. 1999)).

Plaintiff cannot dispute that the Lawsuit Video is substantially true. He cannot deny he made the settlement demands described in the Lawsuit Video. St. 46, 48. He cannot deny that he made the allegations contained in his FAC. St. 52. He cannot deny he initiated this lawsuit. Rather, the entire premise of Plaintiff's claim is that Defendants are responsible for this lawsuit because they believed the Critique Video was fair use, refused to take it down and directed

Plaintiff to speak with their attorney if he wished to pursue his threat of legal action. This, according to Plaintiff, "forced" him to find an attorney and sue. St. 43-44. But Plaintiff ignores that he threatened legal action first and denied the possibility Defendants engaged in fair use. St. 43. Furthermore, no reasonable juror would believe the inclusion of the Email would create a different effect on the mind of the viewer. Plaintiff fails to realize the public backlash was due to him initiating this lawsuit and insisting the Critique Video was not fair use.

Plaintiff claims that Defendants' defamed him by omitting mention of the Email in the Lawsuit Video. St. 63. Defamation claims "based on the *omission* of facts" require an omission resulting in "*materially* changing the meaning of the statement expressed." *Biro,* 883 F. Supp. 2d at 466 (emphasis added). No reasonable juror would think the omission was material because it would not change the reality that Plaintiff sent the settlement demands, elected to sue and file an FAC containing absurd allegations. As such, Defendants' defamation claim must fail.

## V.    CONCLUSION

Plaintiff may be bold, but well-settled law and undisputed facts are not the women in his videos; he cannot win this lawsuit by persistently denying their hostility. He may not recognize that Defendants engaged in fair use, but no reasonable juror would agree with him. He may not believe Defendants had a good faith belief that the Critique Video was erroneously taken down, but no reasonable juror would agree with him. He may believe Defendants defamed him by omitting mention of his Email, but no reasonable juror would agree with him. Rather, this is a fantasy best left for Plaintiff's videos, not a Court of law.

For the reasons stated above, Defendants respectfully request this Court to grant their Motion in full and enter judgment against Plaintiff on all his claims.

ACTIVE\44413742.v1-2/13/17

DATED:  February 13, 2016

**FOX ROTHSCHILD LLP**

By: <u>/s/ Rom Bar-Nissim</u>
    Caroline A. Morgan
    Fox Rothschild LLP
    100 Park Avenue, 15th Fl.
    New York, NY 10017
    Telephone: 212-878-7900
    Fax: 212-692-0940

    Jeffrey S. Kravitz (admitted *pro hac vice*)
    Rom Bar-Nissim (admitted *pro hac vice*)
    Fox Rothschild LLP
    1800 Century Park East, Suite 300
    Los Angeles, CA 90067-1506
    Telephone: 310-598-4150
    Facsimile: 310-556-9828
    Attorneys for Defendants

26