Page 1

1                   UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF NEW YORK

3

4

   MATT HOSSEINZADEH,                    )

5                                        )

                      Plaintiff,         )

6                                        )

                vs.                      ) Civ. Action No.

7                                        ) 16-CV-3081 (KBF)

   ETHAN KLEIN and HILA KLEIN,           ) ECF Case

8                                        )

                      Defendants.        )

9    _____)

10

11

12

13               DEPOSITION OF ETHAN KLEIN

14               Los Angeles, California

15             Thursday, December 29, 2016

16                      Volume I

17

18

19

20    Reported by:

      AMANDA J. KALLAS

21    CSR No. 13901

22    Job No. 2506655

23    PAGES 1 - 318

24

25

Page 2

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4

    MATT HOSSEINZADEH,                    )

5                                         )

                        Plaintiff,        )

6                                         )

     vs.                                  )   Civ. Action No.

7                                         )   16-CV-3081 (KBF)

    ETHAN KLEIN and HILA KLEIN,           )   ECF Case

8                                         )

                        Defendants.       )

9    _____ )

10

11

12

13

14

15       Deposition of ETHAN KLEIN, Volume I, taken on behalf of

16      Plaintiff, at 707 Wilshire Boulevard, Suite 3500, Los

17      Angeles, California, beginning at 9:23 A.M. and ending at

18      6:15 P.M. on Thursday, December 29, 2016, before Amanda J.

19      Kallas, Certified Shorthand Reporter No. 13901.

20

21

22

23

24

25

                                                              Page 3

1       A P P E A R A N C E S:

2

3       For Plaintiff:

4           THOMPSON BUKHER LLP

5           BY:  TIM BUKHER, ESQ.

6                (APPEARING TELEPHONICALLY)

7                MIKE THOMPSON, ESQ.

8                (APPEARING TELEPHONICALLY)

9           75 BROAD STREET

10          SUITE 2120

11          NEW YORK, NEW YORK 10017

12          212-920-6050

13          TBUKHER@THOMPLEGAL.COM

14

15      For Defendants:

16          FOX ROTHSCHILD LLP

17          BY:  ROM BAR-NISSIM, ESQ.

18               JEFFREY S. KRAVITZ, ESQ.

19               (APPEARING TELEPHONICALLY)

20          1800 CENTURY PARK EAST

21          SUITE 300

22          LOS ANGELES, CALIFORNIA 90067

23          310-598-4150

24          RBAR-NISSIM@FOXROTHSCHILD.COM

25

Ethan Klein                                            December 29, 2016

                                                    Page 4

1        A P P E A R A N C E S (CONTINUED):

2

3        Also Present:

4                 CHRIS LANDRUM, IT TECH

5                 HILA KLEIN, DEFENDANT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ethan Klein                                          December 29, 2016

Page 5

1                            INDEX

2    WITNESS                              EXAMINATION

3    ETHAN KLEIN

4              (By Mr. Bukher)              16

5

6

7          QUESTIONS INSTRUCTED NOT TO ANSWER

8                    Page       Line

9                    312         17

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:16-cv-03081-KBF   Document 92-5   Filed 02/27/17   Page 6 of 196

1                   EXHIBITS

2   NUMBER              DESCRIPTION              PAGE

3   Exhibit 1    LIST OF VIDEOS FROM THE ETHAN   54

4                AND HILA CHANNEL

5

6   Exhibit 2    LIST OF VIDEOS FROM THE h3h3    70

7                CHANNEL

8

9   Exhibit 3    YOUTUBE ANALYTICS SPREADSHEET   101

10               BY VIDEO TITLE FOR THE ETHAN

11               AND HILA CHANNEL

12               BATES: DEF000560

13

14  Exhibit 4    YOUTUBE ANALYTICS SPREADSHEET   110

15               BY DATE FOR THE ETHAN AND HILA

16               CHANNEL

17               BATES: DEF000560

18

19  Exhibit 5    YOUTUBE ANALYTICS SPREADSHEET   115

20               BY VIDEO TITLE FOR THE h3h3

21               CHANNEL

22               BATES: DEF000559

23

24

25

1                        EXHIBITS

2    Exhibit 6    YOUTUBE ANALYTICS SPREADSHEET    115

3                 BY DATE FOR THE h3h3 CHANNEL

4                 BATES: DEF000559

5

6

7                 ***EXHIBIT 7 NOT MARKED***

8    Exhibit 8    EMAIL RE: "[COPYRIGHT TAKEDOWN    165

9                 NOTICE] YOUR VIDEO HAS BEEN

10               TAKEN DOWN FROM YOUTUBE:

11               PRANKINVASION - h3h3 REACTION

12               VIDEO"

13               BATES: DEF000012 - 000013

14

15   Exhibit 9    EMAIL RE: "[COPYRIGHT TAKEDOWN    165

16               NOTICE] YOUR VIDEO HAS BEEN

17               TAKEN DOWN FROM YOUTUBE:

18               KISSING PRANKS - h3h3 REACTION

19               VIDEO"

20               BATES: DEF000016 - 000017

21

22

23

24

25

Ethan Klein                                    December 29, 2016

Page 8

```
 1                     EXHIBITS

 2   Exhibit 10    EMAIL RE: "[COPYRIGHT TAKEDOWN    168

 3                 NOTICE] YOUR VIDEO HAS BEEN

 4                 TAKEN DOWN FROM YOUTUBE: YEARS

 5                 AGO EXE [h3h3 Productions]"

 6                 BATES: DEF000018 - 000019

 7

 8   Exhibit 11    EMAIL RE: "[6-2944000011509]    169

 9                 NEW COPYRIGHT

10                 COUNTER-NOTIFICATION"

11                 BATES: DEF000184 - 000185

12

13   Exhibit 12    EMAIL RE: "[9-8970000013098]    170

14                 COPYRIGHT TAKEDOWN REQUEST

15                 RECEIVED FOR YOUR YOUTUBE

16                 VIDEO"

17                 BATES: DEF000010 - 000011

18

19   Exhibit 13    EMAIL RE: "COPYRIGHT    172

20                 INFRINGEMENT"

21                 BATES: DEF000190 - 000193

22

23

24                 ***EXHIBIT 14 NOT MARKED***

25
```

Ethan Klein                                          December 29, 2016

                                                      Page 9

1                          EXHIBITS

2    Exhibit 15    INFRINGING VIDEO                    217

3                  0,00 - 1,43.MP4

4                  ***NOT ATTACHED***

5

6    Exhibit 16    INFRINGING VIDEO                    220

7                  1,43 - 2,07.MP4

8                  ***NOT ATTACHED***

9

10   Exhibit 17    INFRINGING VIDEO                    224

11                 10,00 - 10,17.MP4

12                 ***NOT ATTACHED***

13

14   Exhibit 18    INFRINGING VIDEO                    261

15                 10,17 - 10,39.MP4

16                 ***NOT ATTACHED***

17

18   Exhibit 19    INFRINGING VIDEO                    265

19                 10,39 - 11,02.MP4

20                 ***NOT ATTACHED***

21

22   Exhibit 20    INFRINGING VIDEO                    268

23                 11,02 - 11,19.MP4

24                 ***NOT ATTACHED***

25

Ethan Klein                                                    December 29, 2016

Page 10

```
1                           EXHIBITS

2      Exhibit 21    INFRINGING VIDEO                 270

3                    11,19 - 12,07.MP4

4                    ***NOT ATTACHED***

5

6      Exhibit 22    INFRINGING VIDEO                 274

7                    12,07 - 13,47.MP4

8                    ***NOT ATTACHED***

9

10     Exhibit 23    INFRINGING VIDEO                 225

11                   2,07 - 3,31.MP4

12                   ***NOT ATTACHED***

13

14     Exhibit 24    INFRINGING VIDEO                 233

15                   3,31 - 5,02.MP4

16                   ***NOT ATTACHED***

17

18     Exhibit 25    INFRINGING VIDEO                 236

19                   5,02 - 6,48.MP4

20                   ***NOT ATTACHED***

21

22     Exhibit 26    INFRINGING VIDEO                 237

23                   6,48 - 7,27.MP4

24                   ***NOT ATTACHED***

25
```

Ethan Klein                                    December 29, 2016

Page 11

```
 1                     EXHIBITS

 2    Exhibit 27    INFRINGING VIDEO              241

 3                  7,27 - 8,12.MP4

 4                  ***NOT ATTACHED***

 5

 6    Exhibit 28    INFRINGING VIDEO              242

 7                  8,12 - 9,12.MP4

 8                  ***NOT ATTACHED***

 9

10    Exhibit 29    INFRINGING VIDEO              251

11                  9,12 - 10,00.MP4

12                  ***NOT ATTACHED***

13

14    Exhibit 30    DEFAMATORY VIDEO 1.MP4        282

15                  ***NOT ATTACHED***

16

17    Exhibit 31    DEFAMATORY VIDEO 2.MP4        284

18                  ***NOT ATTACHED***

19

20    Exhibit 32    DEFAMATORY VIDEO 3.MP4        288

21                  ***NOT ATTACHED***

22

23    Exhibit 33    DEFAMATORY VIDEO 4.MP4        293

24                  ***NOT ATTACHED***

25
```

Ethan Klein                                    December 29, 2016

                                                        Page 12

1                        EXHIBITS

2    Exhibit 34    DEFAMATORY VIDEO 5.MP4           294

3                  ***NOT ATTACHED***

4

5    Exhibit 35    DEFAMATORY VIDEO 6.MP4           297

6                  ***NOT ATTACHED***

7

8

9            ***EXHIBIT 36 NOT MARKED***

10   Exhibit 37    THE LAST EPISODE OF ETHAN AND    90

11                 HILA.MP4

12                 ***NOT ATTACHED***

13

14   Exhibit 38    WHO ARE THE FINE BROTHERS.MP4    142

15                 ***NOT ATTACHED***

16

17   Exhibit 39    CENSORSHIP ON YOUTUBE.MP4        151

18                 ***NOT ATTACHED***

19

20

21         ***EXHIBITS 40 AND 41 NOT ATTACHED***

22   Exhibit 42    MARSHAL POPE VIDEO.MP4           178

23                 ***NOT ATTACHED***

24

25

Page 13

1                          EXHIBITS

2    Exhibit 43    PRANKINVASION VIDEO.MP4              207

3                  ***NOT ATTACHED***

4

5    Exhibit 44    PI EXCERPT.MP4                       181

6                  ***NOT ATTACHED***

7

8    Exhibit 45    PI EXCERPT.MP4                       186

9                  ***NOT ATTACHED***

10

11   Exhibit 46    PI EXCERPT.MP4                       188

12                 ***NOT ATTACHED***

13

14   Exhibit 47    PI EXCERPT.MP4                       189

15                 ***NOT ATTACHED***

16

17   Exhibit 48    PI EXCERPT.MP4                       191

18                 ***NOT ATTACHED***

19

20   Exhibit 49    PI EXCERPT.MP4                       192

21                 ***NOT ATTACHED***

22

23   Exhibit 50    PI EXCERPT.MP4                       195

24                 ***NOT ATTACHED***

25

Ethan Klein                                                December 29, 2016

                                                            Page 14

1                          EXHIBITS

2    Exhibit 51    PI EXCERPT.MP4                            198

3                  ***NOT ATTACHED***

4

5    Exhibit 52    EMAIL RE: "CEASE AND DESIST RE.  300

6                  ETHAN KLEIN AND HILA KLEIN"

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ethan Klein                                        December 29, 2016

Page 15

1    Thursday, December 29, 2016; Los Angeles, California

2                        9:23 A.M.

3                       -- o0o --

4

5                    ETHAN KLEIN,

6      the witness, having been administered an oath in

7       accordance with CCP Section 2094, testified as

8                        follows:

9

10           THE WITNESS:  All right.

11           MR. BAR-NISSIM:  And Tim, just so we have

12    it on the record, as we discussed the other day,

13    objections will just be as though set on the FRCP,

14    and we'll have 30 days to review and revise;

15    correct?

16           MR. BUKHER:  That's correct; we're

17    stipulating to that.

18           MR. BAR-NISSIM:  Okay.  And just so you

19    know, when we get into certain sections that deal

20    with the financials, I'll be designating the

21    deposition as confidential; okay?

22           MR. BUKHER:  That's fine.

23           MR. BAR-NISSIM:  Okay.

24           MR. BUKHER:  Sorry; but I'm hearing an echo

25    of myself in the background.  Are there multiple

Ethan Klein

December 29, 2016

Page 24

1        And are you -- are you literate in Hebrew?

2   I'm assuming not, if you said you didn't speak

3   Hebrew.

4        A    No.

5        Q    So your role was to edit English language

6   marketing articles?

7        A    Correct.

8        Q    And how long did you do that for?

9        A    Five years.

10       Q    And just so I have the dates, you said you

11  graduated from Santa Cruz in 2009; is that correct?

12       A    I can't recall the specific year, but to

13  the best of my knowledge, that is correct.

14       Q    Okay.  So to the best of your knowledge,

15  2009 through, would you say, 2014, you worked for

16  this marketing company in Israel?

17       A    Yes.

18       Q    All right.  And what did you do after that

19  for employment?

20       A    I started doing YouTube at that -- after

21  that.  I quit working there because my YouTube

22  channel had started picking up.

23       Q    And when you say your "YouTube channel,"

24  what are you referring to?

25       A    h3h3 Productions.

Ethan Klein                                    December 29, 2016

Page 25

1      Q    Was that your first YouTube channel?

2      A    Yes.

3      Q    And when did you start that?

4      A    I would say -- I can't recall the specific

5    date; but if I had to estimate, I would say 2010.

6      Q    So you were still at the Israeli marketing

7    company when you started your YouTube channel?

8      A    Correct.

9      Q    Okay.  And what kind of content did you

10   post to that channel?

11     A    Comedy.

12     Q    When you say "comedy," was it comedy of

13   films of yourself?  Or some other films?  Can -- can

14   you just elaborate on that?

15          MR. BAR-NISSIM:  Objection.  Vague and

16   ambiguous.

17   BY MR. BUKHER:

18     Q    Well, when you say "comedy," what do you

19   mean by that?

20     A    Videos intended to make my audience laugh.

21     Q    Okay.  Were these videos of yourself?

22     A    Yes.

23     Q    Did you ever feature other people in those

24   videos?

25     A    Yes.

1        Q    Did you film those other people?  Or

2    were -- well, let's -- let's keep it at that.

3             Did you film those other people?

4        A    At time -- yes, sometimes.

5        Q    When you say "sometimes," did you do

6    something else other times?

7             MR. BAR-NISSIM:  Objection.  Vague and

8    ambiguous.

9             THE WITNESS:  I -- can you clarify?

10   BY MR. BUKHER:

11       Q    Well, you said "sometimes," what do you

12   mean by "sometimes"?

13            MR. BAR-NISSIM:  Again, objection.  Vague

14   and ambiguous.

15            THE WITNESS:  I don't know what you're --

16   BY MR. BUKHER:

17       Q    I'm simply asking what you meant when you

18   said that sometimes you featured other people in

19   your video.

20       A    Some- --

21       Q    What do you mean by "sometimes"?

22       A    Some videos were of me, and some videos

23   were featuring other people.

24       Q    And you said sometimes you filmed them; is

25   that correct?

Page 27

1    A    That's correct.

2    Q    Okay.  And other times, did they film

3    themselves?

4    A    Yes.

5    Q    And did they submit those films of

6    themselves to you?

7    A    No.

8    Q    How did you get those films?

9    A    Usually on the internet.  I mean, on the

10   internet.

11   Q    Can you elaborate on that?  What did you

12   mean by "on the internet"?

13   A    Sorry, could you repeat the question?  I

14   was coughing.

15   Q    No -- no problem.

16        What do you mean by "on the internet"?

17   A    Websites, YouTube, reddit.

18   Q    Okay.  And just to be clear with you, you

19   know, I'm not acting stupid, I know what you're

20   talking about; the reason I'm trying to elaborate

21   is, you know, the Court will be reading this, they

22   may not know what we're talking about.  So to that

23   extent, I'm just trying to be as broad as possible.

24        So when you say that you sometimes took

25   these videos off of YouTube, reddit, how did you

Ethan Klein                                    December 29, 2016

Page 29

```
 1    I didn't --
 2              THE WITNESS:  Can you clarify your
 3    question?
 4    BY MR. BUKHER:
 5         Q    Sure.
 6              You said that your initial videos, for h3h3
 7    Productions, were comedy.
 8         A    Yes.
 9         Q    Is that correct?
10         A    Yes.
11         Q    And you said you sometimes used other
12    people's videos --
13         A    Correct.
14         Q    -- for --
15              Okay.  And did you use them for the comedic
16    value?
17         A    No.
18         Q    Okay.  What did you use them for?
19         A    Because I had something critical to say
20    about them.
21         Q    And in saying something critical about
22    them, did that serve the purpose of comedy for your
23    initial videos?
24         A    Yes.
25         Q    Okay.  So saying something critical about
```

Ethan Klein                                          December 29, 2016

1    these other videos was funny?

2        A    Yes.

3        Q    Okay.  So just going back, you said that

4    you started your channel around 2010.  You continued

5    to work for this marketing company until around

6    2014; is that correct?

7        A    Approx- --

8             MR. BAR-NISSIM:  Objection.  Compound.

9             THE WITNESS:  Approximately correct.

10   BY MR. BUKHER:

11       Q    Okay.  Did you have any other jobs after

12   that?  Or did you switch over to working full time

13   with your channel?

14       A    Full time to You- -- doing YouTube.

15       Q    And was that around 2014 that you switched

16   to YouTube full time?

17       A    Yes.

18       Q    And are you familiar with the

19   Ethan and Hila channel?

20       A    Yes.

21       Q    When did that start?

22       A    That channel started beginning of 2016, my

23   best guess would be; although, I cannot speculate.

24   I can't recall the exact date.

25       Q    So there -- you're saying there was no

Ethan Klein                                    December 29, 2016

Page 31

1     Ethan and Hila channel before 2016?

2          A     No.

3          Q     Okay.

4          A     I don't re- --

5          Q     And just to confirm, you --

6                MR. BAR-NISSIM:  Just a second --

7                MR. BUKHER:  Sorry, go ahead.

8                MR. BAR-NISSIM:  -- he wanted to explicate

9     on his answer.

10               Go ahead, Ethan.

11               THE WITNESS:  I -- I don't recall how --

12    how long, specifically, that channel was created,

13    but I can say that it was made well after the h3h3

14    Productions channel was created.

15    BY MR. BUKHER:

16         Q     Okay.  So we'll back up then.

17               You're not sure whether it existed before

18    2016, but not much longer before 2016; right?

19         A     I can't recall the specific date; only that

20    it was created well after h3h3 Productions.

21         Q     Okay.  That's fine.  And -- and just to

22    confirm, you created the Ethan and Hila channel; is

23    that correct?

24         A     Yes.

25         Q     Okay.  And did you also call it the h2h2

Page 36

1    in order to create a -- an entity.  The -- the --

2             Does that clarification make sense to you?

3        A    Are you asking me if I created a

4    incorporation to create the channels?

5        Q    No.  But are the channels run by any

6    corporation or any other type of entity that you've

7    created?

8        A    We do have a company, but I'm not sure I

9    understand what it is you are asking me.

10       Q    All right.  Well, let's talk about the

11   company.

12            What's the company that you have?

13       A    It's called Ted Entertainment, Inc.

14       Q    And when you say "we own a company," who

15   are you referring to?

16       A    Me and my wife.

17       Q    And -- and can you please just state your

18   wife's name for the record?

19       A    Hila Klein.

20       Q    And when did you incorporate

21   Ted Entertainment?

22       A    I don't recall the exact date.

23       Q    Was it after 2010?

24       A    Yes.

25       Q    Was it after 2014?

Ethan Klein                                    December 29, 2016

Page 46

1    vice president as well?

2        Q    No.  Apart from -- apart from yourself and

3    Ms. Klein.

4        A    No.

5        Q    Okay.  But Ted Entertainment does collect

6    revenues generated by the h3h3 channel; is that

7    correct?

8        A    Yes.

9        Q    Okay.  Now, the h3h3 channel is a YouTube

10   channel; is that correct?

11       A    Correct.

12       Q    Is that YouTube channel -- let me back up.

13            That's registered in connection with a

14   YouTube account?

15            MR. BAR-NISSIM:  Objection.  Vague and

16   ambiguous.

17            THE WITNESS:  Can you -- can you clarify

18   your question, please?

19            MR. BUKHER:  Sure.

20   BY MR. BUKHER:

21       Q    Do you -- do you have an understanding of

22   what a YouTube account is?

23       A    I don't know if I understand the

24   terminology you've used.

25       Q    Have you ever heard of the word, "account,"

Page 49

1       Q    Is there any way for you to log into the

2    Ethan and Hila channel other than via the

3    HilaLilushKlein@gmail.com account?

4       A    No.

5       Q    Now, going back a bit to the content that's

6    on the h3h3 channel.

7            Is that similar to the content that's on

8    the H- -- on the Hila and Ethan channel?

9       A    Yes.

10      Q    Do the two channels have identical purpose?

11           MR. BAR-NISSIM:  Objection.  Vague and

12   ambiguous.

13           THE WITNESS:  Can you -- can you clarify --

14   clarify your question?

15   BY MR. BUKHER:

16      Q    Yeah, that's fair enough; I wasn't being

17   clear.  I'm sorry.

18           You said earlier, that the H2- -- h3h3

19   channel, its purpose was to showcase comedy videos;

20   is that correct?

21      A    Correct.

22      Q    Is that still its purpose today?

23      A    Yes.

24      Q    Has that always been its purpose?

25      A    Yes.

Page 50

1      Q    Okay.  Now, switching over to Ethan and

2    Hila channel, is -- has -- is the purpose of that

3    channel to showcase comedy videos?

4      A    Yes.

5      Q    Has --

6      A    No.  Not entirely, no.

7      Q    -- it always been --

8      A    Well, yeah.  Yeah.  No.  Comedy, yeah,

9    sorry, it is comedy videos, yes.

10      Q    Okay.  And has it always been its purpose,

11    to showcase comedy videos?

12      A    Yes.

13      Q    Do other -- do either of the channels

14    showcase any other types of videos other than

15    comedy?

16      A    I -- I can't recall.  But -- no, I can't --

17    I can't recall any specific example.

18      Q    And do you consider yourself a comedian?

19      A    Yes.

20      Q    Or -- or a comic personality, would that be

21    accurate?

22      A    Yes.

23      Q    Do you consider yourself a literary critic?

24      A    No.

25      Q    Do you consider yourself a film critic?

Ethan Klein                                          December 29, 2016

Page 51

1        A     No.

2        Q     Does the term, "reaction video," mean

3    anything to you?

4        A     Yes.

5        Q     What is your understanding of the term,

6    "reaction video"?

7        A     In the way that -- that we use it, it

8    refers to us giving a critical analysis, parodying,

9    commentarying on a specific video or -- and in most

10   cases, a specific video.

11       Q     When you say "specific video," do you mean

12   your own video?

13       A     No.

14       Q     You mean some other person's video?

15       A     Yes.

16       Q     Okay.

17             MR. BAR-NISSIM:  Tim, are we approaching a

18   point where we could have a quick bathroom break

19   sometime soon?

20             MR. BUKHER:  Yeah.  Mr. Klein -- and if you

21   don't mind, I'll -- sometimes I might refer to you

22   as Ethan, but if you mind, let me know.

23             THE WITNESS:  I don't mind.

24             MR. BUKHER:  If, at any point, you want

25   to -- thank you.

Ethan Klein                                    December 29, 2016

Page 52

```
 1            If, at any point, you want to take a break,
 2    just let me know.
 3            THE WITNESS:  I could use the restroom,
 4    actually.
 5            MR. BUKHER:  Okay.  Let's take a
 6    five-minute break.
 7      (Whereupon there was a break in the proceedings.)
 8    BY MR. BUKHER:
 9       Q    Okay.  So we were just talking about the
10    types of videos that you had on the h3h3 channel, on
11    the Ethan and Hila channel, and I asked you about
12    reaction videos, if you recall.
13            Can you please -- and I'm sorry if I'm
14    asking you to repeat yourself; we just took a break.
15       A    No problem.
16       Q    Walk me through what a reaction video
17    means.
18       A    A reaction video, as it pertains to us,
19    specifically, means being critical and analytical,
20    offering our personal insight, in a comedic way --
21       Q    Okay.
22       A    -- while -- while reviewing --
23            MR. BAR-NISSIM:  Just a second, Tim, let
24    him finish.
25            THE WITNESS:  While -- while reviewing
```

Ethan Klein                                                      December 29, 2016

1    someone else's video.

2    BY MR. BUKHER:

3        Q    Okay.  And -- and then you said, "as

4    pertains to you," does -- does the term react video,

5    as it pertains to someone else, mean something

6    different?

7        A    I can't speculate what it means to other

8    people.

9        Q    Okay.  Well, when you say "as pertains to

10   us," do you mean as to just you, personally?  Or do

11   you mean the greater YouTube community?

12       A    I can only speak for myself.

13       Q    Do you -- well, I'm not going to ask you to

14   speculate.

15           Can we agree that if I use the term,

16   "react," as in, have you ever reacted to this, I'm

17   asking you whether you've ever posted a reaction

18   video?  Along some- -- those lines?  Can we agree to

19   that definition?

20       A    Not -- no.  I don't think so.

21       Q    Okay.  Can -- can we say that all of the

22   videos, that you've posted to the h3h3 channel, are

23   reaction videos?  Or are there other types of

24   videos?

25       A    There are other types of videos.

Ethan Klein                                    December 29, 2016

Page 71

```
 1        A    Not -- not that I recall, specifically.

 2        Q    To your recollection, has it ever reacted

 3    to any novels?

 4        A    Not that I recall.

 5        Q    Has h3h3 ever reacted to any short stories?

 6        A    Not that I recall.

 7        Q    Has h3h3 ever reacted to any feature films?

 8        A    Not that I recall.

 9        Q    Has h3h3 ever reacted to any short films?

10        A    By your definition of a short film, I'm

11    sure there are many.

12        Q    Okay.  Well, I won't have you go through

13    them.  Why don't we switch the topic a little bit.

14             Have you ever heard of Prank Evasion [sic]?

15        A    Yes.

16        Q    And am I saying that right?  Is it prank --

17        A    Invasion.

18        Q    -- evasion?  Or invasion?

19        A    It's more of an invasion that he does; I

20    think people wish it was an evasion, but sadly, for

21    those involved, it's an invasion.

22        Q    Okay, but what is it actually called?

23    Prank --

24        A    It's PrankInvasion.

25        Q    PrankInvasion, with an "I"?
```

Ethan Klein                                      December 29, 2016

```
 1        A    Correct.

 2        Q    Okay.  What is PrankInvasion?

 3        A    PrankInvasion is a YouTube channel.

 4        Q    And what's featured on that channel?

 5        A    He has, as you defined it, I would describe

 6   as short films mostly.

 7        Q    You would describe the content of

 8   PrankInvasion as short films?

 9        A    As you -- as you described it, yes.

10        Q    Okay.  So that's scripted films, with

11   actors and a plot; right?

12        A    Correct.

13        Q    Okay.  And what -- what happens in those

14   films?  Is it all different?  Or can we talk about

15   it in general?

16        A    Oh, it's quite -- quite repetitive; I think

17   I could describe them all to you.  He basically

18   plays a --

19        Q    Could you, please?

20             Go ahead.

21        A    He plays a quick game for a quick kiss.  He

22   approaches -- in -- in his narrative, random girls

23   on the street, and he -- he does a little handshake

24   with them, he goofs them up, and then they got to

25   give him a kiss.  Sometimes it goes further --
```

Ethan Klein                                    December 29, 2016

1      Q    Now, when you say -- sorry.

2           Go ahead.

3      A    Sometimes it goes even further than a kiss.

4      Q    How far does it go?

5      A    They -- they cut off at all the good

6    moments, Tim.  So you don't know.

7      Q    Because you can't have good moments on

8    YouTube?

9      A    They leave you in suspense.  Sadly, yeah.

10     Q    When you say "he," when you refer to these

11   films, who are you talking about?

12     A    I'm talking about the -- the main character

13   of PrankInvasion, Chris, as he refers to himself in

14   the videos.

15     Q    What's the actor's name that plays the

16   character?  Do you know?

17     A    No.

18     Q    Do you know if the actor's real name is

19   Chris?

20     A    I do not know.

21     Q    Now, these videos, are they meant to be

22   conveyed as fictional?

23     A    Their intention is to be consumed as real.

24     Q    What do you mean by that?

25     A    You know, I can't -- I can't speculate as

Ethan Klein                                        December 29, 2016

1    to -- as to his intention, but it does appear to be

2    scripted.

3        Q    Well, you've reacted to his intention

4    before, on the h3h3 channel, haven't you?

5        A    Yeah.  Uh, yes.

6        Q    And what was your reaction?

7        A    My reaction was that he is, essentially,

8    selling a kind of unrealistic fantasy to -- to young

9    impressionable men, that women are easy.  And, you

10   know, he -- he's conveying a false reality,

11   essentially.

12       Q    So when you say he's "conveying a false

13   reality," are you saying that he is trying to make

14   that these short films appear as if they happened in

15   reality?

16       A    I believe that is his intention.

17       Q    So just to be clear for the record:

18            You believe that it is Prank Invasion's

19   intention to make his short films seem like they are

20   documentary; is that correct?

21       A    Yes.

22       Q    Okay.  Well, going back, for a second, to

23   the film that you mentioned, our client's film, and

24   I'm sorry, I don't recall what you called your

25   reaction video to it.  What was it again?

Ethan Klein                                      December 29, 2016

Page 75

1        A    To whom's are you speaking?  Which channel

2    are we --

3        Q    Mr. Hoss's video.

4        A    "The big, the BOLD, the Beautiful."

5        Q    Okay.  "The Big, the BOLD, the Beautiful,"

6    the video that you featured there, you considered

7    that a short film by my definition; is that correct?

8        A    Yes.

9        Q    Okay.  Do you believe that it was

10   Mr. Hoss's intention to convey that film as a

11   documentary?

12            MR. BAR-NISSIM:  Objection.  Speculative.

13            THE WITNESS:  I couldn't --

14   BY MR. BUKHER:

15       Q    Well, I --

16       A    I don't know what --

17       Q    Just to be clear -- sorry.  I interrupted

18   you, Ethan.

19       A    Uh-huh.

20       Q    I'm not asking you to speculate as to what

21   Mr. Hoss's intention was; I'm asking you what you

22   think his intention was with the film.  You told me

23   you felt your [sic] intention, with PrankInvasion,

24   was to make it seem like their films were

25   documenting real events; right?

Ethan Klein                                          December 29, 2016

Page 76

1        A    Yes.  Yes.  I did say that.

2        Q    Do you feel that -- do you feel that

3   Mr. Hoss's film was trying to document a real event?

4   Or come off that way?

5        A    I think so.

6        Q    So park -- PrankInvasion, when you say that

7   it was trying to come off as real events, are you

8   saying it made it seem as if it were not actors

9   reading scripts?

10       A    Yes.

11       Q    What about Mr. Hoss's film?  Did it seem to

12  you like it was trying to make itself seem like it

13  wasn't actors reading scripts?

14       A    I believe it's -- it's obvious in Matt's

15  film that it's scripted.

16       Q    Well, you say that it's obvious, then does

17  it seem obvious to you, in that case, that it wasn't

18  trying to come off as real life events?

19       A    I believe Matt's -- Matt's video kind of

20  spun a similar narrative of, you know, this false

21  perception of reality.  So I do believe that his

22  intention was to be based off of -- off of reality.

23       Q    What do you mean by that, that his

24  intention was to be based off of reality?

25       A    Well, he -- I believe he was trying to

Ethan Klein                                    December 29, 2016

Page 77

```
 1    express that, in a way, this -- this is his kind
 2    of -- his idea of -- of how the world is.
```

 3        Q    You mean, in the metaphysical sense?

 4        A    Can you define what you mean by that?

 5        Q    Well, are you saying he -- Mr. Hoss, Matt

 6    Hoss, was trying to express his subjective

 7    understanding of reality with his film?

 8            MR. BAR-NISSIM:  Objective -- objection.

 9    Speculative.

10            THE WITNESS:  I don't know what Matt --

11    what his intentions were to --

12    BY MR. BUKHER:

13        Q    Okay.  But you -- we noted that you've

14    reacted to the PrankInvasion films before; right?

15        A    Yes.

16        Q    And in your reaction, you -- you seem to

17    have taken issue with the fact that these films try

18    to come off as depicting real events; isn't that the

19    case?

20        A    Yes.

21        Q    Do you take issue with Mr. Hoss's film

22    trying to come off as if it's trying to depict real

23    events?

24            MR. BAR-NISSIM:  Objection.  Vague and

25    ambiguous.

1        THE WITNESS:  Can you rephrase the

2    question?  Can you be a little more concise?

3    BY MR. BUKHER:

4        Q    Sure.

5             You -- you took issue -- you've taken

6    issue, in the past, with PrankInvasion attempting to

7    portray itself as -- its films conveying real

8    events; right?

9        A    Yes.

10       Q    Do you take issue with Mr. Hoss's film

11   doing the same thing?

12       A    No.

13       Q    Why not?

14       A    It's -- it's -- it's not -- it's -- it's

15   not shot the same way.

16       Q    What do you mean by that?

17       A    Well, it's not like hidden cam, kind of

18   thing, like what PrankInvasion does.

19       Q    PrankInvasion does hidden cam?

20       A    It's kind of the -- that's the vibe you get

21   watching it.

22       Q    Well, what kind of vibe do you get watching

23   Mr. Hoss's film?

24       A    More -- more of a -- more of a Vloggy kind

25   of film.

1       Q     Sorry, I didn't understand that word.  Can

2    you say that again?

3       A     More like a Vlog, I would say.  Just, you

4    know, there's no intention to film from behind a

5    tree, or something, it's just a dude with a camera.

6       Q     Okay.  So can we go back and redefine our

7    definition of short film to exclude anything that

8    attempts to convey the impression of reality,

9    when -- when it's not, in fact, real?

10      A     If that's how you would like to define it.

11   I mean, I would disagree with -- with that

12   definition.

13      Q     Okay.  Just so that we're in agreement, can

14   we call a creative short film one that does not

15   attempt to portray itself as depicting real life

16   events?

17            MR. BAR-NISSIM:  Objection.  Asks, also,

18   for a legal conclusion.

19            THE WITNESS:  I don't believe I can...

20            MR. BUKHER:  Sorry, but I'm not asking for

21   any legal conclusions.  I'm not sure that creative

22   short film is defined in any statute anywhere; I'm

23   asking if we can agree on a definition, just for the

24   purposes of this definition, of the term, "creative

25   short film."

Ethan Klein                                    December 29, 2016

Page 89

1      A    Yes.

2      Q    So when you react to films here, you're

3   doing so in a funny way?

4      A    That's my intention.

5      Q    Your intention is to create comedy; is that

6   correct?

7      A    Correct.

8      Q    Okay.  Now, these channels, the Ethan and

9   Hila channel and the h3h3 channel, I'll just refer

10  to them as the channels, just so that I don't have

11  to ask you duplicate questions.

12         The channels, how do they generate money?

13     A    Money is generated through YouTube/Google.

14     Q    I'll be honest, I don't know anything about

15  how this works; would you mind just going into

16  detail for me?

17     A    Basically, YouTube and Google service ads

18  on your video, and they split the -- they split the

19  percentage of their earnings.

20     Q    Meaning they split it between, what,

21  YouTube, and you, the content creator?

22     A    Correct.

23     Q    Okay.  And what is the amount of money,

24  that is generated, based on?

25     A    I cannot speculate to that.

1      Q    Do you know whether it's based on the

2    number of viewers that have seen a video?

3      A    It's based on many factors that YouTube and

4    Google determine.

5      Q    Do you know what those factors are?

6      A    I do not.

7              MR. BUKHER:  Can I, please, have the tech

8    play Exhibit 37 for Mr. Klein?

9                        (Whereupon Exhibit 37

10                       was marked for identification

11                       by the court reporter and

12                       was retained.)

13             MR. LANDRUM:  Sure.

14                   (Video played.)

15   BY MR. BUKHER:

16     Q    So Mr. Klein, in this video --

17     A    Are you going to ask me if we ever got that

18   watermelon?

19     Q    No.

20     A    Okay, sorry.

21     Q    In this video, you talked about merging the

22   Ethan and Hila channel into h3h3.

23             Did you ever do that?

24     A    We stopped posting on -- on Ethan and Hila.

25     Q    Okay.  Did you ever actually merge the

Ethan Klein                                    December 29, 2016

Page 97

1    Q    Okay.  And when I say "comments," what is

2    your understanding of that term?

3    A    Leaving a comment.

4    Q    Okay.  Am I missing any other types of

5    analytics that would be relevant to you, as somebody

6    who makes their entire living from this channel?

7         MR. BAR-NISSIM:  Objection.  Vague and

8    ambiguous.

9         THE WITNESS:  I don't know what -- what

10   would -- what you would define as that.  I -- I

11   can't speculate to -- to what would be relevant to

12   me, in that regard.

13   BY MR. BUKHER:

14   Q    Okay.  And in terms of subscriber numbers,

15   does that have any correlation to how much money a

16   channel earns?

17   A    No.

18   Q    So a channel can have one subscriber and

19   make as much money as the h3h3 Production channel?

20   A    Yes.

21   Q    Does the number of viewers a channel has

22   have any correlation with how much money it earns?

23        MR. BAR-NISSIM:  Objection.  Vague and

24   ambiguous.  And speculative.

25        THE WITNESS:  I don't.  Can -- can you

Ethan Klein                                        December 29, 2016

Page 120

1    foundation.

2            THE WITNESS:  I did not seek --

3    BY MR. BUKHER:

4        Q    When you --

5        A    Go ahead.

6        Q    You said you weren't seeking to garner

7    exposure for your channels?

8        A    The collaborations were more about making

9    videos with my friends.  Exposure happened as a

10   result.

11       Q    Are you a member of any advertising

12   networks?

13       A    Can -- no.

14       Q    Okay.  Do you know the -- what I'm

15   referring to, when I say the Omnia networks?

16       A    Yes.

17       Q    What is that?

18       A    That is a YouTube network.

19       Q    And what's the purpose of that network?

20       A    It's a bit of, like, an agency for YouTube.

21       Q    What do they do?

22       A    Well, that is to -- they've -- they've

23   brought up brand deals, I suppose, is -- is what

24   they've done for us thus far.

25       Q    Can you elaborate on that?  I don't know

Ethan Klein                                    December 29, 2016

Page 121

1    your industry at all.

2         A    Yeah.  Sure.  They brought us, for example,

3    like we did an advertisement.  Like we posted

4    something on Instagram, and they -- and they paid us

5    for it.  Or they, you know, someone went through

6    them to get to us to pay them -- to have someone pay

7    us to put something on Instagram, for example.

8              Does that clarify for you?

9         Q    Yeah.  It does.

10             And -- and you're -- so you're a member of

11   the Omnia network; is that correct?

12        A    Yes.

13        Q    Now, your YouTube revenues for the

14   channels, do they come to you through the Omnia

15   network?

16        A    Yes.

17        Q    They don't come through YouTube; is that

18   correct?

19        A    They go through YouTube to Omnia.

20        Q    When you want to look at how much you've

21   earned in any given month, do you look that up on

22   YouTube?  Or does Omnia give you a way to look at

23   those analytics?

24        A    I would look those up on YouTube.

25        Q    So YouTube does have -- even though you're

Page 124

1      Q    You talked about memes in that video.

2            What did you mean by memes?

3      A    Well, I've always dreamed of being asked to

4   define what a meme is.

5      Q    Well, only as you use it in that video.

6      A    It's a -- it's -- a meme is a somewhat

7   broad, nebulous term used by internet personalities.

8   It doesn't mean anything, specifically; it's just

9   kind of a word that you lean on, it's a bit of a

10  meaningless word, if I can -- if I can define it as

11  such.

12     Q    Okay.  When you -- when you were talking in

13  this video about the -- the differences between

14  the -- the videos posted on -- well, let me back up.

15           Is there a difference between the types of

16  videos that are posted on the Ethan and Hila channel

17  versus the types of videos posted on h3h3

18  Productions?

19     A    I would say there is, yes.

20     Q    What -- what is the difference?

21     A    I think the Ethan and Hila channel was --

22  was more personal.  Or well, namely, it involved

23  Hila, hence the name.

24     Q    Do h3h3 Production videos not usually

25  involve Hila?

Ethan Klein                                    December 29, 2016

Page 125

1         A     At -- at the point, when we were making

2    Ethan and Hila videos, it was just me in front of

3    the camera, and Hila was filming, so she --

4         Q     Is there any other difference, in the

5    videos, between the two channels?

6         A     That's the biggest difference.

7         Q     You talked about, in your video, the one

8    that we just watched, you said that you take

9    episodes that you would see on Ethan and Hila, but

10   then, "we pour ourselves into it, we make it as good

11   as we can."

12              Do you recall saying that?

13        A     Yes.

14        Q     What did you mean by that?

15        A     I believe what I meant is that

16   Ethan and Hila was intended to be a little more

17   lighthearted and easy going, but it turned out that

18   we were working just as hard on those videos, so it

19   ended up not -- not being -- it ended up becoming

20   very time-consuming for us.

21        Q     Okay.  And then going back to the content

22   of -- of both of these channels, really, so I'll

23   just refer to them as the channels.

24        A     Uh-huh.

25        Q     Again, we talked about you primarily using

Page 126

1    what you call a reaction videos.  And that's

2    correct; right?

3        A    I wouldn't say primarily; it's one of a

4    type of video we make.

5        Q    Okay.  And in these react videos or

6    reaction videos, you react to the videos of other

7    people; right?

8        A    In reaction videos, yes.

9        Q    Okay.  How many reaction videos use the

10   videos of other people versus your purely original

11   content?

12           MR. BAR-NISSIM:  Objection.  Vague and

13   ambiguous.

14   BY MR. BUKHER:

15       Q    Well, do any of your reaction videos use

16   purely your own original content?

17       A    Reaction videos tend to be a blend of

18   commentary and original content.

19       Q    Okay.  But all of your reaction videos, to

20   some extent, use the videos of other people; is that

21   correct?

22       A    I can't recall, specifically, if that is

23   such a universally true statement.

24       Q    Okay.  Do you -- are -- I guess that's

25   fair, we did see a video where you reacted to your

Ethan Klein                                        December 29, 2016

Page 129

1    attorney.

2              MR. BUKHER:  Outside of what your attorneys

3    have told you, based on your own research, what have

4    you read about fair use?

5              THE WITNESS:  Fair use protects those

6    who -- who seek to critique, criticize, comment, and

7    transform others' works.

8    BY MR. BUKHER:

9        Q    Have you ever consulted -- and -- and I'm

10   not asking you for the substance of any discussions,

11   but have you ever consulted with an attorney about

12   fair use before this lawsuit?

13       A    Yes.

14       Q    Have you consulted with an attorney, about

15   fair use, with respect to every one of the reaction

16   videos that you've ever published?

17       A    No.

18       Q    Do you typically consult with an attorney

19   before you publish a reaction video?

20       A    No.

21       Q    When was the first time that you consulted

22   with an attorney regarding a reaction video?

23       A    I can't recall the -- the specific date of

24   that.

25       Q    Have you done so before this year?

Ethan Klein                                      December 29, 2016

                                              Page 130

1        A    I can't recall.

2        Q    Okay.  You -- you just gave me your

3    understanding, based on your research, of -- of what

4    fair use is.  Did that knowledge come from an

5    attorney?  Or is it just from your personal

6    research?

7             MR. BAR-NISSIM:  Asked and answered.

8    Give -- objection.  Asked and answered.  Given the

9    nature of the instruction, the limiting instruction.

10            THE WITNESS:  Can you rephrase?

11   BY MR. BUKHER:

12       Q    You gave me a definition, as you understand

13   it, of fair use, based on your research.  Did that

14   definition come from an attorney?  Or is that just

15   on your own personal research?

16       A    That definition is derived from me

17   reading -- reading the -- the -- the relevant

18   information I could find.

19       Q    Do you recall when you read that

20   information?

21       A    I -- I don't recall exactly where I read

22   it.

23       Q    Do you recall if that was more than a year

24   ago?

25       A    I do not recall.

Ethan Klein                                    December 29, 2016

1      Q    And that is specific -- specifically, with

2    respect to YouTube, that's pretty much how it works,

3    the YouTube, in this case, is the service provider;

4    is that correct?

5      A    Indeed.

6      Q    Okay.  Would you say that your

7    understanding of takedown process is fairly

8    sophisticated?  Or not at all?

9      A    Are you talking referring to YouTube?  Or

10   the general --

11     Q    To YouTube.

12     A    I would say that I understand how it works

13   as it pertains to YouTube.

14     Q    And you say -- are you say -- would you say

15   you're pretty experienced with that process?

16     A    What do you mean by experienced?

17     Q    Have you had any personal experience in

18   connection with the takedown process?

19     A    Yes.

20     Q    And we'll get to that shortly, but going

21   back to your understanding of fair use, and you gave

22   me this understanding that you had based on your

23   research, do you have any understanding of fair use

24   beyond that?  Again, nothing with respect to what

25   your attorneys may have told you.

1      A    Based on, you know, reading the law, and my

2   own research is how I've come to understand it.

3      Q    Okay.  And I apologize that I'm asking you

4   to repeat yourself, but --

5      A    It's fine.

6      Q    -- just so that I don't have to go back and

7   have the reporter repeat it, can you tell me again

8   what it was that your understanding of fair use was?

9          MR. BAR-NISSIM:  Objection.  Asked and

10  answered.  Asks for a legal conclusion.  And

11  limiting instruction:  Objection.  Based on

12  privilege of what you did not learn outside of your

13  attorneys.

14         THE WITNESS:  As I have mentioned

15  previously, fair use protects criticism, critique,

16  commentary of -- of another's work as it transforms

17  their work and offers a new perspective, in short.

18  BY MR. BUKHER:

19     Q    Do you -- do you understand this as a

20  blanket protection?  And I'll clarify for you what I

21  mean by blanket.

22     A    Yeah.

23     Q    Do you believe that anything, that is a

24  criticism of another's work, is protected by fair

25  use?

Page 136

1    because he is also someone who has given his

2    understanding of law as applied to facts that would

3    require legal analysis or a legal conclusion.  So

4    that is why I'm making those objections to preserve

5    the record, and that's it.

6              MR. BUKHER:  Okay.  That's fair enough.  So

7    what I'll do is I'll establish a foundation.

8    BY MR. BUKHER:

9         Q    Mr. Klein, when you were publishing your

10   videos, did you care whether or not they were

11   protected by fair use?

12        A    Yes.

13        Q    Assuming that you cared that they were

14   protected by fair use, did you think that they were

15   protected by fair use because they were works of

16   criticism?

17        A    In our cases, and our specific use of other

18   people's work, I believe that -- that our criticism,

19   and comments, and the, you know, the factor of use

20   was -- was substantial and transformative, and I was

21   confident that our use of other people's videos is

22   fair.

23        Q    How did you decide how much of another

24   user's original video to use in your videos?

25        A    I would use as little as -- as required for

                                              Page 137

1    me to -- to make my -- my -- make my statement about

2    the video.

3        Q    Was that your understanding of fair use,

4    that you had to use as little as required to make

5    your statements?

6            MR. BAR-NISSIM:  Objection.  Asks for a

7    legal conclusion.

8            THE WITNESS:  It was not only my

9    understanding of the law, but also my decision, as

10   a -- as a -- as a commentator and criti- -- and

11   criticizer, to use as little of their work as

12   necessary to make my point.

13   BY MR. BUKHER:

14       Q    How much is too much in your opinion?

15           MR. BAR-NISSIM:  Objection.  Vague and

16   ambiguous.

17           THE WITNESS:  That -- that is a real- -- I

18   don't believe that there's any right answer to that

19   question, as you're asking for a legal conclusion

20   and I believe that I -- I'm not to say.

21   BY MR. BUKHER:

22       Q    As a content creator, do you believe that

23   using too much of a video can affect that original

24   video's potential commercial value?

25           MR. BAR-NISSIM:  Objection.  Vague and

Ethan Klein                                    December 29, 2016

Page 138

1    ambiguous.  Asks for a legal conclusion.

2             THE WITNESS:  I can't speculate as -- as to

3    that.

4    BY MR. BUKHER:

5        Q     Have you ever heard the term Facebook

6    freebooting?

7        A     Yes.  I have.

8        Q     What does that term mean for you?

9        A     Facebook freebooting is when a Facebook

10   page re-uploads somebody else's video.  Sometimes --

11       Q     Have you ever complained about Facebook

12   freebooting of your videos?

13       A     Yes.

14       Q     What happened there?

15       A     I believe we made a video criticizing

16   Facebook for allowing plagiarism to run rampant on

17   their website.  I don't know what happened as a

18   result to that, to -- to the video that that was

19   freebooted from.

20       Q     Did you feel like too much of your video

21   was used?

22       A     Well, it wasn't about the amount.  It was

23   just a re-upload of my video.  There was no

24   criticism, or commentary, or transformation.

25       Q     Have you ever gotten in trouble for using

Ethan Klein                                    December 29, 2016

Page 139

1      other people's videos, other than with respect to

2      this lawsuit?

3          A    Can you define what getting in trouble

4      means?

5          Q    Have you ever been threatened with a

6      lawsuit before?

7          A    Yes.  Once before.

8          Q    When was that?

9          A    That was during -- we made a video about

10     SoFloAntonio.

11         Q    And what was that video about?

12         A    I don't recall the specific -- oh, yeah,

13     right.  It was in re- -- we were make -- if I

14     recall, I -- I can't really speculate to -- to --

15     I'll -- I'll make my best guess, as I -- as I

16     remember it.

17              We made a video about SoFloAntonio, who is

18     a prolific Facebook freebooter, and they accused us

19     of defamation.  Not copyright infringement.

20         Q    Okay.  And then just going back to our

21     discussion about fair use, have you ever heard of

22     the term, "transformative use"?

23         A    Yes.

24         Q    Aside from anything your attorneys may have

25     told you, what is your understanding of that term?

1            MR. BAR-NISSIM:  Objection.  Asks for a

2     legal conclusion.

3            THE WITNESS:  As a lawyer, I can't really

4     speculate as to what that means, but to my personal

5     understanding, transformation means, in its essence,

6     to change the meaning, the expression of the video

7     that's being criticized.

8     BY MR. BUKHER:

9        Q    Have you ever heard of that term,

10    transformative, used before this lawsuit?

11       A    Yes.

12       Q    Was that based on your own research of fair

13    use?

14       A    Yes.

15       Q    It wasn't from an attorney; is that

16    correct?

17       A    Correct.

18       Q    Before this lawsuit, had you ever consulted

19    an attorney on the question of fair use?

20            MR. BAR-NISSIM:  Objection.  Asked and

21    answered.

22            THE WITNESS:  I -- I -- I can't recall.

23    BY MR. BUKHER:

24       Q    With respect to uploading your videos, over

25    the last couple of years, it was never your policy

1    to consult an attorney to decide whether or not

2    those videos were fair use; is that correct?

3        A    On a case-by-case basis.  That is, we did

4    not consult an attorney every time we uploaded a

5    video.

6        Q    Was there a not case-by-case basis in which

7    you consulted attorneys?

8        A    I can't recall every -- every time we've

9    consulted an attorney over the -- over the career.

10       Q    All right.  Whenever you uploaded a video,

11   did you have a policy of analyzing its content

12   yourself and deciding, based on your own research,

13   that it was a fair use?

14       A    Yes.  In -- in editing, there was

15   consideration.

16       Q    Can you talk to me about that consideration

17   of it?  What was that process?

18       A    So while editing, I was mindful to

19   basically cut out as much of the original video as

20   possible, and to make sure that we were commenting

21   or critiquing every -- every segment that came

22   before.  So it was part one, reducing the amount of

23   the original video.  And part two, making sure that

24   there was transformative use of it.

25       Q    So would -- would your previous videos,

Page 142

1    you're saying you were careful to only use so much

2    of the original videos as was necessary for your

3    commentary?

4        A    That's correct.

5        Q    Going to switch topics for a second, and

6    ask you, if you know, who are the Fine Bros?

7        A    The Fine Bros are a -- it's a YouTube

8    channel.

9        Q    What does that channel focus on?

10       A    They make re- -- re- -- well, they make

11   their own brand of reaction videos.

12       Q    Okay.  Well, I'm going to ask you to watch

13   a six-minute video, which will give us just enough

14   time to ask you a couple of questions about that

15   video before we take lunch, so if you don't mind,

16   we'll put on Exhibit No. 38 for you, please?

17       A    Okay.

18                        (Whereupon Exhibit 38

19                        was marked for identification

20                        by the court reporter and

21                        was retained.)

22                        (Video played.)

23            THE WITNESS:  It's -- it's finished, Tim.

24   Are you there?

25   //

Page 143

1    BY MR. BUKHER:

2        Q    There we go.  Sorry.  So before we go off

3    to lunch, can we just talk about this video?

4        A    Yup.

5        Q    Can you tell me what this was about?

6        A    This video was -- well, the Fine Bros were

7    trying to trademark and copyright reaction videos as

8    a genre.  So this was my response.

9        Q    There seems -- is it fair to say there was

10   some sort of controversy around this on YouTube?

11       A    Yes.

12       Q    Can you speak to that controversy of it?

13       A    Well, people thought it was ridiculous that

14   they would try to, you know, own such a broad genre.

15       Q    All right.  Well, so the YouTube community,

16   then, does have some sort of understanding of -- of

17   a reaction video?

18            MR. BAR-NISSIM:  Objection.  Speculative.

19            THE WITNESS:  I cannot speculate to what --

20   how others -- other people, you know, define a

21   reaction video.  A reaction video is a very personal

22   experience, I can only speak to our -- our use of a

23   reaction video, how we use it.  It's a very broad

24   term.

25   //

1    BY MR. BUKHER:

2        Q    Well, what was your feeling about the Fine

3    Bros trying to protect the format of a reaction

4    video?

5        A    I just, I mean, the -- the -- I thought it

6    was -- again, it was silly that they were trying to

7    own such a collectively broad genre.

8        Q    So you just said that it is a collectively

9    broad genere.

10            What do you mean by that?

11       A    Reaction video is a broad genre.

12       Q    Who defines that genre?

13       A    That's my point.  Kind of.  It's not well

14   defined.  It's a very personal experience, which is

15   why their video was so problematic.

16       Q    Did they have a particular format that they

17   were trying to protect at the time?

18       A    They were not specific, as I recall, which

19   was what was, again, troubling.

20       Q    Do you recall what it is -- what it was

21   that they were trying to protect?  And I'll -- let

22   me -- before you answer, you know, it seems to me

23   they were trying to say we have a specific format.

24   You cannot do this without our permission; is that

25   fair to say?

Ethan Klein                              December 29, 2016

1        A    I can't speculate on that.

2        Q    Well, I'm not asking you to speculate.

3    Were they saying that?  Were they saying that

4    YouTube users could not --

5        A    They weren't --

6        Q    -- do something in a certain format?

7        A    They weren't very clear about it.  It was

8    very ambiguous, which was part of the concern.

9        Q    Well, what was the concern, exactly, then?

10       A    As I've stated previously, that they were

11   trying to own a very broad market.

12       Q    Okay.  And -- and I guess you reacted to

13   that, what was your reaction to them trying to own a

14   very broad market?

15       A    As I stated previously, I believe that it

16   was an absurd, you know, it was absurd.  That was my

17   reaction.

18       Q    Okay.  And in this -- in this reaction to

19   the Fine Bros, it looked like you took excerpts of

20   their own videos; is that correct?

21       A    Yes.

22       Q    Do you consider this to be a fair use --

23   or -- or let me back up.  I'm not going to ask you

24   to make a legal conclusion.

25            Did you, at the time, think this was a fair

1    use?

2         A    Yes.

3         Q    Okay.  Is it because you talked about the

4    Fine Bros trying to monopolize a particular format,

5    that you were criticizing them?

6         A    Well, there's -- I -- I critiqued and

7    transformed their -- their video.  So that was my

8    basis.  I added a new -- a new --

9         Q    In what way did you transform their video?

10        A    Well, their video was meant to express how

11   cool their brand of owning the react genre was.  And

12   my expression was that it wasn't cool, essentially,

13   entirely flipping their intended purpose.

14        Q    You made their video seem un-cool; right?

15        A    Not un- -- I mean, not specifically

16   un-cool, that -- that's just in- -- inverting their

17   intention, I would say.

18        Q    You made their video funny?

19        A    No.  They wanted --

20        Q    Well, you --

21             MR. BAR-NISSIM:  Let --

22   BY MR. BUKHER:

23        Q    Go ahead.

24             MR. BAR-NISSIM:  Yeah.  Let Ethan finish.

25             MR. BUKHER:  I apologize, Ram, might be a

Ethan Klein                                December 29, 2016

Page 147

1    bit of a delay; it's not my fault.

2            MR. BAR-NISSIM:  Yeah, no.  No, understood.

3    That's completely understood, Tim.

4            THE WITNESS:  The Fine Bros' intention was

5    to copyright a huge, very general genre.  And as

6    I've stated previously, my intention was to show

7    that what they thought was cool, and fair, and

8    exciting was a cash grab, unethical, and immoral, in

9    a sense.

10   BY MR. BUKHER:

11       Q    Well, I understand you're saying -- you're

12   essentially speculating as to what the Fine Bros

13   intended, but I guess what I'm asking is:  With

14   respect to their video, that you used in your video,

15   you know, in your opinion, was the intention of that

16   video?  What were they trying to do with it?

17           MR. BAR-NISSIM:  Objection.  Vague and

18   ambiguous.

19           Just to clarify, you're referring to the

20   Fine Bros video?  Like what they --

21           MR. BUKHER:  I'm referring to the -- yes,

22   I'm referring to the Fine Bros video that Mr. Klein

23   reacted to in his video that we watched just now.

24           MR. BAR-NISSIM:  Objection.  Speculative.

25           THE WITNESS:  I can't speculate on to what

Ethan Klein                                    December 29, 2016

Page 148

1    their intentions were.

2    BY MR. BUKHER:

3        Q    Okay.  Then how do you know you were

4    transforming it?

5        A    Well, I was commenting and criticizing what

6    they said in it.  I can't speculate as to what their

7    intention was.  But what they said, I commented,

8    criticized, and transformed.

9        Q    What did you transform, exactly?

10        MR. BAR-NISSIM:  Objection.  Asks for a

11   legal conclusion.

12   BY MR. BUKHER:

13       Q    Well, you just said that you're commenting

14   and criticizing and that transformed it, is it your

15   opinion that commenting and criticizing a video

16   necessarily transforms it?

17       A    It -- it depends, obviously, on -- on a

18   case-by-case basis, so I can't draw a conclusion

19   based on one example.  If I understand.

20       Q    Okay.

21       A    I don't -- I'm not quite sure what you're

22   trying to refer to.

23       Q    Well, in this video, you made a comment

24   that Bill Cosby invented react videos; is that

25   right?

Ethan Klein                                      December 29, 2016

Page 149

```
 1        A    Correct.  I referred to that.
 2        Q    And you showed a clip of a Bill Cosby show?
 3        A    Yes.
 4        Q    You basically interjected that into your
 5   video in addition to using the Fine Bros original
 6   video; is that correct?
 7        A    Correct.
 8        Q    And you also played around with one of the
 9   Fine Bros eyes to make him look kind of weird; is
10   that correct?
11        A    Yes.  Correct.
12        Q    Is that to make fun of him?
13        A    I mean, it -- it -- its intended purpose
14   was comedy, and, you know, transforming the -- the
15   original footage in a way that expressed new
16   meaning.
17        Q    Okay.  So the intended purpose of your
18   reaction video was comedy?
19             MR. BAR-NISSIM:  Objection.  Asked and
20   answered.
21             This question, Tim, has been asked a couple
22   of times of what he's trying to do with it.  And
23   he's already said that it was comment, and
24   criticism, and combined with comedy.
25             THE WITNESS:  Yes.  My intent --
```

Ethan Klein                                    December 29, 2016

Page 150

1    BY MR. BUKHER:

2         Q    So to be clear:  Comedy was one of the

3    purposes here of your video; right?

4         A    Well -- yes.  That's correct.

5         Q    All right.  Because the original Fine Bros

6    video was not funny.

7              Would you agree with that?

8         A    I would agree with that.  Yes.

9         Q    So by making fun of one of the Fine Bros

10   eyes, and otherwise making fun of them, you've

11   transformed it into a funny video; is that correct?

12        A    That is a -- only one aspect of what

13   transformed the video.  The other being, you know,

14   talking, for historical purpose, and criticizing the

15   message.  They all combine.

16        Q    Okay.  So we could take a break now.

17             MR. BAR-NISSIM:  Okay.

18   (At 12:36 p.m., the deposition adjourned for lunch.)

19

20

21

22

23

24

25

Ethan Klein                                    December 29, 2016

Page 151

1              (At 1:44 p.m., the deposition of.

2                 Ethan Klein was reconvened.)

3      BY MR. BUKHER:

4          Q    Okay.  So let's -- thanks for joining us

5      again.

6          A    Yes.

7          Q    Let's start with a review of Exhibit

8      No. 39, that's for the technician, it is a short

9      video.

10                          (Whereupon Exhibit 39

11                          was marked for identification

12                          by the court reporter and

13                          was retained.)

14              THE WITNESS:  All right.

15                          (Video played.)

16      BY MR. BUKHER:

17          Q    So, you seem pretty upset in this video.

18          A    Yes.

19          Q    What were you upset about?

20          A    Well, it was -- it was in my opinion that

21      Fullscreen was misusing the -- the system in place

22      to sensor me from criticizing one of their partners.

23          Q    Which one of their partners were you

24      criticizing?

25          A    PrankInvasion.

 1        Q     Is that the videos we talked about, where

 2    he pretends to -- well, actually, I'll back up.

 3              Which one of those videos are we talking

 4    about?

 5        A     It is similar.  There -- all of his videos

 6    are relatively the same, so if you go back, the

 7    video has come back up, and if I go back enough, I

 8    can tell you.  I think it's just called Kissing

 9    Pranks h3h3 Reaction Video.

10        Q     And what does PrankInvasion do in these

11    kissing pranks?

12        A     Usually, he'll approach a girl, do a little

13    quick game for a quick kiss.  It's his famous line.

14        Q     And how did you react to that in your video

15    that you talked about --

16     (Whereupon the reporter requested clarification.)

17    BY MR. BUKHER:

18        Q     In this Exhibit 39, you talked about how

19    you were censored when Fullscreen took your reaction

20    video to PrankInvasion down; what was your reaction

21    video reacting to?  What, exactly, was the substance

22    there?

23        A     I don't recall specifically; it's been a

24    long time since I reviewed that video.

25        Q     You -- what -- what was the point of this

Ethan Klein                                    December 29, 2016

Page 153

 1    video, the censorship on YouTube video, what was

 2    your objective here?

 3       A    My objective was kind of, in a way, to

 4    explain why your No. 1 video on your channel had

 5    been removed.

 6       Q    This was your No. 1 video on your channel

 7    when?

 8       A    At the time that we made that video, it was

 9    our most watched -- most popular video.

10       Q    Wasn't that around November 2015?

11       A    I don't recall the exact date.

12       Q    Does it sound accurate to be in late 2015?

13       A    Yeah.  It sounds accurate.

14       Q    Okay.  So late 2015, you said it was your

15    most popular video at the time; you don't remember

16    what the substance of the video was?

17       A    As I said, it's -- it's -- it's been a long

18    time since I've reviewed that video, so I can't

19    recall it precisely.

20       Q    Okay.  Without getting precise in general,

21    do you remember what -- what exactly it was that you

22    were reacting to, what point you were making in that

23    video?

24            MR. BAR-NISSIM:  Objection.  Vague and

25    ambiguous.

Ethan Klein                                    December 29, 2016

Page 154

1          Just to clarify, Tim, you're talking about

2     what they were critiquing in the Exhibit 39 that you

3     showed us?  Or in the kissing pranks video that was

4     taken down, what you were -- what they were

5     commenting on?

6          MR. BUKHER:  I'm asking -- I'm asking about

7     the kissing pranks video.  And we do have that full

8     video as an exhibit, but if you want to save the

9     time of watching the entire video, if you can

10    recall, and we can just move forward.

11         THE WITNESS:  Yeah.  I understand.  Let me

12    think for a moment.

13         I believe my -- my -- to the best of my

14    recollection, my criticism was that he was spinning

15    a false reality in which he was promoting lewd

16    behavior, almost, and enticing kids to kind of go

17    out and try to commit what could only be construed

18    as sexual assault.

19    BY MR. BUKHER:

20         Q    What do you mean by false reality?

21         A    As I -- as we've spoke about earlier, his

22    videos are portrayed to be -- to be real, so he is

23    kind of conveying to his audience that getting

24    kisses, or blow jobs, or whatever he does in his

25    videos is as simple as playing a quick game.

Ethan Klein                                        December 29, 2016

1    And -- and of course, it's very misogynistic in its

2    description of women who are so willing to put out.

3        Q    So the events depicted in his videos were

4    portrayed as if they really happened in real life;

5    is that what you're saying?

6        A    That is correct.

7        Q    And just to contrast for a second, the Matt

8    Hoss video, in this case, doesn't do that; right?

9        A    It's debatable.

10        Q    So when you watch Matt Hoss's video, the

11    bold guy versus Parkour Girl, it seems to you like

12    he's trying to portray a real parkour battle, where

13    he wins the affection of this athletic girl?

14        A    It's -- it's -- his -- Matt's version is

15    clearly more scripted.

16        Q    Well, you're saying it's scripted, but --

17    but -- but is he trying to make it seem like this is

18    happening in real life?  Or is this very clearly

19    just a fictionalized video?

20        A    I mean, I cannot -- I can't guess to -- to

21    Matt's intentions.  But it is more --

22        Q    Well --

23        A    It's more scripted than PrankInvasion's.

24    It's more cinematic.

25        Q    I mean, there are multiple camera angles;

1    right, when they're running around, doing their

2    parkour?

3       A    Yeah.  But PrankInvasion uses multiple

4    cameras as well; that's no indication of anything,

5    in my opinion.

6       Q    So you think when -- when they were doing

7    the parkour, in Matt Hoss's video, what -- they

8    could have just run anywhere, he just happened to

9    have cameras in those places that they happened to

10   run?

11      A    I mean, as -- as I said before, it is

12   certainly more cinematic than PrankInvasion.

13      Q    Well, what do you mean by cinematic?

14      A    It's more scripted.

15      Q    I mean, wouldn't you say it's fully

16   scripted?  Everything that was done in that video

17   was scripted?

18      A    That -- that would be my impression.

19      Q    Yeah.  And -- and -- and -- and would --

20   did it seem to you like the video was trying to

21   convey itself as not being scripted?

22      A    No.

23      Q    Because it had a soundtrack in the

24   background, didn't it?

25      A    Yeah.  But I don't think that has any

1    indication to whether it's his intention.  I believe

2    PrankInvasion also had a soundtrack.

3         Q    So going back to this censorship on YouTube

4    video.  At some point in the video, around the

5    45-second mark, you said that your reaction video

6    that was taken down was clearly a fair use.

7             What did you mean by that?

8         A    I think that it was my opinion, at the

9    time, that from a objective point of view,

10    and -- and based on the industry standard on

11    YouTube, that it -- it transformed the video to the

12    point of being a completely different experience.

13    So I think, objectively, in my opinion, at the time,

14    it was fair use.

15         Q    What is the industry standard on YouTube?

16             MR. BAR-NISSIM:  Objection.  Speculation.

17             MR. BUKHER:  Well, I'm sorry, Rom, but your

18    client raised the issue of industry standard, I

19    mean --

20             MR. BAR-NISSIM:  No.  That, I understand.

21             MR. BUKHER:  -- he could speculate.

22             MR. BAR-NISSIM:  I understand, Tim.  But

23    that answer also might encompass things that are

24    beyond his knowledge.  What he can speak to is what

25    he understands the specific, you know, YouTube

Ethan Klein                                    December 29, 2016

Page 158

1    industry practice to be.  Not just in an overall

2    definitive sense.

3    BY MR. BUKHER:

4         Q    Well, let's assume that to the extent that

5    I asked you about industry standard, I'm asking you

6    to tell me what you meant when you said that there

7    is a YouTube industry standard.

8         A    What I meant is that there is a large

9    community on YouTube, a standard practice of

10   making -- making comments on other people's videos.

11        Q    And -- and are you saying according to that

12   industry standard, those types of comments are fair

13   use?

14        A    As I said previously, fair use, you know,

15   is -- is judged on a case-by-case basis.  Our

16   certain category of reaction videos, I would say, in

17   that specific case, in this specific video we're

18   talking about, it was my opinion that it was

19   objectively fair use.

20        Q    So it was your opinion that the reaction

21   video to PrankInvasion, that was taken down by

22   Fullscreen, was a fair use?

23        A    Yes.

24             THE REPORTER:  I'm sorry.  Was not?

25             MR. BUKHER:  Was a fair use.

Ethan Klein                                    December 29, 2016

Page 159

1           THE WITNESS:  Yes.  Then yes.  My answer is

2     yes.

3     BY MR. BUKHER:

4           Q     So did they issue a takedown request of

5     that reaction video?  Is that how this started?

6           A     Yes.  To the best of my -- my recollection.

7           Q     And was the video taken down by YouTube?

8           A     Yes.  It was.

9           Q     Did you ever issue a counter-notification?

10          A     Yes.

11          Q     Did you provide us with that

12    counter-notification?

13          A     I -- to the -- if I had it, I -- I would --

14    I don't recall, but if I had it, I would have

15    provided it to you.  If it was available to me.

16          Q     You said --

17          A     I would have provided it.

18          Q     I apologize, by the way, for interrupting

19    you again.  There is a bit of a lag.

20          A     No worries.

21          Q     And I didn't mean to interrupt you.

22          A     I completely understand.  No apology

23    required.

24          Q     Okay.  So if there was a

25    counter-notification, you mentioned that there was

Ethan Klein                                    December 29, 2016

Page 161

1    removed, and therefore no longer available to be

2    viewed.

3        Q    Okay.  But -- but otherwise, as far as you

4    know, there are no ramifications to your revenue

5    when you receive a copyright strike?

6        A    That is correct.

7        Q    You seem very confident in this video that

8    your reaction was a fair use.  You said clearly that

9    it was a fair use.  Are you still confident that it

10   was a fair use?

11       A    It's been a long time since I've reviewed

12   that video, so I don't want to make any statement to

13   that now.

14       Q    Was there a YouTube community controversy

15   around this event, after you posted your video

16   censorship on YouTube?

17       A    Yes.  You could say that.

18       Q    And what was this controversy about?

19       A    Well, I think the controversy was more

20   about a large network of whom there were creators in

21   that network, who did work similar to me, using its

22   leverage to sensor another channel.

23       Q    I'm not sure I follow.  Can you clarify

24   what you meant by network and members in the

25   network?

Ethan Klein                                    December 29, 2016

Page 162

1       A    Sure.  So Fullscreen is a YouTube network.

2    In their network, there are channels doing similar

3    content to me.  So it was -- without even

4    considering fair use, it was very hypocritical of

5    them to remove our video on the grounds of

6    copyright, and it seemed like a transparent attempt

7    to sensor us rather than judging it on its merit of

8    fair use.

9       Q    And does this controversy arise as a result

10   of your video, "Censorship on YouTube"?

11      A    I think that's accurate to say, yes.

12      Q    Was it a very popular video, "Censorship on

13   YouTube"?

14      A    I don't recall the exact numbers.  I don't

15   know how to gauge popularity.  Compared to what?

16      Q    Did it have more than a million views?

17      A    I don't actually recall.

18      Q    If it had more than a million views, would

19   you say that it was pretty popular?

20      A    It's -- it's very relative.  I mean, not

21   necessarily.

22      Q    But it was popular enough that it caused a

23   controversy in the YouTube community?

24      A    Yes.

25      Q    And then, as a result of that controversy,

1    did Fullscreen remove their strike against your

2    account?

3        A    I don't know if it was as a result of the

4    controversy.  I do know that they had issued a

5    statement saying they had it wrong.  And I do know

6    that the creator of the video, Chris, from

7    PrankInvasion, had told me that he had no intention

8    to remove it, and it was a general consensus on

9    their part that it was due to an error and not

10   because it was copyright infringement.

11       Q    Sorry, I'm not following.  You said Chris

12   had no intention of removing the copyright strike?

13       A    They -- on -- what Fullscreen had said is

14   that it was an automated error, and they had no

15   intention of removing it because -- on the basis of

16   copyright infringement.

17       Q    Oh, they had no -- sorry, I just want to

18   clarify, they had no intention of removing the video

19   you sent?

20       A    It was a -- it was an automated error.  And

21   the CEO personally made a statement, I believe, if I

22   recall correctly, saying they had got it wrong in

23   that case.

24       Q    So after you brought it to their attention

25   with this "Censorship on YouTube" video, they

1    realized their error and reinstated your video?

2         A    I believe that's a correct assessment.

3         Q    Have you had many instances, where you've

4    had takedowns of your video that proved to be

5    unwarranted?

6         A    Can you define many?

7         Q    More than three.

8         A    Can you can you re- -- restate the

9    question?  What was it?

10        Q    Were there more than three instances, when

11   you've had your YouTube videos taken down,

12   and -- and -- and it was -- ended up being

13   unwarranted?

14        A    I don't recall the exact number, but it --

15   I believe it may be around three.

16        Q    Well, is it enough times for you to vent

17   your frustration, with the process on YouTube, at

18   least once?

19        A    Can you -- are -- are -- I'm confused as to

20   what you may be referring to.

21        Q    Well, did you ever publish any YouTube

22   videos venting your frustration about false

23   copyright takedowns of videos?

24        A    I believe we just watched one of them.  To

25   any other ones, I can't recall.

Ethan Klein                                    December 29, 2016

Page 165

1    Q    Turning to Exhibit 8.

2                    (Whereupon Exhibit 8

3                    was marked for identification

4                    by the court reporter and

5                    is attached hereto.)

6    BY MR. BUKHER:

7    Q    You can take a moment to look at that.

8         Can you tell me what we're looking at?

9    A    Yes.  This was a takedown by the creator of

10   PrankInvasion's intro, it was erroneously issued.

11   And after speaking with PrankInvasion, he had

12   the -- the takedown removed, and the video was

13   reinstated.

14   Q    What do you mean by PrankInvasion intro?

15   A    At the beginning of his videos, there's a

16   very techno, musical party music, and there's a

17   graphic of PrankInvasion coming on, in the very

18   beginning, so this individual FX channel house is

19   the person who made that.  But he erroneously

20   removed it, as PrankInvasion is the one who actually

21   owned the graphic, and commissioned him to make it.

22   Q    Okay.

23        MR. BUKHER:  And then can we turn to

24   Exhibit 9, please?

25                    (Whereupon Exhibit 9

1                          was marked for identification

2                          by the court reporter and

3                          is attached hereto.)

4          THE WITNESS:  Yes.  I have it before me.

5     BY MR. BUKHER:

6          Q    Okay.  Can you tell us what this is?

7          A    Yes.  So again, this -- this shows that I

8     disputed it, and Fullscreen rejected it, and

9     resulted in a takedown.

10    BY MR. BUKHER:

11         Q    Well, let's back up and say what it is,

12    because, I mean, we have to talk about what's on the

13    page.  I guess I could ask:  Is this a takedown

14    notification for your kissing pranks reaction video?

15         A    It appears to be that, yes.

16         Q    And this was issued by Fullscreen; is that

17    correct?

18         A    Yes.

19         Q    Is that the ones that resulted in your

20    video that we just watched, "Censorship on YouTube,"

21    Exhibit 39?

22         A    Correct.

23         Q    And you got copyright strike for this?

24         A    Correct.

25         Q    This was the one ultimately after you

1    published your "Censorship on YouTube" video, and

2    there was some controversy, Fullscreen pulls back

3    its counter copyright strike; is that correct?

4         A    Your timeline may be a little off.  I'll

5    clarify:

6              This was received before that video took

7    place, and it was removed afterwards.

8         Q    Right.  This -- this takedown request was

9    received before you published the "Censorship on

10   YouTube" video, and then was pulled back afterwards;

11   right?

12        A    That is correct.

13        Q    Okay.  And then you said you -- you

14   actually did a counter-notification to this?

15        A    I cannot recall.  I can't recall.

16        Q    Okay.

17             MR. BUKHER:  Ram, we are requesting a

18   counter-notification to this as part of our original

19   production request.  If you do find it, can you

20   please send that over to us or otherwise confirm

21   there isn't one?

22             MR. BAR-NISSIM:  Absolutely.  When -- how

23   much time will you give us to be able to look

24   through our records?

25             MR. BUKHER:  Anytime before discovery ends.

Ethan Klein

December 29, 2016

Page 172

1      A    -- was -- originated from Facebook.

2      Q    Okay.  So you're saying that there was a --

3    YouTube had its own initiative to fight false

4    copyright claims?

5      A    That is correct.

6      Q    And you -- do you know when that started?

7      A    I don't recall the exact date, but it had

8    happened, as I recall it, after our -- sometime

9    around, after the initial video outlying, the we're

10   being sued.

11     Q    After we're being sued?

12     A    Yes.  To the best of my recollections.

13     Q    Then let's do Exhibit 13.

14                    (Whereupon Exhibit 13

15                    was marked for identification

16                    by the court reporter and

17                    is attached hereto.)

18          MR. BUKHER:  And this one's a back and

19   forth e-mail, so please just take your time reading

20   through it to refresh your recollection.

21          THE WITNESS:  Okay.  Will do.

22          I -- I recall this e-mail.

23   BY MR. BUKHER:

24     Q    Can you tell us what this is, Exhibit 13?

25     A    Yes.  This is an e-mail we received from

1    Matt Hoss demanding we remove his video, because it

2    is digital piracy and copyright infringement.

3         Q    And how did you respond to this?

4         A    I believe I politely declined his

5    invitation.

6         Q    You said that this falls within the realm

7    of fair use, did you not?

8         A    Yes.  I did say that.

9         Q    What did you mean by that?

10        A    As I -- as I've defined my understanding of

11   fair use in previous conversations with you, fair

12   use means that I've transformed his video, added new

13   substance and commentary that has offered a new

14   viewing experience to the audience.

15        Q    That's what you meant by fair use when you

16   wrote back?  And again, I don't mean to be

17   facetious, I'm just --

18        A    I --

19        Q    You know, we're talking about that

20   particular e-mail, I want to --

21        A    Yeah.  No.

22        Q    -- make sure that this is what you meant

23   when you wrote this e-mail.

24        A    Completely understood.  As I said several

25   times, previous to this e-mail, that is what I meant

1    as I defined fair use.

2         Q    Okay.  And you wrote here, I'm looking at

3    page 2, top of page 2, you wrote, (reading):

4                        "It is, of course, within

5                        your right to file a DMCA, but

6                        we will dispute it and the

7                        video will be reinstated within

8                        two weeks.  We've dealt with

9                        this many times, it is a matter

10                       of routine for us."

11        Did you write that?

12        A    Yes.  I did.

13        Q    What did you mean, "it is a matter of

14   routine for you," what did you mean by that?

15        A    I believe that every YouTuber, of a

16   certain, you know, level, encounters somebody who

17   would wish to sensor them under the guise of

18   copyright infringement, so I don't think it's a

19   unique experience to us, but just part of being a

20   YouTuber in general, of people attempting to sensor

21   you because you -- they said something that -- that

22   you didn't like about them, under the guise of

23   copyright infringement.

24        Q    So it was a matter of routine to you

25   because you had gotten several takedown requests

Ethan Klein                                    December 29, 2016

1   before, that you've successfully fought; right?

2       A    I believe that it's more a comment to what

3   it means to be a YouTuber as a whole.  It's -- it's

4   just a matter of routine for a YouTuber, of any --

5   of any particular size, to encounter such an

6   incident.

7       Q    Well, it says you -- it says, "We will

8   dispute it and the video will be reinstated within

9   two weeks," you seem pretty sure about that.  Were

10  you pretty sure about that?

11      A    In my experience, that -- that -- that is

12  the way that the system works on YouTube.

13      Q    That was your experience with the

14  PrankInvasion video; right?

15      A    That, I don't recall.

16      Q    We just discussed the PrankInvasion video.

17  Your experience was that after fighting it, you got

18  it reinstated.

19      A    Yeah.  I -- as I said in that previous

20  conversation, I don't recall if I had to actually

21  dispute it.  It was resolved by Fullscreen itself.

22      Q    Now, you urged, in this letter, that

23  Mr. Hoss speak directly with your attorney, Mr. Ryan

24  Morrison; is that correct?

25      A    That is correct.

Ethan Klein                                    December 29, 2016

                                                    Page 184

1    PrankInvasion.

2         Q    Okay.  So this was the second one?  Just so

3    I understand.

4         A    I believe, in chronological sense, this --

5    this was the second one.

6         Q    Okay.  Do you recall this video?

7         A    I do recall this video.

8         Q    It looks like it was taken down here.  Did

9    you dispute this takedown?

10        A    I don't recall if I disputed it, but the FX

11   channel house lifted it after speaking with them.

12        Q    Do you see this video as fair use of the

13   PrankInvasion video?

14        A    Yes.

15        Q    Why?

16        A    As I've stated previously, fair use, you

17   know, it means transformative new experience with

18   commentary and criticism.  I believe that applies

19   equally to this video, as it does to the rest of our

20   videos, as I've stated previously several times.

21        Q    Okay.

22             MR. BUKHER:  Well, then let's turn to

23   Exhibit 44.

24             THE WITNESS:  All righty.

25                  (Video played.)

Ethan Klein                                      December 29, 2016

1    BY MR. BUKHER:

2       Q    So what did you do, in this video, that was

3    not the original PrankInvasion video?

4       A    I can't speculate as to the difference

5    of -- of two videos.

6       Q    Well, was there a modulation of -- of the

7    speaker's voice, in the original video, where he was

8    speaking deeply, "No Clothes Family Day"?

9       A    I -- I'm sorry, can you rephrase your

10   question?  What is it exactly you're asking?

11      Q    You see, towards the end of that video we

12   just watched, in Exhibit 44 --

13      A    Yes.

14      Q    -- where the speaker's video [sic] got

15   deeper?

16      A    Yes.

17      Q    Was that in the original video?

18      A    I don't recall if -- if we used that same

19   device in the first video.

20      Q    No.  No.  Was that -- I'm sorry if I'm

21   being unclear.

22      A    Oh.  Was the exact --

23      Q    Was that in PrankInvasion's original video,

24   that deep voice?

25      A    I don't think so, no.

Ethan Klein                                    December 29, 2016

Page 186

```
 1        Q    So -- so you modified it?

 2        A    Yes.

 3        Q    For what purpose?

 4        A    Oh.  Well, in the -- in the context of that

 5   clip you showed us, which I -- I should add that

 6   it's taken, you know, it should be taken as a whole,

 7   in consideration of the whole video and the whole

 8   experience, but referring just to that small

 9   excerpt, it's used to highlight the absurdity of

10   such a day, such as "No Clothes Family Day," where

11   families go to Venice Beach and walk around naked,

12   and their daughters make out with a young -- with a

13   young stranger.  As I -- I'll also comment during

14   that clip to kind of highlight that same purpose.

15        Q    So you made that alteration to the host's

16   voice to highlight absurdity?

17        A    That is correct.

18             MR. BUKHER:  Okay.  Can we see Exhibit 45

19   now, please?

20                       (Whereupon Exhibit 45

21                        was marked for identification

22                        by the court reporter and

23                        was retained.)

24                       (Video played.)

25   BY MR. BUKHER:
```

Ethan Klein                                    December 29, 2016

```
1        Q    So that's another clip, from the
2   PrankInvasion video, that we're talking about; is
3   that correct?
4        A    As I recall, that is correct.
5        Q    And there was an insertion there, of a
6   video of a -- an older lady falling down some
7   stairs; is that correct?
8        A    That's correct.
9        Q    Was -- was that in the original
10  PrankInvasion video?
11       A    No.  It was not.
12       Q    Did you put that in --
13       A    Yes.
14       Q    -- video in, of the older lady falling
15  down?
16       A    Yes.  I did.
17       Q    And what was the purpose of that?
18       A    Well, the purpose of -- well, it was
19  historical context.  It was a joke of ours,
20  previously in our career, we had used it and talked
21  about it on stream.  So it was a historical context,
22  and it kind of just further highlighted the
23  absurdity of using this old lady to -- to kind of
24  participate in his voyeuristic pornography.
25       Q    So it was a comment on the old lady, that
```

Ethan Klein                                    December 29, 2016

Page 188

1    he was using in that clip, to participate; is that

2    correct?

3        A    Along with the historical significance of

4    the clip, that is correct.

5        Q    Okay.

6             MR. BUKHER:   Then can we take a look at

7    Exhibit 46?

8                         (Whereupon Exhibit 46

9                         was marked for identification

10                        by the court reporter and

11                        was retained.)

12                        (Video played.)

13   BY MR. BUKHER:

14       Q    So again, we can agree that this was

15   another clip of the PrankInvasion video we're

16   discussing?

17       A    Correct.

18       Q    And you included a clip in that of another

19   completely unrelated video; is that correct?

20       A    Correct.

21       Q    And -- and then additional video, that you

22   included there, was commenting on something that

23   happened in the PrankInvasion video; is that right?

24       A    That's correct.

25       Q    And what was it doing exactly?  What was

Ethan Klein                                    December 29, 2016

Page 189

```
 1    the commentary there?
 2         A    Well, I was likening his acting and premise
 3    to the -- the acting and -- and premise in a
 4    pornography, essentially.  In a bad pornography.
 5         Q    What do you mean by that?
 6         A    I think it's a -- it's a well accepted
 7    trope, that pornography starts with really bad
 8    acting and premises, so I was likening the
 9    experience of watching PrankInvasion to watching
10    such -- such kind of pornography.
11         Q    Okay.
12                   MR. BUKHER:  Can we now see Exhibit 47?
13                        (Whereupon Exhibit 47
14                         was marked for identification
15                         by the court reporter and
16                         was retained.)
17                        (Video played.)
18    BY MR. BUKHER:
19         Q    So we're looking, again, at another clip
20    from the PrankInvasion video we're discussing; is
21    that correct?
22         A    Correct.
23         Q    And in this one, you focus on the
24    grandparents that are showed in the original
25    PrankInvasion video; is that right?
```

Ethan Klein                                    December 29, 2016

1        A    Can you indicate what you mean by original?

2        Q    Again, when I say original, with respect to

3   these exhibits that we're talking about, I'm talking

4   about the PrankInvasion video, "No Clothes Family

5   Day."

6        A    That is -- in that case, I agree.

7        Q    So you -- you -- this exhibit, that we just

8   saw, it zoomed in on the grandparents, it showed

9   head shots of them towards the end; is that right?

10       A    Yes.

11       Q    Was it zoomed in that way in the original

12  "No Clothes Family Day," PrankInvasion video?

13       A    No.

14       Q    So did you zoom in on those grandparents?

15       A    Yes.

16       Q    Why did you do that?

17       A    Again, as previously stated, to highlight

18  the absurdity of using these kind of out-of-place

19  old people to participate in this voyeuristic

20  pornography experience.

21       Q    So you edited the video, adding this -- can

22  we call it a stylistic element, in order to make a

23  point?

24       A    Yes.  I can agree to that.

25       Q    Okay.

Ethan Klein                                    December 29, 2016

Page 191

1              MR. BUKHER:  Can we take a look at

2      Exhibit 48?

3                          (Whereupon Exhibit 48

4                          was marked for identification

5                          by the court reporter and

6                          was retained.)

7                          (Video played.)

8      //

9      BY MR. BUKHER:

10         Q    So this is another excerpt of the original

11     "No Clothes Family Day," PrankInvasion video; is

12     that right?

13         A    Yes.  Correct.

14         Q    Okay.  And -- and here, in your reaction

15     video, there was a -- an insertion of a picture at

16     the end of that excerpt; is that right?

17         A    Correct.

18         Q    What was that a picture of?

19         A    That was a picture of a guy known on the

20     internet, I believe, as Harold.  He's famous for

21     making really silly, goofy faces.

22         Q    And what was your reason for inserting that

23     picture into that particular clip?

24         A    You've taken it out of context, so if you

25     looked at it as a whole, you'll find that he was

Page 192

1    used as a device, throughout the entire video, to

2    highlight the creepiness of the -- of the videos and

3    the characters within it.

4        Q    All right.  Just to be clear, I don't mean

5    to take it out of context, I'm just trying to avoid

6    showing the entire long video to you.

7        A    I appreciate that.

8        Q    I'm happy for you to say that, you know --

9    yeah.  You know, if you're saying that it was

10   throughout the video, that's fine.  My -- the point,

11   that I'm trying to arrive at, is that you had a

12   reason for inserting that picture; is that right?

13       A    That is correct.

14            MR. BUKHER:  Okay.  And then let's take a

15   look at Exhibit 49.

16                          (Whereupon Exhibit 49

17                          was marked for identification

18                          by the court reporter and

19                          was retained.)

20                          (Video played.)

21   BY MR. BUKHER:

22       Q    So this clip we just watched again, can we

23   agree that that was your reaction to the "No Clothes

24   Family Day" video?

25       A    Yes.

```
 1        Q    And towards the end of that clip, it looks
 2   like the video slowed down and started to take on a
 3   red tint; is that right?
 4        A    Correct.
 5        Q    Did you edit that in?  Or was that in the
 6   original "No Clothes Family Day" video?
 7        A    I added it.
 8        Q    You added that red tint?
 9        A    Yes.
10        Q    And in this video, we're basically watching
11   the host, you know, kiss -- kiss a girl in front of
12   her dad; is that right?
13        A    That's the premise of the video.
14        Q    And the dad had this kind of sociopathic
15   staring look on his face; right?
16        A    That's -- that's -- yes.  That was my
17   interpretation.
18        Q    And -- and why did you edit in that red
19   tinge that suddenly came on?  Was that related to
20   that?
21        A    Yes, it was.  As -- as I said --
22        Q    What --
23        A    -- just to highlight, once again,
24   the -- the absurd, voyeuristic pseudo pornography,
25   the creepiness, the force -- the forceness all used
```

Ethan Klein                                    December 29, 2016

Page 194

1    to -- to comment on -- on his video.

2         Q    Well, was the red tint that you brought in

3    and the slow-down of the video, were they

4    highlighting the absurdity of the video in general?

5    Or were they highlighting the sociopathic look on

6    the dad's face in that video?

7         A    I believe that it was commenting on the

8    video itself more about Chris's intentions to create

9    a voyeuristic experience through this character.

10        Q    So what did the -- sorry to interrupt, I

11   didn't mean to.  What was the red tint?  What did

12   that have to do with the overall voyeuristic intent

13   of the video?

14        A    Well, I believe he, you know, he instructed

15   this character to act in this way to excite his

16   audience, so it more is a criticism of the video as

17   a whole, with these very provocative, strange

18   characters to create this voyeuristic pornographic

19   experience.

20        Q    So you believe that he instructed the dad

21   in the video to act like a sociopath?

22        A    I can't recall.  I can't act to his

23   intention.

24        Q    No.  No.  No.  I'm just saying you -- you

25   believe that he did that, and that's why you had the

1  red tint come in; is that right, to just make fun of

2  the dad's look?

3      A    Not just to make fun of the dad's look.  As

4  I previously stated, it's a comment on the video, as

5  a whole, as it were at -- you know, with these

6  absurd characters he's putting in there, creating a

7  voyeuristic pornographic experience.

8      Q    Is that fair to say that it's basically

9  underscoring the dad's fake sociopathic look with

10 that red screen to show the absurdity of the video

11 as a whole?

12     A    It's fair to say that I used it to

13 highlight the -- yeah, the absurd character that

14 Chris put in there to create this voyeuristic

15 experience, thereby, you know, commenting on -- on

16 the video itself.

17             MR. BUKHER:  Could we take a look at

18 Exhibit 50 now, please?

19                     (Whereupon Exhibit 50

20                     was marked for identification

21                     by the court reporter and

22                     was retained.)

23                     (Video played.)

24 BY MR. BUKHER:

25     Q    That's another clip from your reaction to

```
 1    "No Clothes Family Day" PrankInvasion; is that
 2    right?
 3         A    Yes.
 4         Q    Did you edit in a clip of Neil deGrasse
 5    Tyson into that video?
 6         A    Yes.  Yes.  I did.
 7         Q    What was the purpose of that?
 8         A    Once again, that -- that clip has
 9    historical relevance, and it's used, once again, as
10    a -- as I've explained before, to comment on the
11    voyeuristic pseudo pornographic experience that
12    Chris is -- that the creator of the video is trying
13    to thrust on to his -- his audience and is used to
14    kind of --
15         Q    Well --
16         A    Go ahead.
17         Q    Is that particular clip, the actors --
18    let's call them actors; right?
19         A    Yes.
20         Q    Were they kissing?
21         A    Two -- well, not all of them.
22         Q    Two of them were kissing?
23         A    Yes.
24         Q    And then you had a clip come in of Neil
25    deGrasse Tyson look like he was cringing; is that
```

Ethan Klein                                    December 29, 2016

1    fair to say?

2        A    That's what it depicted, yeah.

3        Q    Would you say you edited that in as a -- as

4    a commentary, saying that he was cringing at that

5    kiss?

6        A    It's more a commentary about, you know,

7    Chris's -- or I'll refer to him as the creator of

8    the video's intent to make you sexually aroused by

9    this voyeuristic experience.  It's more a comment to

10   the video's intention, than actually the kissing on

11   the screen, itself.

12       Q    Well, was that Neil deGrasse Tyson edit of

13   him cringing, was that -- would that edit have made

14   any sense in any other part of the video?  Or is

15   that intentional after the kiss?

16       A    I think it could have been used to the same

17   effect throughout the video.

18       Q    So it didn't speak to the kiss at all in

19   that particular clip?

20       A    It spoke -- it spoke to both the kiss and

21   the intention of the author.  It was a comedic

22   timing.

23       Q    Just the kiss --

24       A    It was a comedic timing.

25       Q    Sorry about that, I didn't mean to

Ethan Klein                                    December 29, 2016

Page 198

1    interrupt.

2         A    No problem.

3         Q    So the -- you said it did speak to the kiss

4    at least to some extent; right?

5         A    You could say that.  But I think that it

6    speaks -- it speaks equally to both the -- the --

7    the video as a whole and the kiss, it works on both

8    levels.

9         Q    Okay.

10                  MR. BUKHER:  Well, let's take a look at

11   Exhibit No. 51.

12                            (Whereupon Exhibit 51

13                            was marked for identification

14                            by the court reporter and

15                            was retained.)

16                            (Video played.)

17   BY MR. BUKHER:

18        Q    So that's another clip from your reaction

19   to "No Clothes Family Day" PrankInvasion video;

20   right?

21        A    Yes.

22        Q    What happens in that video?

23        A    That clip, you mean?

24        Q    Yeah.  That clip.  I'm sorry.

25        A    I believe, since we're looking at each clip

Ethan Klein                                    December 29, 2016

1    a little bit out of context and it's been a while

2    since I've watched the video as a whole, I think one

3    of the threads, throughout the whole video, was a

4    commentary on YouTube's policy on pornography, and

5    how he pushed the boundary of that in his video.  So

6    I was reading YouTube's guidelines on using elicit

7    pornographic images, and contrasting -- I was using

8    the image, itself, with the contrast of YouTube's

9    policy, to highlight the absurdity and kind of how

10   Chris has kind of tricked his way into sneaking

11   pornography onto YouTube.

12        Q    Well, how did -- how did that particular

13   clip highlight the absurdity?

14        A    Well, I was showing in what in my opinion

15   was very pornographic footage while contrasting it

16   to the very stark description of YouTube's policy.

17   Which, you know, side by side served as a very good

18   commentary on -- on the clips being shown.

19        Q    Would you mind, for the record, just

20   describing what the footage in that clip was?

21        A    There was a woman in a very revealing

22   swimming suit having a full on make-out session next

23   to, I believe -- I don't recall the relation of the

24   of the person next to her, some kind of family

25   member.  And I -- I don't recall the -- I can't

Page 200

```
 1    recall exactly what else happened in the clip, but I

 2    was reading YouTube's terms of service regarding

 3    pornography over the clip.

 4        Q    Just to be safe, let's watch the clip one

 5    more time.  Exhibit 51.

 6        A    Sure.

 7                  (Video played.)

 8    //

 9    BY MR. BUKHER:

10        Q    So having seen it again, visually again,

11    what happens in that clip visually?  Not in terms of

12    what you were talking about.

13        A    I use -- I use the head of a -- kind of a

14    historical relevant meme, I would call it, of a guy

15    named Eddy Wally to sensor what I thought was almost

16    too pornographic to show my viewers.

17             Is that -- is that what you want me to --

18    is that what you're looking for me to describe?  I

19    believe I described every other thing.

20        Q    All right.  So you -- you used a floating

21    head to sensor what you were commenting on as

22    particularly pornographic footage; is that right?

23        A    Yes.  The head has historical, you know,

24    value to our channel.  It's a character called Eddy

25    Wally, who goes, "Wow," and it was kind of -- it was
```

1    a commentary using -- using his historical

2    significance to -- to cover up the nudity.

3         Q    And -- and you were covering up the girl in

4    the video, who had a particularly revealing

5    swimsuit; right?

6         A    Yes.

7         Q    And -- and that -- that head that you

8    inserted into the video, that -- that was not part

9    of the original "No Clothes Family Day" Invasion

10   Prank [sic] video; right?

11        A    No.

12        Q    You edited that in?

13        A    That's correct.

14        Q    What kind of software did you use to edit

15   that in?

16        A    I use Premier -- Adobe Premier.

17        Q    So throughout these clips that we just

18   looked at, Exhibits 44 through 51, it looks like you

19   made quite a few, I guess, again, what we just

20   discussed, stylistic edits to the original clip; is

21   that correct?

22        A    Stylistic is kind of a vague term.  I'm not

23   sure if -- I'm not sure what you're implying with

24   that.  If I could re- --

25        Q    Well, you -- you -- go ahead.  I'm sorry.

Ethan Klein                                          December 29, 2016

                                                    Page 202

1        A    I -- I would -- I would describe it as --

2    as our, you know, using artistic liberty to

3    commentary -- to make a comment using -- using

4    alteration of the original video.  Stylistic is a

5    bit too vague.

6        Q    Okay.  Well, I -- I think, in general, we

7    can probably say that that's what it is, but just

8    for the sake of our conversation.  I mean, can we

9    say that you -- you altered the voice of the

10   speaker, at one point, you inserted a clip from a

11   completely different video of a grandmother falling

12   down, and Rom, I understand that this is compound,

13   but if you'd like, I'd go one by one, but just let

14   me go through it.  Tell me if I'm wrong about any of

15   these.  But you altered the voice, you inserted a

16   clip of an outside media of an --

17            THE REPORTER:  Sorry, can you slow down a

18   little bit?

19            MR. BAR-NISSIM:  Tim, I think the request

20   comes from the court reporter and not me on this

21   one.

22            MR. BUKHER:  You know what, we'll go one by

23   one and this way we can make sure we're not

24   inaccurate.

25   BY MR. BUKHER:

Ethan Klein                                    December 29, 2016

1       Q    You, in one clip, altered the voice of the

2    speaker; is that correct?

3       A    Yes.

4       Q    You, in another clip, inserted a video of

5    an older lady falling down some stairs that had

6    nothing to do with the original video; is that

7    correct?

8            MR. BAR-NISSIM:  Objection.  Vague and

9    ambiguous.  Original video you're referring to is

10   the PrankInvasion video; correct?

11           MR. BUKHER:  Yes.  Yes.

12   BY MR. BUKHER:

13      Q    You inserted a video of an older lady

14   falling down some stairs that was not in the

15   original video; is that correct?

16      A    It was not in the original video.  Your

17   original phrasing was that it had nothing to do with

18   that video, which I think would be presumptuous.

19      Q    You're right.  I take that back, and I

20   stick with my second one.  That is correct; right?

21      A    That is correct.

22      Q    Okay.  And then you inserted a video, again

23   not the original video, regarding pornography?

24      A    Are you speaking to the floating head?

25      Q    No.  I'm speaking to the -- the two guys in

Ethan Klein                                December 29, 2016

Page 204

1    the woods.

2         A    Yes.  I did insert that clip.

3         Q    Okay.  Then, and another clip, you zoomed

4    in on a head shot of -- of the grandparents featured

5    in the video, the zoom that was not originally in

6    the video; is that correct?

7         A    That is correct.

8         Q    And in another one, you had that screen

9    start begin to tint red while one of the characters

10   was looking on a kiss; is that correct?

11        A    Correct.

12        Q    In another video, you inserted a picture of

13   Neil deGrasse Tyson cringing, which was not in the

14   original video; correct?

15        A    Correct.

16        Q    And in another video, you inserted a

17   floating head to cover the exposed private parts, of

18   one of the characters, in the original video; is

19   that correct?

20        A    Yes.

21        Q    Can we call all these stylistic

22   alterations; would that be fair?

23        A    Sure.  That's fair.

24        Q    And these, you did for the artistic purpose

25   of commenting on the video; right?

Ethan Klein                                          December 29, 2016

Page 205

1         A    I don't believe that they were solely

2    necessary.  I included them for the comedic value.

3    I believe the commentary stood -- stood alone, you

4    know, as enough to -- to -- to exhibit fair use.

5    They were added for texture and comedic effect,

6    and -- and contributed to the fair use aspect of it.

7         Q    Okay.

8              MR. BUKHER:  Let's -- let's take a break at

9    this point, if you guys don't mind?

10             MR. BAR-NISSIM:  All right.  Great.  Thank

11   you so much.

12    (Whereupon there was a break in the proceedings.)

13             MR. BAR-NISSIM:  Back on record.

14   BY MR. BUKHER:

15        Q    So we were just discussing the "No Clothes

16   Family Day" reaction video, and we talked about all

17   of the what we called stylistic alterations that you

18   made.  And you said that the stylistic alterations

19   contributed to the fair use; is that correct?

20        A    I don't think that's a -- a -- necessarily

21   accurate.  I think it was used for comedic

22   and -- and stylistic purpose, I think the commentary

23   itself served enough to make the fair use argument.

24             MR. BUKHER:  Can we read that back, please,

25   the last thing that Mr. Klein said?  I believe he

1    did say that it contributed to the fair use.

2            (Whereupon the record was read as follows:

3                    "Answer:  I don't believe that

4                    they were solely necessary, I

5                    included them for the comedic

6                    value.  I believe the commentary

7                    stood --stood alone, you know, as

8                    enough to -- to -- to exhibit fair

9                    use they were added for texture and

10                    comedic effect and -- and

11                    contributed to the fair use aspect

12                    of it.")

13   BY MR. BUKHER:

14        Q    Does that refresh your recollection?

15        A    And I echo that sentiment, where I'm

16   basically, you know, as I said previously, the

17   commentary is the heart of the -- of the critique

18   and the fair use.  The stylistic edits are, you

19   know, a texture, I would say.

20        Q    Okay.  So if we took the stylistic edits

21   out, would you still feel like this was a fair use

22   of the original "No Clothes Family Day" video?

23        A    Yes.

24        Q    You feel that way because the commentary

25   was sufficient to make it a fair use?

Ethan Klein                                    December 29, 2016

Page 207

```
 1        A    Yes.

 2        Q    Why?

 3        A    I don't recall the -- the -- the video as a

 4   whole.  I'd have to review it to give a judgment.

 5        Q    You want to watch the whole video?

 6        A    I -- it's hard for me to give you my exact

 7   opinion without reviewing the whole video.

 8        Q    Do you recall at all what you were

 9   commenting on in that video?

10        A    I don't recall.

11        Q    Okay.

12             MR. BUKHER:  Let's put on Exhibit 43.

13                          (Whereupon Exhibit 43

14                           was marked for identification

15                           by the court reporter and

16                           was retained.)

17                          (Video played.)

18             MR. BUKHER:  Can we pause that for a

19   second?

20             MR. BAR-NISSIM:  Pause it.

21             Tim, you had a question?  It's paused.

22   BY MR. BUKHER:

23        Q    Yeah.  Is that enough to refresh your

24   recollection on what the point you were making?  Or

25   do we keep going?
```

Ethan Klein                                                    December 29, 2016

1        A    I prefer to see the video as a whole to

2    represent my answer as best as possible.

3        Q    Okay.  Let's continue the video then.

4        A    Thank you.

5                    (Video played.)

6    BY MR. BUKHER:

7        Q    You make good videos.

8        A    Thank you.

9        Q    Now, let me just say, after watching your

10    video, "the Big, the BOLD, the Beautiful," you know,

11    I didn't even want to watch my client's video.

12            Does that surprise you?

13        A    I can't speak to that -- to the surprise

14    factor of that, but I'm flattered nonetheless.  I

15    think Matt's a talented guy.

16        Q    I'm being tricksy; that's fine.

17            MR. BAR-NISSIM:  Yes, you totally were.

18    Tim, what about that no-gotcha representation?

19    BY MR. BUKHER:

20        Q    So going back to this, you just watched the

21    video.  Does that refresh your recollection about

22    what that video was about?

23        A    Yeah, definitely.  Thank you for reviewing

24    it for me.  I would say, after reviewing it, that

25    the commentary is definitely the heart of the video,

Ethan Klein                                              December 29, 2016

Page 209

```
 1    and stands firmly on fair use without any additional
 2    added texture.
 3         Q    And why do you say that?  Just work me
 4    through that.
 5         A    Well, my -- my commentary is essentially,
 6    you know, taking Chris's work and exposing it for
 7    the kind of pseudo pornography that it is.  In a
 8    landscape that's supposed to be family friendly, and
 9    by reading YouTube's own terms of service regarding
10    pornography, and how he clearly, in my opinion,
11    breaks those rules, he's found this weird niche
12    place to serve pornography, on YouTube, to kids who
13    don't otherwise have access to pornography.
14         Q    How -- how does he break those rules, the
15    YouTube rules?
16         A    If you can play back the clip of the part
17    where I'm reading over the -- while they're kissing,
18    I think I explain the -- I read the rules there
19    verbatim.
20         Q    Okay.  Well -- well, we won't replay that.
21    But that was part of your commentary, you're saying,
22    that pointing out how he breaks the YouTube rules?
23         A    Yeah.  Along -- along with the other points
24    I brought up.
25         Q    Could you repeat them for me?  I'm sorry,
```

1    I'm taking notes.

2         A    No worries.

3              Essentially, he's carved out a place for

4    pornography on YouTube, where it doesn't belong.

5    And he's kind of -- he's turned what seems to be

6    almost like a documentary into a niche of

7    pornography for children, who otherwise wouldn't

8    have access to it.  He's showcasing what he thinks

9    is cool, suave behavior, but is actually, really,

10   really, highly inappropriate behavior and is just

11   really borderline inflammatory misogynistically a

12   world-view of women that is just so unrepresentative

13   of reality.

14        Q    And in what way would you say that this is

15   like pornography?  Is it the way the women in those

16   videos are dressed?  I -- just to get an idea.

17        A    Oh, it's everything.  It's the way they

18   dress.  It's the way that he interacts with them;

19   he's got this macho bravado, it's so easy to pick up

20   women.  It's just, he portrays a reality that

21   appeals to -- to people, where they can look at it

22   and say, "Hey.  This turns me on.  You know, I mean,

23   if you would like to -- can you define pornography?

24   And maybe I can tell you better if it fits your

25   definition of it or not.

1    Q    Well, you said pornography.  I'm going by

2    whatever you're defining it as.  I guess I'm trying

3    to get your definition of pornography.

4    A    Something that, you know, excites you

5    erotically.  I think it accomplishes that for his

6    audience.

7    Q    Okay.  You said he -- he's showcasing suave

8    behavior.

9         What do you mean by that?

10   A    Well, he's this -- he's this guy, who can

11   just pick up any chick by pretty much walking up to

12   them, so it's a -- a bit of a twisted reality that

13   kind of even promotes toxic behavior into the real

14   world.

15   Q    When you say "he," you mean Chris, the

16   PrankInvasion guy?

17   A    Correct.

18   Q    Right?  The character?

19   A    Correct.

20   Q    And is he trying to portray himself as a

21   real person?  Do you think it's clear, from this

22   video, you said -- let me back up.

23        You said that you think these videos are

24   self-incriminated; is that correct?

25   A    That's -- that's my understanding, yes.

1        Q    What's that understanding based on?

2        A    I'm fairly certain -- I'm certain there's

3    been events of -- of the woman he's used in his

4    videos being found on Craigslist and model agencies.

5        Q    Okay.  And if -- if they're scripted, do

6    you feel like he's trying to -- he, being Chris,

7    and/or PrankInvasion, do you feel like PrankInvasion

8    is trying to be clear to the viewer that these are

9    scripted videos?

10        A    I can't speak to his intention.  Although,

11    I don't think that it matters.

12        Q    Why do you think that it doesn't matter?

13        A    Well, the message is not really all -- I

14    mean, the message of the video is kind of the same,

15    this kind of twisted reality, where men can just

16    approach women and take their way with them.

17        Q    Okay.  So you -- you have a problem with

18    the message of the video.  And -- and the message,

19    in your mind, does not include the fact that the

20    video seems like it's portraying reality?

21        A    I mean, that's definitely one of my

22    criticisms of his video, but certainly not the only,

23    and certainly not the central one.

24        Q    Okay.  So you are criticizing the video,

25    because you think it's really a fake video.  It

Ethan Klein                                December 29, 2016

Page 213

1    tries to come off as showcasing something that's

2    actually happening in reality, whereas as you

3    believe that these are scripted characters?

4        A    In this particular video, that is one of my

5    criticisms.

6        Q    And you have a problem with this guy

7    showcasing himself as suave.  Whereas in reality,

8    he's hiring women off of Craigslist to kiss him?

9        A    Correct.

10       Q    Because women don't act like that in real

11   life?

12       A    Correct.

13       Q    And -- and that's what your commentary

14   speaks to; right?  Even without stylistic

15   alterations, your commentary makes fun of the fact

16   that things like this don't happen in real life?

17       A    In this particular video, that is one of --

18   one of my commentaries.

19       Q    And is it one of your commentaries that

20   this video is trying to be something that it's not?

21   Which is, it's trying to act like a documentary or

22   real depiction of events as opposed to a scripted

23   video?

24       A    That is one of my -- my criticisms of that

25   of this particular video.

Ethan Klein                                    December 29, 2016

Page 214

1          Q     And do you feel like that criticism is

2     sufficient to stand on its own for fair use, without

3     even the artistic alterations?  And I'm not asking

4     you to make a legal conclusion, just what's your

5     feeling on that?

6          A     I think that will -- that will -- I mean, I

7     can't speculate as to what, you know, I know you

8     said you're not looking for a -- a legal conclusion,

9     but I can't possibly speculate as to what point of a

10    video's fair use.  But that wasn't my only point,

11    and certainly, I like to raise as many issues and

12    make as many comments and criticisms and

13    transformation as possible in a video.  That was one

14    of the points that I raised; it wasn't -- it wasn't

15    the only one.

16         Q     Well, let me be clear; all right, and I'm

17    not trying to trick you into saying anything.  When

18    I ask you to opine on something like this, I'm

19    really just trying to get your opinion.  I'm not

20    asking you to speculate as to how a court would

21    rule.  You know, whether a court would rule that

22    this is transformative.  Whether a court would rule

23    this as fair use; I'm not asking you that, but I am

24    asking you, because you just said the word,

25    "transformative," you feel that you highlighting the

Ethan Klein                                    December 29, 2016

Page 217

1    made?

2              MR. BAR-NISSIM:  Objection.

3              THE WITNESS:  Yes.

4              Sorry.

5    BY MR. BUKHER:

6         Q    Because the commentary is substantive and

7    speaks to what goes on in the video, and comments on

8    it; is that correct?

9         A    Yeah.

10        Q    Okay.  Let's -- let's turn to "the Big, the

11   BOLD, the Beautiful," Matt Hoss's video that we're

12   talking about here.

13             MR. BUKHER:  So I will play Exhibit 15 for

14   you, please.

15                       (Whereupon Exhibit 15

16                        was marked for identification

17                        by the court reporter and

18                        was retained.)

19                       (Video played.)

20   BY MR. BUKHER:

21        Q    So what were you commenting on in this clip

22   that we just watched, Exhibit 15?

23        A    I believe I was -- I was setting up the

24   video as a hist- -- kind of a historical reference

25   point to what I refer to as "cringe-tube."  Which is

1    kind of a -- if you look back at the YouTube videos

2    that were popular back when this video was popular,

3    you'll find a lot of kind of cringe-y, embarrassing

4    sketch comedy that -- that wouldn't be as successful

5    on today's landscape.  So I was kind of setting it

6    in that historical landscape.

7         Q    And just to be clear:  This video, the

8    original video that you react to in "the Big, the

9    BOLD, the Beautiful," is the creator, Matt Hoss, is

10   he trying to create a video that depicts reality?

11   Is he trying to make it seem like reality?

12        A    I can't speak to his intention.

13        Q    Well, what did it seem like to you?  I

14   mean, are there multiple camera angles in this

15   video?

16        A    You didn't show me the video, I have no

17   point of reference.  I only -- are you referring to

18   just -- because there was just a brief clip you

19   showed me.

20        Q    Okay.  Do you not remember the video at

21   this point?  Do you need to see the whole video?

22        A    It would be helpful to recall it.

23        Q    Well, let's -- I'll save my question to the

24   end, because you're actually, in fact, going to see

25   the whole video.  Because we are just really going

Page 219

1  to go through it.

2       A    So just be more --

3       Q    The entire video.

4       A    If you could just be more specific because

5  your question isn't pertaining to the clip that we

6  just watched, so I'm a little confused.

7       Q    Okay.  So speaking to the clip that we just

8  watched, you said you like the text that does like a

9  wave dance.

10           What were you talking about there?

11      A    Yeah.  In my opinion, was a very cheesy

12 effect.  I can only cons- -- think that.  In -- in

13 Matt's video, the theme throughout is that it's very

14 cool and suave, and -- and very -- very stylistic.

15 But the wave text is kind of a good metaphor for his

16 whole video, where it's -- it's -- he thinks it's

17 very cool, I can only imagine, but it's very, very

18 cheesy, to be frank, and represents this whole

19 cringe-tube era.

20      Q    Did you say that it was cheesy?

21      A    I think that my body language and the way I

22 reacted to it, with the -- I think it's quite

23 obviously inferred from my reaction to it.

24      Q    Didn't you say, "I like the text, it's like

25 a -- does a wave dance prolongs the shit out of

1    that," you see that?

2           Did you say that?

3        A    Yeah.  But the tone -- the tone in which I

4    said that was -- was clearly ironic.  And

5    obviously -- yeah, I'll leave it at that.

6        Q    How is it ironic?

7        A    I believe my tone conveyed -- conveyed

8    irony.  I mean, the dancing, the goofy dancing,

9    the -- the -- I specifically mentioned how it was

10   prolonged, also, kind of indicates to my audience.

11   I'm clearly joking about it in an ironic way, I

12   think it's quite obvious to any reasonable viewer

13   that I don't actually think it's cool.

14       Q    So you are criticizing, here, the -- the

15   opening title screen; right?

16       A    Yes.

17       Q    Okay.

18             MR. BUKHER:  Let's see Exhibit 16.

19                      (Whereupon Exhibit 16

20                       was marked for identification

21                       by the court reporter and

22                       was retained.)

23                      (Video played.)

24   BY MR. BUKHER:

25       Q    So in this clip, we see an excerpt of the

1    bold guy, and I'll refer to the character in the

2    video, the original video, as the bold guy, meeting

3    this athletic girl while she's stretching; is that

4    correct?

5         A    Correct.

6         Q    And you responded to that?

7         A    Yes.

8         Q    And what was your reaction to that?

9         A    Kind of just likening it.  I mean, I

10   referenced PrankInvasion because it taps into that

11   same pornographic market; very animalistic, very,

12   very pseudo pornographic.  And again, just kind

13   of -- just the intention of Matt, I think, was --

14   was to excite and set up this premise, where his

15   suave character can come swoop in and get that --

16   get that ass, as they say.  I was parodying that,

17   kind of just turning -- turning the intention upside

18   down, and giving a new insight.

19        Q    So in PrankInvasion, the host, he's -- he's

20   pretending to come up to random women in the street,

21   isn't he?

22        A    Yes.

23        Q    Like in real life; right?

24        A    I believe that's the intention of his

25   video.

     Q    Okay.  Does it seem to you, here, that

the -- the bold guy is coming up to a real person,

in real life, in this video?

     A    I would say that -- well, I think you --

you're stringing two points together there, and I'll

address it:  I'll say that I can't speak to the

intention of the video, but the -- the -- the

comment -- sorry, can you repeat the question?  It's

been a long day.

     Q    Well, you compare this to PrankInvasion,

where you said the main character, I guess the host,

is coming up to women, and the video is trying to

pretend like this is real life.  This video, where

the bold guy, in the clip that we just watched, is

approaching a girl on the street, is it trying to

come off as real life to you?

     A    I don't think the comparison was made to

make that comment; only to compare the pseudo

pornographic nature of those two videos.

     Q    Okay.  That's fair.  So speak to that for a

moment.  So, you're not comparing the two as if they

were both made to look like real life.  It's clear

to you, in your reality, that one video is trying to

look like it's real life, and the other video is

pretty clear that it's not real life.

Ethan Klein                                December 29, 2016

Page 223

1              Is that clear to you?

2        A    Yes.

3        Q    Okay.  So your comment was really just that

4    the two videos are similar, I guess, in character;

5    right, the suave guys, in the video, picking up a

6    girl.  That's your comment?

7        A    My comment is that they -- they're carving

8    out kind of similar space on YouTube, of this

9    misogynistic pseudo pornography.

10       Q    Who's carving out a space?

11       A    Matt Hoss and PrankInvasion, collectively,

12   are sharing an audience, in a way.  I feel that they

13   would appeal to the same kind of person.

14       Q    But -- but you would agree, a different

15   way; right?  I guess fictional versus nonfictional

16   characters, of the videos, are different; would you

17   agree with that?

18       A    Well, I don't see how that distinction

19   changes the intention -- or audience of the video.

20       Q    But you do see the distinction?

21       A    As I've said previously, there's -- I see

22   the distinction, but I don't see how it changes the

23   commentary of the video.

24       Q    All right.  So the commentary is pretty

25   similar then?

1              was retained.)

2              (Video played.)

3              MR. BUKHER:  Can we just save that for

4      another time?  I apologize, I took the videos out of

5      order.

6              Let's play Exhibit 23 actually.

7                          (Whereupon Exhibit 23

8                          was marked for identification

9                          by the court reporter and

10                         was retained.)

11                         (Video played.)

12     BY MR. BUKHER:

13        Q    So I apologize for the clip that we showed

14     previous to that, but this clip, Exhibit No. 23, is

15     it accurate to say that it's -- it's the next part

16     of your video, after -- after having watched

17     Exhibit 15?

18        A    I can't say that definitively without

19     watching the whole video.

20        Q    Okay.  Well, in this clip, Exhibit No. 23,

21     what's your comment here?

22        A    It's quite a long -- there's a lot in

23     there.  Can you be more specific to which part

24     you're referring?  There's a lot going on in that

25     clip.

Ethan Klein                                    December 29, 2016

Page 226

```
1        Q    Well, here we have the bold guy -- an
2    excerpt, the bold guy talking to the athletic girl
3    about her form and she asks if he's a creep.  We
4    have that; right, that's the excerpt?
5        A    That's -- well, it was a lot longer than
6    that.  Are you -- I can't recall my -- which
7    specific part are you asking me to explain?  You're
8    being rather vague.
9        Q    Well, I'm asking about your comment.  What
10   exactly were you trying to comment on here in this
11   clip?
12       A    Once again, I think there's -- it's --
13   there's -- well, essentially, I mean, at the heart
14   of the whole clip you showed, which we touched on a
15   lot of different points, so I think your question is
16   a little vague; there's a lot of specific parts in
17   there that you can touch on.  But generally, as I
18   would say, in my critique of this clip and the whole
19   video itself is that, you know, Matt has -- has spun
20   this -- this -- this fantasy world, where he's this
21   mass- -- he's this alpha male that comes and gets
22   women as he pleases.  It's almost like a very
23   caveman, BB -- you know, kind of a -- kind of a
24   nature documentary style, it's very animalistic.
25   It's meant -- it's meant to showcase how cool and
```

1    suave he is, but it's really just misogynistic

2    pseudo pornography.

3        Q    Well, you're saying this video is meant to

4    showcase how suave and cool Matt Hoss is?

5        A    Yes.

6        Q    Matt Hoss, the individual who lives in real

7    life?

8        A    I can't -- I can't draw a distinction

9    between -- I wouldn't know what his intent- -- I

10   mean, can you be more specific?  What are you --

11   what is it that you're looking for?

12       Q    Well, are you having trouble drawing a

13   distinction between the character in the video, and

14   Matt Hoss, the filmmaker that made the video?

15       A    No.  I'm speaking to the character in the

16   video.  My critique is of the video, not him as a

17   person.

18       Q    Okay.  You don't know if Matt Hoss, the

19   person, the filmmaker, wants to come off as a suave

20   guy that can pick up any girl?

21       A    Why -- I don't know why you would come to

22   that conclusion.  I'm talking about the video in

23   question, obviously the characters in it.

24       Q    Well, because you keep talking about Matt

25   Hoss, the character is bold guy, isn't it?

Ethan Klein                                        December 29, 2016

Page 228

 1        A    Yeah.  I can refer to him as bold guy, if

 2    that -- if that's more convenient.

 3        Q    Well, I just, you know, again, I just want

 4    to be honest.  You have a degree in literature, as I

 5    understand it.  Have you ever heard of the fallacy

 6    of attributing an author's character to the author

 7    of the work?

 8        A    No.  I have not heard of that.

 9        Q    Okay.  But when you're watching this video,

10    can you tell me if you're watching a guy called Matt

11    Hoss?  Or are you watching a character called the

12    bold guy?  Just so I understand your grasp of what's

13    going on in the video.

14        A    Yeah.  I -- I -- I'm obviously reviewing a

15    fictitious -- a video.  I'm reviewing bold guy.

16        Q    You -- you said you're reviewing a

17    fictitious video?

18        A    Yeah.  It's a -- it's a work of -- of, I

19    think as we established earlier, as you defined

20    it -- well, how did you refer to it?  A short --

21    short fictional video?  Short film, I think you

22    referred to it as?

23        Q    Fictional short film; right?

24        A    Yes.

25        Q    And your criticism here is, what, that the

Ethan Klein                                    December 29, 2016

Page 229

```
 1    fictional character is trying to establish himself

 2    as suave?

 3         A    Yes.

 4         Q    And -- and how do you make that criticism

 5    exactly?

 6         A    As -- as I stated before, I actually -- can

 7    you -- can you replay the clip?  It's honestly been

 8    a while since we watched it, and...

 9              MR. BUKHER:  Sure.  Let's replay

10    Exhibit 23.

11                      (Video played.)

12              THE WITNESS:  You can -- you can pause it.

13              So yeah.  And --

14              MR. BAR-NISSIM:  There you go.

15              THE WITNESS:  In this particular clip --

16    well, forgive me for referring to him as Matt Hoss.

17    The channel name is the Matt Hoss Zone, so I hope

18    you can understand the confusion between Matt Hoss

19    as bold guy, his name is in the title of the

20    channel.  If you prefer, I can refer to him as bold

21    guy.

22              But in this particular clip, we're -- we're

23    obviously talking to the director's intention for

24    creating such a -- such a -- such a piece.

25    BY MR. BUKHER:
```

```
 1        Q    Okay.  So I -- I just want to make clear
 2   that you understand that you're talking to the
 3   director's intention, and you're not talking about
 4   the fictional character, bold guy, doing whatever it
 5   is that he's doing in this clip.
 6        A    I -- I think it's both.  I don't understand
 7   the -- the -- the point of making a distinction.
 8   It's Matt Hoss Zone and it's bold guy, I don't know
 9   if there's such a big difference between the two,
10   and frankly, I can't speak to the -- to the whether
11   that's true or not.
12        Q    Well, from -- from your time studying
13   literature, who's your favorite author?
14        A    Oh, I'd say, probably, Kurt Vonnegut.
15        Q    Any others?
16        A    That's the one that comes to mind.
17        Q    Okay.  Who is not your favorite author, but
18   any other authors that you liked?
19        A    Honestly, to be frank with you, I don't
20   read that much.  That's -- this is the one author
21   that I'm a fan of, that I can recall.
22        Q    Kurt Vonnegut.
23             Have you ever read Chuck Palahniuk?
24        A    No, I don't recall.
25             THE WITNESS:  Could we take a bathroom
```

1    break?

2            MR. BAR-NISSIM:  Tim, it seems Ethan could

3    use a bathroom break real quick; is that okay?

4            MR. BUKHER:  Yeah.  That's fine.  Let's --

5    let me just make a note here, what we're talking

6    about.

7            MR. BAR-NISSIM:  Okay.  Yeah, no.  That's

8    fine.  We'll just make it really quick.

9            MR. BUKHER:  Okay.  Let's -- let's do that.

10   We'll meet back in three to five minutes, whatever?

11           MR. BAR-NISSIM:  Yeah.  That sounds great.

12           THE WITNESS:  Thank you.

13    (Whereupon there was a break in the proceedings.)

14   BY MR. BUKHER:

15       Q    Okay.  So we were discussing the last clip

16   that we watched, which is Exhibit 23.  And you were

17   telling me how this comments on the video as a

18   whole.

19           Can you -- can you go back to that, and

20   just give me a breakdown of the commentary?

21       A    Sorry, can you replay the clip?  I know --

22   I know it's -- we're tight on time, I just want to

23   refresh my memory.

24       Q    Yeah.  Let's do that.

25       A    Okay.

1        Q     Exhibit 23.

2        A     Thank you.

3                   (Video played.)

4              THE WITNESS:  I recall.  Yeah.

5              So I think the -- the commentary here is

6        kind of that, I would say, something along the lines

7        that, like, bold guy is kind of an alterego of Matt

8        Hoss, and that, you know, it just -- it depicts what

9        he thinks is very cool and suave, but in my opinion,

10       is just pseudo pornography that's kind of carved out

11       on the YouTube.

12       BY MR. BUKHER:

13       Q     Okay.  Is there anything else that this --

14       that you're commenting on here, with respect to this

15       clip?  Or is that it?

16       A     It's a really dense clip.  I hesitate to

17       say that that's it.  It's really dense.

18       Q     Well, you make some jokes about the

19       sleeveless shirt with hoodie, yeah?

20       A     Yeah.  That, again, serves to show the bold

21       guy, the character, he's wearing this outfit that he

22       thinks makes him look muscular, and cool, and

23       attractive, but is actually quite cheesy and

24       unappealing, I think, objectively.  So again --

25       Q     You think, objectively, the sleeveless

```
 1    shirt -- hoodie is unappealing?

 2         A    Well, I think objectively is not the right

 3    word.  But I think it -- I think, in my opinion,

 4    it's quite a goofy outfit, and not one that I would

 5    consider sexy.

 6         Q    So you don't appreciate the outfit he was

 7    wearing in that video?

 8         A    Well, I don't think that the intention of

 9    bold guy -- it's -- his intention to be sexy in that

10    outfit, I think, is absurd.  And that was -- that

11    was my commentary on it.

12         Q    You think he intended to look sexy in that

13    outfit?  Or do you think that he was making fun of

14    that outfit, too?

15         A    I -- in my opinion, he was definitely

16    trying to show off his guns and his style.  I don't

17    think he was making fun of it, no.

18         Q    Okay.  So -- so your comment here was that

19    bold guy, who was an alterego of Matt Hoss, is

20    trying to depict himself as cool and suave.  I mean,

21    that's the gist of it; right?

22         A    Yes.

23              MR. BUKHER:  All right.  Let's roll Exhibit

24    24.

25                        (Whereupon Exhibit 24
```

1                            was marked for identification

2                            by the court reporter and

3                            was retained.)

4                            (Video played.)

5     BY MR. BUKHER:

6          Q    So what were you commenting on here?

7          A    I think, again, bringing up the

8     historical -- the historical, you know, significance

9     of -- of what I deemed cringe-tube, and how I don't

10    think a video of kind of -- of the same -- of the

11    same caliber, the same vein would be as successful

12    today.  I consider it almost like a phenomenon, that

13    a video of his was capable of achieving so many

14    views.  And that's what cringe-tube was back then,

15    in my opinion.

16         Q    So you said again, you brought up the

17    significance of cringe-tube?  You brought it up

18    before, right, in these clips?

19         A    Yes.  I've mentioned it.

20         Q    Okay.  And were you also trying to convey

21    that bold guy, who's an alterego of Matt Hoss, was

22    trying to depict himself as cool and suave?

23         A    Well, it was a -- you showed me a clip of

24    mostly us talking, so I don't know which clip you're

25    referring to of the original.

Ethan Klein                                    December 29, 2016

Page 235

1          Q    Well, the excerpt here.  Let's play it

2     again, just to be clear.

3          A    Just -- just the first part, please.

4               MR. BUKHER:  Exhibit 24, please.  Let's

5     stop at -- once the excerpt stops.

6               THE WITNESS:  Yeah.

7                    (Video played.)

8               MR. BUKHER:  Okay.  Let's stop here.

9               THE WITNESS:  So yeah.  My -- my comment is

10    essentially that he's making, you know, pseudo --

11    Matt -- you know, misogynistic pseudo pornography

12    that doesn't really ever go anywhere.  And it kind

13    of carved out this pornographic alpha male place on

14    YouTube for kids to fantasize about.

15    BY MR. BUKHER:

16         Q    So that's relevant here, to this excerpt,

17    in Exhibit 24?

18         A    Yes.

19         Q    Didn't you already say that about the

20    excerpt in Exhibit 23?

21         A    I think that, in combination, it's a thesis

22    throughout the -- the video, that in combination,

23    kind of helped drive -- drive a point home.

24         Q    You're driving the point home; okay.

25               MR. BUKHER:  Let's watch Exhibit 25.

Ethan Klein                                          December 29, 2016

Page 236

```
 1                         (Whereupon Exhibit 25

 2                         was marked for identification

 3                         by the court reporter and

 4                         was retained.)

 5              THE WITNESS:  Sure.

 6                         (Video played.)

 7      BY MR. BUKHER:

 8         Q    So what was the comment here?

 9         A    Yeah.  Again, as I -- as I said, it kind of

10      builds on the thesis that it's this misogynistic

11      pseudo pornography, that bold guy is -- is -- is

12      representing this -- this surreal kind of world,

13      that's just like -- it's porn, but you don't get the

14      payout off, and it's -- it's -- he thinks it's cool,

15      but it's really just misogynistic pornography.

16         Q    So basically, he's just depicting himself

17      as cool and suave?

18         A    Yeah.  And again, he -- he's -- he's

19      depicting a world, where picking up women is as easy

20      as approaching them presenting themselves, and he

21      can just, you know, it's simply -- it's simply that

22      easy for an alpha male, such as bold guy.

23         Q    And you use a couple of clips here, a

24      couple of excerpts, to make that comment; right?

25         A    Yes.
```

 1              MR. BUKHER:  Exhibit 26.

 2                         (Whereupon Exhibit 26

 3                         was marked for identification

 4                         by the court reporter and

 5                         was retained.)

 6                         (Video played.)

 7     BY MR. BUKHER:

 8        Q    So what was the commentary in this clip?

 9        A    Yeah, well, both this whole -- this -- this

10     line of dialogue of

11     you-can-do-whatever-you-want-to-me, just

12     acknowledging of how easy it is to approach women,

13     and again, this masochistic -- this, you know,

14     almost like showing females as these easily

15     achievable objects, and -- and very pornographic in

16     nature, and the absurdity of this claim, you can do

17     whatever you want to me, where women just offer

18     themselves up to bold guy because of his sleeveless

19     hoodie.

20        Q    Didn't the last couple of clips, and the

21     excerpts in those clips, already make that point?

22        A    As I said previously, it's a thesis, where

23     you're kind of driving -- you're building your case

24     and driving the point home.  It's a -- it's a study.

25        Q    So before, earlier today, you said you

Ethan Klein                                           December 29, 2016

Page 238

```
 1    think about fair use when you edit your clips, and

 2    you try to only use what's necessary.  You felt that

 3    this was necessary?

 4        A    I do.

 5        Q    And you talked about a couple of things in

 6    this clip.  Just -- just to rephrase what happened

 7    in the clip, it seems, in the clip, the -- the --

 8    we'll call her "the athletic girl" since the

 9    character doesn't have a name.

10        A    Parkour girl, I believe her name was.

11        Q    Tells the bold guy to catch her and she'll

12    let him do whatever he wants with her; is that

13    correct?

14        A    I believe that's what she said.

15        Q    Okay.  Then, in your commentary, you kind

16    of went off on a tangent there; right?

17        A    I don't believe it was a tangent.  I think

18    it was -- it was speaking to the kind of absurdity

19    of that claim, like whatever you want, I mean, you

20    know, I was kind of illuminating how absurd of a

21    statement that was, by bringing up the -- the carrot

22    and the mayonnaise.

23        Q    So you said, "Are you going to put a carrot

24    up her ass?"  You wrote -- or you said that; right?

25        A    Yes.  I believe that's what I said.
```

Ethan Klein                                        December 29, 2016

Page 239

1        Q    Did -- was that said in the original video?

2        A    No.

3        Q    And you said, "Are you going to shit in her

4   mouth?"  You said that; right?

5        A    Yes.  I said that, I believe.

6        Q    Was that said in the original video?

7        A    Not my recollection, no.  But again, I

8   think that's what brings the new expression the new

9   meaning, highlighting how kind of silly and

10  misogynistic that -- that statement is, where it's

11  like, well, what actually can you do?  That -- that

12  was the point of that comment, to highlight like

13  well, how many options --

14       Q    Well --

15       A    -- actually are there?

16       Q    Well, you're trying to highlight the

17  misogyny in Mr. Hoss's video; you don't think that

18  it's misogynistic to talk about putting carrots in

19  women's asses and shitting in their mouths?  You

20  don't think that's misogynistic?

21       A    I didn't -- no -- I mean, no.  Not

22  necessarily.  It could be quite possible, that's

23  what she's into.

24       Q    That's what who's into?

25       A    Whatever hypothetical, you know, party may

1    be participating in such an act.  Well, obviously,

2    I'm -- I'm -- I'm just saying it for comedic device;

3    I'm not implying that -- that -- that I partake in

4    such a thing.  But I don't think it's misogynistic

5    by its -- by its nature, no.  I mean, what's --

6    what's misogynistic about carrots and mayonnaise.

7        Q    So you were trying to be funny?

8        A    I believe that -- that -- that -- that was

9    part of it.  I mean, it was a -- it was a funny way

10   to acknowledge how absurd of a statement it was she

11   was -- she was making.

12       Q    So when you talked about carrots up the

13   ass, and shitting in the mouth, that was to be

14   funny?

15       A    As I previously stated, funny was only one

16   aspect of it.  The other was to illuminate the

17   absurdity of the statement.

18       Q    What -- was -- was that the -- was funny

19   the aspect behind those particular two statements

20   that I just highlighted?

21       A    I -- I believe -- I think I'm repeating

22   myself, but I'll repeat it again for you:  The

23   comedy aspect is -- is part of being an entertainer.

24   The other part is highlighting some absurd points,

25   so it's both comedy and illuminating -- it's both

1    critical and transformative, as well as being funny.

2    I don't think they exclude each other.

3        Q    What -- well, what absurd points were you

4    highlighting?  Was there a point, where carrots in

5    the mouth was brought up in this at all?

6        A    No.  Again, I -- I -- as I said earlier,

7    the -- she said, "You can do whatever you want to

8    me," so my comment illuminates:  How many things can

9    you possibly do to her?

10       Q    Okay.  But aren't you trying to turn this

11   video on its face as a piece of misogynistic

12   pornography?

13       A    Yes.

14       Q    Well, when you're talking about carrots in

15   the ass, and shitting in somebody's mouth, aren't

16   you just adding to the misogyny?

17       A    No.

18       Q    No?

19       A    No.

20       Q    All right.

21            MR. BUKHER:  Let's watch Exhibit No. 27.

22                    (Whereupon Exhibit 27

23                    was marked for identification

24                    by the court reporter and

25                    was retained.)

Ethan Klein                                    December 29, 2016

Page 242

1                        (Video played.)

2        BY MR. BUKHER:

3            Q    So you noted, in this clip, that you

4        appreciate the entertainment value of the action

5        sequence; is that right?

6            A    Not the action sequence.  I'm just speaking

7        to the character, bold guy, and not particularly the

8        action sequence; the whole video.  And his, you

9        know, his persona, his character, his direction.

10       Just generally, I was speaking about bold guy, Matt

11       Hoss, and his whole -- you know, his whole Matt Hoss

12       Zone, all of his characters.

13           Q    You appreciate the video, that's what

14       you're saying?  Is there any other commentary here?

15           A    I don't -- I can't remember, but that

16       seemed to be the -- the -- I can't recall the entire

17       clip, it's been a long day, but that seemed to be

18       the -- me expressing that -- that I found it

19       entertaining.

20           Q    Okay.

21               MR. BUKHER:  Let's put on Exhibit 28.

22                       (Whereupon Exhibit 28

23                       was marked for identification

24                       by the court reporter and

25                       was retained.)

```
 1                      (Video played.)
 2     BY MR. BUKHER:
 3         Q    So is it fair to say that you talk about
 4     two things in this clip?  And I'll say both of them.
 5         A    Sorry, can you start over?  The clip hadn't
 6     finished.
 7         Q    Sorry about that.
 8              Is it fair to say that we talk -- you talk
 9     about two things in this clip, and I'll separate
10     them so you can answer separately.
11         A    Yes.
12         Q    But the one thing that you talk about is
13     the action sequence; is that fair to say?
14         A    Yes.
15         Q    And the other thing, that you talk about,
16     is you just kind of make fun of what would happen if
17     Matt Hoss' character, bold guy, catches the girl;
18     right?  You say, you know, you can do anything you
19     want to her, et cetera.
20         A    Yes.
21         Q    Okay.  So with respect to you talking about
22     what's going on in the video, you're -- are you --
23     you're pretty much just narrating what's going on in
24     the action; is that right?
25         A    No.  That's not correct.  I think -- I
```

Ethan Klein                                    December 29, 2016

Page 244

1    think my observation -- I think parkour, by its

2    definition, is trying to find like a -- a more

3    direct, more creative way -- I think parkour, by its

4    definition is finding a more direct way to travel,

5    and I think our observation was that he actually

6    could have just taken the sidewalk.  So it --

7         Q    Did you make that -- sorry.  Did you -- did

8    you make that observation in the video?

9         A    Absolutely.  Several times.

10        Q    Well, you -- you just said that parkour is

11   about finding a -- what is it that you just said?

12        A    I'm not -- I'm not -- I'm not a parkour

13   expert like your client, but I would say -- as my

14   understanding, it's about, like, you know, re- --

15   reducing the distance that -- that it takes to

16   travel, from point "A" to point "B."  So I think he

17   thought it was, like, a cool example of parkour, but

18   it was -- it was a bit of a goof, if I may say so.

19        Q    Are you saying that now?  Or did you say

20   that in the clip?

21        A    I think I said that.  Not only in that

22   clip, but throughout the video.

23        Q    No, I don't think you actually said that

24   parkour is the most direct way to travel.

25             Did you say that in the clip?

Ethan Klein                                    December 29, 2016

Page 245

```
 1        A    Oh, no.  I did not say that in the clip.
 2   But I did acknowledge that he could have just taken
 3   the sidewalk.
 4        Q    What does that have to do with your
 5   statement, that parkour is the most direct way to
 6   travel; did you say that in the clip?
 7        A    Well, I'm inferring that that's why this
 8   clip is so silly, because he climbs over a wall
 9   that's right next to the sidewalk.  I mean, anyone
10   who's practicing parkour would just take -- or
11   anyone who is just trying to take a less resistant
12   path would just take a sidewalk, so my point being
13   that the parkour was unnecessary, and therefore,
14   absurd.
15        Q    I'm -- I'm sorry, this whole statement that
16   you made just now, before I asked my question, do
17   you think that people watching the video would have
18   got that from your clip?
19        A    Yes.
20        Q    All right.
21             MR. BUKHER:  Let's watch the clip again.
22   Exhibit 28.
23                     (Video played.)
24   BY MR. BUKHER:
25        Q    Okay.  So did you say, anywhere in that
```

```
 1   video, that parkour is about minimizing the moves

 2   between point "A" and point "B"?

 3       A    I think it was between the lines of the --

 4   of the observation Hila made, by saying, "He could

 5   have just taken the stairs," implying that he didn't

 6   take, you know, the most logical path.  That was the

 7   joke.  That was what made it absurd, and a good

 8   observation.  And it transformed the views of his

 9   clip.

10       Q    So the -- the -- let's separate that out.

11   Were you making a joke about his parkour?  Was it --

12   was the statement meant to be humorous?

13       A    I think you're view -- you're making the

14   mistake of -- and this seems to be a common thread

15   in your questions -- of -- of separating being funny

16   and being critical; I think they don't exclude each

17   other.

18       Q    Okay.  Were you trying to be funny while

19   you were being critical here?

20       A    Yes.

21       Q    Okay.  And you were being critical about

22   his parkour?

23       A    Yes.

24       Q    You just said you were not a parkour

25   expert; is that correct?
```

Ethan Klein                                    December 29, 2016

Page 247

1        A    I am not a parkour expert.

2        Q    What's your experience with parkour?

3        A    Watching your client's videos.

4        Q    So you learned about parkour by watching my

5    client's videos?

6        A    I -- I -- I've seen parkour on the

7    internet.  I mean, I've read a bit about it.

8        Q    What did you -- what have you read about

9    it?

10       A    Basically, what -- what I said to you

11   previously.

12       Q    When did you read these things?

13       A    I don't recall the exact date.

14       Q    Did you read them before making this video?

15       A    I don't recall.

16       Q    Were you trying to be a parkour critic when

17   you filmed this video?

18       A    I think it's one aspect of the -- the

19   character that was so interesting to me.

20   Definitely.

21       Q    So you were trying to criticize the

22   character as portraying himself as cool and suave.

23   And you were also criticizing him as portraying

24   himself as somebody that knows parkour?

25       A    I think you're -- you're -- you're dicing

Ethan Klein                                          December 29, 2016

Page 248

```
 1    together the central point of his character.  Which
 2    is he's -- he's established himself as this alpha
 3    male, who can pick up women, you know, by -- by --
 4    with ease, but it's just misogynistic pseudo
 5    pornography.  And they all tie together to create
 6    that package.
 7         Q    Is it your experience that a lot of alpha
 8    males practice parkour?
 9         A    I think he -- I mean, I can't speculate to
10    that.  That means pretty hypothetical.
11         Q    I'm not asking you to speculate.  I mean,
12    you said alpha male; what do you mean by that?
13         A    Well, he's -- he's the kind of guy, who can
14    just show up and -- and get the girl.  He's -- he's
15    bold.  He's bold guy.
16         Q    So you're criticizing him for being bold
17    guy, the character?
18         A    Once again, as I've previously stated, I'm
19    criticizing the entire package, the entire
20    experience, the entire misogynistic pseudo
21    pornography package that he's sewn together.
22         Q    Well, you used the term, "misogynistic."
23    What's misogynistic about it?
24         A    I think he portrays women as easy.
25         Q    Well -- well, why do you say that?
```

 1        A    Well, I think when you take the video at

 2   its whole face-value, I think we're talking about

 3   specifically this one clip.  But it's the common

 4   thread throughout the bold guy series and the Matt

 5   Hoss Zone channel, where it -- it takes very little.

 6   And usually, in these very implausible scenarios,

 7   where women just give it up to use a bit of

 8   parlance.

 9        Q    Well, let's just talk about this video.

10             What about this video implies that women

11   are easy?

12        A    Well, we haven't quite gotten to that yet,

13   so if you want to -- if you want to play the whole

14   video, I can point it out to you, which parts are.

15        Q    Well, let me ask you, in your life

16   experience, have you ever had to pick up a woman by

17   challenging her to a parkour race?

18        A    Not that I recall.

19        Q    If you had to, would that seem easy to you?

20        A    The parkour is not easy; the girl is.

21        Q    Well, how is the girl easy?  She just had

22   to have a whole parkour race with this guy.

23        A    Well, basically, it starts with her

24   saying -- you know, being disgusted.  And almost

25   immediately, as we draw to the conclusion of the

1    video, being ready to give it up.

2        Q    What makes you draw that conclusion, that

3    she's ready to give it up?  Didn't she challenge him

4    to a parkour race?

5        A    Sorry, can you rephrase that?

6        Q    What makes you say that she was willing to

7    easily give it up, as you said?  Wasn't she

8    challenging bold guy to a parkour race?

9        A    I think depicting a woman who's -- who

10    starts from disgusted to uncontrollably sexually

11    attracted to a man, within the course of -- of -- of

12    a five-minute video, is -- is a woman who is

13    depicted as not realistic and easy, and depicts

14    women, who are overly sexual and overly eager, to

15    pursue this guy that, really, in my opinion, has no

16    charm at all.

17        Q    Is it realistic, do you think, for a woman

18    to be interested in a guy because he beats her in a

19    parkour race?

20        A    I can't -- I can't -- I mean, that's a bit

21    speculative.  I don't know.

22        Q    Well, you're talking about it.  You said

23    it -- it's -- it's strange that this woman starts

24    off as being weird about this guy, but then suddenly

25    is all into him after this parkour race; isn't that

Ethan Klein                                    December 29, 2016

Page 251

1    what you're saying?

2        A    Yes.  But it's more about the turnaround.

3    Not about the athletic joust they shared; more about

4    the -- the, "Hey.  You're disgusting.  Go away."

5    And then five minutes later, you know, "Do anything

6    you want to me."

7        Q    That seems unrealistic to you?

8        A    Yes.

9        Q    Very unrealistic?  Or very unrealistic?

10       A    Very unrealistic.

11       Q    So this video doesn't come off to you as

12   realistic, to you, at all?

13       A    No.  I'm not criticizing it for its

14   realistic value, it's a -- as you pointed out, it's

15   a short film, and I'm critiquing it.

16       Q    No.  No.  But right now.  Not in terms of

17   your criticism in the clip, but right now, does this

18   video seem realistic to you?

19       A    No.

20            MR. BUKHER:  Let's -- let's take a look at

21   Exhibit 29.

22                        (Whereupon Exhibit 29

23                        was marked for identification

24                        by the court reporter and

25                        was retained.)

Ethan Klein                                    December 29, 2016

```
 1                    (Video played.)
 2    BY MR. BUKHER:
 3       Q     So here, with respect to this excerpt, you
 4    talk about what happens when bold guy catches the
 5    girl; is that right?
 6       A     That's correct.  Or the hypothetical.
 7       Q     And you talk about whether he is going to
 8    put carrots in her ass and mayonnaise in her mouth;
 9    is that right?
10       A     That is -- that's correct; it's used to --
11    I mean, the carrots and the mayonnaise --
12       Q     Well -- well, let's -- let's --
13             MR. BAR-NISSIM:  Tim, do not interrupt his
14    answer.
15             Ethan, complete what you were going to say.
16             THE WITNESS:  The carrots and --
17             MR. BUKHER:  Well, no.  I'm sorry, Ram.  I
18    asked a question and he answered it.  I'm not trying
19    to --
20             MR. BAR-NISSIM:  No.  No.  He wanted to
21    give you a complete answer, Tim, so slow down.  Let
22    him give his complete answer.
23             MR. BUKHER:  Well, no.
24             MR. BAR-NISSIM:  It might not be the answer
25    that you'd like --
```

```
 1              MR. BUKHER:  Well, I'll rephrase the
 2      question.
 3              In this case, Ethan --
 4              MR. BAR-NISSIM:  Okay.
 5      BY MR. BUKHER:
 6          Q    My question is:  Did he say -- did you say
 7      that bold guy -- you're asking about what happens
 8      when bold guy catches her; is that correct?  Yes or
 9      no?
10          A    I'm -- I'm highlighting the absurdity, once
11      again, of what started the chasing of, you can do
12      anything you want to me --
13          Q    Sorry.  You didn't ask my -- you didn't
14      answer my question.
15              Did you -- did you say, "What happens when
16      he -- when she -- when he catches her"?  Yes or no?
17          A    I did not say, "What happens when he
18      catches her."
19          Q    "What happens when he catches her," you
20      didn't say that?
21          A    I was -- I -- I was making an -- a -- an
22      absurd observation.  I was -- it was a hypothetical.
23          Q    But did you not say that?  Did you not say,
24      "What happens when he catches her"?
25          A    Yeah.  You're taking it out of context,
```

Ethan Klein                                    December 29, 2016

Page 254

1    though.  It's a hypothetical.

2         Q    I'm not asking you about the context.  I'm

3    asking if you said that.  Did you say, "What happens

4    when he catches her"?

5         A    I don't recall.  I don't recall.

6              MR. BUKHER:  All right.  Let's watch

7    Exhibit No. 29 again.

8                    (Video played.)

9              MR. BUKHER:  Let's stop it right there.

10   BY MR. BUKHER:

11        Q    So did you say, "What happens when he

12   catches her"?

13        A    Yeah.  It was a hypothetical question posed

14   to myself.

15        Q    No.  No.  Did you -- did you ask that?  Did

16   you -- did you say, "What happens when he catches

17   her"?

18             MR. BAR-NISSIM:  Objection.  The video

19   speaks for itself, Tim.  You're just recounting

20   stuff that's happening in the video.  He's trying to

21   explain to you what he did in the video.

22             MR. BUKHER:  I'm not asking for an

23   explanation.  I'm asking whether he said that in the

24   video, Ram.

25             THE WITNESS:  I did present a hypothetical

Ethan Klein                                    December 29, 2016

Page 255

```
 1    question to myself.
 2    BY MR. BUKHER:
 3        Q    No.  No.  No.  I'm not asking you
 4    what -- what you meant by that.  I'm asking you
 5    whether you said that.
 6        A    Yes.
 7        Q    Okay.  And then you said, "Does he have to
 8    tackle her?"  You said that; right?
 9        A    Yes.  In a hypothetical way to kind of
10    parody --
11        Q    Whoa.  Whoa.  Well, you said that; right?
12             THE REPORTER:  Okay.  One at a time.
13             Counsel, there's a delay on your end, so
14    when you cut somebody off, I can't get what you're
15    saying.  It blocks you out.
16             MR. BUKHER:  Ram, let me be very clear:  I
17    understand that Mr. Klein, Ethan, wants to talk to
18    me about what he meant by what he said.  But I'm
19    simply asking him whether he said something or not.
20    And if he's not going to answer the question, if
21    he's going to use up our time on this, I will use
22    this to move for another 7-hour deposition.
23             MR. BAR-NISSIM:  Tim, you're asking
24    questions about what is contained in a video.  So
25    you are --
```

1          MR. BUKHER:  That's --

2          MR. BAR-NISSIM:  -- literally going to --

3     you're going to tell me you're going to move to

4     compel for an extra 7 hours, due to you asking

5     questions about -- you asking questions about what

6     related to the video.  Move on to more substantive

7     questions.  You know what is actually in the video.

8     Let's move on.

9          MR. BUKHER:  No, Ram, I'm sorry, but I'm

10    perfectly within the right to ask what's within a

11    video.  He can either say yes, it happened in the

12    video.  Or no, it did not happen in the video.  And

13    if he's not going to answer, then he's not going to

14    answer.  And then we will just have to extend this

15    for another day.  Or we can simply answer "yes" or

16    "no," that something happened or did not happen in

17    the video.

18          I mean, do you disagree with that?  Do you

19    want to debate it a little bit further?

20          MR. BAR-NISSIM:  No.  But I just think that

21    given the time that you have, if you're concerned

22    about how he's going to -- if you simply want to ask

23    questions about what is contained in the video or

24    not, then --

25          MR. BUKHER:  Yes.  That's that what I'm

Ethan Klein                                                    December 29, 2016

Page 257

1    asking.  Given the time that I have, that's all I'm

2    asking.  And I'm asking that my time not be used up

3    for answers to questions that I'm not asking.  And I

4    think that's very crucial.

5            MR. BAR-NISSIM:  Okay.  Then let us do

6    this, Tim:  If you're going to continue asking

7    questions, and make it clear that is just what is

8    actually being said in the video, then -- then we --

9    then I'll make sure that Ethan does respond as "yes"

10   or "no" in terms of that.

11           But let us also, you know, in terms of the

12   time that you have, I would just think it's merely

13   wiser to ask, you know, stuff other than what is

14   contained in the video.  So to be respectful for

15   your time, let us have you move on, and we'll take

16   it from there.

17           MR. BUKHER:  Ram, I appreciate your advice.

18           Ethan, I am going to ask you questions

19   about whether something or not happened in the

20   video.  In order to keep this brief, can you answer

21   "yes" or "no," and then I may or may not ask you

22   what you mean by what you said in those points, if

23   that's relevant to the question.  And -- and then

24   you could tell me what you meant.

25           Is that clear?

Ethan Klein                                          December 29, 2016

Page 258

1           THE WITNESS:  That's -- that's clear.

2    But -- yeah, that's -- that's clear to me.

3    BY MR. BUKHER:

4        Q    Okay.  Okay.  So you said, in this video,

5    "What happens when he catches her," you said that;

6    right?

7        A    I said, "What happens when he catches her";

8    that is correct.  I said that.

9        Q    And you said, "No, does he, like, take her

10   out and rape her?"

11           Did you say that?

12       A    I -- I did say that, yes.

13       Q    And what do you -- what did you mean by

14   that, when you said that?

15       A    So I was trying to highlight the -- again,

16   the absurdity of this whole chasing, and the premise

17   of her saying, "Do whatever you want to me once you

18   catch me," as kind of like a nature documentary,

19   it's so primal, and so absurd, and so implausible.

20   It highlights how absurd it is, this notion of a man

21   chasing a woman, it's like a -- it's almost like a

22   violent rape scene in a way, it's like -- and I

23   think it's a legitimate question, like, "What

24   happened when he gets to her?"  Like is he going to

25   tackle her, you know what I mean?  I think -- I

Ethan Klein                                    December 29, 2016

Page 259

1    think the comment, the extreme level of the comment,

2    goes to show how absurd this whole chasing is.  It

3    is kind of rape-y, this man chasing woman.

4         Q    Okay.  And did you then say, "Hope he's got

5    carrots -- sorry, "Hope he's got mayonnaise and

6    carrots with him, because that's what I want."

7              Did you say that?

8         A    I -- I said -- I don't recall, exactly, the

9    words, but approximately something like that.

10        Q    All right.  And -- and what does this video

11   have to do with mayonnaise and carrots?

12        A    Once again, the mayonnaise and carrots is a

13   metaphor for this absurd scenario, in which he can

14   do anything he wants to her when he catches her.

15   I've repeated this point to you several times, so

16   I'll say it one more --

17        Q    But you -- well, hold on.  You don't have

18   to say it one more time.  You have repeated this

19   point several times, with respect to the other

20   clips; is that not the case?

21        A    That is the case, as I am building upon

22   this whole thesis of the misogynistic pseudo

23   pornography.  And I think each clip serves to build

24   on that case, and offers a new insight into it.

25        Q    What new insight does this clip offer,

Ethan Klein                                    December 29, 2016

Page 260

1    exactly?

2         A    Well, it -- it builds.  It adds further

3    foundation to my claim.

4         Q    Well, what does it build, exactly?

5         A    I think -- I think this part of him chasing

6    her down kind of adds to the absurd image of this --

7    this, you know, primal standoff, that's just so

8    implausible.

9         Q    Wasn't he chasing her in the previous clip,

10   though?

11        A    Yeah.  That one, we -- we took that moment

12   to -- to joke about his -- and -- and to highlight

13   the absurdity of his parkour, and not taking the

14   path of least resistance.

15        Q    So you're saying more chasing is more

16   building of the primal standoff?

17        A    Well, I believe our comments, in the two

18   different clips, were different, but I --

19        Q    Sorry, what were you saying?

20        A    I had finished.  Sorry.

21        Q    All right.

22             MR. BUKHER:  Let's take a look at Exhibit

23   No. 18 -- sorry, Exhibit No. 17.

24                  (Video played.)

25   BY MR. BUKHER:

Ethan Klein                                       December 29, 2016

Page 261

1      Q    So here, it looks like you're commenting on

2   what was happening in the video.

3           Is that fair to say?

4      A    Yes.

5      Q    But you were narrating what the guy was

6   doing in the video?

7      A    Not narrating.

8      Q    No?  What were you doing?

9      A    Again, I was speaking to the -- the

10  goofiness of his parkour, and building that thesis

11  of this macho, you know, porn- -- misogynistic

12  pornographer, who does cool parkour, but could

13  actually just take the sidewalk, around the wall,

14  instead of jumping over it.  It doesn't express

15  prowess; it just more express a bit of buffoonery.

16     Q    But -- but you understand that this video's

17  fictional.

18          You understand that?

19     A    Yeah.  I'm critiquing -- I'm critiquing

20  both the fictional bold guy, and the director, Matt

21  Hoss.

22          MR. BUKHER:  Okay.  Let's look at

23  Exhibit 18.

24                   (Whereupon Exhibit 18

25                    was marked for identification

```
 1                      by the court reporter and
 2                      was retained.)
 3                      (Video played.)
 4    BY MR. BUKHER:
 5         Q    So what was the point of the excerpt in
 6    this clip?
 7         A    I think it's showing how this exchange
 8    between them is so drawn out, and kind of, you know,
 9    he's -- he's building this tension of -- of, you
10    know, what happens when he can do anything he wants
11    to her, and it's -- it's just showing, again, his
12    false sense of -- of masculinity, and his false
13    sense of confidence in this character.  And again,
14    using the mayonnaise and the carrots as a metaphor
15    for just this -- this absurd -- this absurd action.
16         Q    You didn't actually say anything about
17    mayonnaise and carrots in this clip.
18              Are you having a flashback?
19         A    I think you may be mistaken, I think I did.
20         Q    Okay.  This -- this -- this particular
21    clip --
22         A    You may want --
23         Q    -- you just said it highlights the drawn
24    out relationship between the two characters.  Did
25    you actually say that in the clip?
```

Ethan Klein                                    December 29, 2016

Page 263

1          A    It's infer -- I mean, it is inferred, I
2     don't think.
3          Q    No.  No.  Did you say that in the clip?  I
4     mean, imagine that I'm not inferring anything.  Did
5     you say that in the clip?
6          A    I am capable of expressing, you know,
7     a -- a commentary besides saying explicitly
8     something; that's part of a comedian's job.
9          Q    Part of a comedian's job is to say things
10    that he doesn't say?
11         A    That's an obtuse way of looking at it.
12    What I -- what I meant is that you can say things in
13    more than just saying it explicitly.
14         Q    But you didn't explicitly say that this
15    clip was about showing out the drawn out
16    relationship between the two characters; right?
17         A    Yeah.  Exactly my point.
18         Q    You didn't explicitly say that?
19         A    No.  It was said through -- through --
20    through the use of humor.
21         Q    But you don't explicitly say that; right?
22         A    It was expressed through -- through what we
23    said.
24         Q    But you didn't explicitly say that; right?
25         A    That ex- -- that exact phrase?  No, we did

Ethan Klein                                          December 29, 2016

Page 264

```
 1    not exactly say that.  It was expressed through

 2    our -- our other language.

 3        Q    You didn't -- you didn't -- you didn't say

 4    any phrase that they were -- you didn't actually

 5    say, audibly, any phrase that this clip was

 6    expressing the drawn out --

 7        A    Yes.  I --

 8        Q    -- relationship --

 9        A    I disagree with you.

10        Q    -- relationship of these two characters?

11        A    I'm afraid I disagree with you on that.

12        Q    Did you say those things?  Did you say the

13    word, "drawn out"?

14        A    Can you replay the clip?

15        Q    Yes.

16             Exhibit 18, please.

17                     (Video played.)

18             THE WITNESS:  As you heard Hila say, it's

19    pretty long.

20    BY MR. BUKHER:

21        Q    Yes.  I heard Hila say that it's pretty

22    long.  Did she say that this expresses the drawn out

23    action between the two characters?

24        A    The tone of her voice clearly expresses

25    that, and I -- and I echo that sentiment.
```

Ethan Klein                                    December 29, 2016

Page 265

```
 1        Q    I agree with you, the tone of her voice
 2   probably expressed that, but did she explicitly say
 3   that?
 4        A    I think it was explicit in the way that she
 5   said it.  It's pretty long.
 6        Q    Is that what explicit means?  What's your
 7   understanding of what explicit means?  Just to get
 8   back on that.
 9        A    I think it's clearly conveyed.
10        Q    So you think the tone of Hila's voice
11   clearly conveys the commentary with respect to this
12   excerpt?
13        A    Yes.
14        Q    Is that your sense of many of the other
15   excerpts of this video?  That the tone of voice
16   explicitly conveys commentary?
17        A    I'm speaking about this one clip in
18   particular.
19        Q    Okay.
20             MR. BUKHER:  Well, let's -- let's watch
21   Exhibit 19.
22                       (Whereupon Exhibit 19
23                       was marked for identification
24                       by the court reporter and
25                       was retained.)
```

1                    (Video played.)

2    BY MR. BUKHER:

3        Q    Okay.  So let me just state back to you

4    what you guys said in this clip.

5        A    Sure.

6        Q    You said, Ethan, "That was sick"; is that

7    correct?

8        A    As I recall it, yes.

9        Q    Well, you're recalling from having just

10   watched this clip; is that correct?

11       A    Yes.

12       Q    Okay.  And then Hila said, "Nah."

13       A    Yes.

14       Q    Is that right?

15       A    As I recall it.

16       Q    And then you said -- you said, as you

17   recall, "That was some straight up parkour"; is that

18   correct?

19       A    That's correct.  But I think you're

20   ignoring the tone of -- of the language.

21       Q    Whoa.  Whoa.  We'll get to the tone.

22            And then Hila said, "It's supposed to look

23   effortless"; right?

24       A    Yes.

25       Q    And then you said, "What?  Didn't it look

1    effortless?  That was fucking parkour, dude."

2              Did you say that?

3    A    Yes.

4    Q    Okay.  What are you commenting on here?

5    A    I think, again -- again, it all ties

6    together, that he thinks that the parkour is very

7    cool, very, very alpha male, he's out there, he's

8    doing his thing.  And he's chasing down this girl,

9    it's this primal experience.  But really, he's just

10   a buffoon, his parkour is not cool, he's just a

11   misogynistic pornographer, who is chasing down this

12   girl to presumably do whatever he wants to her.

13   Q    Did you say all of that in this clip?

14   A    Again, as I've previously said, a comedian

15   express --

16   Q    Wait.  Wait.  Yes or no?  We'll get on to

17   your tale.  Yes or no?  Did you just say all of that

18   in your clip?

19   A    I -- I think -- I believe it was expressed.

20   Q    Okay.  But you didn't say it; right?

21   A    Did I specifically say those words to

22   convey that meaning?

23   Q    Yes.

24   A    No.

25   Q    No.  No.  Did you say those words?

1        A    I did not say those words in that way.

2        Q    Okay.  But those -- that -- that meaning

3    was conveyed in the tone?

4        A    I believe so, yes.

5        Q    Okay.

6                MR. BUKHER:  Let's watch Exhibit No. 20.

7                        (Whereupon Exhibit 20

8                         was marked for identification

9                         by the court reporter and

10                        was retained.)

11                       (Video played.)

12   BY MR. BUKHER:

13       Q    So what did you verbally convey in that

14   video?

15       A    Once again, I think this metaphor of the

16   mayonnaise is actually -- is actually --

17       Q    No.  No.  No.  What did you, verbally,

18   convey in that video?  Not -- not what you implied,

19   but I'm just curious what was, verbally, conveyed

20   here?

21       A    I mean, the video speaks for itself.  I

22   don't know -- I don't understand questioning of --

23       Q    Did you say, "Whoa, I'm going to like this

24   video"?

25       A    I -- can we -- can you replay it?  I don't

 1    actually recall saying that.

 2              MR. BUKHER:  Yeah.  Let's replay

 3    Exhibit 20.

 4                    (Video played.)

 5              THE WITNESS:  Yes, so I did say that.

 6    BY MR. BUKHER:

 7        Q    You said, "Well, I'm going to like this

 8    video, that was bad ass"; right?

 9        A    Yes.

10        Q    And then Hila said, "Yeah"?

11        A    Yes.

12        Q    And then you said, "He's going to fuck the

13    shit out of her now, man"?

14        A    Yup.  I don't know if that's exactly what I

15    said.

16        Q    Okay.  What -- okay.  I mean, that's what

17    you said verbally; what were you trying to convey?

18        A    So once again, the metaphor of the

19    mayonnaise comes up, and I think it's important,

20    once again, highlighting the -- the absurdity of

21    this chasing, this animalistic pseudo pornography,

22    this misogynistic, you know, carved out place for

23    pornography.  It's absurd.  "Catch me, do whatever

24    you want to me."  I think it's worthy of criticism.

25    And I think the mayonnaise point is a thread

Ethan Klein                                December 29, 2016

Page 270

1    throughout the video, that drives that point home.

2        Q    Didn't you already make that point several

3    times?

4        A    As I've said to you, you know, many times

5    previously, it's a thesis, it builds.  Each -- each

6    scene adds new meaning and expression, it builds on

7    the thesis to drive this point home.  And I think

8    that it -- it's -- they're each necessary to

9    transform the clip, and for me to convey my -- my

10   message clearly.

11       Q    What meaning did this clip add, exactly?

12       A    Well, it shows how -- how ridiculous this

13   character is, I mean, he -- he catches her, he -- he

14   disappears and appears on the other side.  The

15   audience are -- are expected to look at this and

16   kind of by my comment be like, "Wow, that was

17   awesome.  I'm going to like this video," making a

18   parody of how I'm going to assume the audience

19   should react to this video because obviously that's

20   not my reaction.  It's very cheesy.  It's very

21   canty.  It's very buffoonish.

22            MR. BUKHER:  Okay.  Let's watch Exhibit 21.

23                 (Whereupon Exhibit 21

24                 was marked for identification

25                 by the court reporter and

Ethan Klein                                    December 29, 2016

Page 271

```
 1                      was retained.)
 2            THE WITNESS:  Do you mind if I grab some
 3   water real fast?
 4            MR. BUKHER:  No.  Let's take a break.
 5            MR. BAR-NISSIM:  Okay.
 6     (Whereupon there was a break in the proceedings.)
 7            MR. BUKHER:  Let's watch Exhibit 21.
 8                 (Video played.)
 9   BY MR. BUKHER:
10     Q    So what are you talking in and about this
11   clip?
12     A    Well, I think there's two main parts.
13   Which one are you referring to?
14     Q    Let's go through both.
15     A    Well, the first part talks about how, you
16   know, the action sequence was kind of broke up by
17   this absurd, like he's a teleporter now.  So the
18   character is just inconsistent, I think that's worth
19   commenting on.  That he's a parkour God that can,
20   apparently, also teleport.  It -- it --
21     Q    Did you -- did you find that jarring?
22     A    I expressed -- I expressed -- yeah, in the
23   video, I did express that.  I -- I -- I parodied an
24   audience reaction, by saying, like, "Oh, man.  I
25   thought this was real, but it turns out that he can
```

1    teleport."

2        Q    Did you think that it was real?

3        A    No.  I -- I was parodying the audience

4    reaction.

5        Q    Okay.  What was the second part?

6        A    The second part was, again, this -- this

7    wonderful metaphor of -- of mayonnaise.

8        Q    Walk me through the metaphor again.

9        A    Yeah.  Absolutely.  So again, the -- as

10   I've -- as I've stated previously, the mayonnaise is

11   a metaphor for this absurd, you know, misogynistic

12   pseudo pornography.  This catch me, and you can do

13   anything you want to me.  It's like, how many

14   options are there; right?  So he got her, and I'm

15   wondering, where's the mayonnaise?

16       Q    What does that have to do with mayonnaise?

17       A    Well, it's the metaphor that -- that ties

18   into it.

19       Q    Well, I mean, what you just said, what does

20   that have to do with mayonnaise?

21       A    It draws back, again, to -- to repeat

22   myself for you, in the beginning, he said -- she

23   says, "Catch me, and you can do anything you want to

24   me."  And I observed that there's only so many

25   things that he can do to her.  I mean, you know, the

1    implication of, like, rap, almost, is there.

2    And -- and -- and -- and, you know, mayonnaise is

3    used to highlight the absurdity of the lack of

4    options; right?

5        Q    Well, I'm not sure I understand.  How does

6    mayonnaise highlight the lack of option?  Mayonnaise

7    seems to be one of infinite option.

8        A    That's exactly right.  So you kind of just

9    understood the silliness of my point.  If you

10    consider putting mayonnaise, as a sexual act, as an

11    option for what Matt was thinking about, then you're

12    starting to get what I'm getting at.  It's a satire.

13    It's a parody.

14        Q    So it could have been mayonnaise.  It could

15    have been poodles.  It could have been put dragons

16    up her ass; right?

17        A    No.  That's the joke.  It's just sex.  But

18    if you -- but if you would have made that comment, I

19    would have think that it was a funny and good

20    observation.  Next to the mayonnaise.

21        Q    But why mayonnaise, rather than poodles or

22    dragons?

23        A    As I said, I like mayonnaise.

24              MR. BUKHER:  Can we watch Exhibit No. 22,

25    please.

Ethan Klein                                          December 29, 2016

Page 274

```
 1                    (Whereupon Exhibit 22

 2                     was marked for identification

 3                     by the court reporter and

 4                     was retained.)

 5                    (Video played.)

 6          MR. BUKHER:  Can we stop for a second?

 7     BY MR. BUKHER:

 8          Q    So -- so there was an excerpt just now, and

 9     then you talk about how that was a romp and a riot,

10     was -- were you talking about the excerpt?  Or the

11     video as a whole?

12          A    I think I was referring to both.

13          Q    Because the excerpt was building up the

14     whole video; right?

15          A    I not -- I'm afraid I don't understand what

16     you mean by that.

17          Q    Well, what relevance does the excerpt, that

18     was just shown in this exhibit, have to do with what

19     you're talking about?  This video being a romp and a

20     riot?

21          A    I think it -- the -- you know, he tied it

22     together in a -- in a -- just such a -- such a way

23     that kind of drove him, the thesis home.  How, you

24     know --

25          Q    Well --
```

1        A    -- she -- she hated him.  And after a

2    brief, goofy, parkour chase, she was ready to, you

3    know, engage in sexual activity with him.  And I

4    think that, for the record, you've cherry-picked

5    these clips quite selectively, and I think, taken as

6    a whole, each piece clearly would help to build upon

7    the next, and add new insight.

8        Q    Well, let me -- let me be clear about

9    something:  You said, "cherry-picked these clips,"

10   but aren't these clips literally every sequential

11   clip in your video?

12       A    I don't know.

13       Q    Well, you don't have to admit that, but, I

14   mean, just so you know, we are going to submit it,

15   as an exhibit, in whole.  If you know, you can admit

16   it.  If you don't, I guess you don't have to.

17       A    No.  I actually don't know if there's

18   anything missing or not.  But I think --

19       Q    Okay.  So you --

20       A    I think -- think that --

21       Q    Well, that's fine.

22       A    I think the expression of the video --

23       Q    We don't need to go -- we don't need go

24   into that.  I don't mean to interrupt you.  I do

25   want to conserve our time a little bit.  I apologize

Ethan Klein                                          December 29, 2016

Page 276

```
 1    if I have to cut you off; it's just to keep our time
 2    going.
 3              You talked about the thesis, so your thesis
 4    here, just to rephrase it, is that Matt Hoss's video
 5    stand for this absurd, old style, cringe-tube
 6    misogyny.
 7              Is that, essentially, the thesis?
 8       A    Are you -- you say -- you refer to Matt
 9    Hoss, are you refer -- are you including bold guy,
10    as a character, in that?
11       Q    Well, I'm talking about the director of the
12    videos.  That you're saying that his videos stand
13    for the absurd, old style, cringe-tube, misogyny;
14    right?
15       A    So we're talking about Matt Hoss, the
16    director; not bold guy, the character?
17       Q    Well, bold guy doesn't film characters.
18              You understand that; right?
19       A    Well, I'm just trying to understand the
20    heart of your question.
21       Q    My question is:  Matt Hoss, the plaintiff,
22    it's your thesis that he directs videos that stand
23    for absurd, old style, cringe-tube misogyny.
24              Is that your thesis?
25       A    My thesis is not that simple.  I think it's
```

Ethan Klein                                        December 29, 2016

Page 277

```
 1    more about the -- the -- the -- this kind of
 2    turning -- turning his video upside down, where he
 3    portrays himself as this cool, suave, pick-up,
 4    athletic, you know, sex machine.  But he's actually
 5    a buffoon, a misogynist, and -- and -- and -- and
 6    frankly, I -- yeah, it's -- it's all -- it's all
 7    backwards, I think.  It's -- it's more about the,
 8    you know, the perception he sees as himself is
 9    completely backwards.  So pseudo pornography
10    misogyny.
11         Q    So your -- so your thesis, just to be
12    clear, is that the bold guy tries to portray himself
13    as suave, but in fact, he portrays himself as an
14    absurd misogynist?
15         A    That's part of it.
16         Q    What other part of it?  Let's be thorough.
17         A    Yeah.  Well, it's also a historical
18    commentary on this whole cringe-tube phenomenon,
19    which this video represents.
20         Q    Okay.
21         A    It's also -- it's also a comment -- it's
22    also about misogyny, you know, how men -- certain
23    men see women as these easily -- easy-to-obtain
24    objects.  And it is -- and it is about, you know,
25    with that, again, coming back to that wonderful
```

```
 1    metaphor of mayonnaise, that, you know, highlights
 2    the -- how absurd it is.  Of almost like this rape
 3    scenario, this -- this, you know, "catch me, if you
 4    can, and you can do anything you want to me."
 5        Q    So pretty much every scene in this video
 6    has this cringe-y pseudo pornographic message.
 7             Is that what you're saying?
 8        A    I -- if you -- not exactly, but that's --
 9    that's pretty true.
10        Q    And yet, you felt it was absolutely
11    necessary to use nearly all of their original work
12    in order to make this one, drawn out point?
13        A    How would you define "nearly all"?
14        Q    Well, you used all of the excerpts, that we
15    talked about so far, to make this one point; is that
16    correct?
17        A    Not -- well, you say "this one point," you
18    make it seem more simple than it is.  I think I said
19    a lot more than what you're acknowledging.
20        Q    Well, you said that the video has a
21    cringe-y, pseudo pornographic message that somehow
22    related to mayonnaise?
23        A    Yes.
24        Q    And all of these clips that you showed made
25    that point?
```

1         A    And it's historical context.  And it's

2    about misogyny.  So I'd say my thesis is about

3    historical context, it's about misogyny, it's about

4    this character of bold guy, who thinks he's cool,

5    but he's actually a buffoon.  It's about the

6    director, Matt Hoss, who thinks he's making great,

7    you know, cinema, but it's not.  It's -- it's all of

8    that stuff.

9         Q    And you feel like every excerpt that you

10   used pretty much stands for the same idea?

11        A    I think it's definitely a common thread

12   that you'll find throughout the video.  Especially

13   if you watch it in its entirety.

14        Q    Okay.  Now, in this video that we watched,

15   we talked about the stylistic alterations that you

16   made to the PrankInvasion video.  I noticed that you

17   didn't make any stylistic alterations here.

18            Why is that?

19        A    I think it's a different type -- type of a

20   reaction video.  As I said, there's kind of

21   different types, where I think in lieu of these --

22   these comedic sprinklings of edits, we had Hila on

23   to give a feminine input to help build upon this

24   case of misogyny.  I don't think those clips are --

25   are necessary to -- to, you know, in parodying, and

 1    comment- -- and commentating, and transforming the

 2    clip to have new expression.

 3        Q    So you have felt like having Hila on this

 4    video stood in -- in place as a substitute for

 5    having stylistic alterations?

 6        A    Not in place; it's just, it's a different

 7    medium.  It's a different -- it's a different type

 8    of expression.  They don't substitute each other;

 9    one's not contingent on the other one.

10        Q    Well, you -- you seem to go to great

11    lengths to make stylistic alterations in the

12    PrankInvasion video; you didn't really do that in

13    this video.

14        A    Is that a question?

15        Q    Well, did you do that in this video?

16            MR. BAR-NISSIM:  Objection.  Vague and

17    ambiguous.

18            THE WITNESS:  Did I do, what, in this

19    video?

20    BY MR. BUKHER:

21        Q    Make stylistic alterations.

22        A    In this video, as I've explained, I think

23    the device to -- to -- the device that I chose, to

24    help highlight this video, was to include Hila, for

25    her feminine aspect, to help comment on the

1    misogyny.

2         Q    Okay.  So this -- this video was published,

3    and then a little while later, as I understand it,

4    Mr. Hoss reached out to you; is that correct?

5         A    I don't recall the -- the exact duration of

6    time, but obviously, afterwards, he reached out to

7    me.  After some -- some duration of time.

8         Q    Okay.  And then there was some discourse

9    between your lawyers and Mr. Hoss's lawyers; is that

10   correct?

11        A    Yes.  That's correct.

12        Q    And then you published another video, "We

13   Are Being Sued"; is that correct?

14        A    Yes.

15        Q    What was that about?

16        A    That video was highlighting the absurdity

17   of the -- of the -- of settlement offers, and the

18   kind of the -- the complaints itself.  It was about

19   the lawsuit.

20        Q    What about the absurdity and settlement

21   offers?

22        A    I -- well, first he -- he -- he asked for

23   $4,000, I think approximately, I don't remember the

24   exact amount.  Which I felt was a shakedown, and

25   kind of a silence money, and a bad precedent to set

1    to, you know, give to -- give in to somebody -- set

2    a bad precedent for YouTube and my industry.  So I

3    felt that it was my moral obligation to put my foot

4    down and not accept that settlement offer.

5         And secondly, the second offer was -- in --

6    in follow-up to that, was the offer for me to

7    promote him in exchange for a settlement.  Which I

8    found just quite -- quite -- quite absurd.

9         Q    All right.

10             MR. BUKHER:  Let's take a look at

11   Exhibit 30.

12             THE WITNESS:  Sure.

13                      (Whereupon Exhibit 30

14                      was marked for identification

15                      by the court reporter and

16                      was retained.)

17                      (Video played.)

18   BY MR. BUKHER:

19        Q    You said a couple of things about fair use

20   in this video; is that correct?

21        A    I think I said one thing about it, if I

22   recall correctly.

23        Q    What did you say about fair use?

24        A    I think what I said, is that it's apparent

25   to most people that this is fair use, unlike another

1    YouTubers' use of videos.  Which I think is not fair

2    use.

3        Q    You also said fair use is a defense; right?

4        A    Yes.  I said that.

5        Q    All right.  The first part, where did you

6    get that?  How -- what makes you so certain that it

7    was apparent, that this was a fair use?

8        A    Well, it's in -- in my opinion, and in my

9    research, that the video that we're speaking

10    about -- which video are we speaking about that's

11    fair use?

12        Q    "The Big, the BOLD, the Beautiful."

13        A    Oh, okay.  My --

14        Q    Hold on.  Did you think that we were

15    speaking about any other videos?

16        A    Well, you weren't -- you weren't clear

17    about which video we were talking about.  We're

18    looking at a different video, so I was confused.

19    Sorry about that.

20        Q    Have you had this conversation about other

21    videos?

22        A    No.  I was confused between the one you

23    turned on and the one we had just watched.  You

24    didn't clarify, so I was confused.

25        Q    Okay.  We're talking about "the Big, the

Page 284

1    BOLD, the Beautiful."  Speak to that.

2        A    So it was my opinion, based on my research

3    and understanding of fair use, that the video was

4    fully transformative and, changed the meaning,

5    expression, you know, didn't harm the original

6    market.  And I think that that, you know, based on

7    my own research and understanding of fair use -- and

8    probably, most people's, that it was -- it was a

9    clear fair use video.  As compared to people, who --

10   who, in my opinion, do not use others videos fairly.

11       Q    So the statements that you made in that

12   video were based on your own research; it's not

13   based on anything a lawyer told you?

14       A    Correct.

15       Q    Okay.

16            MR. BUKHER:  Let's watch Exhibit No. 31.

17                        (Whereupon Exhibit 31

18                        was marked for identification

19                        by the court reporter and

20                        was retained.)

21                        (Video played.)

22   BY MR. BUKHER:

23       Q    What did you talk about in this clip?

24       A    Well, you -- I think the way you cut it up

25   is a little confusing because I start on one topic,

Ethan Klein                                          December 29, 2016

1        A    I don't think that -- I'm confused.

2    Because I don't think the two -- I don't think

3    they're -- two statements are exclusive of each

4    other.

5        Q    What two statements?

6        A    Well, you -- you quoted back what I said,

7    and then you asked me if nothing happened.  But

8    they're -- both the statements can be true.

9        Q    Well, you said, "Several months passed,

10   nothing happened."  Several months passed, and

11   nothing happened, is -- is that really what

12   happened?

13       A    I don't know what -- what -- what do you --

14   what do you mean by nothing?  I don't understand

15   what you're getting at.

16       Q    Well, isn't it the case that you posted it

17   "the Big, the BOLD, the Beautiful" video, and then

18   Matt Hoss sent you an e-mail, which we talked about,

19   exhibit --

20       A    I recall the e-mail.

21       Q    -- 13.

22       A    Yeah.  I recall.

23       Q    Asking you to remove his video.

24            Is that not what happened?

25       A    That -- that -- that did happen, yes.

Ethan Klein                                    December 29, 2016

Page 290

1        Q    Okay.  So several months did not pass,

2    nothing happened.  Mr. Hoss, and I apologize for not

3    using his full name; it's just easier, and he

4    doesn't mind.

5        A    That's fine.  That's fine.

6        Q    Mr. Hoss sent you an e-mail, asking you to

7    remove his video; isn't that correct?

8        A    Yes.  That's correct.

9        Q    Okay.  So it's not the case that nothing

10   happened.  He sent you an e-mail asking you to

11   remove his video.

12       A    I think you're confused about the several

13   months.  I don't think I'm excluding that

14   necessarily.  Just -- just I made an editorial

15   decision to not include that part, to keep the

16   narrative intact.  And I didn't feel that it was,

17   you know, completely relevant to the story.  I

18   don't think it changed the story at all in an

19   impactful way.  I didn't think it was important.

20       Q    So you made an editorial decision not to

21   include Mr. Hoss asking you to remove his video from

22   YouTube?

23       A    It was my editorial decision that it

24   doesn't affect the -- the heart of -- of the video.

25       Q    The heart of the video, to talk about how

Ethan Klein                                    December 29, 2016

1    you were hit with an extortion letter from Matt

2    Hoss's attorneys?

3        A    No, I don't -- I don't believe that this

4    letter would -- would change the impact on the

5    audience at all.

6        Q    What do you mean by that?

7        A    Well, the letter is rather belligerent.  If

8    anything, I think the audience would have -- would

9    have, you know, found it rather tasteless, if

10   anything.  But the -- the heart of -- of the video

11   is about --

12       Q    Whoa.  Whoa.  Whoa.  Just -- just -- let's

13   back up --

14            MR. BAR-NISSIM:  Tim -- Tim --

15   BY MR. BUKHER:

16       Q    I'm sorry, we have a very short time.

17            Matt Hoss's attorneys, you said in this

18   video, asked you for $4,000 to settle this case; is

19   that correct?

20       A    I believe I said that.  Again, I'm not

21   100 percent sure on the figure, but something around

22   $4,000.

23       Q    Well, that's what you said?

24       A    Okay.

25       Q    Did Matt Hoss, in his letter, Exhibit 13,

1    ask you for any money?  In connection with removing

2    his video?

3        A    Oh, you're asking -- did he ask me for

4    money in the e-mail?

5        Q    Yeah.

6        A    No.  He did not ask me for money, but he

7    did threaten me.

8        Q    Okay.  He just asked you to remove the

9    video; is that correct?

10       A    Yes.  That's correct.

11       Q    Okay.  And -- and then Matt Hoss's

12   attorneys, namely me, sent you a letter demanding

13   that you take down the video and some amount of

14   settlement money; is that correct?

15       A    That's correct.

16       Q    But you failed to mention, in your video,

17   the first part, the fact that Matt Hoss reached out

18   to you and didn't ask you for any money; isn't that

19   correct?

20       A    That's correct.  But again, I don't think

21   that that's relevant --

22       Q    That was an editorial decision; right?

23            MR. BAR-NISSIM:  Tim, please let him finish

24   his answer.

25            MR. BUKHER:  Sorry, that -- that was --

```
 1              MR. BAR-NISSIM:  I understand you're trying

 2     to --

 3              MR. BUKHER:  Well --

 4              MR. BAR-NISSIM:  Let him complete his

 5     answer.

 6              THE REPORTER:  One at a time.

 7              MR. BAR-NISSIM:  Tim, let him complete his

 8     answers.  You know, I understand your time is tight.

 9     But let him complete his answers.

10              MR. BUKHER:  Okay.

11              Was that correct?

12              THE WITNESS:  I did not include it, because

13     I don't think that it was relevant to the heart

14     of -- of the video.  I don't think it changed the

15     meaning of the video.

16     BY MR. BUKHER:

17        Q    Okay.  But you didn't include it; right?

18        A    I did not include the detail, that -- that

19     Matt had e-mailed me.

20        Q    Okay.  Just a minor detail?

21        A    In my opinion, irrelevant.

22        Q    All right.

23              MR. BUKHER:  Let's take a look at

24     Exhibit 33.

25                      (Whereupon Exhibit 33
```

Ethan Klein                                    December 29, 2016

                                                    Page 294

1                          was marked for identification

2                          by the court reporter and

3                          was retained.)

4                      (Video played.)

5            THE WITNESS:  I can't hear you, Tim.

6      BY MR. BUKHER:

7        Q    What were you conveying here?

8        A    I was conveying, kind of, the bad precedent

9      it set, to pay -- to pay off -- to pay the

10     settlement.  The bad precedent set not just for us,

11     but for YouTube as a whole.

12       Q    Okay.

13           MR. BUKHER:  Let's take a look at

14     Exhibit 34.

15                     (Whereupon Exhibit 34

16                      was marked for identification

17                      by the court reporter and

18                      was retained.)

19                     (Video played.)

20     BY MR. BUKHER:

21       Q    So what -- what was that clip supposed to

22     convey?

23       A    I -- I think I was highlighting the -- the

24     absurdity of the claim, that it wasn't substantive

25     by showing what my opinion was a really funny and a

1    substantive moment.  And, you know, again,

2    bringing -- if we keep coming back to this analogy

3    of the mayonnaise jar.

4        Q    Whoa.  Whoa.  Whoa.  So I'll let you make

5    that analogy in a moment.  So you're saying that the

6    carrots in the ass, mayonnaise in the mouth thing

7    you talk about in this video was substantive?

8        A    Yes.

9        Q    And you think Hila's response, in this

10   clip, laughing at that, she was confirming with her

11   laugh that, "He.  He.  He," you were making a

12   substantive comment?

13       A    Well, you're kind of -- you're -- you're

14   taking one clip as -- out of a piece of a whole

15   video, to try to quantify her input.

16       Q    Well, I'm trying to -- I'm trying to see

17   what is implied by her tone.  I mean, you make a big

18   deal about the implications of tone; right?

19       A    Well, I'm the one talking, and if you want

20   Hila's reaction, you may want to play back the whole

21   video and analyze it.

22       Q    So did you get any sense, from her tone,

23   whether she thought you were being serious about

24   those comments you made about the carrots and the

25   mayonnaise as substantive?

1      A    I think she was laughing at -- because it
2   was a funny comment.  And as I've mentioned
3   previously, a comedian can use both humor and -- and
4   serious criticism together in the same statement.
5      Q    Because your videos are about comedy?
6      A    It's a part of our -- of our identity, and
7   our intention, yes.
8      Q    As an aside, do you think that you made
9   Matt Hoss's video funnier than it already was?
10     A    I don't think the intended purpose of his
11  video was comedy.
12     Q    Did you make it funnier?
13     A    I don't think I change -- I think that
14  through -- you know, watching it, through our lens,
15  made it funny, you know, that's the whole purpose,
16  that's the whole transformation, you know, we took
17  the --
18     Q    Well, that's what I'm asking.
19          Did you make it funnier?
20     A    Well, you're implying that it was funny to
21  begin with.
22     Q    Okay.  Let's say that I agree with you,
23  that it's not funny; do you think that you made it
24  funnier?
25     A    I think our reaction video was funny.

1              Is that what you're asking?

2         Q    Well, I mean, was it part of your goal to

3    make the video funnier than it was?

4         A    You keep saying funnier.  You keep saying

5    funnier, implying that I'm somehow augmenting the

6    humor that existed in his video.  I don't think

7    there was humor in his video.

8         Q    You don't think his video was funny at all?

9         A    No.

10             MR. BUKHER:  Let's look at Exhibit 35.

11                     (Whereupon Exhibit 35

12                      was marked for identification

13                      by the court reporter and

14                      was retained.)

15                     (Video played.)

16   BY MR. BUKHER:

17        Q    So you're saying that you are curating Matt

18   Hoss's video?

19        A    I think I was -- I was responding to one of

20   the --

21        Q    Well, hold on.  Hold on.  I'm sorry, Ethan.

22             Did you say you were curating his video?

23   Or not?

24        A    I did say the -- I -- yeah, I did say that

25   word, yes.

Page 300

1    Not necessarily as a result of the --

2        Q    Okay.  And in these clips, that we just

3    showed you, the video where you talk about the

4    settlement negotiations --

5        A    Right.

6        Q    -- between Matt Hoss and your attorneys,

7    and I'm sorry to go at length, but where $4,000 was

8    demanded --

9        A    Uh-huh.

10       Q    -- you said that that was extortion; right?

11       A    It was -- it was my opinion, at the time,

12   that it felt like extortion.

13       Q    Right.  And -- and did you threaten

14   Mr. Hoss, that if he didn't back off, that you would

15   disparage him?

16       A    No.

17       Q    Okay.

18            MR. BUKHER:  Can you -- can you take a look

19   at Exhibit 52 for me, please?  That's a written

20   exhibit.

21                    (Whereupon Exhibit 52

22                    was marked for identification

23                    by the court reporter and

24                    is attached hereto.)

25            MR. BAR-NISSIM:  I'd just like it noted,

Page 317

1    STATE OF CALIFORNIA    )

2    COUNTY OF LOS ANGELES    ) ss.

3

4

5            I, ETHAN KLEIN, hereby certify

6    under penalty of perjury under the laws of the State

7        of California that the foregoing is true and

8                    correct.

9            Executed this _____ day of

10   _____, 2017, at _____,

11                  California.

12

13

14        _____

                    ETHAN KLEIN

15

16

17

18

19

20

21

22

23

24

25

Page 319

319

```
 1   Matt Hosseinzadeh v. Ethan Klein

 2   Ethan Klein

 3            INSTRUCTIONS TO THE WITNESS

 4            Please read your deposition over

 5       carefully and make any necessary corrections.

 6       You should state the reason in the

 7       appropriate space on the errata sheet for any

 8       corrections that are made.

 9            After doing so, please sign the errata

10       sheet and date it.

11            You are signing same subject to the

12       changes you have noted on the errata sheet,

13       which will be attached to your deposition.

14            It is imperative that you return the

15       original errata sheet to the deposing

16       attorney within thirty (30) days of receipt

17       of the deposition transcript by you.  If you

18       fail to do so, the deposition transcript may

19       be deemed to be accurate and may be used in

20       court.

21

22

23

24

25   2506655
```

Ethan Klein                                    December 29, 2016

Page 321

321

1    Matt Hosseinzadeh v. Ethan Klein

2    Ethan Klein

3         ACKNOWLEDGMENT OF DEPONENT

4              I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____          _____

14   DATE                SIGNATURE

15

16   Subscribed and sworn to before me this

17   _____ day of _____, 20__.

18

19   My commission expires: _____

20   _____

21   Notary Public

22

23

24

25   2506655