Caroline A. Morgan
Fox Rothschild LLP
100 Park Avenue, 15th Fl.
New York, NY 10017
Telephone: 212-878-7900

Jeffrey S. Kravitz (admitted *pro hac vice*)
Rom Bar-Nissim (admitted *pro hac vice*)
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, California 90067-1506
Telephone:  310-598-4150
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATT HOSSEINZADEH,<br><br>　　　　　　　　*Plaintiff,*<br><br>　　　– vs –<br><br>ETHAN KLEIN and HILA KLEIN,<br><br>　　　　　　　　*Defendants.* | **Civ. 1:16-cv-3081 (KBF)**<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 2

    A.    Plaintiff Matt Hosseinzadeh, The Bold Guy Series And The Work ..................... 2

    B.    Defendants Ethan and Hila Klein And Their Reaction Videos ............................ 4

    C.    The Nature of Defendants' Critique of the Work ................................................. 5

    D.    Plaintiff's Response To The Critique Video ........................................................ 8

III.  LEGAL STANDARD .............................................................................................. 9

IV.   ARGUMENT ........................................................................................................... 9

    A.    The First Fair Use Factor Favors Defendants ....................................................10

        1.    Plaintiff's "Transcript" of the Critique Video Should Be
             Disregarded ..............................................................................................14

        2.    Plaintiff's Argument That The Critique Video Is "Entertainment"
             Does Not Detract From Its Transformative Nature ...................................15

        3.    Plaintiff's Arguments Regarding Defendants' Profession and
             Education and Background Are Irrelevant and Unconstitutional .............18

    B.    The Second Fair Use Factor Favors Defendants ................................................19

    C.    The Third Fair Use Factor Favors Defendants ...................................................20

    D.    The Fourth Fair Use Factor Favors Defendants .................................................21

    E.    Defendants' Purported Infringement Was Not Willful.......................................24

V.    CONCLUSION ......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abilene Music Inc., v. Sony Music Entm't, Inc.*,
    320 F. Supp. 2d 84 (S.D.N.Y. 2003) ........................................................................... 16, 17

*Adjmi v. DLT Entm't, LTD*,
    97 F. Supp. 3d 512 (S.D.N.Y. 2015) ........................................................................... 17, 18

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) .................................................................................................. 9

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ...................................................................................... 10, 19

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006) ...................................................................................... 17, 19

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) ........................................................................ 10, 11, 19, 20, 22

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) .................................................................................................. 11, 16

*Bourne Co. v. Twentieth Century Fox Film Corp.*,
    602 F. Supp. 2d 499 (S.D.N.Y 2009) .......................................................................... 12, 17

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2013) ...................................................................................... 15, 22

*Bryant v. Media Right Prods., Inc.*,
    603 F.3d 135 (2d Cir. 2010) ...................................................................................... 24

*Burnett v. Twentieth Century Fox Film Corp.*,
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ......................................................................... 18

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
    87 F. Supp. 3d 499 (S.D.N.Y. 2015) ........................................................................... 17

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .................................................................................................. *passim*

*Cariou v. Prince*,
    714 F.3d 694 (2d. Cir. 2013) ...................................................................... 10, 11, 12, 19, 20, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................................9

*Chicago Bd. Of Educ. v. Substance, Inc.*,
    354 F.3d 624 (7th Cir. 2003) ...............................................................................20

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010) ..................................................................................9

*Elvis Presley Enter., Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003) ........................................................................ 15, 16

*Equals Three, LLC v. Jukin Media, Inc.*,
    139 F. Supp. 3d 1094 (C.D. Cal. 2015) .......................................... 13, 14, 19, 23

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ................................................................................21

*Fox News Network, LLC v. TVEyes, Inc.*,
    43 F. Supp. 3d 379 (S.D.N.Y. 2014) ............................................................. 14, 15

*Hofheinz v. Discovery Commc'ns, Inc.*,
    No. 00 CIV. 3802 (HB), 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ........... 11, 16

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
    413 F.3d 257 (2d Cir. 2005) ................................................................................24

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998) ...................................... 10, 11, 15, 17, 19, 20

*Lucasfilm, Ltd. v. Media Market Grp., Ltd*,
    182 F. Supp. 2d 897 (C.D. Cal. 2000) .................................................................18

*Mattel, Inc. v. Pitt*,
    229 F. Supp. 2d 315 (S.D.N.Y. 2002) .................................................................18

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 729 (9th Cir. 2003) ......................................................... 11, 17, 18

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) ......................................................... 10, 19, 22

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ................................................................................21

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) .............................................................................15

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014) ................................................................ 15, 17, 20

*TCA Television, Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016) ............................................................... 10, 16, 20

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) .......................................................................................19

*Wade Williams Distribution, Inc. v. Am. Broad. Co.*,
    No. 00 CIV. 5002 (LMM), 2005 WL 774275 (S.D.N.Y. Apr. 5, 2005) ................... 11, 15, 16

*Warner Bros. Entm't, Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) .............................................................. 19, 20

*Yankee Publishing Inc. v. News America Publishing, Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992) (Leval, J.) .....................................................11

## Statutes

17 U.S.C. § 107 ............................................................................................*passim*

## Other Authorities

Fed. R. Civ. P. Rule 56 ......................................................................................2

Fed. R. Civ. P. 56(a) .........................................................................................9

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.05[A][1][a],
    at 13–162 (Matthew Bender, rev. ed., 2016) .......................................................10

WILLIAM F. PATRY, PATRY ON COPYRIGHT, § 10:20 (Sept. 2016 Update) .....................................15

William F. Patry, *Patry on Fair Use* § 4.1 (2015) .....................................................19

Defendants Ethan and Hila Klein (collectively, "Defendants") hereby submit their Opposition to the Motion for Partial Summary Judgment ("Motion") of Plaintiff Matt Hosseinzadeh ("Plaintiff"). The facts underlying Defendants' Opposition are fully set forth in Defendants' Rule 56.1 Counter-Statement of Undisputed Facts ("D.St.") and their Reply to Plaintiff's Rule 56.1 Statement of Undisputed Facts ("R.St.").

## I.    INTRODUCTION

Plaintiff's Motion for Partial Summary Judgment is misguided, unsupported, and should be denied. It rests on egregious distortions of the law governing the four fair use factors under 17 U.S.C. § 107 and self-serving mischaracterizations of both the content of the works at issue and the testimony concerning these works. Indeed, Plaintiff's positions are so transparently overreaching as to both the law and the facts, the Motion inadvertently serves only to highlight that summary judgment should be granted – not for Plaintiff – but for Defendants pursuant to their concurrently-pending Motion for Summary Judgment. Specifically, Plaintiff's Motion should be denied, and Summary Judgment should be entered in favor of Defendants because:

1. As to the first fair use factor of whether Defendants' video, *The Big, The BOLD, The Beautiful* ("Critique Video"), was transformative under 17 U.S.C. § 107, Plaintiff's Motion erroneously argues that Defendants' use is not transformative, characterizing it as entertainment and focusing on the amount copied of *Bold Guy vs. Parkour Girl* ("Work"). These arguments are spurious because most fair uses are for entertainment purposes and they improperly replace the transformative inquiry with the inquiry under the third fair use factor. Accordingly, as a matter of uncontroverted fact, the first factor weighs in favor of summary judgment for Defendants.

2. Regarding the second fair use factor concerning the nature of the Plaintiff's Work, Plaintiff argues that the Work's creative nature weighs in his favor. This argument is unpersuasive because the Work's creative nature becomes irrelevant when (as here) the Work is

1

used for transformative purposes, like commentary and criticism. Accordingly, as a matter of undisputed fact, the second factor weighs in favor of summary judgment for Defendants.

3. Concerning the third fair use factor of the amount and substantiality of the portion used, Plaintiff incorrectly persists in holding Defendants to the erroneous standard that a use must be "absolutely necessary" and unabashedly rejects this Court's admonishment that the "quantum of [W]ork copied" is not dispositive of fair use. (ECF #79 p. 3). These positions are unsupported both legally and factually because the law only requires that Defendants' use be "reasonable" and, at his deposition, Defendant Ethan Klein explained in detail how Defendants' critiques of each clip and the Work itself were reasonable. Thus, it is undisputed that the third factor weighs in favor of summary judgment for Defendants.

4. Finally, as to the fourth fair use factor of effect on the market for the Plaintiff's Work, Plaintiff argues that he suffered market harm, not to the Work itself, but to Plaintiff's derivative rights. Aside from the fact Plaintiff admitted Defendants' Critique Video increased views and revenue for his Work, this argument is specious because Plaintiff offers no evidence that he would have exploited a derivative market for new works critical of the Work or that Defendants' Critique Video served as a market substitute for his Work. Accordingly, it is uncontrovertable that the fourth factor weighs in favor of summary judgment for Defendants.

In sum, Plaintiff is correct that no genuine issues concerning fair use exist for trial under Fed. R. Civ. P. Rule 56, but the absence of these triable issues inures to the benefit of Defendants, not Plaintiff. Accordingly, Plaintiff's Motion should be denied and pursuant to Defendants' pending Motion summary judgment should be entered in favor of Defendants.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Matt Hosseinzadeh, The Bold Guy Series And The Work

Plaintiff makes videos and uploads them onto his YouTube channel, MattHossZone.

D.St. 2. He is the writer, director, producer and star of the Bold Guy ("BG") series ("Series"),

which he created in 2011. D.St. 3. His copyright is for a compilation of 24 episodes of the Series.

D.St. 4. The Work is the twelfth episode of the Series and uploaded in August 2013. D.St. 5

Plaintiff states that he does not analyze his works and leaves it to the viewer to interpret

them. D.St. 16. Yet, he states, as a factual matter, that his works are not misogynistic. D.St. 17.

Plaintiff states the Series' premise is that "[t]he Bold Guy approaches women and tries to

flirt with them and possibly date them," by using confidence and humor.  D.St. 6. He described

BG as follows: "He simply takes action without fear, without worrying what other people think,

what other people's approval of his behavior is." D.St. 7. Frequently, the female characters are

openly hostile to BG but, by the end, quickly become sexually attracted to him. D.St. 8. Often,

BG is bare chested or arms exposed. D.St. 9. Some episodes contain a post-coital conversation

between BG and the female character and some contain a parkour scene. D.St. 10-11.

Plaintiff states he "share[s] characteristics with all the characters [he] create[s]. They're

all parts of [his] psyche." D.St. 12. He received the "bold" moniker from a real life exchange

where he approached a woman, got her number and was told he was bold. This interaction

inspired BG. D.St. 13. Prior to this litigation, Plaintiff explained BG in a Q&A with his fans.

> Every character that I write, boy or girl, is an aspect of me. It comes from my
> brain, obviously. The Bold Guy probably more so than any other character.
> Because it is the main character that I've created that's heavily influenced and
> inspired by my real life.
> …
> I share a lot of qualities with the Bold Guy but I'm not the Bold Guy. The Bold Guy is an
> exaggerated perfect version of me. Of who I wish to be. The ideal that I strive for.

D.St. 14. Only now Plaintiff states it is factually false to describe BG as his alter ego. D.St. 15.

Plaintiff states the Work is a "social satire" and "pokes fun at social politics." He says he

intended to convey a message about sexism and the objectification of women by having the "two

characters turn the tables on each other and flirt with each other and chase each other." He stated

the Work's theme is "[a] guy is chasing a girl and flirting with her," which is shown when the female character ("Woman") says "catch me," a subsequent chase ensues and, once BG catches her, he gets her to chase him. He did not intend any message about pornography. D.St. 18.

### B.    Defendants Ethan and Hila Klein And Their Reaction Videos

Defendants are a married couple who make comedy videos on YouTube. In 2015, they were voted by Reddit users as YouTubers of the Year. D.St. 19. They have two channels: their primary channel H3H3 Productions ("H3H3") and secondary channel Ethan and Hila ("E&H"). One form of comedic content Defendants post on their YouTube channels are reaction videos. D.St. 20. Defendants' reaction videos provide their personal insights on someone else's video through critical analysis, parody and commentary. D.St. 26. Defendants do not select these videos because they consider them inherently funny. Rather, Defendants select these videos because they have something critical to say about the video in a comedic manner. D.St. 27. Defendants use reaction videos to provide social commentary on a variety of issues, like politics, intellectual property and legal issues and online content that is inappropriate. D.St. 22-24.

One example of Defendants using reaction videos to critique sexually inappropriate content on YouTube is their Prank Invasion series of reaction videos. Prank Invasion produces "kissing prank" videos, which are scripted and depict the host approaching women in public and pranking them into a kiss or fellatio. Defendants have targeted Prank Invasion videos for creating a "false reality in which [the host] was promoting lewd behavior … enticing kids to kind of go out and try to commit what could only be construed as sexual assault" and where women are easy prey to alpha males audacious enough to push women well beyond their comfort zone. Defendants made these points by deconstructing Prank Invasion's content. D.St. 25.

The reaction videos on H3H3 differ from the ones posted on E&H. H3H3 reaction videos involve Ethan's reaction while Hila is filming. Ethan reactions are bombastic, expressing

4

comedic outrage to the outrageous things Defendants find online. Some of these videos employ stylistic edits, like editing in other clips, tinting, zooming and using graphic images. Defendants do not rely on these stylistic edits to transform the work. Rather, they consider their commentary and critique to be the heart of their claim to fair use and the stylistic edits merely add texture and comedic effect. D.St. 29. Reaction videos posted on E&H differ in that they include Hila, are intended to be more lighthearted and rarely employ the stylistic edits. Hila is not a substitute for stylistic edits.  Rather, E&H reaction videos are a different format offering Hila's perspective, in addition to Ethan's, which brings an added level of commentary to the video. D.St. 30.

### C.    The Nature of Defendants' Critique of the Work

The Critique Video is 13:47 minutes long and posted unto E&H on February 15, 2016. It uses 24 distinct clips from Plaintiff's Work, each ranging from 1 to 24 seconds with 75% being 12 seconds or less (i.e., 75%). The clips amount to 3:15 minutes of the 5:24 minute Work (i.e, 60%). Defendants' critique and commentary comprises 10:43 minutes of the 13:47 minute Critique Video (i.e., 75%). The longest clip is overdubbed by commentary. D.St. 31.

The thesis of Defendants' commentary and critique of the Work has four over-arching themes: (1) put the Work in historical context; (2) expose the Work as misogynistic; (3) critique the masculinity of BG in the Work and Series; and (4) critique Plaintiff for creating such works. D.St. 32. Below is a summary of each these points, how Defendants made them and why their purpose was to show how these criticisms pervaded the entire Work.

**Historical Context:** Defendants comment on the Work by placing it in historical context (D.St. 33) as follows:

"CringeTube": Defendants begin by placing the Work in historical context by explaining that the Work comes from the "CringeTube" era, which was a period marked by sexually embarrassing (i.e., cringe-worthy) videos on YouTube. Two things are communicated about the

Work by describing it as from the "CringeTube" era: (1) it is sexually inappropriate, cringy and weird; and (2) it is from an era where such content was pervasive and popular on YouTube but would unsuccessful by today's standards. Defendants further explain this point by analyzing the Work's views relative to Plaintiff's subscriber count. Two and a half years after the Work was uploaded (i.e., when the Critique Video was made), the Work received nearly ten million views. But this did not translate into a high subscriber count because the Work served as a form of pseudo pornography; people watched and, once satisfied, moved on without any attachments.

Prank Invasion: Defendants explicate on the Work's historical context by describing it as a predecessor to Prank Invasion. By drawing this comparison, Defendants build on themes they have previously established in their videos about misogynistic and sexually inappropriate content on YouTube that creates false realities for impressionable pubescent males. This comparison also builds on their previous point about the Work being from the "CringeTube" era.

**Misogynistic Pseudo-Pornography:** Defendants critique the Work as misogynistic and pseudo-pornographic (D.St. 34) as follows:

Depiction of the Women: Defendants critique how the Woman is depicted in a misogynistic manner. They critique: (1) how she appears to sexually present herself to BG as he approaches; (2) how her character – and indeed the majority of Plaintiff's female characters – are depicted in a hypersexualized manner; (3) how the Woman and the majority of Plaintiff's female characters begin as incredibly hostile to BG but suddenly shift to being irresistibly attracted to him; and (4) how her dialogue resembles a pornographic film. They use short clips of the dialogue exchanges between the Woman and BG in the beginning and end of the Work to establish the veracity of these critiques. By showing the character's progression throughout the Work instead of an isolated moment or two, Defendants prove their critique that the Woman is

completely unrealistic and emblematic of a male dominated fantasy.

Primal Nature Documentary: Defendants point out the misogynistic nature of the Work by comparing its scenes to a primal nature documentary. Defendants establish this early on in the Critique Video by mocking how the Woman appears to sexually present herself to BG. They build on this point during the Work's chase scene to mock how BG chasing after the Woman resembles a primal standoff where BG is trying to physically conquer the Woman to engage in sexually depraved acts.

Carrots and Mayonnaise: Defendants critique the Work's absurd pornographic and misogynistic premise by using the metaphor of "carrots and mayonnaise." This metaphor is established when the Woman tells BG that, if he catches her, BG can do whatever he wants to her. Defendants portray this line as straight out of a pornographic film. They use the metaphor to ridicule how the line invites an infinite number of sexually depraved possibilities. The metaphor becomes a theme in Defendants' critique of the absurdity of the chase scene and explanation for why BG expends so much effort to catch the Woman. The metaphor is also used to critique how the Work builds to this sexually depraved encounter that never actually materializes.

**Critique of BG**: Defendants critique the depiction of BG's masculinity by holding it up to ridicule (D.St. 35) as follows:

Depiction of BG as an alpha male: Defendants lambast how the Work depicts BG as an alpha male who can simply swoop in and get any woman he pleases. Through ridiculing the various clips of dialogue and plot from throughout the Work, they critique how the character's arc and Work's narrative project a false reality whereby women are easy and will engage in sexual relations if a man is an alpha male who is bold and impervious to a woman's hostility.

Portraying BG as a buffoon: Defendants dismantle Plaintiff's portrayal of masculinity by

pointing out the numerous instances the Work attempts to portray BG as suave, clever and athletic when he is actually a buffoon. They illustrate this point by ridiculing clips of BG's pseudo-clever rejoinders, smug expressions, sleeveless hoodie costume, fervently chasing after the Woman and lack of physical prowess during the parkour chase scene.

**Critique of Plaintiff**: Defendants critique Plaintiff for creating the Work, BG and Series (D.St. 36) as follows:

The works are a reflection of Plaintiff's mind: Defendants ridicule how the Work, BG and the Series are a reflection of Plaintiff's mind. This point is set up initially when Hila states: "What I love about [Plaintiff's] videos is that he setup that situation. … [T]his is his script. … So, if you look at it from his point of view, this is just a girl doing this stuff on the street." By exposing the multiple instances where the Work resembles misogynistic pseudo-pornography, how the female characters are emblematic of a male fantasy and how BG's masculinity is actually buffoonery, Defendants take Plaintiff to task for creating works that are replete with absurd and perverse themes and messages. It serves to reinforce the point that the Work's plot, dialogue, action and characters are all a sexual fantasy Plaintiff is trying to play out on video.

BG as Plaintiff's alter ego:  Defendants critique BG as being Plaintiff's alter ego. They mock how Plaintiff created BG and the Work to live out his sexual fantasy. They expose how the multiple instances where Plaintiff attempts to showcase his masculinity, athleticism, wit and sexual appeal are actually highly manicured, such as (1) how he writes the dialogue to compliment himself physically and make himself appear clever; (2) how his attempt to come across as suave only make him appear smug and unappealing; and (3) how his use of parkour does not show physical prowess but is gratuitous, absurd and graceless.

**D.    Plaintiff's Response To The Critique Video**

Plaintiff saw the Critique Video and viewed it for infringement. The primary focus of his

analysis was the amount used. Plaintiff believes Defendants did not comment, critique or ridicule his Work. Yet, he recognizes Defendants' Critique Video was different then his Work because Defendants talked about his content. D.St. 37. He does recognize the following comments from individuals other than Defendants as forms of criticism: (1) his work is misogynistic (even though he believes that is factually false); (2) his work is cringe-worthy; and (3) his parkour is bad (but only in those exact words). D.St. 38.

### III.    LEGAL STANDARD

Summary judgment is appropriate when the movant carries its burden by "show[ing] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Material facts are "facts that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). The court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir. 2010).

### IV.    ARGUMENT

The Copyright Act states: "[F]air use of a copyrighted work ... for purposes such as *criticism* [or] *comment* … is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). Section 107 sets forth four factors courts should use to determine the question of fair use: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. The factors are non-exclusive and "weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

### A.    The First Fair Use Factor Favors Defendants

The touchstone inquiry of the first factor is whether the use is "transformative." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir. 2006). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Cariou v. Prince,* 714 F.3d 694, 708 (2d. Cir. 2013) (quoting *Campbell,* 510 U.S. at 579). Plaintiff does not argue that the Critique Video was commercial.

The "transformative use" inquiry asks "whether the new work merely supersedes the objects of the original creation, or instead ***adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message***." *TCA Television, Corp. v. McCollum* ("*TCA*"), 839 F.3d 168, 180 (2d Cir. 2016) (emphasis in the original) (quoting *Campbell,* 510 U.S. at 579); *Cariou,* 714 F.3d at 705-06.

It is well-established: "Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it." *Authors Guild v. Google, Inc.,* 804 F.3d 202, 215 (2d Cir. 2015) (Leval J.).[1]  The Second Circuit noted: "The possibility of criticism or comment – whether or not parodic – is a risk artists and their subjects must accept." *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 n. 7 (2d Cir. 1998).

"***Humorous forms of criticism*** … may claim fair use under § 107." *Campbell,* 510 U.S. at 579-80 (emphasis added). To "ridicule" the original for "comic effect" is one of the "types of comment and criticism that traditionally have had a claim to fair use protection as transformative

---

[1] *See also TCA*, 839 F.3d at 179 ("[T]he uses identified by Congress in the preamble to § 107— criticism [and] comment … might be deemed 'most appropriate' for a purpose or character finding indicative of fair use.") (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.05[A][1][a], at 13–162 (Matthew Bender, rev. ed., 2016)); *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 477 (2d Cir. 2004) ("[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107").

works." *Id.* at 579-83. "[H]umorous forms of criticism … ***provide social benefit***, by shedding light on an earlier work, and, in the process, creating a new one." *Id.* at 579 (emphasis added).

The standard the Supreme Court created to determine whether a use constitutes as criticism is if the secondary work "***reasonably could be perceived as commenting on the original or criticizing it, to some degree***." *Campbell,* 510 U.S. at 583 (emphasis added). To make this inquiry, courts must "examine how the [works] may ***'reasonably be perceived' in order to assess their transformative nature***." *Cariou,* 714 F.3d at 707 (emphasis added).

The Supreme Court formulated this standard to avoid subjective value judgments.

> As Justice Holmes explained, "it would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of a work, outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke." *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251 (1903) (circus posters have copyright protection); cf. *Yankee Publishing Inc. v. News America Publishing, Inc.,* 809 F. Supp. 267, 280 (S.D.N.Y. 1992) (Leval, J.) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed") (trademark case).

*Campbell*, 510 U.S. at 582–83 (internal brackets omitted).[2]

The parody/satire distinction is useful to determine whether Defendants criticized Plaintiff's Work. *See Blanch,* 467 F.3d at 255 ("We have applied *Campbell* in too many non-

---

[2] *See also Blanch,* 467 F.3d at 255 ("It is not, of course, our job to judge the merits of [defendant's work] or of [defendant's] approach to art."); *Mattel, Inc. v. Walking Mountain Prods.,* 353 F.3d 729, 802 (9th Cir. 2003) ("However one may feel about [defendant's] message – whether he is wrong or right, whether his methods are powerful or banal – his photographs [are] parody …."); *Leibovitz,* 137 F.3d at 113 ("The Court cautioned that the quality of the parody is not to be evaluated"); *Wade Williams Distribution, Inc. v. Am. Broad. Co.*, No. 00 CIV. 5002 (LMM), 2005 WL 774275, at *9 (S.D.N.Y. Apr. 5, 2005); ("Courts have consistently and prudently avoided subjective judgments in copyright cases, and this Court will not engage in one here.") (citing *Bleistein,* 188 U.S. at 251); *Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 CIV. 3802 (HB), 2001 WL 1111970, at *4 (S.D.N.Y. Sept. 20, 2001) ("Section 107 does not explicitly distinguish between entertaining and serious, plausible and implausible, or weighty or frivolous commentaries, and I do not propose to engage in such subjective line-drawing.").

parody cases to require citation for the proposition that the broad principles of *Campbell* are not limited to cases involving parody. But the satire/parody distinction may nevertheless be relevant to the application of these principles."); *Cariou,* 714 F.3d at 707 ("[W]e do not analyze satire or parody differently from any other transformative use.").

"The distinction between parody and satire turns on the object of the 'comment' made by the allegedly infringing work." *Bourne Co. v. Twentieth Century Fox Film Corp.,* 602 F. Supp. 2d 499, 504-05 (S.D.N.Y 2009). A parody "*at least in part, comments on that author's works.*" *Campbell,* 510 U.S. at 580 (emphasis added). A satire has "*no critical bearing on the substance or style of the original.*" *Id* at 580-81(emphasis added).

Defendants' four-fold thesis critiquing the Work is readily apparent. First, their commentary placing the Work in historical context may reasonably be perceived. D.St. 33. Examples include: (1) the discussion on the Work being from the "CringeTube" era; (2) describing the Work as a predecessor to Prank Invasion; and (3) analysis of the Work's popularity when it was released and why it resulted in relatively few subscribers.

Second, Defendants' commentary about the Work's misogynistic nature may reasonably be perceived throughout the Critique Video. D.St. 34. For example, they point out how (1) the Woman appears as if she is sexually presenting herself to BG (which Plaintiff states does not have any overt or covert sexual connotation (St. 44)); (2) the dialogue is emblematic of a pornographic film; (3) the female characters are unrealistic and resemble a male fantasy by suddenly shifting from being incredibly hostile to irresistibly attracted to BG; (4) the Work's premise is absurd and misogynistic (i.e., the Woman's sexual challenge that, if BG catches her, he can do whatever he wants to her); (5) the Work resembles a primal nature documentary; (6) the Work seeks to appeal to a young audience who would otherwise not be able to access

pornography; and (7) the repeated references to "carrots and mayonnaise" to ridicule the Work's plot, characters, themes and messages.

Third, Defendants' critique of BG's masculinity in the Work and Series may reasonably be perceived. D.St. 35. Some examples are how: (1) BG presents a distorted reality where an alpha male can swoop in and conquer any woman; (2) BG's masculinity is actually buffoonery; (3) the character treats women like sexual objects; and (4) the parkour is gratuitous and absurd.

Finally, Defendants' critique of Plaintiff as the author of the Work, BG and Series may reasonably be perceived, by (1) pointing out how the plot, dialogue and characters are all a reflection of his mind; (2) critiquing Plaintiff's plot, dialogue and characters as reflecting his misogynistic fantasy; (3) critiquing how Plaintiff writes dialogue complimenting his body and to make his character appear clever; and (4) critiquing his parkour skills. D.St. 36.

*Equals Three, LLC v. Jukin Media, Inc.,* 139 F. Supp. 3d 1094 (C.D. Cal. 2015) provides valuable guidance, since it is the only decision to tackle the "reaction video" genre. The court found that the reaction videos at issue "highly transformative" comment and criticism because:

> Equals Three's episodes directly respond to and highlight humorous aspects of Jukin's videos. The episodes do so via the host's reactions to the videos, jokes, narration, costumes and graphics. The host's narration does not simply recount what is shown in Jukin's videos; instead the host makes comments about Jukin's videos that highlight their ridiculousness by creating fictionalized narratives of how the events transpired, using similes, or by directly mocking the depicted events and people.
> …
> This is not a case where the addition of minimal narration, an introduction, or text did not change the essential character of the original work.

*Id.* at 1104-05.

Here, Defendants' use is nearly identical to that in *Equals Three.* Their commentary directly mocks the ridiculousness of the Work's plot, dialogue, characters, and action sequences. D.St. 39-40. Defendants created fictional narratives about the Work, like imagining what BG

will do when he catches the Woman and parodying the audience's response to the Work. D.St. 42. No one would view their commentary as merely "minimal narration, an introduction, or text" that "did not change the essential character of the original work."[3]

1.    **Plaintiff's "Transcript" of the Critique Video Should Be Disregarded**

Plaintiff's desperate attempt to avoid acknowledging Defendants critiqued his Work is comically absurd. As a threshold matter, the primary piece of evidence he uses to advance these arguments is a "transcript" of the Critique Video. Motion, 13-19. Plaintiff disingenuously states his "transcript" is meant to be "illustrative*." Id*. 12-13. It is not. Plaintiff's "transcript" fails to include any dialogue from the Work and employs generic plot descriptions to sanitize the Work's misogynistic nature.[4] R.St. 18-32. These manipulative omissions have one purpose: to obfuscate Defendants' critique by misrepresenting the object of their criticism, the Work itself.[5]

Plaintiff's "transcript" also strips key expressive elements of the Critique Video, like tone, facial expressions and comedic timing. In an audiovisual work, the speaker's "tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, ***powerfully modifying the content***." *Fox News Network, LLC v. TVEyes, Inc.,* 43 F. Supp. 3d 379, 392-93 (S.D.N.Y. 2014).

---

[3] Plaintiff misguidedly treats stylistic edits as a necessary condition for a reaction video to constitute fair use. This is false. In *Equals Three,* the court found certain episodes transformative solely due to the host's commentary. 139 F. Supp. 3d at 1104-05.

[4] For example, Plaintiff described the following as a "[s]ixteen second excerpt continued exchange between Athletic Girl and Bold Guy": "***Parkour Girl***: I don't have to act like a lady simply because you expect me to. ***Bold Guy***: Then don't expect me to act like a gentleman. ***Parkour Girl:*** (shaking her fist) How would you like me to shove this up your ass?! ***Bold Guy:*** I'm not into fist-fucking. But thanks anyway." R.St. 22.

[5] Additionally, there are numerous instances where Plaintiff's "transcript" fails to capture Defendants' dialogue accurately. He also mischaracterizes the Critique Video at 8:21-8:36, stating his score was "digitally fed into the Infringing Video rather than as background music on the Defendants' computer." R.St. 25. A cursory examination of this clip demonstrates that the clip was playing in the background because Ethan clicks his mouse, which pauses the Work and the score. A near identical moment occurs at 9:20-21. R.St. 26.

(emphasis added). That is because "a speaker's demeanor, tone, and cadence can often *elucidate his or her true beliefs* far beyond what a *stale transcript* or summary can show." *Id.* (emphasis added) (quoting *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P. ("Swatch"),* 756 F.3d 73, 84 (2d Cir. 2014)). Because Plaintiff's "transcript" cannot capture these elements, it is of no assistance to determine whether the Critique Video "reasonably could be perceived as commenting on the original or criticizing it, to some degree." *Campbell,* 510 U.S. at 583.

### 2. Plaintiff's Argument That The Critique Video Is "Entertainment" Does Not Detract From Its Transformative Nature.

Plaintiff argues Defendants did not criticize Plaintiff's Work. Rather, he argues that Defendants' use was purely for entertainment purposes. *See e.g.,* Motion at 16 (Defendants "sought nothing more than to *compound entertainment upon existing entertainment*") (emphasis added); *Id.* at 11 (the Critique Video had a "*purely entertainment*, *rather than commentary, intent*.") (emphasis added). This argument is erroneous because critical commentary can be entertaining and many transformative works are primarily for entertainment. *See e.g., Campbell,* 510 U.S. 569 (song by famous hip hop group); *Leibovitz,* 137 F.3d 109 (poster advertising Hollywood film); *Seltzer v. Green Day, Inc.,* 725 F.3d 1170 (rock concert) (9th Cir. 2013); *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687 (7th Cir. 2013) (animated cable television show).

Indeed, noted copyright scholar William F. Patry described this argument as "spurious" because "much comment and criticism [is] made in an entertainment context." WILLIAM F. PATRY, PATRY ON COPYRIGHT, § 10:20 (Sept. 2016 Update). Additionally, it has been rejected twice by courts within this Circuit. Like here, the plaintiff in *Wade* sought "to *alter the law of fair use* by drawing a distinction between 'commentary or criticism' and 'entertainment,' and cite[d] *Elvis Presley Enter., Inc. v. Passport Video,* 349 F.3d 622 (9th Cir. 2003) in support of

this proposition." 2005 WL 774275, at *9 (emphasis added). The court rejected this distinction. "The problem with such a rule lies in the difficulty of discerning what constitutes 'entertainment' and what does not. … Courts have consistently and prudently avoided subjective judgments in copyright cases, and this Court will not engage in one here." *Id.* (citing *Bleistein,* 188 U.S. at 251); *see also Hofheinz*, 2001 WL 1111970, at *4 ("Section 107 does not explicitly distinguish between entertaining and serious, plausible and implausible, or weighty or frivolous commentaries, and I do not propose to engage in such subjective line-drawing.").

While fair use is not a license to merely exploit the "intrinsic entertainment value" of a work, in the Second and Ninth Circuits, a work's "intrinsic entertainment value" is interpreted narrowly. In *Elvis*, the "intrinsic entertainment value" at issue was the "***inherent entertainment value of Elvis' appearance*** on such shows as *The Steve Allen Show, The Ed Sullivan Show,* and *The 1968 Comeback Special.*" 349 F.3d at 628 (emphasis added). When an Elvis documentary played clips from these shows "without much interruption" or commentary, the use was not transformative because the clips served "the same intrinsic entertainment value that is protected by Plaintiffs' copyrights." *Id.* at 629. In *TCA*, a play failed to transform a famous comedy routine when the use had "***no critical bearing on the substance or style of the original***" and the "***only purpose*** served by the extent of defendants' taking [was] ***identically comedic*** to that of the original authors [and copied] extensively for its ***original comedic effect.***" 839 F.3d at 182-83 (emphasis added); *see also Abilene Music Inc., v. Sony Music Entm't, Inc.,* 320 F. Supp. 2d 84, 91 (S.D.N.Y. 2003) ("appropriate[ing] material … for humorous effect, without directing its criticism or ridicule at the copied work itself," is not transformative).

Defendants did not use the Work for its "intrinsic entertainment value" but as an object of ridicule with "the altered purpose or context of the [W]ork … evidenced by surrounding

commentary or criticism." *Swatch,* 756 F.3d at 84 (citing *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 609–610 (2d Cir. 2006). Defendants surrounded the 24 clips of Plaintiff's Work with commentary and criticism, which comprised 75% of the Critique Video D.St. 31. Defendants' critique targeted the Work's dialogue, characters, plot, action, themes and messages. D.St. 39-40. "Such 'surrounding commentary or criticism' clearly militates for a finding of transformative use." *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 507 (S.D.N.Y. 2015) (quoting *Swatch,* 756 F.3d at 84).

Even Plaintiff admits that Defendants did not use the Work for its inherent comedic and entertainment value. He states the Critique Video was "***far more pornographic, offensive, and disturbing than any interpretation*** of the Work which served to ***supplant*** – rather than comment upon ***the Work's intended humor***." Motion at 2 (emphasis added). He claims Defendants' "comments about rape and object-insertion served to ***supplant the Work with sexual innuendo far above and beyond what was insinuated in the original***." *Id.* at 18 (emphasis added).

A work is considered transformative when it changes the context, tone, associations or feel of the original. *See Mattel,* 353 F.3d at 802 (giving "different set of associations and a different context" to the original was transformative); *Leibovitz,* 137 F.3d at 114 (facial expression that "contrasts so strikingly" with original that it could "reasonably be perceived as commenting on the seriousness, even the pretentiousness, of the original" was transformative); *Adjmi v. DLT Entm't, LTD,* 97 F. Supp. 3d 512, 531-32 (S.D.N.Y. 2015) (screenplay with "markedly different tone" that served as a "vehicle to criticize and comment on the original's light-hearted, sometimes superficial, treatment of certain topics and phenomena" was transformative); *Bourne,* 602 F. Supp. 2d at 509 (television parody of song was transformative because "strikingly different in tone and message."); *Abilene,* 320 F. Supp. 2d at 90 (song was

17

transformative because it had "a tone that might reasonably be perceived as sarcastic.").

Making a work more crude, vulgar or pornographic is also transformative. *See Campbell,* 510 U.S. at 583 ("degrading taunts, a bawdy demand for sex, and a sigh of relief from paternal responsibility" made work transformative); *Mattel,* 353 F.3d at 802 (placing original in "sexually suggestive contexts" was transformative); *Adjmi,* 97 F. Supp. 3d at 532 (finding transformative use when "unrelentingly vulgar" compared to the original); *Burnett v. Twentieth Century Fox Film Corp.,* 491 F. Supp. 2d 962, 968 (C.D. Cal. 2007) ("crude joke" constituted fair use because it placed the original in an "awkward, ridiculous, crude, and absurd situation"); *Mattel, Inc. v. Pitt* ("*Pitt*"), 229 F. Supp. 315, 322-23 (S.D.N.Y. 2002) (using "sadomasochistic costume and/or storylines" was transformative); *Lucasfilm, Ltd. v. Media Market Grp., Ltd,* 182 F. Supp. 2d 897, 901 (C.D. Cal. 2000) (pornographic version of Star Wars was fair use).[6]

Plaintiff is correct in one regard: Defendants did "supplant" [i.e., supersede or replace] the Work's inherent humor with their own, markedly different, humor. By definition, this is transformative. Plaintiff "may not like that transformation, but it is a transformation nonetheless." *Adjmi,* 97 F. Supp. 3d at 530.

### 3. Plaintiff's Arguments Regarding Defendants' Profession and Education and Background Are Irrelevant and Unconstitutional

Plaintiff's argument that Defendants did not engage in criticism because they identify as comedians, do not identify as "film" critics and have no education in "film" or "literary" criticism is legally baseless. Motion, 1, 11. However, Section 107 does not mention a speaker's

---

[6] Whether the use is in "good taste or bad does not and should not matter to fair use." *Campbell,* 510 U.S. at 582*; Burnett,* 491 F. Supp. 2d 962, 968; *Mattel,* 353 F.3d at 801 (whether the use "is in bad taste is not relevant to whether it constitutes fair use."); *Pitt,* 229 F. Supp. 2d at 323 n. 2 ("Nor is the question of whether [defendant's works] are in good taste relevant.").

profession, education or background. *See* 17 U.S.C. § 107. To the contrary, the Second Circuit

found criticism by "self-styled experts" to be fair use. *See NXIVM,* 364 F.3d at 475. To interpret

the availability of Section 107 protection as contingent on speaker's profession, education or

background would violate the First Amendment because it "reflect[s] the Government's

preference for the substance of what the favored speakers have to say (or aversion to what the

disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994);

*see also Campbell*, 510 U.S. 569 (hip hop group capable of critiquing classic rock); *Leibovitz,*

137 F.3d 109 (movie studio capable of critiquing photo of famous actress); *Equals Three*, 139 F.

Supp. 3d 1094 (YouTube channel capable of critiquing online videos).

> Stripped bare, Plaintiff's sole argument that the Critique Video is not transformative is

the amount copied of the Work. But this is not the transformative use inquiry; it is the inquiry

under the third fair use factor. *See Warner Bros. Entm't, Inc. v. RDR Books* ("*WB*")*, 575 F. Supp.

2d 513, 544 (S.D.N.Y. 2008) (the impact of the amount copied on transformative use is

discussed "more fully in analyzing the 'amount and substantiality' factor.").

### B.    The Second Fair Use Factor Favors Defendants

> The second statutory factor examines whether the Work is (1) creative or factual; and (2)

published or unpublished. *Cariou,* 714 F.3d at 709-10 (quoting *Blanch,* 467 F.3d at 256). "The

second factor has rarely played a significant role in the determination of a fair use dispute."

*Author's Guild,* 804 F.3d at 220 (Leval, J.) (citing William F. Patry, *Patry on Fair Use* § 4.1

(2015)). Plaintiff argues that the Work's creative nature weighs in his favor.  However, the fact

that the Work is creative is of "limited usefulness where, as here, the creative work of art is being

used for a transformative purpose." *Cariou,* 714 F.3d at 710 (internal quotes omitted) (quoting

*Bill Graham,* 448 F.3d at 612). Therefore, this factor favors Defendants, given the highly

transformative nature of the Critique Video and the limited weight given to this factor.

C.      **The Third Fair Use Factor Favors Defendants**

As Plaintiff proudly proclaims, the "heart of [his] motion rests on the fact that the Defendants used virtually the entirety of Plaintiff's [Work]."[7] Motion at 1. He tries to hold Defendants to the exacting and legally baseless standard of using "only so much of the original as is ***absolutely necessary***." *Id.*; *see also Id.* at 1, 6, 12, 13, 19, 22.

This is not the standard: "The law does not require that the secondary artist may take no more than is necessary." *Cariou,* 714 F.3d at 710 (citing *Campbell,* 510 U.S. at 588; *Leibovitz,* 137 F.3d at 114). Indeed, the case Plaintiff relies on for the "heart" of his Motion makes clear "'judges must not police criticism' or other transformative uses 'with a heavy hand' [and must be] hesitant to substitute [their] own judgment for that of an author[.]" *WB,* 575 F. Supp. 2d at 546 (quoting *Chicago Bd. Of Educ. v. Substance, Inc.,* 354 F.3d 624, 629 (7th Cir. 2003)).

Ultimately, even Plaintiff concedes that the third statutory factor only requires that "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are ***reasonable*** in relation to the purpose of the copying." *TCA,* 839 F.3d at 185 (internal ellipsis omitted; emphasis added) (quoting *Campbell,* 510 U.S. at 586); *Blanch,* 467 F.3d at 257. "[W]here an evaluation or description is being made, copying the exact words may be the only valid way precisely to [*sic*] report the evaluation." *Swatch,* 756 F.3d at 85.

Plaintiff's sole argument that Defendants' use was unreasonable is his conclusory allegation that Ethan's explanation of Defendants' critique is implausible, due to the amount copied. His sole evidence rests on mischaracterizations of Ethan's deposition testimony and

---

[7] Defendants are confounded by Plaintiff's insistence they used virtually the entirety of Plaintiff's Work. It is indisputable that they used 60% of the Work. D.St. 31. Defendants are also confounded by Plaintiff claiming this took the "entirety of [the Work's] substance" because it implies 40% of the Work was completely superfluous.

Plaintiffs misleading "transcript." Not only is this insufficient, it is disingenuous.

The amount and substantiality of the Work used was reasonable in light of Defendants purpose to: (1) place the Work in historical context; (2) expose Plaintiff's Work as misogynistic; (3) critique the masculinity of BG in the Work and Series; and (4) critique Plaintiff for creating such works. D.St. 31. At deposition, Ethan went into great detail explaining Defendants' thesis, how it manifested itself and why each clip served as evidence to establish and prove their thesis clearly. D.St. 45. Their purpose was to prove how these criticisms applied to the entire Work and were not isolated occurrences taken out of context. D.St. 46. Also, Defendants' criticisms – particularly on the misogynistic portrayal of Plaintiff's female character and deconstructing the image of BG's masculinity – extended to the entire Series, not just the Work. D.St. 34. Defendants' explanations, along with their highly transformative critique, demonstrate the amount they used was reasonable.

### D.    The Fourth Fair Use Factor Favors Defendants

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell,* 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)).

The Supreme Court made it clear: because a critique "may quite legitimately aim at garroting the original, destroying it commercially as well as artistically, [Citation] the role of courts is to *distinguish* between 'biting *criticism* that merely *suppresses demand* and *copyright infringement* which *usurps it.*'" *Campbell,* 510 U.S. at 592 (emphasis added; internal brackets omitted) (quoting *Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir. 1986)). "If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a *devastating review of a book that quotes liberally from the original to show how silly and poorly written it is*), this transformative use will be found to be fair use, notwithstanding the harm." *On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001) (emphasis added).

21

It is undisputed: Defendant's Critique Video generated views and revenue for the Work. The Work's views and revenue flat-lined three months before the Critique Video was posted. After Defendants posted the Critique Video on February 15, 2016, the Work experienced a spike in views and revenue. D.St. 48. Plaintiff confirmed this at his deposition and admitted he has no evidence that Defendants' use siphoned views or revenue. D.St. 49. To the contrary, in the month following the spike, the Work experienced an increase of views and revenue. D.St. 50. Defendants hope this illustrates that, when a reaction video provides new insights and meaning to the original, it increases the market for the original by enticing viewers to experience the original on their own. *See Brownmark Films,* 682 F.3d at 693.

Plaintiff cannot argue Defendants' use harmed his ability to license his Work for critical reaction videos because "the law recognizes no derivative market for critical works." *Campbell,* 510 U.S. at 592. The fact Defendants' Critique Video "may impair the market for derivative uses by the very ***effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market***." *Id.* at 593 (emphasis added).

> This distinction between potentially remediable displacement and unremediable disparagement is reflected in the rule that there is no protectible derivative market for criticism. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

*Id.* at 592. Consequently, "the only harm to derivatives … is the harm of ***market substitution***." *Id.* (emphasis added); *See also Cariou,* 714 F.3d at 708 ("[O]ur concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.") (quoting *Blanch,* 467 F.3d at 258; *NXIVM,* 364 F.3d at 481-82).

22

Plaintiff disregards these well-established principles, claiming completely speculative and specious "market harms." First, he claims he lost advertising revenues from third-parties who purportedly watched Defendants' Critique Video instead of his Work. R.St. 84-85. This is false; Plaintiff admitted at deposition the Critique Video increased views and revenue for his Work and his declaration completely contradicts his deposition testimony that he has no knowledge of anyone seeing Defendants' Critique Video instead of his Work. D.St. 49. *See Equals Three,* 139 F. Supp. 3d at 1108 (rejecting identical assertion by the copyright holder).

Second, Plaintiff claims Defendants impeded his ability to license additional advertising space for his Work. R.St. 86-88. But Plaintiff provides no explanation for how Defendants' Critique Video usurped his right to pursue those opportunities. Plaintiff points to brand and sponsorship opportunities that Defendants received from their YouTube Network. *Id.* YouTube Networks are also called Multi-Channel Networks or MCNs. MCNs do not license videos or ad space to videos. MCNs work with YouTube channels to provide them sponsorship and brand opportunities to promote products and services in their upcoming videos. Consequently, these opportunities do not exist for pre-existing videos, like Plaintiff's Work. Nor does Plaintiff explain how Defendants' Critique Video served as a market substitute for a brand or sponsorship opportunity because nothing was promoted in the Critique Video with the notable exception of Plaintiff and his YouTube channel. D.St. 52. Finally, Plaintiff testified that he refuses to join a MCN because "they were not offering a better deal than YouTube directly." D.St. 51.

Third, Plaintiff claims Defendants' impeded his ability to license elements of the Work, including his soundtrack. R.St. 87. But Defendants used the Work for a critical purpose and Plaintiff has no derivative right in critical works. *See Equals Three,* 139 F. Supp. 3d at 1107-08.. Once again, Plaintiff contradicts his deposition testimony where he stated he does not license his

works to third parties. D.St. 51. These repeated instances of Plaintiff contradicting his deposition testimony demonstrate Plaintiff is willing to say anything to manufacture market harm.

Fourth, Plaintiff claims Defendants impeded his ability to sell his music that appeared in the Work. R.St. 84, But he provides no explanation how Defendants' use of 24 clips from the Work – and not the isolated soundtrack – would serve as a market substitute for his music, particularly in light of Defendants' critical purpose. *See Campbell,* 510 U.S. at 592.

As such, Plaintiff has suffered no cognizable market harm under the Copyright Act.[8]

### E.     Defendants' Purported Infringement Was Not Willful

Even assuming Defendants did not engage in fair use (which they did), Defendants' infringement was not willful. Plaintiff concedes he has no direct evidence that Defendants knew or recklessly disregarded the possibility of infringement. *See Bryant v. Media Right Prods., Inc.,* 603 F.3d 135, 143 (2d Cir. 2010). Rather, he relies solely on attenuated inferences, which are improper for a summary judgment motion, particularly when the inferences are in dispute. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005)). Indeed, upon scrutiny, the facts Plaintiff offers for these inferences reveal he is merely trying to bootstrap his DMCA misrepresentation and defamation claim to his copyright claim. R.St. 94-112; D.St. 53-66.

Moreover, Defendants argument for willful infringement is internally inconsistent. On one hand, he argues that Defendants' Prank Invasion reaction videos are a paragon of fair use.

---

[8] Plaintiff cites Professor Beebe's article for the proposition that "if a defendant makes a *commercial use* of a creative, published work," particularly the "*entirety of that work*," the likelihood of a fair use is low. Motion at 23 n. 2 (emphasis added). As stated, Plaintiff does not argue commercial use and it is factually false to say Defendants took the entirety of the work. Also, the majority of cases cited in this brief come after 2005, which the article does not cover.

R.St. 93. Yet, he cites an incident where Prank Invasion's network, Fullscreen, wrongfully issued a takedown notice for one of Defendants' Prank Invasion reaction videos for his argument that Defendants purposefully generate controversy "to bring other copyright holders to their knees." Motion at 25. This is not willful infringement; this is Defendants standing up for fair use.

## V.   **CONCLUSION**

Plaintiff may be bold, but his thin skin is not protected by the Copyright Act. Based on the undisputed facts and law discussed above, no genuine issue exists for trial supporting Plaintiff's position that the Critique Video is not a fair use under 17 U.S.C. § 107. Thus, for the reasons stated above and in Defendants' concurrently-pending Motion for Summary Judgment, Defendants respectfully request this Court to DENY Plaintiff's Motion and to enter Judgment in favor of Defendants.

DATED:  February 27, 2017                     **FOX ROTHSCHILD LLP**


By: /s/ Rom Bar-Nissim
      Caroline A. Morgan
      Fox Rothschild LLP
      100 Park Avenue, 15th Fl.
      New York, NY 10017
      Telephone: 212-878-7900
      Fax: 212-692-0940

      Jeffrey S. Kravitz (admitted *pro hac vice*)
      Rom Bar-Nissim (admitted *pro hac vice*)
      Fox Rothschild LLP
      1800 Century Park East, Suite 300
      Los Angeles, CA 90067-1506
      Telephone: 310-598-4150
      Facsimile: 310-556-9828
      Attorneys for Defendants