**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATT HOSSEINZADEH,

                                    *Plaintiff*,

          – against –

ETHAN KLEIN and HILA KLEIN,

                                    *Defendant*s.

**Civ. Action No**.: 16-cv-3081 (KBF)
**ECF Case**

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THOMPSON BUKHER LLP
75 Broad Street, Suite 2120
New York, New York 10004
(212) 920-6050

*Attorneys for the Plaintiff*

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

LEGAL STANDARD .....................................................................................................4

ARGUMENT ...................................................................................................................5

      A.     The Infringing Video Does Not Constitute a Fair Use ...........................................5

            1.     Purpose and Character of the Use: The Infringing Work is Not Transformative. ...................................................................................5

            2.     Nature of the Copyrighted Work ..............................................................11

            3.     The Amount and Substantiality of the Portion Used ................................12

            4.     Effect of Use on Market for Plaintiff's Work .........................................13

      B.     Plaintiff's DMCA Misrepresentation Claim is Ripe for Trial ..............................15

      C.     Plaintiff's Defamation Claim is Ripe for Trial ....................................................19

CONCLUSION ...............................................................................................................22

**TABLE OF AUTHORITIES**

## Cases

*Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) ....................... 4

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 926 (2d Cir. 1994)................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).................................... 4

*Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006) ............. 5, 10

*Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) ........................ 19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ........................................ 4

*Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001) ......................................... 8

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003).......................... 6

*Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D.C.A. 2015) ............. 10

*Fleckenstein v. Friedman*, 266 N.Y. 19, 193 N.E. 537, 538 (1934) ............................ 20

*Folsom v. Marsh*, 9 F. Cas. 349 (CDD Mass. 1841)........................................ 8

*Isl. Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005) ............. 19

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) ................... 20

*Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153-54 (9th Cir. 2016) .................... 18

*Printers II, Inc. v. Professionals Publishing, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986)................. 20

*Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) ....................... 8

*Stepanov v. Dow Jones & Co., Inc.*, 120 AD3d 28, 34 (1st Dept 2014)....................... 19

*Stewart v. Abend*, 495 U.S. 207, 237 (1990)............................................. 11

*Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) ....................... 10

*TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016)...................... 12

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008) ............. 6, 11

**Statutes**

17 U.S.C. § 512(f) ......................................................................................................... 15

17 U.S.C. § 512(g)(3)(c) ................................................................................................ 18

Fed. R. Civ. P. 56(a) ........................................................................................................ 4

**Other Authorities**

Barton Beebe, <u>An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005</u>, 156 Pa. L.
   Rev. 549, 618 (2008) .................................................................................................. 15

Restatement [Second] of Torts § 558 .............................................................................. 19

Plaintiff Matt Hosseinzadeh ("**Plaintiff**") submits this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgement as filed by defendants Ethan Klein ("**Mr. Klein**") and Hila Klein ("**Ms. Klein**") (collectively the "**Defendants**").

The facts underlying this opposition are fully set forth in Plaintiff's Rule 56.1 Statement of Undisputed Facts filed in connection with Plaintiff's Motion for Partial Summary Judgment ("**Pl. St.**") as well as in Plaintiff's Counter-Statement in Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts filed in connection with this motion ("**Pl. Ctr. St.**").

## PRELIMINARY STATEMENT

Defendants seek to argue that their use of virtually the entirety of Plaintiff's original creative work (the "**Work**") is a fair use because Defendants included the Work in a larger video (the "**Infringing Video**") that allegedly commented on excerpts of the Work. It is evident from the Infringing Video itself that nearly all of the Defendants' use of the Work served as a jumping board for their own comedy routine rather than as a piece to "critique." Indeed, Defendants' jokes in the Infringing Video are far more pornographic, offensive, and disturbing than the features of the Work they now claim they were "critiquing," and their additions—which serve to supplant rather than comment upon the Work's intended humor—are no more transformative than a laugh track added to a television sitcom that had not bothered to include one. Such an addition constitutes nothing more than an unlicensed derivative work.

Plaintiff has addressed Defendants' fair use defense in exhaustive detail in Plaintiff's own motion for partial summary judgment. Accordingly, with respect to the fair use issue, Plaintiff focuses this brief primarily on how the caselaw cited by Defendants either (i) does not support their legal propositions; or (ii) is completely inapposite to the facts of this matter. On Plaintiff's own motion, and in this opposition, Plaintiff cites numerous Second Circuit as well as Ninth Circuit

1

cases that perfectly address a fact pattern where the defendants, as here, used excerpts from a work of entertainment as part of their own work of entertainment. The courts in these cases, *Elvis Presley, Twin Peaks*, *Castle Rock*, and *Ringgold* all refused to find transformative use and, by extension fair use, when the defendants used the original work primarily for its inherent entertainment value. This is despite the fact that defendants in those cases, as here, allegedly sought to make some commentary about the works used. Those cases also failed to find fair use because the defendants used far in excess of the original work than was necessary for the purposes of their alleged commentary.

Defendants, on the other hand, rely on a handful of cases that deal explicitly with news reporting; holding that secondary use in the context of news reporting is fair use. Those courts all noted the high degree of deference to which news reporting is afforded under the First Amendment which is precisely why Defendants desperately cling to this body of law in an effort to distort the Court's review. The one non-news-reporting case to which Defendants cite, *Equals Three*, deals with the secondary use of non-creative works that are each so small in length that the defendant in that case used numerous such different works in a single video. And even then, *Equals Three* found no fair use with respect to a work that only received tenuous commentary from the defendant. Most of the Defendants' jokes in the Infringing Video are likewise tenuously related to the Work—they use the Work as nothing but a prop for their comedy routine.

On the issue of DMCA misrepresentation, Defendants argue that their misrepresentation was made in "subjective good faith." On the other hand, Plaintiff has, on his motion for partial summary judgment, submitted a significant volume of evidence in the form of Mr. Klein's deposition testimony to give rise to an inference that Defendants' copyright infringement was willful. If Defendants knew, or should have known, that their infringement was willful, then they

could not have made their misrepresentations as to fair use in good faith.

Finally, with respect to Plaintiff's defamation claim, Plaintiff has submitted evidence that Defendants' false statements made in Defendants' video (the "**Defamatory Video**") caused Plaintiff significant financial damage. It is not a question of law, but a genuine issue of disputed material fact, as to whether the Defamatory Video would have made the same impression on Plaintiff's peers (the viewing public) if it accurately portrayed the events leading up to this lawsuit. Such question is ripe for trial.

## STATEMENT OF FACTS

### Copyright Infringement and Fair Use

The facts underlying Defendants' infringement of Plaintiff's Work, as well as the four factors in connection with the Defendants' affirmative defense of fair use, are set forth in detail in the Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts in connection with Plaintiff's motion for partial summary judgment ("**Pl. St.**"). Plaintiff also respectfully asks the Court to review the Plaintiff's Counter-Statement in Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("**Pl. Ctr. St.**") which underscores that the majority of facts that the Defendants seek to submit as "uncontroverted" are in fact self-serving argumentative statements that have no basis in reality. (Pl. Ctr. St. 22-36; 39; 41-2; 44; 57-62.)

### DMCA Misrepresentation

As part of his motion for partial summary judgement, Plaintiff submitted evidence of the Defendants' willful infringement. Specifically, that (i) Defendants understood the principles of fair use and ignored them with respect to the Plaintiff's Work (Pl. St. 68-75; 89-93); and (ii) that the Defendants deemed Plaintiff an insignificant threat and therefore were doubly reckless in their use of his Work (Pl. St. 94–112). Defendants' subjective state of mind in willfully infringing upon

Plaintiff's Work is relevant to their subjective good faith belief made in connection with their DMCA counter-notification.

**Defendants' False Statements Cause Significant Financial Damage to Plaintiff**

In opposition to the Defendants' instant motion to dismiss Plaintiff's defamation claim, Plaintiff has submitted additional exhibits, cited in Plaintiff's Counterstatement, which show a comparison of the average monthly revenue of Plaintiff's YouTube channel for the five months following the publication of the Defamatory Video (June 2016 through October 2016) as compared to the same five months in the previous year (June 2015 through October 2015).[1] (Pl. Ctr. St. 64.) According to this comparison, Plaintiff's average monthly revenues dropped by 88.2% after the publication of the Defamatory Video. (Pl. Ctr. St. 66.)

## LEGAL STANDARD

Summary judgement should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). In making its determination, the Court must resolve all ambiguities and draw all reasonable inference in favor of the non-movant. *Anderson,* 477 U.S. at 255.

---

[1] Plaintiff has produced the same months of the previous year, rather than the five months immediately prior to the Defamatory Video, because he has found that YouTube revenues are seasonal and that, therefore, comparing the same months from year to year would provide the most accurate contrast of expected revenues for each month. (Pl. Ctr. St. 65.)

## ARGUMENT

### A.      The Infringing Video Does Not Constitute a Fair Use

With the aim of conserving judicial resources and, as much as possible, to avoid duplicative arguments, Plaintiff respectfully refers the Court to Plaintiff's motion for partial summary judgement and accompanying documents (Dkts. 86-90) which detail the legal arguments and evidentiary basis for dismissing Defendants' affirmative defense of fair use. Defendants' instant motion for summary judgement on fair use should be denied for the same reasons that Plaintiff's partial motion for summary judgement on the same issue should be granted. Accordingly, Plaintiff shall focus this section of his brief on addressing those of Defendants' arguments and caselaw not already covered in Plaintiff's motion for summary judgment.

### 1.   Purpose and Character of the Use: The Infringing Work is Not Transformative.

To briefly restate the standard: the first factor in determining fair use is "whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 608 (2d Cir. 2006). Specifically, courts ask "whether the new work **merely 'supersede[s] the objects' of the original creation**, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (emphasis added). The fair use doctrine seeks to protect a secondary work if it "adds value to the original-- if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings," because such a work contributes to the enrichment of society. *Castle Rock Entm't, Inc. v. Carol Publ'g Grp. Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (alteration in original).

### a. Defendants' marginal commentary is ancillary to their comedic purpose.

Defendants seek to argue that a secondary use is transformative when *some* form of commentary on the original "may reasonably be perceived" in such use. (Def. Mem. at 16.) This is not supported by law. New works are described as transformative "when the works use copyrighted materials **for purposes distinct from** the purpose of the original material;" not when they are used primarily for the same purpose but also incidentally add minor instances of commentary or criticism. *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (holding video clips of Elvis Presley incorporated into a supposed biography non-transformative because the biography was "at least in part" seeking to profit from the "inherent entertainment value of Elvis' appearances") (emphasis added); *accord Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008) (citing *Elvis* and finding against transformative use where defendant's Harry Potter "Lexicon often lacks restraint in using Rowling's original expression for its inherent entertainment and aesthetic value").

It is clear from the Infringing Video, and from Mr. Klein's deposition testimony, that the primary purpose of the Infringing Video is comedic—specifically "intended to make [the Defendants'] audience laugh." (Pl. St. 34-41.) Mr. Klein admits that he has no formal education in critiquing film. (Pl. St. 35.) Mr. Klein's lack of formal education as a critic may be overlooked if not for the fact that Mr. Klein further admits that the Defendants' YouTube channels were specifically created to showcase comedy videos, that Mr. Klein considers himself to be a comedian and comic personality, and that Mr. Klein—lack of formal education notwithstanding—does not, in any case, consider himself to be a literary or film critic. (Pl. St. 37-41.)

Notwithstanding the foregoing, Defendants argue that in this one, specific instance, they meant for the Infringing Video to function as a work of criticism and commentary. Such argument

clearly belies the actual content of the Infringing Video wherein the Defendants used virtually the entirety of the substance of Plaintiff's Work to make the same jokes over and over again despite the fact that many of the jokes had absolutely nothing to do with the excerpts of Plaintiff's Work copied and displayed without license. Plaintiff respectfully refers the Court's attention to pages 12 though 19 of Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgement (Dkt. 90) where Plaintiff thoroughly transcribes each segment of the Infringing Video followed by Mr. Klein's own testimony regarding the Defendants' justifications for using each excerpt of the Plaintiff's Work. (See also Pl. St. 43-66.)

It would be clear to any reasonable juror that Mr. Klein's continuous repetition of the phrase "misogynistic pseudo pornography," like some mantra to invoke the gods of fair use, is a transparent, self-serving, post-hoc revision of the real purpose for the Defendants' use of the Work. Defendants used the Work because it was funny; nothing more. The Work's intrinsic comedic value served as a good springboard—a prop—for the Defendants' own comedic work. In addition to springboard, the Work also served to pace the Defendants' Infringing Video; that is why the excerpts of the Work were shown in their original sequential order and that is why the Defendants used enough excerpts to preserve **100%** of the Work's original storyline. To put another way: Defendants could have used a mere fraction of the Work they used and still managed, as Defendants put it, to (i) note the historical context; (ii) note the "misogynistic pseudo pornography;" (iii) note the masculinity of the Bold Guy character[2]; and (iv) critique the Plaintiff.[3] (See Def. Mem. at 6.)

---

[2] How is this theme different from subpart (ii)? It seems the Defendants have run out of things to say in their 13:47 minute video.
[3] How is this theme different from subparts (i) and (ii)?

7

Defendants' Infringing Work may at times seem to comment on or criticize aspects of the Plaintiff's Work, but the central question under the first factor is whether such comment or criticism "adds value to the original – if [the Work] is used as a raw material, transformed in creation of new information, new aesthetics, new insights and understandings," *Blanch v. Koons*, 467 F.3d 244, 251-52 (2d Cir. 2006) (citing *Castle Rock Entm't, Inc.*, 150 F.3d at 132), or "whether the new work merely supersedes the objects of the original creation." *Id*. at 251 (citing *Davis v. The Gap, Inc*., 246 F.3d 152, 174 (2d Cir. 2001) (internal quotations omitted).

The Second Circuit has declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work. *See Twin Peaks Prods. v. Publ'ns, Int'l, Ltd*., 996 F.2d 1366, 1376 (2d Cir. 1993) (defendant's book **commentary** on the popular "Twin Peaks" television show summarized the plot of every one of the show's episodes); *Castle Rock Entm't Inc.*, 150 F.3d at 142-43 (quiz book called the "Seinfeld Aptitude Test" not transformative when its purpose was "to repackage [the television show] Seinfeld to entertain Seinfeld viewers"); *Ringgold v. Black Entm't Television, Inc*., 126 F.3d 70, 79 (2d Cir. 1997) (copy of plaintiff's painting used as decoration for a television program's set not transformative because it was used for "the same decorative purpose" as the original).

To be clear, Plaintiff does not argue that comedy and humor do not constitute criticism or commentary under Section 107, or that the Court should engage in a subjective judgment of the value of the Infringing Work. Instead, Plaintiff respectfully submits that the Court should focus its attention on the first factor's central purpose of investigation: "in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation." *Campbell*, 510 U.S. at 579 (citing *Folsom v. Marsh*, 9 F. Cas. 349 (CDD Mass. 1841)); accord *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985) ("supplanting" the original). If highlighting the Work's

"pseudo pronographic misogyny" was truly the Defendants'intent, rather than a suspiciously well-rehearsed retroactive justification for their slavish copying, then Defendants did not need to use over sixty percent of the Work, virtually one hundred percent of the substantive portions of the Work, and certainly the heart of the Work, to make this one point over and over again.

### b. Defendants' cited caselaw is inapposite to the facts of this matter.

Defendants cite *Blanch*, as well as lower court ruling citing *Blanch*, for the proposition that the Court should not engage in a subjective evaluation of the quality of the Defendants' commentary. (Def. Mem. at 15.) Plaintiff is not asking the Court to engage in such evaluation. Nor does it need it. As argued above, and as held in Blanch, it is very much the Court's purview to evaluate whether the Defendants "had a genuine rationale for borrowing [Plaintiff's Work], rather than using it merely 'to get attention or to avoid the drudgery in working up something fresh.'" *Blanch*, 467 F.3d at 255 (quoting *Campbell*, 510 U.S. at 580). As argued above, and as detailed in Plaintiff's motion for partial summary judgement on this issue, (i) Defendants had no genuine rationale for using so much of the Plaintiff's Work to make so few alleged points; (ii) Defendants had no genuine rationale, other than pacing their own work, for displaying excerpts of the Plaintiff's Work in their original sequence in a manner that showed 100% of the Work's original story in perfectly entertaining, perfectly watchable, chronological order; and (iii) the nature of the Defendants' business, which requires weekly video postings in order to keep the Defendants relevant on YouTube, is such that it makes perfect sense that they would use the original works of others to avoid the drudgery (in light of the weekly time constraints) in working up something fresh. The Court does not need to so much as consider the subjective value of Defendants' commentary. The commentary disqualifies itself under the first-factor scrutiny on its face.

Defendants cite *Swatch* in support of their argument that surrounding Plaintiff's Work with

commentary and criticism evidences a transformation of the Work. *Swatch* dealt with the use of a copyrighted work in a news report, expressly premising its fair use analysis on secondary uses of work "[i]n the context of news reporting and analogous activities." *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). Here, the Defendants were not reporting on the Plaintiff's 3-year-old Work. The Defendants' other transformative use cases are equally distinguishable. *Bill Graham* found transformative use where original poster images were **arranged** in sequential order for historical context. *Bill Graham Archives.,* 448 F.3d at 609. Here, the Defendants **preserved** the sequential order of Plaintiff's Work excerpts for their original entertainment value *rather than* to add something new as the ordering had done in *Bill Graham*.

Again, the purpose of the first factor analysis is to decide "whether the new work merely supersede[s] the objects' of the original creation, or instead adds something new." *Campbell*, 510 U.S. at 579 (internal quotations omitted). The purpose of Plaintiff's Work was comedic. The purpose of Defendant's Infringing Video was comedic. Defendants did add roughly eight minutes of extraneous banter to Plaintiff's original Work; but they in no way added "something new." If that is what *Campbell* meant by adding "something new," then any feature film would be fair game for Defendants' brand of fair use treatment so long as they sporadically pepper the film with mostly irrelevant, repetitive jokes.

Finally, Defendants' continued reliance on *Equals Three* is inapposite to the facts at issue. *Equals Three* dealt with the treatment of **multiple** videos that were "typically short, 'point-and-shoot' style depictions of **events that actually happened**" where the defendant host reacted to each video with jokes, made up narrative, and even "repeat[ed] portions of [plaintiff's] videos multiple times within the same segment" for comedic effect. *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D.C.A. 2015) (emphasis added). In contrast, the Infringing

10

Video used nearly the entirety of Plaintiff's single scripted, produced, musically-scored Work without editing it in any way as to transform its original narrative structure. More importantly, *Equals Three* held that one of the videos used was not a transformative use because the jokes "were not directly aimed at criticizing or commenting on the video." *Id*. at 1105. The Defendants used many excerpts from Plaintiff's Work without directly criticizing or commenting on those specific excerpts, and many more excerpts received the **same exact** commentary as previous excerpts. In order to conform the *Equals Three* decision to the instant facts, each of the excerpts of the Work that the Defendants used must be treated as a stand-alone copyrighted video (like the multiple videos used in *Equals Three*), in which case most of them did not receive *any* transformative treatment and were, therefore, infringed upon by the Defendants. Defendants needlessly infringed upon so many of the Work's excerpts that, taken as a whole, their copying of the entire Work was not a fair use.

Second Circuit law, *supra*, is as clear as the Ninth Circuit on this issue: when a work is copied for its intrinsic entertainment value or when defendants copy **in excess** of what is reasonably necessary for their commentary, such use is not deemed transformative. *See also Warner Bros. Entm't Inc.*, 575 F.Supp.2d at 545 (citing *Elvis* and finding against transformative use where defendant's Harry Potter "Lexicon often **lacks restraint** in using Rowling's original expression for its inherent entertainment and aesthetic value" (emphasis added)).

### 2.  Nature of the Copyrighted Work

Tellingly, Defendants position the second factor last in their fair use analysis. The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586; *see also Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair

11

use is more likely to be found in factual works than in fictional works"); *Twin Peaks Prods.*, 996 F.2d at 1376 (second factor "favors . . . creative and fictional work"). Although this factor may be of less importance when assessed in the context of certain transformative uses, *see, e.g., Campbell*, 510 U.S. at 586 (creative nature of original "Pretty Woman" song "not much help" to fair use analysis "since parodies almost invariably copy . . . expressive works"), the fictional nature of the copyrighted work remains significant in the instant case where, as discussed above, the secondary use is, at best, minimally transformative.

Defendants admit that the Work is a scripted, creative Work.  Thus, in light of Defendants non-transformative or, at best, minimally transformative use of the Work, the second statutory factor favors the Plaintiff. *Castle Rock Entm't, Inc.*, 150 F.3d at 144 (holding the second factor in favor of plaintiff where the secondary use was minimally transformative).

### 3.   The Amount and Substantiality of the Portion Used

The law requires that "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016). In *Campbell*, a decision post-dating *Twin Peaks*, the Supreme Court clarified that the third factor—the amount and substantiality of the portion of the copyrighted work used—must be examined in context. The inquiry must focus upon whether "the extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." 510 U.S. at 586-87. "By focussing [sic] on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 926 (2d Cir. 1994).

Defendants somehow conclude that this factor favors them. Defendants argue that it was *necessary* to use virtually all of the substance of Plaintiff's Work, unquestionably the heart of the Work, to make four discrete points (the last two of which, as discussed above, are encompassed in the first two). As discussed in Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgement (at 22-23), Defendants could have made their four points using only 24 seconds of the Work. The rest of Defendants' copying—some 2:54 minutes—was wholly unnecessary.

### 4.   Effect of Use on Market for Plaintiff's Work

Under this factor, courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation marks and citation omitted). The fourth factor must also "take account . . . of **harm to the market for derivative works**," *id*. (emphasis added), defined as those markets "that creators of original works would in general develop or license others to develop." *Id*. at 592. "In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work." *Id*. at 593. The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original. *Id*. at 591.

On the issue of direct revenues, Defendants use of statistics in their argument is misleading. The views of Plaintiff's Work was not "flat-lined" in the number of daily views before Defendants infringed on it. Plaintiff's Work was receiving steady revenue (e.g., a flat but *positive* line on a graph) up to and after the infringement. It is true that the Work received a one day spike in revenue on the day after Defendants posted their Defamatory Video, but clearly this spike was generated

as a result of the controversy and media coverage, and not because people watched the Infringing Video **which was no longer available by that point**.

On the issue of the market for licensing, not only has Plaintiff received numerous offers to license his work—including elements present in his work such as his original music—but so too are the Defendants aware of the licensing opportunities present in such YouTube works to the extent that Defendants have in fact licensed their own work under such opportunities. The evidence submitted herewith shows not only that there is a market to display advertising in connection with the Work, but that the Work's underlying elements can be licensed by the Plaintiff for separate derivative projects. This is why Plaintiff has, in the past, as well as now, zealously enforced his copyrights.

The point here, as made in factor one, is that Defendants used Plaintiff's work for its entertainment value. If the Defendants only used the 24 seconds that they would have needed for their comments, then this possibly would not have harmed Plaintiff's exclusive right to license his Work out for its entertainment value. Defendants attempt to argue that Plaintiff has no market interest in licensing his Work to critics for the point of criticism. That is obvious and correct. But Plaintiff *does* have a market interest in licensing his Work to comedians, like the Defendants, to (i) help them get attention by re-playing a work that has over 10 million views to its name; and (ii) avoid "the drudgery in working up something fresh." *Campbell*, 510 U.S. at 580.

As Prof. Beebe found in his survey of all fair use cases from 1978 through 2005:

The fourth factor essentially constitutes a metafactor under which courts integrate their analyses of the other three factors, in doing so, arrive at the outcome not simply of the fourth factor, but of the overall test.

…

The synthetic and dispositive nature of the fourth factor analysis may explain why no real subfactors have developed under factor four … Instead, the vast majority of the opinions simply conducted what amounted to little more than an unstructured

and conclusory rule-of-reason analysis.

Barton Beebe, <u>An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005</u>, 156 Pa. L. Rev. 549, 618 (2008).

Assuming Defendants did use 24 seconds of the Work as commentary, the Defendants still used 2:54 minutes of the Plaintiff's work purely for something that they should have licensed from Plaintiff—to entertain their viewers. Additionally, the Defendants have not only usurped Plaintiff's exclusive right to license his Work and its underlying elements, but have expressly encouraged the greater YouTube community to do the same by posting a video to their 4 million subscribers denigrating Plaintiff and touting their infringement as an "obvious" fair use.

**B.      <u>Plaintiff's DMCA Misrepresentation Claim is Ripe for Trial</u>**

Section 512(f) of the Copyright Act provides that:

Any person who knowingly materially misrepresents under this section—

> (1) that material or activity is infringing, or

> (2) that material or activity was removed or disabled by mistake or misidentification,

> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

In their counter-notice to YouTube, Defendants affirmed under penalty of perjury, that the Infringing Video "is fair use under U.S. copyright law because it is noncommercial and transformative in nature, uses no more of the original than necessary, and has no negative effect on the market for the original work" and "was removed due to a mistake or misidentification of the material to be removed or disabled." (Pl. St. 12.).

15

As a threshold matter, there is no question that the Infringing Video was *not* "noncommercial." Defendants knew that it was commercial—Defendants testified to making money from their YouTube content. (Pl. St. 88.) Accordingly, to the extent that we engage in the below analysis, we only do so in the event that this Court holds as a matter of law that certain perjurious statements are small enough that they can be ignored.

This Court noted that Plaintiff's DMCA claim is "exceedingly week" (Dkt. 79, p.3 n.1) before Plaintiff had a chance to submit evidence of Defendants' willful infringement of his Work. Now Plaintiff presents to this Court Mr. Klein's deposition testimony, as well as exhibits of Defendants' prior videos, showing that Defendants admit to having had an understanding of fair use prior to infringing upon the Work, and their understanding is evidenced by a number of their prior videos that show a significantly higher degree of editorial thought than afforded to Plaintiff's Work. (Pl. St. 68-74; 89-93.) For example, in their previous reactions to a certain PrankInvasion video, where the host films himself approaching random women and seducing them into kissing him in front of their family members, Defendants (i) highlighted the creepiness of the hosts voice by editing it with voice modulation; (ii) highlight absurdity by inserting an image of an old lady falling down stairs; (iii) highlight the pornographic nature of the videos by inserting a short clip from a pornography video; (iv) highlight voyeuristic aspects of the video by editing zoom onto the faces of people in the video; (v) highlight creepiness of the action by inserting the picture of an internet meme known as "Harold;" (vi) highlight a father's fury over watching his daughter kissed by editing the video to a red tint; and (vii) highlight the pornographic experience of the video by inserting an image of Neil DeGrasse Tyson over a woman's exposed private area. (Pl. St. 70-71.) Defendants made significant stylistic alterations to their other reactions videos, including the "Who Are The Fine Brothers" video and the "Marshal Pope" video. (Pl. St. 73.) At deposition, Mr. Klein

discusses at length the stylistic edits made to the "Marshal Pope" video which is particularly instructive to the Defendants' prior understanding of fair use. (Pl. St. 74.) Mr. Klein admits that Defendants understood that stylistic alterations contributed to the fair use aspect of their PrankInvasion video. (Pl. St. 75.) As the Court has seen, the Infringing Video does not make a single stylistic alteration to the Work as was done in the Defendants' other videos. (Pl. St. 72.)

The Defendants admit that that when they edit their videos they are "mindful to basically cut out as much of the [third-party video content] as possible, and to make sure that [Defendants] were commenting or critiquing every – every segment that came before. So it was part one, reducing the amount of the [third-party video content]. And part two, making sure that there was transformative use of it." (Pl. St. 91.) Defendants' editorial care with respect to the economy of original third-party content used and the editorial thoughtfulness of adding stylistic alterations as a way to highlight the substance of their commentary is readily apparent in examples of their other videos such as "Who Are The Fine Brothers" video, their "Marshal Pope" video, and their "Reaction to PrankInvasion Videos." (Pl. St. 95.) This was, on its face, the opposite of what they did with Plaintiff's Work in the Infringing Video.

Finally, it is apparent from Mr. Klein's deposition that Defendants did not bother to exercise editorial thoughtfulness with Plaintiff's Work because they deemed Plaintiff an insignificant threat. For example, at one point, the Defendants were issued a DMCA take-down of one of their other videos by third-party content network FullScreen (the advertising agent of PrankInvasion). (Pl. St. 102.) After the Defendants posted their "Censorship On YouTube" video in reaction to the FullScreen takedown, there arose a YouTube community controversy around this event. (St. Pl. 105.) Defendants admit that the YouTube community controversy arose as a result of their video, "Censorship on YouTube," and that, following the YouTube community

17

controversy, FullScreen reinstated the Defendants' video and FullScreen's CEO personally made a statement that the takedown of the Defendants' video was in error. (Pl. St. 106-107.) And so, when Plaintiff initially reached out to the Defendants' to ask them to remove the Infringing Video, Defendants replied that they "will disputed (sic) it and the video will be reinstated within two weeks. We've dealt with this many times, it is a matter of routine for us." (Pl. St. 108.) And, just as they threatened, when Plaintiff filed this lawsuit, Defendants responded by publishing the Defamatory Video to their subscriber base of 4 million subscribers which, as the Court knows, resulted in the threatened media controversy. (Pl. St. 99; 110.) To highlight a sense of disparity on each of the above party's ability to sway the public opinion: Defendants' channels have 4 million subscribers; PrankInvasion's channel has 2.5 million subscribers; Plaintiff's channel has 170,000 subscribers. (St. Pl. 100; 111-112.)

Defendants' blanket dismissal of Plaintiff's take-down request and their prior course of conduct—their success at generating controversy to bring other copyright holders to their knees as they attempted to do with Plaintiff—show both circumstantially and directly give rise to an inference of willful infringement. (Pl. St. 94-112.) Defendants intentionally neglected to modify the Work in any way to test the limits of a fair use defense. Defendants resurrected the Infringing Video after being requested to remove it. Defendants had every intent that their actions would cause Plaintiff to back down on his infringement claim.

Defendants correctly cite the standard for DMCA misrepresentation, noting that Plaintiff must show that Defendants lacked a "good faith belief" that their Infringing Video was erroneously taken down, and that a "subjective good faith belief" standard is applied by courts in this instance. *See* 17 U.S.C. § 512(g)(3)(c); *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153-54 (9th Cir. 2016). Plaintiff has proffered ample circumstantial evidence in the form of Mr. Klein's testimony

and documentary exhibits to give rise to an inference of willful conduct with respect to the Defendants' infringement. *See Bryant v. Media Right Prods., Inc*., 603 F.3d 135, 143 (2d Cir. 2010) (reciting standard); *Isl. Software & Computer Serv. v. Microsoft Corp*., 413 F.3d 257, 264 (2d Cir. 2005) ("proffering circumstantial evidence that gives rise to an inference of willful conduct"). If the Defendants' infringement was willful, which is necessarily a subjective state of mind, then they could not have had a subjective good faith belief that their Infringing Video was erroneously taken down.

Accordingly, in light of Plaintiff's proffered evidence, if the Court rules that the Defendants' infringement was willful, then the Court must deny Defendants' motion to dismiss Plaintiff's DMCA misrepresentation claim. Alternatively, and at the very least, Plaintiff has produced sufficient evidence of Defendants' willfulness that Defendants' "subjective good faith belief" is a genuine issue of triable fact that must proceed to trial.

## C.     Plaintiff's Defamation Claim is Ripe for Trial

"Defamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Stepanov v. Dow Jones & Co., Inc.*, 120 AD3d 28, 34 (1st Dept 2014). "To create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Restatement [Second] of Torts § 558.

Defendants argue the substantial truth doctrine by seeking to cast the entire Defamatory Video as one big statement. The standard to assert a substantial truth defense requires the Defendants to show that "the gist or substance of the **challenged statements** be true." *Printers II,*

*Inc. v. Professionals Publishing, Inc*., 784 F.2d 141, 146 (2d Cir. 1986) (emphasis added). New York courts hold that "[a] statement is substantially true if the statement would not 'have a <u>different effect on the mind of the reader</u> from that which the pleaded truth would have produced.'" *Jewell v. NYP Holdings, Inc*., 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 193 N.E. 537, 538 (1934)) (emphasis added).

Defendants admit that they lied when they stated that after publishing the Infringing Video "several months passed and nothing happen[ed], and then we get an email from [Plaintiff's] lawyer" demanding removal of the Infringing Video and fees. Plaintiff now submits evidence that this false statement caused scores of Defendants' fans to leave comments on Plaintiff's YouTube channel, iTunes store page, and Amazon store page with fake reviews about his products including:

- Tried to listen to it but was dmc removed and lawsuit up the bot
- H3H3 criticized his work and got sued for it, grade A piece of s*** here.
- I added this album to my wishlist and instantly received an email saying that I was being sued.
- Remember, if you can't make quality content that stands on its own, you can always sue your critics to keep them at bay.
- I'm being sued as I write this review for writing a review.

These examples clearly evidence that the public has decided that Plaintiff is a trigger-happy litigant who immediately activates his lawyers when he is criticized. This was in fact the intention of the Defamatory Video where, at the beginning, Mr. Klein says, "And I think the heart and soul of this is, like that, he doesn't like it that we made fun of him and so he's suing us." This of course is a non-actionable opinion. But the opinion is buttressed by the false statement that "nothing happened" before Plaintiff came out of nowhere with a demand for money via his lawyers when in fact Plaintiff personally reached out to the Defendants to ask for the removal of their Infringing Video, making no other demand, before Defendants snidely refused and told Plaintiff to take it up with their lawyer. It was Defendants who escalated this matter to one involving attorneys. They

intentionally lied about this specifically so their subscribers would think exactly what they ended up thinking—that Plaintiff unnecessarily escalated the matter without more amicable attempts at resolving that he did indeed make.

Numerous mainstream media publications picked up and reprinted the Defendants' false statement. For example, *Techdirt* writes "it all began with a demand for the removal of the video and $3,750 in legal fees racked up so far by Hoss's lawyer." *Variety* reprinted the Defendants' statement, "The heart and soul of this is, like, that he doesn't like that we made fun of him, and so he's suing us." As a direct result of the effect that Defendants' statements had on the public Plaintiff's average monthly channel revenues for the five months following the publication of the Defamatory Video (June 2016 through October 2016) dropped by 88.2%[4] from Plaintiff's average monthly channel revenues for the same period in the previous year. This drop in revenue has no explanation other than the public's reaction to the Defamatory video, specifically the belief that Plaintiff is a trigger-happy litigant rather than a content creator enforcing his legitimate rights.

Plaintiff submits that the public, whose first brush with this case originated with the Defamatory Video and news reports echoing the false sequence of events in the Defamatory Video, would have likely had a different opinion of the Plaintiff but for the false statement—at the very least, some portion of the public would have viewed Plaintiff as concerned about Defendants infringing his Work rather than taking action because he was criticized.

Ultimately, given that Defendants have admitted to making a false statement in the Defamatory Video, that Plaintiff was soundly derided by the public on the basis of such false statement, and Plaintiff has submitted ample evidence that he was damaged by the Defamatory Video, it remains genuine dispute of material fact as to whether Plaintiff's peers, at trial, will find

---

[4] Plaintiff's monthly channel revenues are submitted to the Court as Exhibits 31 – 40 which are filed under seal pursuant to the Court's protective order.

that the Defamatory Video would have had a "different effect" on their mind had it provided an accurate factual background to the genesis of this lawsuit.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Dated: New York, New York
February 27, 2017

THOMPSON BUKHER LLP

By: _____
    Tim Bukher (TB1984)
    Michael Feldberg (MF0220)
75 Broad Street, Suite 2120
New York, New York 10004
Telephone: (212) 920-6050
Facsimile: (646) 349-2366

*Attorneys for the Plaintiff*