UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATT HOSSEINZADEH,

                         *Plaintiff*,

– against –

ETHAN KLEIN and HILA KLEIN,

                         *Defendant*s.

**Civ. Action No.**: 16-cv-3081 (KBF)
**ECF Case**

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGEMENT</u>**

THOMPSON BUKHER LLP
75 Broad Street, Suite 2120
New York, New York 10004
(212) 920-6050

*Attorneys for the Plaintiff*

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ..........................................................................................................................1

    A.    The Infringing Video Does Not Constitute a Fair Use ............................................1

        1.    First Factor: Purpose and Character of the Use ..........................................1

        2.    Nature of the Copyrighted Work .................................................................5

        3.    The Amount and Substantiality of the Portion Used ..................................5

        4.    Effect of Use on Market for Plaintiff's Work .............................................6

    B.    Plaintiff Has Presented Sufficient Evidence to Show that Defendants'
        Infringement Was Willful ......................................................................................9

CONCLUSION .....................................................................................................................10

## **TABLE OF AUTHORITIES**

**Cases**

*Bill Graham Archives v. Doring Kindersley Ltd.*, 448 F.3d 605, 611 (2d. Cir. 2006)..........................3

*Bryant v. Media Rights Prods., Inc.,* 603 F.3d 135, 143 (2d Cir. 2010)...............................9

*Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013)........................................................1, 5

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003).................4

Folsom v. Marsh, 9 F. Cas. 349 (CDD Mass. 1841)........................................................2

*Isl. Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005).......9

*Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010 (2d Cir. 1995)......................................9

*N.A.S. Import Corp. v. Chenson Enters., Inc*., 968 F.2d 250, 252 (2d Cir. 1992) ...............9

*TCA Television, Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016) .............................6

*Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993) ......................3

**Other Authorities**

Barton Beebe, An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005, 156 Pa. L. Rev. 549, 618 (2008) ........................................................................................................8

Plaintiff Matt Hosseinzadeh ("**Plaintiff**") submits this Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgement against defendants Ethan Klein ("**Mr. Klein**") and Hila Klein ("**Ms. Klein**") (collectively the "**Defendants**").

## ARGUMENT

### A.     The Infringing Video Does Not Constitute a Fair Use

Plaintiff's moving papers (Dkts. 86-90) detail the central legal arguments and evidentiary basis for dismissing Defendants' affirmative defense of fair use. Accordingly, this Reply memorandum will focus on addressing the counter-arguments set forth in the Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgement ("**Def. Op. Mem.**").

#### 1.   First Factor: Purpose and Character of the Use

The thesis of Defendants' argument with respect to the first fair use factor is that, so long as criticism or commentary could "reasonably be perceived" in their Infringing Video, their use of the Work is transformative—they support this by misquoting *Campbell*. This is not the legal standard for transformative use. Defendants misquoted *Campbell* to support their thesis by deliberately failing to include the prelude to their quoted standard: "**The threshold question** when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 (1994) (emphasis added). While *Cariou* has interpreted the "reasonably be perceived" standard to encompass all types of use—including non-parodic uses—this standard remains, however, a purely **threshold inquiry**. *See Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).

Thus, while it is undisputed that the Infringing Video may reasonably be perceived to make certain comments upon the Work, it remains the Court's task to decide whether such comments have transformed the Work in accordance with the standards set forth by the prevailing law. The law tasks the Court to decide "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new

1

expression, meaning, or message." *Campbell*, 510 U.S. at 579. The Court must decide "whether the new work merely 'supersede[s] the objects' of the original creation." *Id. (*citing *Folsom v. Marsh,* 9 F. Cas. 349 (CDD Mass. 1841)); *accord Harper & Row, Publrs.,* 471 U.S. at 562 ("supplanting" the original). And contrary to Defendants' argument, that the amount of a work used is not relevant to the analysis, the Court is indeed tasked to evaluate whether Defendants copied more than they needed for their "commentary" because "[a] finding of verbatim copying in excess of what is reasonably necessary diminishes a finding of transformative use." *Warner Bros. Entm't Inc*., 575 F.Supp.2d at 544 (citing *Campbell*, 510 U.S. at 587 (observing that "whether a substantial portion of the infringing work was copied verbatim from the copyrighted work . . . may reveal a dearth of transformative character under the first factor, or a greater likelihood of market harm under the fourth")).

Defendants made comments relating to the Work—albeit their post-hoc interpretation of their commentary significantly, and conveniently, exaggerates its intent and transformative effect. Nonetheless, even granting Defendants their interpretations, it remains the case that they used far more of the Work than necessary to make their "points" and, more importantly, those unnecessary portions of the Work they used were used for their original purpose: to entertain the viewer.

The first factor seeks to examine the "**purpose** and character of the use." A significant portion of the Work, some 2:54[1] minutes, was used for no other purpose than to (i) provide entertaining filler to break up Defendants' ten-minute diatribe; and (ii) provide cliff-hanger-like pacing for the Infringing Video by encouraging viewers to watch through the entire Infringing Video if they wanted to know what happens in each subsequent excerpt of the Work. To be clear: there is no "commentary" reason for Defendants to have shown excerpts of the Work, almost its entirety, in their sequential order. Defendants did not need to copy and perform the entire Work's storyline in order to "(1) put the Work

---

[1] As argued in Plaintiff's main brief on this motion, the "commentary" identified by the Defendants at deposition and in their briefs on the parties' instant cross-motions, could have been illustrated by using 24 seconds of Plaintiff's 3:18 minute Work. (Pl. Mem. at 20.)

2

in historical context; (2) expose the Work as misogynistic; (3) critique the masculinity of BG in the Work and Series; and (4) critique Plaintiff for creating such works." (Def. Op. Mem. at 5.) All of this could have been accomplished by, at most, three excerpts totaling 24 seconds—certainly not eighteen excerpts amounting to nearly all of the Work.

Defendants persist with their assertion that Plaintiff believes the Infringing Video fails to transform the Work because the Infringing Video happens to be entertaining. This is merely tactical on Defendants' part, as Plaintiff argues no such thing. The Infringing Video fails to transform the vast swaths of the Work that it uses because it used those excerpts for no other purpose than to serve their original intent. Second Circuit doctrine addressing the blatant overuse of original work for its original purpose is perfectly on point with this matter.

"Inevitably, some identification of the subject matter of a [commentary] must occur before any useful comment may be made about it ... In the pending case, [defendant's] detailed report of the plots goes far beyond merely identifying their basic outline for the transformative purposes of comment or criticism." *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993) (failing to find transformative use for the reason quoted). In *Twin Peaks* the Second Circuit expected the defendant to have limited itself to "identifying [the] basic outline" of the plots of the film works used. Here, the Defendants have copied and performed the entire plot—not a single second of the Work's plot was left out of the Infringing Video. *See also Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 545 (S.D.N.Y. 2008) ("The [secondary work's] use lacks transformative character where [it] fail[s] to "minimize[] the expressive value" of the original expression."). *Warner Bros.* quoted *Bill Graham Archives* on this point where the Second Circuit found transformative use precisely because the defendant had "<u>minimized the expressive value</u> of the reproduced [original images concerning the subject] by combining them with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the [secondary work.]" *Bill Graham Archives v. Doring Kindersley Ltd.*, 448 F.3d 605, 611 (2d. Cir. 2006) (emphasis added). Defendants have, in

3

contrast, used the entire expressive value of the Work when they could have used far less, and they used it for its original expressive value rather than for the purposes of their commentary.

### a. Plaintiff's Transcript is Perfectly Appropriate as an Illustrative Aid

Plaintiff expects the Court to watch the Infringing Video. The purpose of Plaintiff's transcript of the Infringing Video is to illustrate how many times the Defendants said virtually the same thing about Plaintiff's Work while showing nearly all of the Work. Certainly, watching the Infringing Video will provide the Court with the added benefit of hearing the Defendants' tone of voice, seeing the arch of their eyebrows, etc. However, this will not change the fact that Defendants admit in their briefs and in their testimony that the Infringing Video said the same four things about the Work over and over again. This was clearly not a case of "minimiz[ing] the expressive value of the reproduced [work]" in aid of their commentary. *Id.*

### b. Plaintiff Does Not Argue that the Infringing Video's Entertainment Value Detracts from its Transformative Nature

Defendants use four pages of their brief to argue against the strawman premise that works of entertainment cannot be transformative. Plaintiff never argued this. Instead, Plaintiff argues that (i) his original Work is entertainment; (ii) the Infringing Video is entertainment and *maybe* some commentary; and (iii) the Infringing Video uses most of the Work for entertainment rather than commentary. Again, this is a case of the Infringing Video, for the most part, "supersed[ing] the objects of the original creation." *Campbell*, 510 U.S. at 579. The Ninth Circuit case, *Elvis*, is on point here, denying transformative use when video clips of Elvis Presley's concerts were incorporated into a biographic work, a documentary, because the secondary work sought to profit "at least in part" from the "inherent entertainment value of Elvis' appearances." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003). As argued, *supra*, Defendants used vast swaths of the Work for no other purpose than to serve as entertainment and filler for their Infringing Video.

### c. Defendants' Profession, Education, and Background Are Relevant to Analyze Their Stated Purpose for Using the Work

4

At deposition Defendants admit (i) that Mr. Klein has no formal education in critiquing film; (ii) that Defendants' YouTube channels were specifically created for the **purpose** of showcasing comedy videos; (iii) that Mr. Klein considers himself to be a comedian and comic personality; and (iv) that Mr. Klein does not purport to be a literary or film critic. Plaintiff does not introduce Mr. Klein's profession, education, and background to argue that he is incapable of commenting on a creative work, but rather that Mr. Klein's **purpose** in using the Work was not commentary or critique. The court in *Cariou* noted that the defendant's testimony explaining the purpose of his secondary use, which he chose not to give, "might have lent strong support to his defense." *Cariou*, 714 F.3d at 706. Certainly here Mr. Klein's testimony, which expressly identified the central purpose of his work to be entertainment, is relevant to an analysis of whether the Defendants' secondary work, which was meant to serve as entertainment, superseded the entertainment purposes of the original.

### 2. Nature of the Copyrighted Work

The Work is creative. This is undisputed. What is disputed is whether Defendants' use of the Work was transformative and, if so, how much. As argued, *supra*, the Infringing Work is not transformative, or it is only minimally transformative to the extent that it uses far in excess of what is necessary to say four things about the Work. Accordingly, the second fair use factor favors Plaintiff.

### 3. The Amount and Substantiality of the Portion Used

Defendants cite *Cariou* to state that "[t]he law does not require that the secondary artist may take no more than is necessary." *Cariou*, 714 F.3d at 710. *Cariou* then goes on to say that "[w]e consider not only the quantity of the materials taken but also 'their quality and importance' to the original work. *Id.* (citing *Campbell*, 510 U.S. at 587). The secondary use "must be [permitted] to 'conjure up' at least enough of the original" to fulfill its transformative purpose. *Id.* at 588.

As argued, *supra*, Defendants used virtually all of the Work, including all of the heart of the Work, leaving out not a second of the Work's substantive plot, to make four points that could have

5

been made using 24 seconds of the 2:54 minutes used. This was far more than necessary to fulfill the transformative purpose, if any, of the Defendants' Infringing Video. This was not reasonable. *See TCA Television, Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016) ("While the portion of the [work] copied by defendants takes less than two minutes to perform, it plainly reveals the singular joke underlying the entire [work]"). Defendants' use did not minimize the expressive value of the Work. *See Bill Graham Archives,* 488 F.3d at 611.

The third fair use factor not only favors Plaintiff, but in this case should carry particular weight,[2] because allowing Defendants to use so much of an original work to say so little[3] would undermine the basic purposes of copyright. If people could display entire works of film and call it "fair use" so long as they spend three times the length of the films repeating a handful of things that are only tenuously relevant to the films—regardless of the entertainment value of the things said—this would void the purpose of copyright as a promoter of the arts.

### 4. Effect of Use on Market for Plaintiff's Work

As noted in Plaintiff's opposition to Defendants' motion for summary judgement (Dkt. 99. Pl. Mem. Law at 13), the Defendants attempt to mislead the Court by mischaracterizing the chart showing the Work's daily views and revenues as having "flat-lined" when in fact the chart shows a flat but *positive* line of steady daily revenue—the line is not flat at $0, it is flat and steady at a positive dollar value per day. (Dkt. 41.) Indeed, the line is actually quite jagged when viewed during a time span of nine months (any x-axis graphical line would "flatten out" as we "zoom away" from the x-axis). In fact, the graph shows that Plaintiff's average daily revenue fell from roughly $16 prior to the early 2016 infringement, to roughly $4 after the infringement, and even lower after the publication of the Defamatory Video. This analysis does not favor Defendants.

---

[2] "[The four factors] are to be explored, and the results weighted together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.
[3] It is not relevant that the Infringing Video contains ten minutes of the Defendants talking to three minutes of the original Work when the Defendants, by their own admission, say the same four things repeatedly for ten minutes.

6

Moreover, at deposition Plaintiff testified that the Defamatory Video, not the Infringing Video, caused a spike in views of his Work but only caused a slight bump in revenue because the negative behavior of the users negatively impacted the subsequent traffic. (Dkt. 101, Pl. Ctr. St. 39.) This has no bearing on the instant fair use factor.

Defendants seek to argue that the Infringing Video "provides new insights and meaning to the original, it increases the market for the original by enticing viewers to experience the original on their own." (Def. Op. Mem. at 22.) This argument perfectly underscores why the third fair use factor should be afforded the greatest weight in this matter: Having seen the entirety of the Work in the Infringing Video—especially considering how perverse and stupid, as the Defendants "comment," the Work is—why would anyone choose to re-watch it all over again? What could anyone possibly have missed in watching the Infringing Video that they would discover in the Work?

The fourth factor must also "take account . . . of <u>harm to the market for derivative works</u>," *id*. (emphasis added), defined as those markets "that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592. "In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work." *Id*. at 593.

Plaintiff does not argue that Defendants usurped his ability to license critics to criticize his work; Plaintiff argues that Defendants have usurped his ability to license the expressive elements of his Work for their underlying entertainment value (see factor one, *supra*). Not only has Plaintiff received numerous offers to license his work—including elements present in his work such as his original music—but so too are the Defendants aware of the licensing opportunities present in such YouTube works to the extent that Defendants have in fact licensed their own work under such opportunities. The evidence submitted herewith shows not only that there is a market to display advertising in connection with the Work, but that the Work's underlying elements can be licensed by

7

the Plaintiff for separate derivative projects. This is why Plaintiff has, in the past, as well as now, zealously enforced his copyrights.

The point here, as made in factor one, is that Defendants used Plaintiff's work for its entertainment value. If the Defendants only used the 24 seconds that they would have needed for their comments, then this possibly would not have harmed Plaintiff's exclusive right to license his Work for its entertainment value. Defendants attempt to argue that Plaintiff has no market interest in licensing his Work to critics for the point of criticism. That is obvious and correct. But Plaintiff *does* have a market interest in licensing his Work to comedians, like the Defendants, to (i) help them get attention by re-playing a work that has over 10 million views to its name; and (ii) avoid "the drudgery in working up something fresh." *Campbell*, 510 U.S. at 580.

> As Prof. Beebe found in his survey of all fair use cases from 1978 through 2005:
>
> The fourth factor essentially constitutes a metafactor under which courts integrate their analyses of the other three factors, in doing so, arrive at the outcome not simply of the fourth factor, but of the overall test.
>
> …
>
> The synthetic and dispositive nature of the fourth factor analysis may explain why no real subfactors have developed under factor four … Instead, the vast majority of the opinions simply conducted what amounted to little more than an unstructured and conclusory rule-of-reason analysis.

Barton Beebe, An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005, 156 Pa. L. Rev. 549, 618 (2008).

Defendants attempt to distinguish Professor Beebe's article by arguing that "Plaintiff does not argue commercial use and it is factually false to say Defendants took the entirety of the Work." (Def. Op. Mem. at 24.) Of course the Infringing Video is a commercial use—Plaintiff has submitted undisputed testimony from the Defendants confirming that (i) in addition to advertising revenues, Defendants make licensing revenues off their work, including the Infringing Work (St. 88); and (ii) Defendants treat the operation of their YouTube channel as their "job" because that is how they make their living (St. 101). And it is uncontroverted that the Defendants took virtually the entirety of the

8

Work, leaving only non-substantive portions out that have no bearing on the plot or any other element of its expression.

At the very least, the Defendants have usurped Plaintiff's ability to license his work to use as a prop in similarly lazy works of comedy. Defendants are, themselves, a representative of the market for Plaintiff's style of "cringeworthy" humor.

### B. Plaintiff Has Presented Sufficient Evidence to Show that Defendants' Infringement Was Willful

Defendants cite the standard for willful infringement, that Plaintiff must show Defendants knew or recklessly disregarded the possibility of infringement. *See Bryant v. Media Rights Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010). What Defendants neglected to cite is the evidentiary standard for proving willfulness: that "even in the absence of evidence establishing the infringer's actual knowledge of infringement, a plaintiff can still prove willfulness by proferring circumstantial evidence that gives rise to an inference of willful conduct." *Isl. Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005); *see e.g., Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010 (2d Cir. 1995) (noting that "knowledge of infringement may be constructive rather than actual; that is, 'it need not be proven directly but may be inferred from the defendant's conduct'") (quoting *N.A.S. Import Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992)).

Plaintiff has presented the Court with Mr. Klein's deposition testimony, as well as exhibits of Defendants' prior videos, showing that Defendants admit to having had an understanding of fair use prior to infringing upon the Work, and their understanding is evidenced by a number of their prior videos that show a significantly higher degree of editorial thought than afforded to Plaintiff's Work. (St. 68-74; 89-93.) For example, the Defendants made significant editorial edits to their PrankInvasion video to transform the expression therein. (St. 70-71.) Defendants made significant stylistic alterations to their other reactions videos, including the "Who Are The Fine Brothers" video and the "Marshal Pope" video. (St. 73.) At deposition, Mr. Klein discusses at length the stylistic edits made to the

9

"Marshal Pope" video which is particularly instructive to the Defendants' prior understanding of fair use. (St. 74.) Mr. Klein admits that Defendants understood that stylistic alterations contributed to the fair use aspect of their PrankInvasion video. (St. 75.) As the Court has seen, the Infringing Video does not make a single stylistic alteration to the Work as was done in the Defendants' other videos. (St. 72.)

Additionally, it is apparent from Mr. Klein's deposition that Defendants did not bother to exercise editorial thoughtfulness with Plaintiff's Work because they deemed Plaintiff an insignificant threat. The Defendants had prior success in using their internet fame to bring much bigger copyright holders than Plaintiff to their knees. They threatened do the same with Plaintiff and they followed through with the threat. (St. 94-112.)

Accordingly, Plaintiff has met his evidentiary burden and submitted a broad record of circumstantial evidence giving rise to an inference of willful infringement. Defendants have not submitted a shred of evidence in opposition—not even to shift the evidentiary burden to a "neutral" position wherein it could be said that a genuine issue of triable material facts exists. Accordingly, the Court should find that Defendants' infringement was willful.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgement in its entirety.

Dated: New York, New York
March 6, 2017

                                                    THOMPSON BUKHER LLP

By: _____
    Tim Bukher (TB1984)
    Michael Feldberg (MF0220)
75 Broad Street, Suite 2120
New York, New York 10004
Telephone: (212) 920-6050
Facsimile: (646) 349-2366

*Attorneys for the Plaintiff*